UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC,<br><br>*Plaintiffs,*<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the United States Secretary of Education,<br><br>*Defendants.* | No. 4:24-cv-259 |

## COMPLAINT

Plaintiffs Ogle School Management, LLC and Tricoci University of Beauty Culture, LLC bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

## PRELIMINARY STATEMENT

1.      This lawsuit concerns the most recent and most unlawful attempt yet in the Department of Education's on-again, off-again regulatory quest to prevent for-profit schools from participating in federal financial-aid programs. The rule at issue—known as the "gainful employment" rule—is projected to affect nearly every program at every one of the thousands of for-profit schools around the Nation. But the rule is expected to deliver the biggest blow to cosmetology (or beauty) schools. Indeed, it is no exaggeration to say that the rule poses an existential threat to cosmetology programs, as nearly every such program will fail the tests created by this rule and lose the ability to process federal student aid as a result, thus making it exceptionally difficult for many of them to operate and serve their students. Simply put, the Department's gainful-employment rule is the poster child of regulatory overreach. This Court should set it aside as soon as possible.

2.      The primary statute at issue here is the Higher Education Act of 1965 (HEA). Title

IV of the HEA authorizes the federal government's student-aid programs, and schools can participate in those programs and process federal financial aid only after qualifying as "eligible" under Title IV. Congress has expressly provided that, so long as they satisfy certain conditions, for-profit schools are among the schools that can secure such eligibility.  Subject to enumerated exceptions, one of those conditions is that for-profit schools must "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," with "eligible program" in turn defined as "a program of training to prepare students for gainful employment in a recognized profession."

3.      Although Congress has tweaked that language over the decades, it has never substantively altered it, as the Department has previously acknowledged.  And for almost the entire first half-century of the HEA's existence, the Department enforced that language consistent with its ordinary meaning:  For-profit schools simply had to provide instruction designed to get those who are currently enrolled in the program ready for a paying job in an acknowledged vocational field, as opposed to providing more general instruction in the liberal arts or humanities.

4.      In 2011, however, the Department dramatically changed course.  Invoking the much-maligned *Chevron* doctrine—which the Supreme Court is currently considering whether to discard or significantly curtail—the Department purported to discover a lurking "ambiguity" in the HEA's long-extant "gainful employment" language and promulgated a rule (2011 Rule) that announced for the first time ever that the Department could strip programs at for-profit schools of their Title-IV eligibility based on various never-before-seen tests, including one that included two complex metrics that endeavored to assess the debt-to-earnings ratios of program graduates several years after they leave school.

5.      Those debt-to-earnings tests suffered from numerous flaws.  One of the ratios (which assessed student-loan debt against "annual earnings") came from the mortgage industry—namely, the view among mortgage underwriters that non-mortgage-related debt ideally should not exceed 8% of annual earnings.  The other ratio (which assessed student-loan debt against "discretionary earnings") came from a 2006 academic paper that never mentioned the HEA but instead referenced sources like "[t]he European literature on overindebtedness."  That academic paper, moreover, emphasized that

applying the 8% threshold from the mortgage industry had "no particular merit or justification" in the student-loan context. And while the paper championed the different theory that student debt should not exceed 20% of discretionary earnings, which it defined as income above 150% of the federal poverty guideline, it candidly described that metric as "somewhat arbitrary."

6.      The problems with the 2011 Rule ran deeper. To calculate the earnings component of the debt-to-earnings ratios, the Department used a dataset that captured only those earnings reported by taxpayers to the federal government, even though it is well-recognized that those who work in cash- and tip-heavy industries—such as cosmetology—do not, in fact, report all earnings to the federal government. And while the Department itself acknowledged this issue and thus gave schools the opportunity to submit alternative and more accurate earnings data, it made that process virtually impossible to utilize in practice.

7.      For-profit schools promptly challenged the Department's 2011 Rule, and a federal court promptly declared it unlawful—a decision that the Department declined to appeal. But after a period of reflection, the Department concluded in 2014 that it would promulgate a substantially similar new rule (2014 Rule), which again sought to exploit supposed ambiguity in the HEA's "gainful employment" language. Thus, again placing its chips on *Chevron*, the Department again insisted that it could disqualify programs at for-profit schools from participating in Title-IV programs based on the debt-to-earnings ratios of their alumni, and it again relied on the very same inapposite sources as it did in 2011 to establish those ratios. And although the Department again recognized the potential for significant inaccuracies when using federal earnings data, it again elected to make the process for submitting alternative earnings data more theoretical than real.

8.      After cosmetology schools challenged the 2014 Rule, another federal court held that the Department acted unlawfully then too. As the court recognized, not even the Department disputed that federal earnings data is deeply flawed when it comes to cosmetologists—indeed, the Department knew of studies estimating the underreporting rate at around 60%—and yet the Department forged ahead with a rule that effectively relied exclusively on that very data.

9.      By 2019, the Department had finally taken the hint and promulgated a rule (2019 Rule)

3

that rescinded its 2014 Rule.  In the process, the Department admitted that it had "incorrectly de-scribed congressional intent" in the HEA when promulgating its prior gainful-employment regulations and that it had engaged in inexcusable "regulatory overreach."  The Department emphasized that even its own hand-picked sources had described a mortgage-industry-inspired 8% ratio of debt-to-annual-earnings as having "no particular merit or justification" in the student-loan context, and it found the 20% ratio of debt-to-discretionary-earnings irrational too.  Furthermore, the Department explained that extensive earnings underreporting in the cosmetology sector rendered earnings-based tests sub-ject to significant errors, and it recognized that such tests effectively penalized schools for post-grad-uate developments beyond their control—*e.g.*, if graduates decided to work part-time or left the labor force altogether to care for children, in which case their earnings would drop considerably or even fall to zero.  Finally, the Department acknowledged that stripping Title-IV eligibility from cosmetology programs would lead to widespread closures of programs that disproportionately enroll women and minorities—all in an economic sector that the federal government itself described as having a "bright outlook."  The Department therefore vowed never again to take the same "fundamentally flawed" regulatory approach.

10.     Unfortunately for schools, their students, and the rule of law, the Department has not kept that vow.  Notwithstanding its two prior judicial defeats and its own prior concession that it had engaged in *ultra vires* and arbitrary-and-capricious conduct when promulgating its prior gainful-em-ployment rules, the Department boldly proclaimed in 2023 that it would adopt the "strongest-ever" gainful-employment rule.  The Department did exactly that last October, when it promulgated the rule at issue here (2023 Rule).

11.     The 2023 Rule establishes two tests.

12.     The first test is familiar:  Relying on the same defective sources that the Department cited in 2011 and 2014 but later rejected in 2019, the 2023 Rule examines whether more than half of program graduates who are three years removed from school devote more than 8% of their annual earnings or more than 20% of their discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down their student-loan debt each year.

13. The second test, however, surfaces for the first time in the HEA's 60-year history: That test examines whether the median program graduate who is three years removed from school (regardless of whether she has voluntarily exited the labor force by that time) fails to outearn the median high school graduate in her state aged 25-34 who never enrolled in postsecondary education (but only if that median high school graduate is in the labor force and regardless of how dissimilar his job is to the program graduate's).

14. To conduct these atextual and irrational tests, the Department has again declared that it will rely on federal earnings data, even as it again acknowledged that such data is inaccurate vis-à-vis cosmetologists. But unlike in the 2011 and 2014 Rules, the Department is now explicitly refusing to offer programs any opportunity to submit alternative earnings data—thus guaranteeing erroneous test results.

15. And failing the Department's tests is no trivial matter. To the contrary, programs that fail either test just once are required to provide warnings to current and prospective students that they could lose Title-IV eligibility the following year—warnings that the Department believes may prompt transfers and non-enrollments. And as that penalty foreshadows, programs that fail either test in two out of three consecutive years are disqualified from Title-IV participation altogether.

16. The 2023 Rule is expected to impact all manner of programs at for-profit schools, but most especially cosmetology programs. Indeed, the Department's own data revealed that, of the hundreds of cosmetology programs nationwide that are subject to the 2023 Rule, virtually every one of them (save only 13) would fail one or both of the tests. And while various other programs "pass," that is only because the Department is incapable of applying its understanding of the HEA's "gainful employment" language to those programs, such as newer programs that do not yet have alumni with multi-year earnings histories, as well as smaller programs with few graduates.

17. Plaintiffs here, however, operate some of the hundreds of cosmetology programs that are projected to fail under the 2023 Rule. Plaintiffs have operated cosmetology schools in Texas, Illinois, Indiana, and Wisconsin for decades, and they have well-prepared thousands of students— who are largely low-income female students who identify as members of racial-minority groups—for

paying and rewarding jobs in the cosmetology industry.  Indeed, Plaintiffs' graduates pass state licen-sure exams at extraordinarily high rates, and the vast majority of graduates quickly obtain jobs within their fields of study.  Nonetheless, absent relief from this Court, the Department will brand Plaintiffs' cosmetology programs a failure because their graduates purportedly earn too little and have too much debt, even though those graduates of these relatively brief programs typically need devote only around $65 or $83 to student-loan payments each month and default on their loans at rates well below what Congress has deemed unacceptable.

18.     The Court should award Plaintiffs' requested relief and enjoin the implementation of the 2023 Rule.  The Department's action exceeds its statutory authority by a significant margin, and it is arbitrary and capricious on multiple levels to boot.  And the Court should at least provide prelimi-nary injunctive relief *before* the 2023 Rule's effective date of July 1, 2024—specifically, by May 20, 2024 (60 days from the date of this filing).  Although sanctions like warnings and Title-IV disqualification are a year or two away, the 2023 Rule still requires schools to collect and provide to the Department an enormous range of information by this coming July to enable the agency to compute its misguided metrics.  Because of sovereign immunity, Plaintiffs cannot recover those compliance costs once in-curred.  Instead of allowing the Department to inflict this irreparable harm in service of a profoundly unlawful rule, the prudent course is to enjoin that rule at the earliest possible juncture.

## THE PARTIES

19.     Plaintiff Ogle School Management, LLC (Ogle) operates a cosmetology school that is currently Title-IV-eligible.  Ogle has nine campuses across Texas, including in the Dallas/Fort Worth area.  Ogle's address is 2208 W. Park Row Drive #100, Arlington, Texas 76013.

20.     Plaintiff Tricoci University of Beauty Culture, LLC (Tricoci) operates a cosmetology school that is currently Title-IV-eligible.  Tricoci has 15 campuses across Illinois, Indiana, and Wis-consin.

21.     Defendant Miguel Cardona is the Secretary of Education, who is sued in his official capacity.  In that official capacity, Secretary Cardona promulgated the 2023 Rule.

22.     The Department of Education is a federal, cabinet-level agency tasked by Congress

6

with administering various education-related statutes, including the HEA.

## JURISDICTION AND VENUE

23.     Plaintiffs' causes of action arise under the Administrative Procedure Act (APA). *See* 5 U.S.C. §§702, 705, 706. This Court has jurisdiction under 28 U.S.C. §1331.

24.     Venue is proper in this district under 28 U.S.C. §1391(e) because Ogle resides in this district and no real property is involved in this action and also because a substantial part of the events giving rise to the claim occurred in this district.

## BACKGROUND

### A.     Historical & Statutory Background

25.     The federal government's financial support for education, including career and technical education, is over a century old. In 1917, for example, Congress enacted the Smith-Hughes Act, which "is often referred to as the Magna Carta of vocational education." David Carleton, *Landmark Congressional Laws on Education* 63 (2002) (Carleton). That legislation provided federal subsidies to states to fund the salaries of teachers of agricultural, trade, industrial, and home-economics education, so long as "the controlling purpose of such education shall be to fit for useful employment" "persons over fourteen years of age who have entered upon or who are preparing to enter upon" work in the given field. Pub. L. No. 64-347, §§2-3, 10-11, 39 Stat. 929, 930-31, 934 (1917). In other words, the Smith-Hughes Act sought to encourage preparation for remunerative—*i.e.*, gainful—employment. *See, e.g.*, Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* 121, 206 (1898) (describing "useful" as synonymous with "remunerative" and "gainful").

26.     After World War II, the federal government began "provid[ing] financial support directly to students" to "allow[] them to attend institutions of higher learning." Linda E. Coco, *Mortgaging Human Potential*, 42 Sw. L. Rev. 565, 582 (2013). The first such effort came with the enactment of a statute commonly known as the GI Bill, which offered subsidies for veterans to attend the institution of their choice, including for-profit schools. *See* Pub. L. No. 78-346, 58 Stat. 284 (1944). Although some unscrupulous "fly-by-night" for-profit schools "cropped up" "to take advantage of public dollars," Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257, 264 n.18, 266 n.23 (1999),

the GI Bill proved a resounding success, as it "sen[t] nearly 8 million World War II veterans to college," U.S. Dep't of Educ., *The Federal Role in Education* (last modified June 15, 2021), https://rb.gy/f1jxy0.

27. Congress created similarly tailored programs for students in the 1950s—*e.g.*, "national defense fellowships" for certain students at qualifying institutions, so long as they did "not engag[e] in gainful employment other than part-time employment by such institution in teaching, research or similar activities" during the fellowship period. Pub. L. No. 85-864, §§401-05, 72 Stat. 1580, 1590-91 (1958).

28. But by the 1960s, Congress determined that offering federal student aid to a much broader swath of the population would best serve the national interest. To that end, Congress enacted two statutes in 1965, each of which sought to benefit students at different types of schools.

29. One of those statutes—the HEA—declares that its purpose is "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965). To accomplish that objective, in Title IV of the HEA, Congress established a variety of "loan" and "grant" programs. To participate in those programs and process federal student aid, the HEA imposed various requirements on schools. Among other things, a school had to satisfy the definition of "eligible institution" under Title IV, *id.* §427(a)(1), and the statute defined that term in relevant part as "a public or other nonprofit institution" that "admits as regular students only persons having a certificate of graduation from a school providing secondary education," *id.* §435(a)(1), (4). Those eligible institutions generally had to "provide[] an educational program for which it awards a bachelor's degree or provides not less than a two-year program which is acceptable for full credit toward such a degree." *Id.* §435(a)(3). But the HEA also stated that eligible institutions included "any school which provides not less than a one-year program of training to prepare students for gainful employment in a recognized occupation." *Id.* §435(a). Accordingly, under the HEA, public or nonprofit institutions could participate in Title-IV programs regardless of whether their students chose to enroll in liberal-arts or humanities programs that led to a bachelor's degree, or instead chose to enroll in programs that offered training in the skills and knowledge necessary for paid employment in a particular field.

8

30. Congress enacted the second relevant statute—the National Vocational Student Loan Insurance Act of 1965 (NVSLIA)—as a complement to the HEA.  Pub. L. No. 89-287, 79 Stat. 1037 (1965).  The NVSLIA sought "[t]o establish a system of loan insurance and a supplementary system of direct loans to assist students to attend post-secondary business, trade, technical, and other vocational schools."  *Id.* at 1037.  Like the HEA, the NVSLIA required schools who wished to participate in these programs to satisfy the definition of "eligible institution."  *Id.* §8(a)(1).  But the NVSLIA defined that term differently from the HEA.  Among other things, the NVSLIA stated that an eligible institution is "a business or trade school, or technical institution or other technical or vocational school," that provides "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations."  *Id.* §17(a)(2).  And the NVSLIA also stated that eligible institutions could "admit[] as regular students only persons who have completed or left elementary or secondary school."  *Id.* §17(a)(1).  Thus, unlike the HEA, which categorically disqualified for-profit schools and categorically denied student aid to all non-high-school graduates, the NVSLIA expanded the institutions at which students could receive federal financial-aid assistance "as widely as possible" and provided a pathway for the "large numbers of actual and potential students who have left elementary or secondary school" to "attain the goals they have established for themselves."  S. Rep. No. 89-758, at 3, 12 (1965); *see also* H.R. Rep. No. 89-308, at 9 (1965).  At the same time, Congress endeavored to protect the public fisc by "explicitly eliminat[ing] from eligibility" the bad-actor "'fly by night' institutions of the post-World War II era"—an objective that Congress achieved by inserting an additional "eligibility feature" into the definition of "eligible institution," *see* NVSLIA §17(a)(3), "which require[d] an institution to have been in existence for 2 years."  S. Rep. No. 89-758, at 7; *see also* H.R. Rep. No. 89-308, at 9.

31. This bifurcated system did not last long.  In 1968, Congress repealed the NVSLIA and "merge[d]" it with the HEA.  Pub. L. No. 90-575, 82 Stat. 1014, 1023 (1968).  In the revised version of the HEA, Congress renamed as "institution[s] of higher education" the public and nonprofit schools that qualified as eligible institutions under the original HEA, while renaming as "vocational school[s]" the schools that qualified as eligible institutions under the NVSLIA.  *Id.* §116(a).  Although

this merger allowed for-profit schools that provided career and technical education to qualify as eligible institutions under Title IV of the HEA for the first time, the revised version of the HEA otherwise maintained the same eligibility features that existed before the merger. Thus, as under the NVSLIA, the schools now known as "vocational schools" could qualify as eligible institutions under the HEA if (among other things) they provided programs "designed to fit individuals for useful employment in recognized occupations," "admit[ted] as regular students only persons who have completed or left elementary or secondary school," and "ha[ve] been in existence for two years." 20 U.S.C. §1085(c) (1970).

32. Congress left this statutory scheme largely untouched for nearly 25 years. *See, e.g.*, 20 U.S.C. §1085(b)-(c) (1992).

33. In 1992, however, Congress enacted the Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (1992), which removed the term "vocational school" from the HEA and replaced it with two other terms: "proprietary institution of higher education" (covering for-profit schools focused on career and technical education) and "postsecondary vocational institution" (covering public and nonprofit schools focused on career and technical education) *Id.* §481; *see* 20 U.S.C. §§1088(b)-(c) (1994).

34. While the 1992 amendments tweaked the Title-IV-eligibility requirements for these schools, they did not fundamentally alter them. For example, whereas "vocational schools" previously had to provide programs "designed to fit individuals for *useful* employment in recognized occupations," the 1992 amendments stated that "proprietary institutions of higher education" and "postsecondary vocational institutions" had to "provide an eligible program of training to prepare students for *gainful* employment in a recognized occupation," with "eligible program" defined as "a program of training to prepare students for *gainful* employment in a recognized profession." *Id.* §§1088(b)(1), (c)(1), (e)(1)(A)(i) (1994) (emphasis added). As the Department has explained, there is "not" a "substantive" difference between the "useful employment" phraseology and the "gainful employment" phraseology (which appeared in the original version of the HEA, *see* ¶29, *supra*). Defs.' Cross-Mot. for Summ. J. 17, *Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18;

*see also, e.g., Shorter Oxford English Dictionary* 1066 (6th ed. 2007) (defining "gainful" as "(of employment) paid, useful").

35.     Furthermore, whereas "vocational schools" could "admit[] as regular students only persons who have completed or left elementary or secondary school," the 1992 amendments similarly allowed "proprietary institutions of higher education" and "postsecondary vocational schools" to "admit[] as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located," regardless of whether they actually graduated from high school (though proprietary institutions of higher education could admit high school graduates too). 20 U.S.C. §§1088(b)-(c) (1994).

36.     And just as "vocational schools" had to "ha[ve] been in existence for at least 2 years," the 1992 amendments said the same thing about "proprietary institution[s] of higher education" and "postsecondary vocational schools," *see id.* §§1088(b)(5), (c)(3), thus ensuring that bad-actor fly-by-night schools could not proliferate.

37.     Today, "proprietary institutions of higher education" and "postsecondary vocational schools" can secure and maintain Title-IV eligibility by meeting these same basic requirements and certain other ones. *See* 20 U.S.C. §§1002(b)(1)-(2), (c)(1)-(2), 1088(b)(1)(A)(i).

38.     And in recognition of the fact that for-profit schools are capable of providing something other than career and technical training, Congress in 2008 provided an additional option by which for-profit schools could establish Title-IV eligibility:  Instead of "provid[ing] an eligible program of training to prepare students for gainful employment in a recognized occupation," they could instead "provide[] a program leading to a baccalaureate degree in liberal arts," so long as they had "provided such a program since January 1, 2009" and "continuously held … accreditation since October 1, 2007." *Id.* §1002(b)(1)(A); *see* Pub. L. No. 110-315, 122 Stat. 3078, 3086 (2008).

### B.     Regulatory Background

39.     As this statutory history demonstrates, for nearly 60 years, Congress has provided that for-profit schools could qualify as eligible for federal student-aid programs, including those under Title IV of the HEA, if they offer programs of training to prepare students for gainful/useful employment

in recognized occupations.

40.     For nearly 50 of those years, it never occurred to the Department that this language meant that schools that should lose their eligibility if their students did not, in fact, obtain that employment after graduation, let alone if their alumni did not meet certain financial benchmarks after leaving school.  That is unsurprising:  A requirement that schools provide a program of training to prepare students for gainful employment in a recognized occupation is an especially obtuse way of saying that schools must guarantee that their alumni satisfy specific post-graduate earnings and debt standards that the statute never actually specifies.

41.     That conclusion is reinforced by the fact that Congress repeatedly used language elsewhere in the HEA that specifically addresses matters of debt and earnings.  For example, the HEA includes separate provisions (the "cohort default rate" provisions) providing that schools will lose their Title-IV eligibility if their graduates default on their student loans at rates that Congress has deemed excessive—specifically, if at least 30% of a particular cohort defaults for three consecutive years.  *See* 20 U.S.C. §§1085(a)(2)(A), (B)(iv), (m)(1).  The HEA also includes other provisions establishing extended-repayment and income-driven-repayment programs that reduce monthly and annual debt payments and that ultimately allow for complete loan forgiveness, *see id.* §1098e, and the Department has promulgated regulations that effectuate that congressional directive, *see* 88 Fed. Reg. 43,820, 43,820 (July 10, 2023).  Furthermore, the HEA includes still other provisions requiring the Department to conduct a regular survey of federal financial-aid recipients that is supposed to "describe the … debt burden of such loan recipients, and their capacity to repay their education debts," as well as the "impact of such debt burden on the recipients' … post-graduation plans."  20 U.S.C. §1015a(k)(D).  And the list goes on.

42.     In keeping with the understanding that the HEA's "prepare students for gainful employment in a recognized occupation" language does not relate to post-graduate earnings and debt, the Department consistently maintained that the "statutorily intended goal or result" of this language is simply "preparation for gainful employment in such an occupation"—"not that such a goal or result be potentially derived or incidentally available at the conclusion of the program." *In re Acad. For Jewish*

*Educ.*, Dep't of Educ., 1994 WL 1026087, at \*2-3 (Mar. 23, 1994); *see In re Bnai Arugath Habosem*, Dep't of Educ., 1994 WL 1026098, at \*1 (June 16, 1994) ("[I]t is not sufficient to simply show that gainful employment in a recognized occupation is potentially *derived or incidentally available* at the completion of the school's program; it must be shown that an institution's program builds toward a specific, employment oriented goal.").  Put another way, even if students in fact "subsequently … obtained jobs" in recognized occupations after completing their programs, the Department would still deny Title-IV eligibility if schools did "not" actually "design[]" those programs to prepare students for gainful employment in particular vocations, *In re Derech Ayson Rabbinical Seminary*, Dep't of Educ., 1995 WL 931579, at \*5 (Jan. 12, 1995), or if those programs did not "build[s] toward a specific, employment oriented goal," *In re Academy For Jewish Educ.*, 1994 WL 1026087, at \*3; *see also In re Beth Medrash Eeyun Hatalmud*, Dep't of Educ., 1999 WL 33954497, at \*2 (Apr. 1, 1999) (explaining that "an eligible institution must provide training in a specifically identifiable occupation," not "merely provide training that may generally improve the employability of its students," and emphasizing that this "standard is long-standing"); *In re Seminar L'moros Bais Yaakov*, Dep't of Educ., 1994 WL 1026093, at \*1 (Mar. 21, 1994) (finding gainful-employment requirement satisfied because the school "has programs which have a major, co-equal purpose of training students to become teachers in Jewish schools"); *In re Sara Schenirer Teachers Seminary*, Dep't of Educ., 1994 WL 1026085, at \*2 (Mar. 25, 1994) (similar).

43.     The Department stood by this "already-established standard" in court too.  *Hatalmud v. Riley*, 1998 WL 157059, at \*2 & n.3 (S.D.N.Y. Apr. 3, 1998); *cf. Beth Jacob Hebrew Tchrs. Coll. v. Riley*, 73 F.Supp.2d 262, 264-65 (E.D.N.Y. 1999).

44.     And schools likewise organized their operations in reliance on this commonsense understanding of the HEA.  Plaintiffs here are illustrative.  Ogle opened its first cosmetology[1] school in Arlington, Texas in 1973 and has since expanded to nine campuses across the Dallas/Fort Worth, San Antonio, and Houston areas.  *See* Ex.A ¶¶5-6.  At each one, Ogle has always designed its programs to prepare its students for careers in the beauty industry by offering salon-modeled, student-centered

---

[1] This complaint uses the term "cosmetology" and "cosmetologists" as shorthand for all beauty programs and professionals.

training and development.  *See* Ex.A ¶7.  Tricoci pursued a similar strategy.  After opening its first cosmetology school in Chicago, Illinois in 2004, Tricoci expanded to 15 campuses across Illinois, Indiana, and Wisconsin, and at each one, it has made sure to design its programs so that its students are prepared for licensure requirements and have the tools necessary for paid employment in professional salons.  *See* Ex.B ¶¶5-7.  Precisely because the Department could not seriously dispute that Plaintiffs provided programs of training to prepare students for gainful employment in recognized occupations[2] (and satisfied all other Title-IV-eligibility requirements), they had no trouble securing Title-IV eligibility.  *See* Ex.A ¶10; Ex.B ¶10.

45.     ***The 2011 Rule:***  The Department radically shifted course in 2010, when it proposed its first gainful-employment rule, *see* 75 Fed. Reg. 43,616, 43,620 (July 26, 2010), which it later finalized in 2011.  In the 2011 Rule, the Department—invoking the HEA's "prepare students for gainful employment in a recognized occupation" language, which it now described as "subject to many different views and interpretations"—declared that it would determine whether programs at for-profit schools and certificate programs at public and nonprofit schools could still qualify as Title-IV-eligible based on two tests that purported to measure the ability of program graduates "to repay their [student] loans." 76 Fed. Reg. 34,386, 34,388, 34,393 (June 13, 2011).  The first test, which examined debt-to-earnings ratios using a dataset that included only those earnings reported by taxpayers to the federal government, assessed whether program graduates in their first few years after graduation had an "annual loan payment … less than or equal to 30 percent of discretionary income" (defined as those earnings above 150% of the federal poverty guideline) or less than or equal to "12 percent of annual earnings." *Id.* at 34,400, 34,450.  The second test assessed whether the "loan repayment rate" among program graduates "is at least 35 percent." *Id.*  The Department then declared that, if programs failed

---

[2] The Department's regulations acknowledge that employment in the cosmetology sector is a "recognized occupation." *See, e.g.*, 34 C.F.R. §600.2 (defining "Recognized occupation" to include "[a]n occupation that is … Identified by … an Occupational Information Network O*Net–SOC code established by the Department of Labor, which is available at www.onetonline.org"); O*Net OnLine, *See All Occupation*s, https://rb.gy/fmlm66 (last visited Mar. 20, 2024) (listing "Hairdressers, Hairstylists, and Cosmetologists" under O*Net-SOC Code 39-5012.00).

both of these tests in three out of the four most recent fiscal years, they would lose Title-IV eligibility, while also having to provide warnings to students if they failed just once or twice. *See id.* at 34,388.

46.     The Department then offered additional insight into its debt-to-earnings test. The metric examining the ratio of debt to discretionary income, the Department stated, is "based on research conducted by economists Sandy Baum and Saul Schwartz," who issued a paper for the College Board in 2006 titled "How Much Debt Is Too Much? Defining Benchmarks for Manageable Student Debt"—a paper that never mentioned the HEA or its "prepare students for gainful employment in a recognized occupation" language. 75 Fed. Reg. at 43,620; *see* Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much? Defining Benchmarks for Manageable Student Debt*, College Board (2006), https://rb.gy/zcsl1r (Baum & Schwartz). After Baum and Schwartz considered the "various possible approaches to setting benchmarks for reasonable student debt levels," including those proposed in "[t]he European literature on overindebtedness," they settled on the "somewhat arbitrary" ceiling of 20% of discretionary income ("defined as income exceeding 150 percent of the poverty level for a single person") as the appropriate benchmark. Baum & Schwartz 4, 11-12. In selecting that figure, Baum and Schwartz explained that the theretofore-most-common benchmark for assessing excessive debt—when non-mortgage-related debt exceeds 8% of annual earnings—has "no particular merit or justification" in the student-loan context and that its "shortcomings" are readily "apparent." *Id.* at 2-3. As Baum and Schwartz emphasized, the 8% threshold "arose from mortgage underwriting standards"—*i.e.*, the rule of thumb that mortgage debt should not exceed 28% of annual earnings and that total debt should not exceed 36% of annual earnings, leaving 8% for the payment of non-mortgage-related debt—and does not reflect "the experience of young people who have recently left school" and who often lack mortgages. *Id.*

47.     After providing that background, the Department declared that it had chosen the debt thresholds of 30% of discretionary earnings and 12% of annual earnings—thresholds that are "50%" higher than those discussed by Baum and Schwartz—because it is purportedly "unambiguous that a program's debt levels are excessive" at those levels. 75 Fed. Reg. at 43,620.

48.     During the notice-and-comment period for the 2011 Rule, the Department heard

complaints that debt-to-earnings measures are an inappropriate way to enforce the HEA's "prepare students for gainful employment in a recognized occupation" language in general, but are especially out of place in the context of programs that prepare students for employment in cash- and tip-heavy businesses (such as cosmetology programs) because a disproportionate "magnitude" of earnings are not reported to the federal government in those settings. 76 Fed. Reg. at 34,424-25. In response to that concern, the Department observed that any program that failed the debt-to-earnings test could submit "alternative earnings data" that more "[]accurate[ly]" reflected actual earnings—such as state earnings data capturing the earnings of "more than 50 percent" of graduates in the relevant student cohort (which the Department conceded "may be difficult for an institution to obtain") or a school survey that included responses from virtually all program graduates. *Id.* at 34,421, 34,425, 34,428-29.

49.     While the 2011 Rule generated numerous critical comments during the notice-and-comment period, it also produced considerable criticism outside of that process. For instance, "a bipartisan group of 113 Members of the House of Representatives … sent a letter in 2011 to President Obama asking him to withdraw the GE regulations." 84 Fed. Reg. 31,392, 31,402 (July 1, 2019). And a bipartisan near-supermajority of the House (289 members) also voted to block the 2011 Rule altogether. *See* Nick Anderson, *Democrats Join GOP in Voting to Block Tighter Regulation of For-Profit Schools*, Wash. Post (Feb. 19, 2011), https://rb.gy/jrztyi.

50.     Moreover, the 2011 Rule also promptly generated a legal challenge from for-profit schools, which argued, among other things, that the Department exceeded its statutory authority and had engaged in arbitrary and capricious conduct. *See Ass'n of Priv. Colls. & Univs. v. Duncan* (*APSCU I*), No. 11-cv-1314 (D.D.C. filed July 20, 2011). In defending its novel rule, the Department insisted that the HEA's "'prepare students for gainful employment in a recognized occupation'" language is "ambiguous" and therefore asked the court to "defer[]" to its interpretation of that language under step two of the framework announced in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), while further claiming that its rule passed muster in all other respects. Defs.' Reply in Supp. of Cross-Mot. for Summ. J. at 4 & n.2, *APSCU I* (D.D.C. filed Feb. 2, 2012), Dkt.20.

51.     The district court obliged the Department's request and held that the Department's

interpretation of the statutory language deserved *Chevron* deference.  *See APSCU I*, 870 F.Supp.2d 133, 146 (D.D.C. 2012).  But that victory proved short-lived for the Department, as the court proceeded to hold that "[t]he debt repayment standard … was not based upon any facts at all" and thus failed arbitrary-and-capricious review—and that the repayment standard "cannot be severed from the other debt measures," including the debt-to-earnings measures.  *Id.* at 154.  Accordingly, the court set aside the 2011 Rule in its entirety.

52.    ***The 2014 Rule:***  Instead of appealing that decision, the Department embarked on a new rulemaking process, which resulted in a new gainful-employment rule in 2014.  *See* 79 Fed. Reg. 64,890 (Oct. 31, 2014).  Although the 2014 Rule abandoned the loan-repayment-rate test that doomed the 2011 Rule, the Department doubled-down on the proposition that the HEA's "prepare students for gainful employment in a recognized occupation" language meant that the Title-IV eligibility of programs at for-profit schools could hinge on their graduates' debt-to-earnings ratios.  Thus, once again invoking "research conducted by economists Sandy Baum and Saul Schwartz" as well as "mortgage industry practices," the Department proclaimed that programs would fail its new rule if graduates had a median annual loan payment above 30% of discretionary earnings and 12% of annual earnings, with the earnings figures again coming from a dataset that included only those earnings reported by taxpayers to the federal government.  *See id.* at 64,919.  Adding a new twist, however, the 2014 Rule also provided that programs would fall into a regulatory purgatory known as "the zone" if graduates had a median annual loan payment between 20% and 30% of discretionary earnings or between 8% and 12% of annual earnings.  *See id.* at 64,919-20.  The Department then explained that, if a program failed the debt-to-earnings measure in two consecutive years, or had a combination of debt-to-earnings rates that either fell into the zone or failed for four consecutive years, it would lose its Title-IV eligibility, while also mandating that schools provide "warnings to current and prospective students for a program in any year in which the program faces potential ineligibility based upon its next set of final D/E rates."  *Id.* at 64,891, 64,924.  But, acknowledging that earnings figures reported by taxpayers to the federal government may suffer from an "underreporting" problem, the Department also allowed schools whose programs failed the debt-to-earnings test to initiate an "alternate earnings

17

appeal" in which the Department could consider either state earnings data that included the earnings of at least 50% of students in the relevant student cohort (if such data existed) or earnings data that the school collected through a graduate survey (if the school could collect such data for virtually every graduate). *Id.* at 64,955, 65,010.

53.     The 2014 Rule prompted three legal challenges.  In two of them, for-profit schools again argued that the Department exceeded its statutory authority and had engaged in arbitrary and capricious conduct, among other things.  *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan (APSCU II)*, No. 14-cv-1870 (D.D.C. filed Nov. 6, 2014), Dkt.1; *Ass'n of Proprietary Colls. v. Duncan (APC)*, No. 14-cv-8838 (S.D.N.Y. filed Nov. 6, 2014), Dkt. 1.  The Department invoked similar defenses:  The 2014 Rule reflected a "permissible interpretation of an ambiguous statutory requirement, and should therefore be upheld under the analysis in *Chevron*," and "the APA's 'highly deferential' standard of review" foreclosed all other arguments.  Defs.' Mem. of Law in Support of Cross-Mot. for Summ. J. 8, 18, *APSCU II* (D.D.C. filed Mar. 6, 2015), Dkt.18; *see* Defs.' Mem. of Law in Support of Their Cross-Mot. for Summ. J. 10, 38, *APC* (S.D.N.Y. filed Feb. 20, 2015) (similar).  Relying heavily on the *Chevron* analysis from the decision addressing the 2011 Rule, the courts agreed that the Department's statutory interpretation survived under *Chevron* step two and proceeded to reject every other challenge.  *See APSCU II*, 110 F.Supp.3d 176, 184-204 (D.D.C. 2015), *aff'd*, 640 F.App'x 5 (D.C. Cir. 2016); *APC*, 107 F.Supp.3d 332, 344-69 (S.D.N.Y. 2015).

54.     The Department had less success in the third lawsuit that focused on the distinct problems that the 2014 Rule posed for cosmetology schools.  That suit, filed by the American Association of Cosmetology Schools (AACS), challenged both the Department's decision to rely on federal earnings data that failed to account for the underreporting of income and the Department's stringent alternate-earnings-appeal process.[3]  *See AACS v. DeVos*, No. 17-cv-263 (D.D.C. filed Feb. 10, 2017).  The district court concluded that the Department's "wooden use" of federal earnings data "is problematic," as the Department "openly acknowledged that underreporting is an issue" in the

---

[3] AACS has also challenged the 2023 Rule.  *See AACS v. U.S. Dep't of Educ.*, No. 23-cv-1267 (N.D. Tex. filed Dec. 22, 2023).  Plaintiffs agree with the arguments asserted there.

cosmetology sector—in fact, the Department knew of a Stanford economic analysis that had esti-mated the underreporting rate at approximately 60%. *AACS v. DeVos*, 258 F.Supp.3d 50, 63, 73 (D.D.C. 2017). While the Department attempted to defend its approach on the theory that "underre-porters are subject to civil and criminal penalties," the court described that defense as a "non sequitur" and "irrelevant," since underreporting had long occurred notwithstanding the existence of such pen-alties. *Id.* at 63-64. Nor did the court find the Department's alternative-earnings-appeal process suf-ficient to mitigate the issue, as the Department had "unjustifiably made appeals difficult to mount"—*i.e.*, "[m]any cosmetology schools operate in states that do not maintain state-sponsored data and the schools anticipate that they will be unable to obtain the student responses required to use institutional data." *Id.* at 61, 64. Given these concerns, the court determined that cosmetology schools "need not secure any specific amount of survey responses or state-sponsored data to raise an appeal." *Id.* at 76-77. The Department did not appeal that decision and never fully implemented the rule.

55.     ***The 2019 Rule:*** By 2018—the year after its second judicial defeat—the Department announced its intent to rescind the 2014 Rule entirely, *see* 83 Fed. Reg. 40,167 (Aug. 14, 2018), and it followed through on that intent in 2019, *see* 84 Fed. Reg. 31,392 (July 1, 2019). In doing so, the De-partment acknowledged the litany of errors with its prior regulatory approach.

56.     At the outset, the Department "recognize[d]" that it had "incorrectly described con-gressional intent" in the HEA and had "engaged in regulatory overreach" in promulgating its gainful-employment regulations. *Id.* at 31,402. For decades, the Department continued, "the term 'gainful employment' has been widely understood to be a descriptive term that differentiates between pro-grams that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities," as Congress "reaffirmed" in the Higher Education Opportunity Act of 2008, which "allowed a small number of proprietary institutions" to secure Title-IV eligibility by "offer[ing] baccalaureate degrees in liberal arts" instead of programs focused on career and technical education. *Id.* at 31,401. The Department also found it telling that, "[d]espite numerous reauthoriza-tions of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-

earnings ratios." *Id.* at 31,401-02.

57.     The Department also stressed that "Congress has elected to address concerns about unmanageable student loan debt" in other deliberate ways. *Id.* at 31,401. The Department noted, for example, that Congress has "provid[ed] numerous extended repayment and income-driven repayment programs that reduce monthly and annual payments and provide loan forgiveness if, after 20 (or in some cases 25) years of income-driven repayment, an outstanding loan balance remains." *Id.* The Department further highlighted that Congress required the Department to "restrict[] title IV eligibility to those institutions, including proprietary institutions, that pass the CDR [cohort default rate] test." *Id.* at 31,403. And the Department found it odd to interpret "gainful employment" language that applies only to a subset of schools as a covert congressional effort to ensure that borrowers can repay their loans, since "Congress intends for all Federal student loan borrowers to repay their loans, not just those who borrow to attend 'vocational training' programs." *Id.* at 31,401. In short, the Department explained that it would return to "enforc[ing] the law … in the same way it enforced it between 1968 and 2011": by "disallow[ing] proprietary institutions, other than those exempted by the above-mentioned provision of the [Higher Education Opportunity Act], to offer general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation." *Id.*

58.     Apart from finding the 2014 Rule *ultra vires*, the Department also found the debt-to-earnings tests in that rule "fundamentally flawed." *Id.* at 31,438. The Department observed that the 8% ratio assessing debt-to-annual-earnings "is not appropriate to use in determining a program's continuing eligibility in title IV programs," as it is "a mortgage standard and one that 'has no particular merit or justification' for use in establishing student borrowing limits"—as Baum and Schwartz conceded. *Id.* at 31,407; *see id.* at 31,426. Turning to the 20% ratio assessing debt-to-discretionary-earnings, the Department explained that it had "failed to provide a sufficient, objective, and reliable basis" for it. *Id.* at 31,407. The Department also deemed that metric irrational given that the Department's own income-based repayment plans "established 10 percent as the debt-to-discretionary income threshold that is used to determine a borrower's monthly payment obligation," which "render[ed] the 20 percent debt-to-discretionary income threshold in the 2014 Rule obsolete since no borrower would

ever be required to pay more than 10 percent of their discretionary income." *Id.*

59.     The Department added that it "does not believe that it should sanction institutions" because of incorrect federal earnings data or "for aspects of student debt and earning outcomes that are outside of the institution's control." *Id.* at 31,409.  For instance, the Department observed that, in "heavily tip-influenced professions, such as cosmetology," not all income is reported to the federal government—which is "not the fault of institutions"—and that underreporting "renders the earnings portion of the D/E calculation subject to significant errors." *Id.* at 31,409-10; *see id.* at 31,431 ("It is well known … that tip income is an important part of the total earnings of cosmetologists.").  More-over, the Department recognized that "some students take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices," and it described "[p]enalizing programs" because students choose those options as "absurd." *Id.* at 31,410, 31,413.  In addition, the Department observed that, "because the GE regulations do not calculate D/E rates until years after a student is admitted," those regulations effectively required schools "to predict macro-economic con-ditions, future earnings, and various other factors that influence employment and earnings well in to the future in order to establish a price that will guarantee passing D/E rates, a nearly impossible task." *Id.* at 31,417.  And the Department also lamented that "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups" too. *Id.* at 31,414.

60.     Finally, the Department warned that, if left standing, its gainful-employment rule could negatively impact women and minorities.  "Since many GE programs serve high proportions of women and minorities," the Department stated, "sanctions that would eliminate these programs could reduce postsecondary opportunities, thereby contributing to the earnings and opportunity gap." *Id.*  And the Department expressed especial concern for the fate of cosmetology programs under its prior regime: "[C]osmetology … programs were disproportionately represented among the programs that failed the D/E rates measure," but "these occupations are considered by the U.S. Department of Labor to be 'bright outlook' occupations, suggesting that it is possible that GE-related program clo-sures could reduce availability of … programs needed to fill high-demand occupations." *Id.* at 31,400

(footnote omitted); *see id.* at 31,414-15 ("[G]iven that a large number of programs that failed the D/E rates measure … were medical assisting and related programs, or cosmetology programs—both female-dominated professions—it seems clear that women will be impacted more significantly by program closures than men."). For all of these reasons, the Department "determined that the 2014 Rule is fundamentally flawed and does not provide a reliable methodology for identifying poorly performing programs and, therefore, should not serve as the basis for high stakes sanctions that negatively impact institutions and students." *Id.* at 31,426.

### C.   The Challenged 2023 Rule

61.   Last year, the Department reviewed this prior history and reached the stunning conclusion that it allowed the agency to promulgate "the strongest-ever Gainful Employment (GE) rule." U.S. Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 17, 2023), https://rb.gy/uyl2xk. The Department therefore issued a proposed rule spanning over 200 pages of the Federal Register, *see* 88 Fed. Reg. 32,300 (May 19, 2023), and gave interested parties just 30 days to comment on it—the minimum period allowed by federal law, *see* 5 U.S.C. §553(d). Although numerous parties, including Plaintiffs, moved quickly to denounce the proposed rule as *ultra vires* and arbitrary and capricious and cautioned that it would have a devastating impact on for profit-schools, especially cosmetology schools, *see* Ex.A-1 (Ogle comments); Ex.B-1 (Tricoci comments); Ex.C (AACS comments, which both Ogle and Tricoci expressly incorporated by reference), the Department promulgated the final rule in October 2023 with virtually no changes in a document that again consumed approximately 200 pages of the Federal Register, *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023).

62.   The centerpiece of the 2023 Rule is "an accountability and eligibility framework for gainful employment programs" that "reinstates" certain features of the 2014 Rule—*i.e.*, features that the Department itself had just acknowledged to be unlawful and irrational in the 2019 Rule—while also introducing a new feature that has no historical precedent at all. *Id.* at 70,005.

63.   The 2023 Rule thus has two distinct tests.

64.   The first test marks the Department's third attempt to determine whether the "gainful

employment" language in the HEA is satisfied using complex debt-to-earnings ratios: "[B]ased on research conducted by economists Sandy Baum and Saul Schwartz" and applying "mortgage-under-writing standards," the Department's first test assesses whether the share of annual earnings that the median graduate in a two- or four-year cohort period needs to devote to paying down her debt (which the Department amortizes over a 10-, 15-, or 20-year period depending on the credential[4]) is less than or equal to 8%, or less than or equal to 20% of discretionary earnings (which the Department defines as annual earnings above 150% of the federal poverty guideline). *See id.* at 70,020, 70,124.

65.     The second test is entirely novel: Dubbed the "earnings premium," it purports to examine whether at least half of program graduates (regardless of whether they have voluntarily elected to opt out of the labor force in the years after graduation) have higher earnings than at least half of high school graduates in the state between the ages of 25 and 34 who never enrolled in post-secondary education (but only if those high school graduates have opted in to the labor force and no matter what jobs they have).[5] *See id.* at 70,124-25.

66.     In most circumstances, the Department will conduct these tests three years after the students have graduated from their programs, and "[t]he first official rates … will, for most programs, be based on students who completed a program in award years 2018 and 2019, measuring their

---

[4] The Department amortizes loans for "undergraduate certificate, associate degree, post-baccalau-reate certificate programs, and graduate certificate programs" over a 10-year period, regardless of the borrower's actual amortization period. 88 Fed. Reg. at 70,124.

[5] The earnings-premium test seeks to compare program graduates to high school graduates who never enrolled in post-secondary education "[n]ationally" if "fewer than 50 percent of the students in the program are from the State where the institution is located, or if the institution is a foreign insti-tution." 88 Fed. Reg. at 70,186. But it is doubtful whether the Department can accurately measure the earnings of *either* the targeted group of in-state high school graduates *or* the targeted group of national high school graduates. That is because the Department obtains earnings information about high school graduates from the Census Bureau's American Community Survey, *see id.* at 70,022, which allows respondents to identify as having only a high school degree even if they *have* enrolled in post-secondary education—indeed, even if they have obtained a credential like a cosmetology certificate, *see* U.S. Census Bureau, *American Community Survey* 12 (2024), https://rb.gy/0jxt5c (Question 11). So, the supposed pool of high school graduates who never enrolled in post-secondary education that the Department would like to assess likely includes high school graduates who *have* attended or completed a technical or vocational post-secondary certificate or degree program.

earnings outcomes in 2021 and 2022." *Id.* at 70,037, 70,099. The Department expects to release its first test results in 2025. *See id.* at 70,160. But because the Department lacks the information necessary to conduct these tests, the 2023 Rule also requires schools to supply it with a wide range of information. *See id.* at 70,191; *id.* 70,153 ("Our initial estimate of the time cost of these reporting requirements for institutions is 5.0 million hours initially and then 1.4 million hours annually after the first year."). Although the first such reporting deadline is July 31, 2024, the Department anticipates that schools will initiate the information-gathering process many "months" before July 1, 2024—the date when the 2023 Rule officially takes effect—since that process is extremely time-intensive. *Id.* at 70,063. Plaintiffs anticipate that they will have to expend considerable resources to comply with the reporting requirement. *See* Ex.A ¶¶25-36; Ex.B ¶¶25-37. Due to Defendants' sovereign immunity, Plaintiffs can never recover those costs if the 2023 Rule is deemed invalid—a textbook example of irreparable harm. *See, e.g.*, *Texas v. EPA*, 829 F.3d 405, 433-34 (5th Cir. 2016); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

67.     There are, however, limits to the information that the Department deems relevant when conducting its tests. Among other things, the Department refuses to account for any exogenous factors that may depress earnings, such as economic "recessions," "the COVID-19 pandemic," or voluntary decisions by graduates who "choos[e] not to work full-time" or who leave the labor force altogether—even though the Department acknowledged that graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job." 88 Fed. Reg. at 70,035, 70,045, 70,099; *see also id.* at 70,092 ("We acknowledge that the COVID-19 pandemic likely affected the earnings of workers in salons, spas, the beauty industry, and many other industries besides.").

68.     As with the 2011 and 2014 Rules, schools that fail the 2023 Rule face dire consequences. If a program fails either the debt-to-earnings or earnings-premium tests just once, the school must issue a warning to all students enrolled or interested in a program alerting them that the program may lose its Title-IV eligibility the following year. *See id.* at 70,052, 70,084, 70,193. The Department anticipates that these warnings may prompt students "to transfer to another program or choose not to enroll in such a program" and that "it may be more difficult for programs that must issue student

warnings to attract and retain students." *Id.* at 70,078.  Then, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title-IV programs entirely. [6]  *See id.* at 70,052, 70,084.

69.     In promulgating the 2023 Rule, the Department purported to discover crystal clarity in the text of the HEA where it previously saw sheer ambiguity.  As the Department put it, its debt-to-earnings and earnings-premium tests are "consistent with the ordinary meaning of the operative words in the statute," and "all indications of Congress's intent" confirm that "a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt"—as defined by mortgage underwriters and a 2006 academic paper heedless of the HEA—or "if they earn no more than comparable high school graduates." *Id.* at 70,012. The Department also observed that the HEA "generally requires that students already have a high school diploma or recognized equivalent" in order for students (as opposed to schools or their programs) to participate in Title-IV programs, so "comparing the earnings of typical program completers with those of comparable high school graduates" is purportedly "consistent with the text, structure, and purposes of the statute" in that respect too. *Id.* at 70,013.  The Department "recognize[d]" that these supposed statutory clues escaped its attention for half-a-century or more, but it expressed its "belie[f]" that "initially refrain[ing] from issuing regulations" comparable to the 2023 Rule is irrelevant. *Id.* at 70,014.  In all events, the Department declared, its interpretation of the HEA is "reasonable," as "past litigation" applying *Chevron* deference supposedly confirmed.  *Id.* at 70,012.

70.     Notwithstanding the Department's confidence that the 2023 Rule is consistent with "all indications of Congress's intent," *id.* at 70,007, 70,012, it acknowledged that it could not actually apply its understanding of the statute to all schools covered by the "prepare students for gainful employment in a recognized occupation" language.

---

[6] The 2023 Rule also establishes a "financial value transparency framework"—*i.e.*, a website—that utilizes the same school-reported information to calculate the same debt-to-earnings and earnings-premium figures for all Title-IV-eligible programs, not just gainful-employment programs.  88 Fed. Reg. at 70,005.  But "the financial value transparency metrics do not impact program eligibility for non-GE programs."  *Id.* at 70,065.

71.     For instance, because "[t]he Department must have student outcomes data to measure program performance, which can only come after a period of time," "new programs" could qualify as Title-IV-eligible—meaning that the Department would have to certify that the program is "providing a program of training to prepare students for gainful employment in a recognized occupation"—even though the Department could not apply the tests that purportedly capture Congress' intent vis-à-vis that language.  *Id.* at 70,018.

72.     Furthermore, because the Department lacked "confiden[ce]" in the data for U.S. Territories and the Freely Associated States (the Marshall Islands, Micronesia, and Palau), it concluded that it had no choice but to "exempt" every school in those locations from the 2023 Rule (and those schools would seemingly have to prove that they are preparing students for gainful employment in recognized occupations in some other way).  *Id.* at 70,027-28.

73.     And "to protect the privacy of individuals who complete smaller programs," the Department concluded that it could not legitimately apply the 2023 Rule to programs that had fewer than 30 graduates in a two- or four-year cohort period (a numerical threshold that, according to the Department, had the effect of exempting numerous "public and private nonprofit institutions").  *Id.* at 70,046.  As the Department admitted, that 30-graduate "n-size" requirement meant that it could not subject "many programs" to its tests.  *Id.*  In fact, by the Department's calculation, approximately 74% of gainful-employment programs are exempt due to an insufficient number of graduates.  *See id.* at 70,127 ("We estimate that … 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort.  An additional … 11 percent of programs have an n-size of between 15 and 29 and would be likely have [*sic*] metrics computed using a four-year completer cohort.").

74.     The Department also recognized that the 2023 Rule has imperfections when applied to the programs (mostly offered by for-profit schools) that remain subject to it—including cosmetology programs.  For example, to calculate both the debt-to-earnings and earnings-premium metrics, the Department announced that it would use a dataset that includes only those earnings reported by taxpayers to the federal government, and it expressed a "preference for the use of … IRS data."  *Id.* at 70,045.  As the Department observed, however, that data contains "statistical noise" for privacy

26

reasons, which creates a "risk of inaccurate determinations." *Id.* 70,095.  In addition to that statistical noise, the Department recognized that the reported earnings of cosmetology professionals are simply not reflective of actual earnings.  The Department emphasized one recent study, which examined only the underreporting of tips, that indicated that federal earnings data is off-the-mark by 8-10%, and it also acknowledged (but downplayed) prior studies—including one from a Stanford economist—that placed the figure as high as 60%.  *See id.* at 70,042 & n.139.  Nonetheless, the Department declared that it would rely on the concededly inaccurate federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting."  *Id.* at 70,042.  Instead, the Department proclaimed, it would allow schools to protest only if the Department made errors in arithmetic when working with the inaccurate data.  *See id.* at 70,090.

75.     By any calculus, this approach is almost certain to devastate cosmetology schools. Third-party analyses estimate that approximately two-thirds of cosmetology programs at for-profit schools would fail one or both of the tests in the 2023 Rule.  *See, e.g.*, Sharon Lurye & Collin Binkley, *AP Analysis:  Most Beauty School Programs Would Be In Jeopardy Under US Proposal* (May 18, 2023), rb.gy/p6m31n (AP Analysis).  The Department's own data present an even starker picture.  As part of its regulatory impact analysis, the Department posted a program-level dataset approximating the (otherwise-nonpublic) "administrative systems the Department uses to administer the Title IV, HEA programs along with earnings data produced by the U.S. Treasury."  88 Fed. Reg. at 32,410.  The Department describes this dataset as "the best possible [public] depiction of the rule's impact given the data currently available to the Department."  Dep't of Educ., *2022 Program Performance Data Description* 1, https://rb.gy/xc3abb (last visited Mar. 20, 2024).  And according to this dataset, of the 1,270 cosmetology programs currently eligible for Title-IV funding, *only 13* would pass under the 2023 Rule. The majority of the current programs—639 programs enrolling 80% of students attending such programs, *compare* 88 Fed. Reg. at 70,140 (Table 4.18), *with id.* at 70,138 (Table 4.16)—would fail.  The

remaining programs would duck the rule because they have an insufficient number of graduates.[7]

76.     Plaintiffs here operate some of the hundreds of cosmetology programs expressly identified by the Department as likely to fail the 2023 Rule.  *See* Ex.A ¶22; Ex.B ¶22.  Because the vast majority (over 90%) of Plaintiffs' students rely on Title-IV aid to fund their education, the 2023 Rule is almost certain to fundamentally disrupt operations.  *See* Ex.A ¶24; Ex.B ¶24.

77.     Young women and racial minorities would suffer the most under the 2023 Rule.  Indeed, as of today, 98% of the students at Ogle's schools are women; 72% identify as either Black/African American or Hispanic; and the median age at graduation is 24.  *See* Ex.A ¶¶13-14.  The statistics at Tricoci are similar:  96% are female; 63% identify as either Black/African American or Hispanic; and the median age at graduation is 23.  *See* Ex.B ¶¶13-14.  Historically, students at Plaintiffs' schools have received more-than-adequate preparation for gainful employment in the cosmetology industry.  Indeed, in the most recent cohort, 98.65% of Ogle students and 86.1% of Tricoci students passed their state licensure exams.  *See* Ex.A ¶15; Ex.B ¶15.  And over 83% of Plaintiffs' students obtained employment within their fields of study.  *See* Ex.A ¶15; Ex.A ¶15.

78.     Those students generally have manageable debt after graduating too.  The average student at Ogle devotes $83 each month to pay down debt, and that number is $65 for the average Tricoci student.  Ex.A ¶16; Ex.B ¶16.  Unsurprisingly given those figures, Plaintiffs have never failed the HEA's "cohort default rate" test.  *See* Ex.A ¶18; Ex.B ¶18.

79.     According to the Department, however, typical alumni from Plaintiffs' schools are living proof of institutional failure, and the only option is to impose "undeniably serious" regulatory sanctions on their alma maters.  88 Fed. Reg. at 70,083.

---

[7] The dataset is available at https://rb.gy/80w20a (go to "General Information," then expand "Federal Register Notices and Fact Sheets" and select "GE Data 3"); an accompanying code sheet explaining the column labels is available at the same location (select "GE Data 2").  To obtain the figures referenced above, filter column "inGE" to "1," column "cipdesc" to "Cosmetology and Related Personal Grooming Services," and column "cred_lvl" to "UG Certificates."

## CLAIMS FOR RELIEF
### COUNT ONE
### Administrative Procedure Act
### Agency Action Not In Accordance With Law And In Excess Of Statutory Limitations

80. Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

81. The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … limitations."  5 U.S.C §706(2)(A), (C).

82. Title IV of the HEA states that "institutions of higher education" must "qualify[]" in order to "participat[e] in programs under this subchapter"—*i.e.*, Title IV.  20 U.S.C. §1099c(a).  The HEA then explains that, "for purposes of student assistance programs" described in Title IV, the term "institution of higher education" includes a "proprietary institution of higher education," which is in turn defined in pertinent part as one that "provides an eligible program of training to prepare students for gainful employment in a recognized occupation."  20 U.S.C. §§1002(a), (b)(1)(A)(i).  And the HEA then defines "eligible program" using materially identical language:  "a program of training to prepare students for gainful employment in a recognized profession."  *Id.* §1088(b)(1)(A)(i).

83. The Department recognizes that "the HEA does not more specifically define" what it means to provide a program of training to prepare students for gainful employment in a recognized occupation or profession.  88 Fed. Reg. at 70,008.  Accordingly, the "the ordinary meaning of the words control."  *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023).  To determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries," *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012).  And when the ordinary meaning of statutory text is "unambiguous," the interpretive exercise not only "begins" with that text, but "ends" there too.  *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018).  That straightfor-ward approach applies here, as the relevant language in the HEA is unambiguous.

84. The term "program" means a "plan of action to accomplish a specified end."  The Random House Dictionary of the English Language 1546 (2d ed. unabridged, 1987) (Random House); *see also* Oxford English Dictionary (online ed.) (OED) (defining program as "a planned series of

activities or events"); Webster's New International Dictionary 1977 (2d ed. unabridged, 1954) (Webster's New International) (defining "program" as "a syllabus").

85.     The term "training" means "[s]ustained instruction and practice (given or received) in an art, profession, occupation, or procedure, with a view to proficiency in it."  OED; *see also* Webster's New International 2687 (defining "training" as "education; discipline"); The American Heritage Dictionary of the English Language 1361 (1969) (American Heritage) (defining "train" as "to make proficient with specialized instruction and practice").

86.     The term "prepare" means to "get ready."  Random House 1527; *see also* Webster's New International 1952 (defining prepare as "to fit, adapt or qualify beforehand for a particular purpose, end, or condition; to make ready"); OED (defining prepare as "[t]o bring into a suitable condition for some future action or purpose; to make ready in advance; to fit out, equip."); American Heritage 1053 (defining prepare as "to make ready").

87.     The term "student" means "a person formally engaged in learning, esp. one enrolled in a school or college."  Random House 1888; *see also* American Heritage 1279 (defining student as "[o]ne who attends a school, college, or university"); OED (defining student as "[a] person studying at a university or other place of higher education" or "[a] person engaged in or dedicated to the pursuit of knowledge, esp. in a particular subject area"); Webster's New International 2502 (defining student as "[a] person engaged in study … esp., one who attends a school");.

88.     The term "gainful employment" means "work that a person can pursue and perform for money."  *Black's Law Dictionary*, Employment (11th ed. 2019) (defining "gainful employment"); *see also* OED (defining "gainful" as "leading to pecuniary gain; lucrative; remunerative"; defining "pecuniary" as "[c]onsisting of money"; defining "lucrative" as "profitable"; defining "remunerative" as "bring[ing] financial remuneration; profitable"; defining "remuneration" as "money paid for work or a service; payment; pay"); *Black's Law Dictionary* 610, 855 (5th ed. 1979) (defining "gainful employment" as "any calling, occupation, profession or work which one may profitably pursue"; explaining that "profitable" means "lucrative" or "bearing or yielding a revenue or salary"); Random House 638, 782 (defining "gainful" as "profitable; lucrative"); Webster's New International 839, 1026 (defining

"gainful" as "productive of gain; profitable; lucrative"); American Heritage 428, 537 (defining "gainful" as "earning a profit; profitable; lucrative").

89.     The term "recognized" means "[a]cknowledged; accepted; known; identified."  OED; *see also* Webster's New International 2079 (defining "recognize" as "to acknowledge formally"); Random House 1611 (defining "recognize" as "to acknowledge or treat as valid").

90.     And the terms "occupation" and "profession" both mean a "vocation."  Webster's New International 1684; OED; *see also* Random House 1339 (same); American Heritage 908 (same).

91.     The relevant text of the HEA thus unambiguously states that, as one of the conditions to qualify as Title-IV-eligible, for-profit schools must provide a plan of instruction that is designed to get those currently enrolled in the program ready for a paying job in an acknowledged vocational field. Nothing in that language suggests an inquiry into debt burdens or relative income levels after graduation.

92.     In the 2023 Rule, however, the Department nevertheless insisted that this same text means that it may require for-profit schools to send warnings to current and prospective students, and that it may ultimately strip programs at for-profit schools of Title-IV eligibility altogether, if (1) the median program graduate devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt or (2) the median program graduate (regardless of whether she has voluntarily exited the labor force) earns less than the median high school graduate in the state aged 25-34 who never enrolled in postsecondary education (but only if that high school graduate is in the labor force).  Because that interpretation is utterly divorced from the statutory text, the 2023 Rule is "not in accordance with law" and "in excess of statutory … limitations," requiring this Court to "hold [it] unlawful and set [it] aside."  5 U.S.C §706(2)(A), (C).

93.     None of the reasoning that the Department provided in the 2023 Rule compels a contrary conclusion.  The Department posited that it is "consistent with the ordinary meaning of the operative words in the statute … to conclude that a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable

debt"—as informed by "mortgage-underwriting standards" and a 2006 academic paper that did not purport to interpret the HEA—or "if they earn no more than comparable high school graduates." 88 Fed. Reg. at 70,012, 70,020. But that interpretation simply "rewrite[s] the law that is the sole source of its authority," *Chamber of Com. v. DOL*, 885 F.3d 360, 373 (5th Cir. 2018), which says nothing at all about program "graduates," their "debt" levels, what amount of debt qualifies as "unaffordable," or how much program graduates should "earn" in relation to "high school graduates" in the state between the ages of 25 and 34.

94.    The inference that the "gainful employment" language is unrelated to post-graduate debt and earnings is particularly strong here because other provisions in the HEA focus more directly on those very issues. For example, Congress has provided in the "cohort default rate" provisions that institutions are "ineligib[le]" under Title IV if their graduates have "high default rates" on their student debt—*i.e.*, if they do not have sufficient earnings to cover their debt. 20 U.S.C. §1085(a)(2)(A), (B)(iv), (m)(1).

95.    Congress has also provided authorization for income-based repayment plans that help ensure that the ratio of debt to earnings is not unmanageable for borrowers. *See id.* §1098e. Indeed, Congress has even provided that a borrower can qualify for debt relief when "the borrower's debt burden equals or exceeds 20 percent of such borrower's gross income." *Id.* §1087dd(e)(1). And Congress has also provided that a borrower can qualify for debt relief if she has an "economic hardship," *id.* §1098e(b)(7)(B)(5), which is a term that requires the Department to consider "the borrower's income and debt-to-income ratio," *id.* §1085.

96.    Furthermore, Congress has also required the Department to develop a "College Navigator" website that makes available information regarding each school that "participates in programs under subchapter IV." *Id.* §1015a(*i*)(1). Of particular note, Congress has mandated the disclosure of information regarding "cost of attendance," the "average annual grant amount (including Federal, State, and institutional aid) awarded," the "average annual amount of Federal student loans provided through the institution," and "[a] link to the appropriate section of the Bureau of Labor Statistics website that provides information on regional data on starting salaries in all major occupations"—in other

words, information regarding debt and post-graduate earnings. *Id.* §1015a(*i*)(1)(N), (O), (P), (W). And Congress has also provided that the Department must conduct regular surveys of federal financial-aid recipients that "describe the debt burden of such loan recipients," "their capacity to repay their education debts," and the "impact of such debt burden on the recipients' … post-graduation plans." *Id.* §1015a(k)(D).

97.     Congress thus has repeatedly "shown elsewhere in the same statute" that it "knows" how to address the subjects that the 2023 Rule addresses, *Jama v. ICE*, 543 U.S. 335, 341 (2005), and it did not make the curious choice of using "gainful employment" language to accomplish that objective. These other provisions thus confirm that, "[i]f Congress had wanted the provision" at issue here "to have th[e] effect" that the Department ascribes to it—*viz.*, that schools must guarantee that alumni meet specific benchmarks related to debt and earnings—"it could have" (and would have) "said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022).

98.     The Department nevertheless suggested that the words "'train' and 'prepare'" support its interpretation of the statute, since those are terms that "'suggest elevation to something more than just any paying job.'" 88 Fed. Reg. 70,012. But those terms actually suggest adding to a skill base, such that a student could obtain a license to provide a service, rather than having anything to do with debt burdens or relative income. Moreover, there is no need for any guesswork about the type of paying jobs for which schools must prepare their students in this context. The statute explicitly states that it is concerned with preparation for paying jobs in a particular "recognized occupation" or "profession." 20 U.S.C. §§1002(b)(1)(A)(i), 1088(b)(1)(A)(i). Nothing about those terms (or any others) suggests that they allow for complex evaluations of post-graduate debt (over an amortization period of 10, 15, or 20 years) relative to post-graduate earnings, or for an assessment of post-graduate earnings relative to the earnings of high school graduates between the ages of 25 and 34.

99.     The Department disagreed in the 2023 Rule, insisting that "success in the job market" is "an indication of whether those students were, in fact, adequately prepared" and that "examining GE programs' outputs in terms of earnings and debts is consistent with the HEA." 88 Fed. Reg. at 70,012 (alteration omitted). That premise does not hold up—as the Department's own reasoning in

the 2023 Rule underscores. Even the 2023 Rule recognized that a host of factors impact graduates' employment and earnings, including that (1) graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job;" (2) others "choos[e] not to work full-time" and instead work "part-time;" (3) "systemic discrimination" against "some groups" "may affect their earnings after graduation"; and (4) unpredictable events like "recessions" and once-in-a-century "pandemic[s]" can depress earnings too. *Id.* at 70,035, 70,031, 70,045, 70,099. It is hard to imagine that Congress envisioned the "gainful employment" language as a license for the Department to sanction schools—including by disqualifying them from Title-IV programs, a "consequence" that the Department concedes is "undeniably serious," *id.* at 70,083—simply because those schools fail to accomplish the "nearly impossible task" of "predict[ing] macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future." 84 Fed. Reg. at 31,417. "Congress does not 'hide elephants in mouseholes'"—"particularly" when the "consequences … 'are undeniably significant.'" *Chamber of Com.*, 885 F.3d at 376.

100.    Nor are these the only flaws with the Department's theory that the "ordinary meaning" of the operative statutory text supports an assessment of post-graduate earnings and debt. For example, Congress made clear that for-profit schools offering gainful-employment programs could secure Title-IV eligibility even if they have existed for only two years. *See* 20 U.S.C. §§1002(b)(1)(E), (c)(1)(C). But as the Department admits, it is impossible to conduct the supposedly statutorily required assessment of post-graduate earnings and debt in that short two-year period: "The Department must have student outcomes data to measure program performance, which can only come after a period of time." 88 Fed. Reg. at 70,018. As the Supreme Court has explained, "[b]asic principles of statutory interpretation require that we construe [statutory provisions] in harmony, not set them at cross-purposes." *Jones v. Hendrix*, 599 U.S. 465, 478 (2023). The Department's view that the "ordinary meaning" of the statutory text necessitates an evaluation of earnings and debt among program alumni several years after graduation—and its acknowledgment that it cannot conduct such an assessment vis-à-vis newer programs that Congress has expressly said can serve as the predicate for Title-IV eligibility—is at war with that elementary rule. 88 Fed. Reg. at 70,012. After all, the HEA's gainful-employment

requirement is a universal requirement that applies to *every* gainful-employment program, not just to those that have existed long enough to have alumni with multiple years of post-graduate financial records. Thus, the Department's admission that it cannot apply the 2023 Rule to programs lacking a multi-year "track record" of post-graduate debt and earnings data for their students, *id.* at 70,018, is an admission that the Department is measuring something that the operative text simply does not contemplate (and a reminder that *other* HEA provisions textually accommodate matters of debt and earnings much more naturally, *see* ¶¶94-97, *supra*).

101.    Newer programs are not even the only ones exempted either. To the contrary, the Department is incapable of applying its reading of the statute to *any* program in any U.S. Territory or any Freely Associated State. *See id.* at 70,027. Worse still, *any* program with fewer than 30 graduates in a two- or four-year cohort period is exempted too. *See id.* at 70,028. The net effect is that *74% of all gainful-employment programs* would fall through the cracks under the Department's interpretation of the statute. *See id.* at 70,0127. That eye-popping figure only reinforces the conclusion that the Department's action is inconsistent with the statute: Congress enacted statutory language that is supposed to apply to 100% of gainful-employment programs; the Department's concession that it is capable of applying its interpretation of the statutory language only to a paltry 26% of such programs is powerful evidence that it has veered far off course. *Cf. Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008) (referencing the "well-established maxim that statutes should be construed to avoid an absurd result").

102.    Lacking plausible arguments rooted in the operative statutory text, the Department shifted to arguing that the HEA's broader "structure" supports the 2023 Rule. Those arguments are equally unavailing. According to the Department, "section 484 of the HEA"—which is codified at 20 U.S.C. §1091(d)—"generally requires that students already have a high school diploma or recognized equivalent" to obtain Title-IV student aid, so "clearly GE programs are supposed to enhance earnings power beyond that of what [*sic*] high school graduates." 88 Fed. Reg. at 70,014. Even setting aside that the Department's debt-to-earnings test (which does not involve a comparison to the earnings of high school graduates) would seem to violate this purportedly "clear" statutory mandate, the

Department is conflating two separate issues.

103.   As the Department acknowledged elsewhere in the 2023 Rule, "Section 498 of the HEA"—which is codified at 20 U.S.C. §1099c—is the provision that "requires *institutions* to establish eligibility" for Title-IV purposes. *Id.* at 70,007 (emphasis added). And the HEA section entitled "Definition of institution of higher education for purposes of student assistance programs" explains in unmistakable language that a for-profit school *can* secure Title-IV eligibility *regardless* of whether the students in its programs are high school graduates: While those schools certainly can "admit[] as regular students … persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate," 20 U.S.C. §§1001(a)(1), 1002(b)(1)(B), they are *also* free to "admit[] as regular students individuals who are beyond the age of compulsory school attendance in the State in which the institution is located" or "who will be dually or concurrently enrolled in the institution and a secondary school," *id.* §1002(b)(2)—*i.e.*, students who never actually received a high school diploma or a recognized equivalent. Thus, the Department's theory that "high-school-level achievement" is the "clear[]" "starting point" for schools and programs seeking to achieve Title-IV eligibility, 88 Fed. Reg. at 70,013-14, "render[s] irrelevant" language in the statute, *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 737 (2022); *see Greenlaw v. United States*, 554 U.S. 237, 251 (2008) ("We resist attributing to Congress an intention to render a statute so internally inconsistent.").

104.   The Department's contrary view is (as noted above) premised on an entirely *different* statutory provision—20 U.S.C. §1091(d)—that is within a statutory section entitled "Student eligibility." As that section title gives away, the Department's cited statute addresses the circumstances under which *students* qualify as eligible to receive Title-IV aid, which is simply not what the 2023 Rule regulates. And in all events, even the student-eligibility provision expressly contemplates that "students who are not high school graduates" *can* qualify for Title-IV funds—which only makes sense given that schools can qualify as Title-IV-eligible (and thus can process federal student aid for students enrolled in their programs) even though they admit non-high-school-graduates. *See id.*

105.   The broader context of the HEA undermines the Department's interpretation in still other ways. As the Department highlighted in the 2019 Rule, Congress in 2008 amended the HEA to

36

make clear that a for-profit school could obtain Title-IV eligibility even if it "provides a program leading to a baccalaureate degree in liberal arts, and has provided such a program since January 1, 2009." 20 U.S.C. §1002(b)(1)(A)(ii).  That amendment thus "reaffirm[s]" that the "prepare students for gainful employment in a recognized occupation" language has a simple and straightforward purpose:  to "differentiate[] between programs that prepare students for named occupations"—*i.e.*, a paying job in a specific field—"and those that educate students more generally in the liberal arts and humanities." 84 Fed. Reg. at 31,401-02.

106.    And if any doubt about the meaning of "gainful employment" still existed, other provisions eliminate it.  Indeed, Congress used the term "gainful employment" in numerous *other* provisions in Title 20, and not a single one suggests that Congress had complicated debt and earnings metrics in mind. *Cf. Azar v. Allina Health Servs.*, 139 S.Ct. 1804, 1812 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").  Rather, those provisions are coherent only if "gainful employment" means a paying job—and not even an especially *high*-paying job.  Congress has consistently and repeatedly used "gainful employment" language in a way that suggests that even low-paying, part-time student employment would generally meet the definition of gainful employment.[8]  *See* 20 U.S.C. §1036(e)(1)(B)(ii) (allowing schools to give grant money to certain students so long as they are not "engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"); *id.* §1134c(a) (similar); *id.* §1135c(d)(2) (similar); *id.* §1161g(d)(5)(B) (similar); *id.* §2008(a) (similar); *id.* §5605(a)(2)(B) (similar).  And Congress also used "gainful employment" language when addressing student aid for those with "intellectual disabilities," who generally earn less than those without such disabilities.  *See id.* §1140(1)(B) (defining "comprehensive transition and postsecondary program for students with intellectual disabilities" as one "designed to support students with intellectual disabilities

---

[8] This understanding is reflected in the original 1965 version of the HEA too.  *See, e.g.*, HEA §527, 79 Stat. at 1260 (authorizing fellowships on the condition that the recipient "is not engaging in gainful employment other than such part-time employment in teaching, research, or similar activities related to his training as has been approved by the Commissioner").

who are seeking to continue academic, career and technical, and independent living instruction at an institution of higher education in order to prepare for gainful employment"); *id.* §1140g(d)(3)(D) (similar); *see also* Jean Winsor et al., *StateData: The National Report on Employment Services and Outcomes Through 2019* 2 (2022), https://rb.gy/9u5429 ("[P]eople with intellectual disabilities (ID) experience greater levels of unemployment, underemployment, low wages, and poverty compared to those without disabilities.").

107. With nothing to show from the HEA's text and structure, the Department ultimately resorted to the "legislative history"—specifically, the Senate and House reports that accompanied the NVSLIA, which later merged with the HEA. 88 Fed. Reg. at 70,012. Of course, "legislative history can never defeat unambiguous statutory text." *United States v. Palomares*, 52 F.4th 640, 646 (5th Cir. 2022). Regardless, the cited legislative reports affirmatively undermine the Department's position. Among other things, those legislative reports discuss the importance of making federal student aid available to the "large numbers of actual and potential students who have left elementary or secondary school, but who later realize the importance of advancing or establishing skills through attendance at a vocational school," S. Rep. No. 89-758, at 3; *see* H.R. Rep. No. 89-308, at 2—not exactly a pillar of support for the proposition that eligible institutions must guarantee that program graduates outearn those who actually completed high school.

108. Furthermore, those legislative reports describe how "the definition of 'eligible institution'" under the NVSLIA, which later made its way into the HEA, "was intended" to "be as liberal as possible" and that Congress effectuated that intent through language explaining that eligible institutions must provide "a program of postsecondary vocational or technical education designed to fit individuals for *useful* employment in recognized occupations." S. Rep. No. 89-758, at 12 (emphasis added); *see* H.R. Rep. No. 89-308, at 9. No ordinary user of the English language would say that preparing students for "useful employment" entails an assessment of debt-to-earnings ratios or comparisons to the earnings of an age-restricted pool of high school graduates. And as the Department has already conceded, the NVSLIA's "useful employment" language and the HEA's "gainful employment" language are "not substantive[ly]" different. Defs.' Mem. of Law in Support of Cross-Mot. for

Summ. J. 17, *APSCU II*.  In reality, nothing in the legislative reports provides any hint that Congress viewed the "useful employment" language as anything other than a modest provision intended to ensure that schools provided students with vocational training.  And although those legislative reports discuss the need to weed out bad-actor "'fly by night' institutions" that took advantage of public spending, they reveal an understanding that Congress had accomplished that objective through the addition of an "eligibility feature which requires an institution to have been in existence for 2 years"— not through the "gainful employment" language.  S. Rep. No. 89-758, at 12; *see* H.R. Rep. No. 89-308, at 9.

109.    Not only does the legislative history undermine the Department's position, but so too do other features of the historical record.  Most obviously, for nearly half-a-century after the HEA's enactment, the Department never suggested that the statute's gainful/useful employment language meant that it could "tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans."  88 Fed. Reg. at 70,005.  Instead, the Department understood that the statutory language simply called for an assessment into whether the "preparation" is "for a specific area of employment."  *Id.* at 70,018 (discussing *In re Acad. For Jewish Educ.*, 1994 WL 1026087).  While the Department evidently believes that this half-century "initial[]" period of regulatory restraint poses no obstacle to the 2023 Rule and its focus on "outcome-based measures," *id.* at 70,014, 70,018, the Supreme Court has expressed a decidedly different view.  As the Supreme Court has repeatedly and recently admonished, the fact that an agency "never before adopted" a particular interpretation of a statute in the previous "half century" is a "telling indication" that a regulation suddenly embracing that interpretation is "beyond the agency's legitimate reach."  *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *see also Biden v. Nebraska*, 143 S.Ct. 2355, 2372 (2023) ("The Secretary [of Education] has never previously claimed powers of this magnitude[.]"); *West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("[T]he want of assertion of power by those who presumably would be alert to exercise it[] is equally significant in determining whether such power was actually conferred.").

110.    There are other telling indications here too.  Long before the enactment of the HEA,

Congress repeatedly deployed gainful/useful employment language, including in the statute considered the "Magna Carta of vocational education," Carleton 63, and it always did so in a way that meant a paying job, not a job that required a comparison of pay in relation to other factors like debt loads. In fact, early statutes like the Smith-Hughes Act and National Defense Education Act involved subsidies or stipends that did not even result in debt for their beneficiaries. *See, e.g.*, 39 Stat. at 930-31, 934; 72 Stat. at 1590-91; ¶¶25, 27, *supra*. That is significant, as courts "normally presume that the same language in related statutes carries a consistent meaning." *United States v. Davis*, 139 S.Ct. 2319, 2329 (2019).

111.   Furthermore, outside the gainful-employment context, the Department has historically understood "gainful employment" in a way that aligns with its actual ordinary meaning. To take one example, the HEA defines "eligible program" for certain purposes as a program that "has a verified placement rate of at least 70 percent, as determined in accordance with the regulations of the Secretary." 20 U.S.C. §1088(b)(2)(A)(ii). To implement that statutory directive, the Department in 1994 promulgated regulations (which remain in effect today) requiring schools to "determine the number of students who, within 180 days of the day they received their degree, certificate, or other recognized educational credential, obtained gainful employment in the recognized occupation for which they were trained or in a related comparable recognized occupation." 34 C.F.R. §668.8(g)(1)(ii). And to prove that graduates are gainfully employed, the Department merely requires schools to submit documents like "[s]igned copies of State or Federal income tax forms" or "[w]ritten evidence of payments of Social Security taxes"—*i.e.*, evidence that graduates have paying jobs. *Id.* §668.8(g)(2). That 30-year (and counting) history thus only reinforces the conclusion that the Department's newfound interpretation is beyond the pale.

112.   While the Department may prefer to ignore these insuperable problems because "past judicial decisions" addressing the 2011 and 2014 Rules gave it room to experiment with the statutory language, that argument is distinctly unavailing. 88 Fed. Reg. at 70,013 & n.63. Those out-of-circuit decisions engaged in just the sort of "reflexive deference" under *Chevron* that is no longer in vogue. *Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780 (5th Cir. 2018) (Ho, J., concurring). Indeed,

"the Supreme Court has not deferred to an agency interpretation of federal law since 2016." Cong. Res. Serv., Chevron *Deference: A Primer* 17 (updated May 18, 2023). And the Supreme Court recently heard oral argument in cases asking it to overrule *Chevron* or at least substantially cabin its scope. *See Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. argued Jan. 17, 2024); *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (U.S. argued Jan. 17, 2024) (same).[9]

113.     In its last-ditch defense of the 2023 Rule, the Department posited that its new interpretation of the statutory text is consistent with the broader "purposes" of the HEA, such as "taxpayer protection." 88 Fed. Reg. at 70,015. But as the Department recognized in the 2019 Rule, "Congress intends for all Federal student loan borrowers to repay their loans, not just those who borrow to attend 'vocational training' programs," so "gainful employment" language that applies only to a fraction of schools is a poor fit to accomplish taxpayer-protection goals. 84 Fed. Reg. at 31,398, 31,401. In reality, the "purpose of title IV, HEA programs"—and the "gainful employment" language in particular—is "to expand opportunity to low-income students." *Id.* at 31,398. Needless to say, a rule projected to prohibit approximately 700,000 students from obtaining federal financial aid to attend some 1,800 programs that they would otherwise choose to attend achieves the exact opposite purpose. *See* 88 Fed. Reg. at 70,140.

114.     All tools of statutory interpretation thus point in the same direction: The 2023 Rule is *ultra vires*.[10]

### COUNT TWO
### Administrative Procedure Act
### Arbitrary And Capricious Agency Action

115.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though

---

[9] Because the statutory language is unambiguous—and unambiguously against the Department—there is no need to contemplate whether *Chevron* deference might apply. But if any ambiguity existed, and if *Chevron* remains good law, the Department's confused and confusing reading of the gainful-employment language is "unreasonable" and thus entitled to zero deference for all the reasons provided above. *See Calumet Shreveport Ref., L.L.C. v. EPA*, 86 F.4th 1121, 1139 n.43 (5th Cir. 2023).

[10] The Department also briefly suggested that other statutory provisions support the 2023 Rule, such as provisions allowing the Department to promulgate "necessary or appropriate" rules. 88 Fed. Reg. at 70,007. But it is neither necessary nor appropriate to promulgate a "gainful employment" rule that countermands Congress' understanding of "gainful employment."

fully set out herein.

116.    The APA provides that courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).

117.    The arbitrary-and-capricious standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  That standard is "searching and careful," *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021), and has "serious bite," *Wages*, 16 F.4th at 1136.

118.    To satisfy that standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). An agency thus acts unlawfully if it "entirely fail[s] to consider an important aspect of the problem," or offers "an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*  Thus, "[i]llogic and … inconsistency" or "shortcomings in the agency's explanations" doom the agency action.  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014, 1018 (5th Cir. 2019).

119.    The 2023 Rule fails the arbitrary-and-capricious standard several times over:  (1) it relies on concededly inaccurate earnings data, (2) it penalizes schools for factors beyond their control, (3) its debt-to-earnings test utilizes inapposite numerical thresholds, and (4) it does not adequately substantiate benefits that bear a logical relationship to the enormous costs that it imposes.

120.    ***The 2023 Rule Illogically Relies on Concededly Inaccurate Earnings Data:*** The first problem with the 2023 Rule is the Department's illogical decision to use concededly inaccurate earnings data.

121.    Under the 2023 Rule, the Department will strip programs at for-profit schools of Title-IV eligibility if, in two out of three consecutive years, (1) the median program graduate devotes more than 8% of annual earnings or more than 20% of discretionary earnings to pay down student-loan debt, or (2) the median program graduate earns less than the median high school graduate in the state aged 25-34 who never enrolled in postsecondary education.  88 Fed. Reg. at 70,008.  Furthermore,

the 2023 Rule requires programs to provide warnings to current and prospective students if they fail either metric once.  *See id.*

122.    The Department therefore finds itself in a position similar to the one that it occupied vis-à-vis the 2011 and 2014 Rules:  subjecting programs to draconian sanctions based on tests that use post-graduate earnings data as a necessary and critical input.

123.    Under those prior regimes, the Department relied on datasets that included only those earnings reported by taxpayers to the federal government.  But the Department understood that many professionals who work in cash- and tip-heavy fields—especially "cosmetology"—do not actually report all their earnings to the federal government.  76 Fed. Reg. at 34,424-25.  Indeed, in recent years, the Department has "openly acknowledged that underreporting is an issue, even identifying cosmetology schools by name," and that studies (including one from a Stanford economist) estimated that "both tip income and self-employment income are, on average, underreported by around 60%."  *AACS*, 258 F.Supp.3d at 59-60, 63.

124.    In an implicit acknowledgement of the serious underreporting problem, both the 2011 and 2014 Rules gave schools whose programs failed the Department's earnings-based tests an opportunity to provide alternative and more accurate earnings data.  *See* 76 Fed. Reg. at 34,428-29; 79 Fed. Reg. at 65,010.  But after cosmetology schools challenged the sufficiency of that alternative-earnings-appeal process, a court concluded that the Department acted arbitrarily and capriciously because it "narrowly circumscribed" that process—*i.e.*, the Department "inexplicably requir[ed] high response rates to submit state-sponsored or survey-based alternate earnings calculations."  *AACS*, 258 F.Supp.3d at 56.  And because the "wooden use" of federal earnings data is "problematic" given the inaccuracy of that data—inaccuracy that the Department "did not dispute"—the court required the Department to "remove[] barriers to appeal."  *Id.* at 56, 73.

125.    In the end, the Department did not have to live with this modified regime for long, because its 2019 Rule scrapped the gainful-employment regulations *in toto*.  But in the course of doing so, the Department "admitted that individuals who work in … cosmetology" "under report their income," and it "agree[d]" that its "exclusion of tip-based income" from its earnings-based tests had

rendered those tests "subject to significant errors," "especially" in the context of "heavily tip-influenced professions, such as cosmetology." 84 Fed. Reg. at 31,409, 31,431.

126.     Given this history, one would have thought that, at a bare minimum, the Department would have avoided the wooden use of federal earnings data in any quixotic effort to resuscitate a gainful-employment rule.  But the 2023 Rule tossed rational thinking aside.  The Department has proclaimed that it will obtain the earnings data necessary to conduct its debt-to-earnings and earnings-premium tests from "a Federal agency with earnings data," and its "current preference" is to use earnings data supplied by the IRS—data that already has privacy-protective "statistical noise" baked into it, which means that it contains errors to the point that any program "could be erroneously declared ineligible" under Title IV.  88 Fed. Reg. at 70,045, 70,096-97.  And although it is beyond debate that federal earnings data contains *additional* inaccuracies since it does not account for income underreporting in the cosmetology sector, the Department has nonetheless declared that it will *not* provide *any* "opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting." *Id.* at 70,042.

127.     The end result is that the Department is embarking on its most "wooden" and "problematic" use of federal earnings data yet. *AACS*, 258 F.Supp.3d at 73.  The Department, the courts, and numerous other parties have spent the last decade "detailing how bad" federal earnings data is when it comes to cosmetologists, but now the Department is adamantly insisting that it will rely on that data with its "conceded defects"—all while eliminating every mechanism that it previously thought necessary to avoid intolerably inaccurate results. *Sw. Elec. Power Co.*, 920 F.3d at 1016.  That is precisely the sort of "illogic" that requires a court to set aside agency action under arbitrary-and-capricious review. *Chamber of Com.*, 885 F.3d at 382.

128.     The Department's strained efforts in the 2023 Rule to justify its puzzling choice are uniformly meritless.

129.     The Department began by arguing that cosmetologist professionals who fail to report their earnings to the federal government are subject to "considerable legal penalties." 88 Fed. Reg. at 70,041.  That argument will sound familiar to those who have followed the Department's prior efforts

to impose a gainful-employment regulation, as it is the very same argument that the district court *rejected* in litigation over the 2014 Rule. As that court explained, the fact that "underreporters are subject to civil and criminal penalties" is a "non sequitur" and plainly insufficient for the Department to overcome the arbitrary-and-capricious standard, as such penalties have obviously failed to cure the underreporting problem in the past. *AACS*, 258 F.Supp.3d at 63-64.

130.   The Department tried to evade that conclusion here by arguing that "circumstances have changed" due to "the increasing prevalence of electronic payment methods" and the fact that "third-party settlement organizations" (*e.g.*, Venmo) will have to abide by a 2021 statute requiring them to issue "1099-K" tax forms to those who receive over $600 in payments via the platform. 88 Fed. Reg. at 70,041. That argument is a dead-end. At the outset, the Department never offered any evidence that cosmetologists are increasingly using these digital methods to accept payment. *But see Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("We do not defer to the agency's conclusory or unsupported suppositions."). More fundamentally, the Department apparently did not get the memo that the IRS has consistently *delayed* the implementation of that requirement, such that it has never taken effect to date and will not take effect until 2025 at the earliest. *See* IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation* (Nov. 21, 2023), https://rb.gy/6jkx6k; IRS, *IRS Announces Delay for Implementation of $600 Reporting Threshold for Third-Party Payment Platforms' Forms 1099-K* (Dec. 23, 2022), https://rb.gy/qrvtt1. Given that the Department will examine earnings data from as early as 2021 and that a program can lose Title-IV eligibility with just two consecutive years of failing scores, *see* 88 Fed. Reg. at 70,099, 70,123, the Department's argument is a complete non-starter.

131.   The Department next attempted to justify its wooden use of federal earnings data on the theory that it uses such data for "determining Pell grant and other aid eligibility, as well as monthly loan payments on income-driven repayment plans." *Id.* at 70,041. But using inaccurate data for multiple purposes does not make the data any less inaccurate.

132.   The Department further argued that its "experience with the earnings appeal process … cautions against making accommodations for the possibility of income underreporting" since

cosmetology schools supposedly reported "implausibly high earnings" in those appeals, as purportedly confirmed by a more "recent study" that disputed the 60% underreporting rate in the Stanford study. *Id.* at 70,041-42 & n.139. But that more recent study did not deny that underreporting occurs in the cosmetology sector. Quite the opposite: Even that study—which purported to assess only the extent of underreporting of tip income among cosmetologists, not the underreporting of all cash earnings—*agreed* that such underreporting is prevalent, emphasized that "it is imperative" that "earnings measures" "accurately reflect student outcomes," and ultimately argued that "a reasonable earnings adjustment would be to allow earnings to be inflated by 8%, or at most, 10%" to accounts for tips. Stephanie Riegg Cellini & Kathryn J. Blanchard, *Hair and Taxes: Cosmetology Programs, Accountability Programs, and the Problem of Underreported Income* 1, 6 (Jan. 2022), https://rb.gy/0pdqg7. Thus, the "choice made" by the Department here—using federal earnings data *without* making *any* adjustments—has no "rational connection" to the "facts found," and its "explanation … runs counter to the evidence before [it]." *State Farm*, 463 U.S. at 43.

133. Taking another tack, the Department observed that the 2023 Rule assesses "graduates' earnings … longer after when they graduate" as compared to the 2014 Rule, which will purportedly provide a "safeguard[] against potential underestimates of earnings." 88 Fed. Reg. at 70,042. But the Department offered no evidence to support its supposition that cosmetologist professionals suddenly underreport a lower amount of their income once they are three years removed from graduation. *Cf. Wages*, 16 F.4th at 1137 (explaining that "conclusory" and "unsupported" reasoning is "wholly insufficient").

134. Finally, the Department suggested that it wanted to "avoid the perverse incentives that would be created by making the rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes." 88 Fed. Reg. at 70,042. As the Department emphasized in the 2019 Rule, however, it is "not the fault of institutions" that graduates underreport income, as schools "do not complete tax returns" for graduates and "cannot guarantee accurate reporting." 84 Fed. Reg. at 31,409. The Department did not explain why a different conclusion is warranted now. If anything, the fact that "graduates' earnings will be measured *longer* after

when they graduate" under the 2023, 88 Fed. Reg. at 70,042 (emphasis added), would suggest that schools have even *less* influence over their graduates' conduct.

135.    In short, the Department's decision to rely exclusively on federal earnings data "runs counter to" the critical limitations associated with that data, *State Farm*, 463 U.S. at 43, and the repeated "shortcomings in the agency's explanations" only confirms that its "paradoxical" action cannot stand, *Sw. Elec. Power Co.*, 920 F.3d at 1016, 1018.

136.    ***The 2023 Rule Illogically Penalizes Schools for Factors Beyond Their Control:*** Even if the Department had made adjustments to account for underreporting in the cosmetology sector, its decision to use earnings-based tests would still flunk arbitrary-and-capricious review. After all, the 2023 Rule brands a school's program a "failure" just because—several years after graduation— its alumni have debt-to-earnings ratios that exceed 8% of annual earnings or 20% of discretionary earnings, or if annual earnings do not exceed those of high school graduates in the state between the ages of 25 and 34. 88 Fed. Reg. at 70,012. The 2023 Rule thus hinges on the idea that schools are solely responsible for determining their former students' post-graduate "financial outcomes." *Id.* at 70,011. That makes no sense.

137.    The Department itself reached just that conclusion in the 2019 Rule. As the Department explained then, schools do "*not* have the ability to control for the many variables that impact earnings." 84 Fed. Reg. at 31,409 (emphasis added). "[S]ome students take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices," all of which can negatively affect individual earnings. *Id.* at 31,413. Moreover, "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups," such as "women and minorities." *Id.* at 31,414. And "macroeconomic" events like "the Great Recession"—which are "outlier events" and by definition unpredictable—"can have a considerable impact on D/E rates outcomes" and impose "downward pressure on wages." *Id.* at 31,410-11. The Department thus concluded in the 2019 Rule that "[p]enalizing" and "sanction[ing] institutions for aspects of student debt and earning outcomes that are outside of the institution's control" is "absurd." *Id.* at 31,409-10.

138.    The 2023 Rule reverses course and punishes schools for all these same uncontrollable factors, as both the debt-to-earnings and earnings-premium tests entail an assessment of post-graduate earnings and demand ignorance of all surrounding context.  Thus, the 2023 Rule assigns all liability to schools for their graduates' earnings even if those graduates "choose" not to work at all or "choos[e] not to work full-time," 88 Fed. Reg. at 70,035, 70,045, or if there are once-in-a-century events like the COVID-19 pandemic that significantly depress earnings, *see, e.g.*, *id.* at 70,065, 70,092 ("The Department recognizes that data from some years included in the initial reporting period were impacted by the COVID-19 pandemic and national emergency," and "[w]e acknowledge that the COVID-19 pandemic likely affected the earnings of workers in salons, spas, the beauty industry, and many other industries besides.").  That approach is "seemingly illogical"—because it is illogical.  *Sw. Elec. Power Co.*, 920 F.3d at 1013-14.

139.    The Department's unsuccessful effort to explain its about-face in the 2023 Rule proves the point.  In response to commenters from the cosmetology sector, the Department explicitly "acknowledge[d] that many workers may choose to pursue occupations with work schedules that suit their lives" and "recognize[d]" that graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job."  88 Fed. Reg. at 70,035, 70,044-45.  But the Department concluded that it would interpret the reduced or even nonexistent earnings of these graduates as proof of the school's failure to prepare its students for gainful employment in the cosmetology sector anyway.  *See id.*  The Department did so because it "believe[d] that, especially with respect to the career training programs covered by the accountability provisions of the regulations, students typically have a strong interest in being employed in the three-year window directly after graduation."  *Id.* at 70,045.  And it found this approach especially appropriate in the context of the earnings-premium test because "some" high school graduates also work part-time.  *Id.* at 70,044.

140.    That reasoning is flawed across the board.  For starters, it bears emphasizing that, as a general matter, women are far more likely than men to choose not to work or to work-part time for family-related reasons.  *See, e.g.*, Beth Almeida et al., Ctr. for Am. Progress, *Fact Sheet: The State of Women in the Labor Market 2023* (Feb. 6, 2023), https://rb.gy/5ah4rp ("A massive gender gap exists in

the share of women and men who are either not working or working part time because of child care or family reasons. Regardless of age or parental status, women were a staggering five to eight times more likely to experience a caregiving impact on their employment in 2022."). And the Department literally just conceded that this dynamic holds true in the predominantly female cosmetology sector too, observing that "many" cosmetologists "often" make eminently rational decisions to work fewer hours or not to work at all *for reasons that have nothing to do with the preparation for gainful employment that they received several years prior.* Indeed, one of the attractive hallmarks of cosmetology as an occupation is the ability to work part-time and accommodate competing needs of family. *See, e.g.*, Ex.A-1 at 3 (Ogle explaining in regulatory comments that its graduates "often choose to work part-time"); Ex.B-1 at 3 (Tricoci explaining in regulatory comments that "high percentages of beauty and wellness professionals have flexible and part-time work schedules"). Those hallmarks are fully present in the first three years of graduation—graduates of cosmetology schools are often young women who are most likely to have young children—and the Department offered no contrary data. Thus, to concede these basic facts about the occupation and then turn around and conclude that these graduates' reduced or non-existent earnings are nonetheless a reflection of institutional failure reflects precisely the sort of "internal inconsistency" that is "characteristic of arbitrary and unreasonable agency action." *Sw. Elec. Power Co.*, 920 F.3d at 1014.

141. The Department itself also cited studies emphasizing that "[t]here aren't many industries where an employee has as much choice about the number of hours they work" as cosmetology, with 99% of employers offering "some or total schedule flexibility"—*i.e.*, "the ability to choose the hours an employee works within business hours"—and only 3.5% of service providers working more than 40 hours per week. Qnity Institute, *A Career in Pro Beauty* 11 (2023) (cited at 88 Fed. Reg. at 70,042 n.139). Given these basic facts about the occupation, which is precisely what makes it an attractive occupation for many women with competing family obligations, comparing cosmetologists to a male-heavy group in which only "some" unknown quantum of people are working part-time (and numerous others are working ordinary 9-5 jobs with fundamentally different salary arcs) is a classic apples-to-oranges comparison that produces arbitrary results and reflects arbitrary reasoning.

142.     And even if one credits the Department's unsupported theory that "typical" graduates of gainful-employment programs desire at least some amount of employment three years after graduation, the logical way to assess how those graduates are faring is to assess only *those graduates*, not graduates who "choose to leave the labor force" and are not even seeking a job in the first place. 88 Fed. Reg. at 70,045. It is not as though the Department is incapable of conducting that kind of more tailored assessment. To the contrary, the earnings-premium test itself involves an evaluation of *only* those high school graduates in the state aged 25-34 who are "in the labor force," which means that they "have a job or report being available and looking for a job." *Id.* at 70,061. The Department offered no explanation why that same type of approach—which at least eliminates the most skewed data from the dataset—is inappropriate vis-à-vis graduates of gainful-employment programs. *Cincinnati Bell Tel. Co. v. FCC*, 69 F.3d 752, 761 (6th Cir. 1995) ("The [agency] is required to give an explanation when it declines to adopt less restrictive measures in promulgating its rules"); *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.").

143.     The Department also "agree[d]" that "systemic discrimination may affect the need for some groups of students to borrow and may affect their earnings after graduation." 88 Fed. Reg. at 70,031; *see also, e.g.*, U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2021* (Mar. 2023), https://rb.gy/ju086j (providing statistics confirming that women and minorities earn less). The Department nevertheless went full steam ahead with tests that incorporate such discriminatory effects because "demographics *alone*" do not explain income. 88 Fed. Reg. at 70,031, 70,145, 70,140 (emphasis added). But the Department tellingly did not deny that the 2023 Rule is holding income-suppressing factors like race and gender against schools—nor could it do so with a straight face. Tricoci offers a particularly vivid example of this dynamic: Although its graduates are almost exclusively female (96%) and a substantial majority identify as racial minorities (63% are Black/African American or Hispanic), *see* Ex.B ¶13, the 2023 Rule pits their earnings against a heavily-male group of high school graduates in states that (like Indiana and Wisconsin) that are well over 80% white—and then brands Tricoci a failure if its graduates fail to outearn the latter. *See* U.S. Census Bureau, *Quick Facts: Indiana*,

https://rb.gy/87nxxr (last visited Mar. 20, 2024); U.S. Census Bureau, *Quick Facts: Wisconsin*, https://rb.gy/lwcgmt (last visited Mar. 20, 2024). That makes no sense. "It is illogical for the rule … to accept" the reality that schools are not responsible for historical discrimination that reduces earnings while "simultaneously" sanctioning schools for those reduced earnings. *Chamber of Com. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023).

144.    The Department lastly sought to downplay the effect of macroeconomic conditions on the theory that the earnings-premium test "is well suited to adjust to State or national disruptions to the labor market," ostensibly because "[t]he earnings of high school graduates" will purportedly fluctuate in sync with the earnings of graduates of gainful-employment programs. 88 Fed. Reg. at 70,058. That assertion is perplexing: Not every business that employs high school graduates had to shut down at the beginning of the COVID-19 pandemic whereas virtually every cosmetology salon did. *See, e.g.*, Off. of the Tex. Governor, *Governor Abbott Issues Executive Order, Implements Statewide Essential Services and Activities Protocols* (Mar. 31, 2020), https://rb.gy/7hswe2 (explaining the Texas governor's "directive" to "avoid" "visiting" "cosmetology salons"); Press Release, Illinois, *Gov. Pritzker Announces Statewide Stay At Home Order to Maximize COVID-19 Containment, Ensure Health Care System Remains Fully Operational* (Mar. 20, 2020), https://rb.gy/j259zd (similar in Illinois). Moreover, as the Department's focus on the earnings-premium test implicitly confirms, the debt-to-earnings test is undeniably *ill*-suited to adjust to disruptions in the labor market. As the Department recognized in the 2019 Rule when addressing a comparable debt-to-earnings test, it "do[es] not calculate D/E rates until years after a student is admitted," so "an institution must be able to predict macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future in order to establish a price that will guarantee passing D/E rates"—and that is "a nearly impossible task." 84 Fed. Reg. at 31,417. The Department has no answer to that considerable problem, further underscoring that the Department has fallen well short of its obligation to "articulate[] a satisfactory explanation for its action." *Sw. Elec. Power Co.*, 920 F.3d at 1013.

145.    ***The 2023 Rule Uses Illogical Debt-to-Earnings Thresholds:*** Although the Department's reliance on fatally flawed earnings data dooms both the 2023 Rule's debt-to-earnings test

and its earnings-premium tests (since both rely on the same earnings data), the debt-to-earnings test suffers from additional flaws. That test purports to measure "unmanageable debt" for graduates of gainful-employment programs using two metrics: one that assesses debt-to-*annual*-earnings and another that assesses debt-to-*discretionary*-earnings. 88 Fed. Reg. at 70,011. A program fails the annual-earnings metric if its median graduate devotes more than 8% of annual earnings to paying down debt, and a school fails the discretionary-earnings metric if its median graduate devotes more than 20% of discretionary earnings to paying down debt, with discretionary earnings defined as those earnings above 150% of the federal poverty guideline. *See id.* at 70,020, 70,124. The Department failed to "adequately justify" both thresholds. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

146.    In seeking to rationalize the 8% threshold in the 2023 Rule, the Department stated only that it is "grounded in mortgage-underwriting standards" and then incorporated its explanation for that threshold from the proposed rule. 88 Fed. Reg. at 70,020. The proposed rule in turn said:

> The acceptable threshold of 8 percent for the annual D/E rate used in the proposed regulations has been a reasonably common mortgage-underwriting standard, as many lenders typically recommend that all non-mortgage loan installments not exceed 8 percent of the borrower's pretaxed income. Studies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit. Eight percent represents the difference between the typical ratios used by lenders for the limit of total debt service payments to pretaxed income, 36 percent, and housing payments to pretax income, 28 percent.

88 Fed. Reg. at 32,326.

147.    The Department did not deign to support this statement with any citations. But the Department's explanation is a copy-and-paste of the one that it provided in the 2014 Rule. *See* 79 Fed. Reg. at 16,443. And that 2014 Rule provided just a single citation to support the use of an 8% threshold: the 2006 paper from Baum and Schwartz entitled "How Much Debt Is Too Much? Defining Benchmarks for Manageable Student Debt." *See id.* at nn.50-51 (citing Baum & Schwartz 2-3).

148.    But the Baum and Schwartz paper comes nowhere close to justifying an 8% threshold. That is because Baum and Schwartz reviewed the existing studies and then stated that "[t]he

shortcomings of the 8 percent rule as a justifiable benchmark for manageable student loan payments are apparent" and that it has "no particular merit or justification," since it does not reflect "the experience of young people who have recently left school," Baum & Schwartz 3—young people who likely do not even have a mortgage, *see, e.g.*, Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* 7 (2023), https://rb.gy/r2e256 ("The typical first-time buyer was 35 years old this year[.]").

149.     All that explains why the Department emphasized in the 2019 Rule that the Baum and Schwartz paper "*does not support the eight percent threshold*, but instead *clearly refutes it* for the purpose of establishing manageable student loan debt." 84 Fed. Reg. at 31,426 (emphases added). That is also why the Department said in the 2019 Rule that it "has no empirical basis for the 8 percent threshold and will … no longer use it to determine title IV program eligibility." *Id.* at 31,407. And if the concern is "manageable debt," default rates are a far better measure, albeit one that the statute addresses separately and that Plaintiffs pass by a considerable margin. *See* ¶¶78, 94-97, *supra*.

150.     The 2023 Rule does not explain why the rejected 8% threshold is suddenly now "acceptable" again. 88 Fed. Reg. at 32,326. To state the obvious, that is a "shortcoming[] in the agency's explanation." *Sw. Elec. Power Co.*, 920 F.3d at 1018; *see also Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998) ("When an agency adopts a regulation based on a study that is not designed for the purpose and is limited or criticized by its authors on points essential to the use sought to be made of it the administrative action is arbitrary and capricious and a clear error in judgment." (alteration omitted)).

151.     And although that shortcoming alone suffices to do away with the debt-to-earnings test since that test could not "function sensibly" without the 8% threshold, *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019),[11] the 20% threshold is equally problematic.

152.     While Baum and Schwartz at least embraced the 20% threshold in their 2006 paper,

---

[11] The Department included a severability provision in the 2023 Rule in an effort to ensure that either the debt-to-earnings test or the earnings-premium test could survive if a court invalidated only one of them. *See* 88 Fed. Reg. at 70,007 n.25; 88 Fed Reg. at 32,341-42. While that provision is not dispositive of any severability analysis, not even the Department suggested that the debt-to-earnings test could survive if a court invalidated either the 8% threshold or the 20% threshold.

even they conceded that it is "somewhat arbitrary," Baum & Schwartz 12—hardly a promising starting point for an agency purporting to engage in "nonarbitrary" conduct, 88 Fed. Reg. at 70,012.

153.    And the problems do not end there.  For example, Baum and Schwartz made clear that their somewhat-arbitrary 20% threshold "should be used thoughtfully with modification for family size" (among other variables).  Baum & Schwartz 12.  But the 2023 Rule does nothing of the sort. Rather, the Department has adopted an approach that assesses debt *only* in relation to the earnings of the "*graduates*" themselves.  88 Fed. Reg. at 70,005 (emphasis added).  As the Department explained in a similar situation in the 2019 Rule, this mystifying approach means that programs can fail the 20% threshold even if their graduates' "household earnings" are more than "adequate to support a family without needing the graduate to work outside of the home"—*e.g.*, $1 million/year.  84 Fed. Reg. at 31,410.  The Department found it "absurd" to embrace a test that countenances such results only five years ago.  *Id.*  The Department fails to offer a reasoned explanation why it should indulge such absurdities now.

154.    The 20% threshold is nonsensical for another reason.  Pursuant to express statutory authority, *see* 20 U.S.C. §1098e, the Department has promulgated regulations that allow borrowers to enter into income-driven repayment programs that cap monthly payments at 5% or 10% of discretionary income (depending on the type of credential for which they obtained student loans), with discretionary income defined as earnings above 225% of the federal poverty guideline.  88 Fed. Reg. at 43,820.  As a result, an individual who makes up to $32,805, or a family of four with household income of $67,500, will not have to make any monthly student-loan payments at all, and earnings in excess of those thresholds are capped well below 20% of discretionary income.  *See id.* at 43,881.  And these borrowers can also have their loans forgiven after a maximum of 20 or 25 years (again depending on the credential) after making yearly payments that do not exceed 5% or 10% of discretionary income.  *See id.* at 43,856. As the Department thus emphasized in the 2019 Rule (when the then-extant income-driven-repayment regulations capped the repayment obligation at 10% of discretionary income and defined discretionary income as earnings above 150% of the federal poverty guideline), a 20% threshold is "obsolete since no borrower would ever be required to pay more than 10 percent of

their discretionary income"—in other words, "[t]he GE regulations essentially held GE programs to a student loan repayment standard that no student would be held to by law or regulation." 84 Fed. Reg. at 31,407, 31,438. That reasoning applies *a fortiori* today, when even *more* income is shielded from repayment and the repayment rate on eligible income is, if anything, even *lower*. And amortizing all student loans associated with "undergraduate certificate, associate degree, post-baccalaureate certificate programs, and graduate certificate programs" over a 10-year period only compounds the problems, 88 Fed. Reg. at 70,124, as those borrowers will in fact have the ability to amortize their loans over many more years.

155.    While the Department at least acknowledged the existence of its income-based-repayment programs in the 2023 Rule, it deemed them irrelevant on the theory that "after-the-fact protections" afforded by such programs "do not address underlying program failures to prepare students for gainful employment in the first place"—*i.e.*, the so-called failure to ensure that graduates have "earnings that would leave [them] in a position to pay off their debt without having to rely on payment programs like income-driven repayment plans." 88 Fed. Reg. at 70,050. But that is just another way of saying that schools are 100% responsible for alumni earnings and that alumni who qualify for income-driven-repayment programs are confirmation of institutional ineptitude. The Department understood in the 2019 Rule that "it cannot be said that a borrower in an IDR plan is one who has been harmed by his or her program or institution," including because "borrowers may elect to pursue a lower paying job in order to benefit from IDR-derived loan forgiveness." 84 Fed. Reg. at 31,400. Yet again, the Department failed to provide a reasoned explanation why a different analysis applies now.

156.    ***The 2023 Rule's Cost-Benefit Analysis Is Illogical:*** Last but certainly not least, the Department's cost-benefit analysis is irrational too. Cost-benefit analysis is an "'important aspect of the problem'" when agencies regulate, and an agency thus must "adequately substantiate[]" "benefits" that "'bear a rational relationship to the … costs imposed.'" *Chamber of Com.*, 85 F.4th at 777. The Department fell far short of that obligation here.

157.    The costs that the 2023 Rule imposes on cosmetology schools are difficult to overstate.

The Department itself estimates that over 50% of all cosmetology schools (which enroll over 80% of all students who attend such schools) would fail either the debt-to-earnings or earnings-premium tests. *Compare id.* at 70,140 (Table 4.18), *with id.* at 70,138 (Table 4.16). Other estimates indicate that fully *two-thirds* of for-profit cosmetology schools would fail one or both of those metrics. *See, e.g.*, AP Analysis, ¶75, *supra*. And all this will happen even though the federal government itself predicts that the cosmetology sector will "grow 8 percent from 2022 to 2032, faster than the average for all occupations." U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook: Barbers, Hairstylists, and Cosmetologists* (last modified September 6, 2023), https://rb.gy/rlhhuo.

158.    In the 2023 Rule, the Department purported to "accept the need for quality programs in the fields of cosmetology and esthetics, as well as people to train those entering these occupations." 88 Fed. Reg. at 70,092. But the Department insisted that the 2023 Rule posed no threat because, according to its "estimate," the "average institution" that awards cosmetology certificates "awarded about 38 percent of its credentials to students who did not receive any Federal aid," and "[t]here is a difference between an institution losing access to title IV, HEA funds and closing." *Id.* at 70,086, 70,093. But even assuming that the Department's 38% estimate is correct (and it is wrong by orders of magnitude with respect to Plaintiffs), the Department did not explain how a school could stay afloat after a precipitous loss of nearly two-thirds of its business.

159.    In reality, the extraordinarily high costs associated with the 2023 Rule are undeniable, requiring the Department to establish commensurate benefits. It did not do so. The best argument that the Department mustered is that the benefits will outweigh the costs because students will transfer to "high-performing programs" that do "not fail the D/E rates or EP measure," and graduates of those programs will eventually earn greater income, which will lead to higher tax revenue for the federal government as well as state and local governments. *Id.* at 70,017, 70,152.

160.    The holes in that reasoning are self-evident. To begin with, majority of the cosmetology programs in the Department's dataset are likely to lose Title-IV eligibility, and the Department offered zero evidence that the remaining minority can accommodate the thousands of students currently attending "failing" programs. *See id.* at 70,138, 70,140. Making matters worse, the Department

did not actually evaluate the overwhelming majority of gainful-employment programs—a whopping 74%—because of an insufficient "n-size." *See id.* at 70,127.  Thus, at the end of the day, the Department has no idea at all whether transfer students will fare any better in their new environments—or whether those schools are even *worse* than the ones that the Department now considers failures. Courts "do not defer to the agency's conclusory or unsupported suppositions." *Texas*, 10 F.4th at 555. Just so here.[12]

## RELIEF REQUESTED

Plaintiffs pray for the following relief from the Court:

a.   A declaration that the 2023 Rule is in excess of Defendants' statutory authority, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

b.   A preliminary and permanent injunction striking, setting aside, and enjoining Defendants from enforcing the 2023 Rule in its entirety or, in the alternative, a preliminary and permanent injunction striking, setting aside, and enjoining the Department from enforcing the 2023 Rule as applied to Plaintiffs;

c.   An order awarding Plaintiffs attorneys' fees and costs pursuant to 28 U.S.C. §2412; and

d.   Any further relief as the Court may deem just and proper.

---

[12] The numerous defects with the debt-to-earnings and earnings-premium test apply equally to the financial value transparency framework too, as that framework utilizes the exact same tests.  *See* p.25 n.6, *supra*.  And those defects also mean that the Department-mandated warnings that schools must provide to current and prospective students violate the First Amendment, as the messages are plainly controversial.  *Cf. APSCU I*, 870 F.Supp.2d at 154-55 n.7 (expressing doubts that similar warnings compelled by an earlier iteration of the gainful-employment rule could survive First Amendment scrutiny).

Respectfully submitted,

Paul D. Clement, VA Bar #37915
  (pro hac vice forthcoming)
Andrew C. Lawrence, VA Bar #99830
  (pro hac vice forthcoming)
Kevin Wynosky*, PA Bar #326087
  (pro hac vice forthcoming)
Chadwick J. Harper*, DC Bar #90003325
  (pro hac vice forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com
chad.harper@clementmurphy.com

*Supervised by principals of the firm who are
  members of the Virginia bar

s/Cole Ramey
Cole Ramey, TX Bar #16494980
Christin Jones, TX Bar #24070017
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7126
cramey@ktslaw.com
cjones@ktslaw.com

*Counsel for Plaintiffs*

March 20, 2024