# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | No. 4:24-cv-259-O |
| U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the United States Secretary of Education, | ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ...........................................................................................................1

STATEMENT OF THE CASE ..........................................................................................4

    A.    Historical & Statutory Background ..............................................................4

    B.    Regulatory Background .............................................................................8

    C.    The Challenged 2023 Rule ......................................................................14

ARGUMENT ...............................................................................................................19

I.    Plaintiffs Are Likely To Succeed On The Merits.............................................19

    A.    The 2023 Rule is *Ultra Vires*...................................................................19

    B.    The 2023 Rule Is Arbitrary And Capricious................................................29

        1.    The Rule Illogically Relies on Concededly Inaccurate Earnings Data............................................................................................30

        2.    The Rule Illogically Penalizes Schools for Factors Beyond Their Control............................................................................34

        3.    The Rule Uses Illogical Debt-to-Earnings Thresholds ....................38

        4.    The Rule's Cost-Benefit Analysis Is Illogical ...............................41

II.    Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction .............43

III.    The Remaining Factors Likewise Support A Preliminary Injunction........................44

CONCLUSION.............................................................................................................44

# TABLE OF AUTHORITIES

**Cases**

*AACS v. DeVos,*
    258 F.Supp.3d 50 (D.D.C. 2017) ................................................................ 12, 30, 31, 32

*AACS v. DeVos,*
    No. 17-cv-263 (D.D.C. filed Feb. 10, 2017) ....................................................12

*AACS v. U.S. Dep't of Educ.,*
    No. 23-cv-1267 (N.D. Tex. filed Dec. 22, 2023) ...............................................12

*Ass'n of Priv. Colleges & Universities v. Duncan,*
    870 F.Supp.2d 133 (D.D.C. 2012).....................................................................11

*Ass'n of Priv. Colls. & Univs. v. Duncan,*
    No. 11-cv-1314 (D.D.C. filed July 20, 2011) ...................................................10

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan,*
    110 F.Supp.3d 176 (D.D.C. 2015).....................................................................11

*Ass'n of Proprietary Colls. v. Duncan,*
    107 F.Supp.3d 332 (S.D.N.Y. 2015) .................................................................12

*Azar v. Allina Health Servs.,*
    139 S.Ct. 1804 (2019)........................................................................................26

*Biden v. Nebraska,*
    143 S.Ct. 2355 (2023)........................................................................................28

*Biden v. Texas,*
    597 U.S. 785 (2022) ..........................................................................................23

*Carlson v. Postal Regul. Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ..........................................................................39

*Chamber of Com. v. DOL,*
    885 F.3d 360 (5th Cir. 2018) ....................................................... 22, 24, 31, 37

*Clarke v. CFTC,*
    74 F.4th 627 (5th Cir. 2023) .............................................................................44

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ..........................................................................................29

*Horn v. State Farm Lloyds,*
    703 F.3d 735 (5th Cir. 2012) ............................................................................20

*In re Acad. For Jewish Educ.*,
    Dep't of Educ., 1994 WL 1026087 (Mar. 23, 1994)........................................................ 8, 27

*Jama v. ICE*,
    543 U.S. 335 (2005) ..........................................................................................................23

*Jones v. Hendrix*,
    599 U.S. 465 (2023) ..........................................................................................................25

*Loper Bright Enters. v. Raimondo*,
    No. 22-451 (U.S. argued Jan. 17, 2024) ..........................................................................29

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ..........................................................................................19

*Martinez v. Mukasey*,
    519 F.3d 532 (5th Cir. 2008) ...........................................................................................25

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*,
    60 F.4th 956 (5th Cir. 2023) ............................................................................................38

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ............................................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) .....................................................................................................30, 33

*NFIB v. OSHA*,
    595 U.S. 109 (2022)..........................................................................................................28

*Nken v. Holder*,
    556 U.S. 418 (2009) ..........................................................................................................44

*Relentless, Inc. v. Dep't of Com.*,
    No. 22-1219 (U.S. argued Jan. 17, 2024) ........................................................................29

*Rest. L. Ctr. v. DOL*,
    66 F.4th 593 (5th Cir. 2023) ............................................................................................43

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ....................................................................................*passim*

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    908 F.3d 127 (5th Cir. 2018) ...........................................................................................20

*Texas Oil & Gas Ass'n v. EPA*,
    161 F.3d 923 (5th Cir. 1998) ...........................................................................................39

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) .......................................................................... 32, 42, 44

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) .............................................................................. 43, 44

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ....................................................................................44

*United States v. Davis*,
    139 S.Ct. 2319 (2019) ...............................................................................................28

*United States v. Koutsostamatis*,
    956 F.3d 301 (5th Cir. 2020) ...................................................................................23

*United States v. Palomares*,
    52 F.4th 640 (5th Cir. 2022) ....................................................................................26

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ...................................................................................29

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ....................................................................................20

*Voices for Int'l Bus. & Educ., Inc. v. NLRB*,
    905 F.3d 770 (5th Cir. 2018) ...................................................................................29

*Wages & White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) .......................................................................29, 33, 43

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ..................................................................................................28

**Statutes**

5 U.S.C. §553(d) ..............................................................................................................15

5 U.S.C §706(2)(A) .....................................................................................................21, 29

5 U.S.C §706(2)(C) .........................................................................................................21

20 U.S.C. §1002(a) ...........................................................................................................20

20 U.S.C. §1002(b)(1) ................................................................................................*passim*

20 U.S.C. §1002(b)(1)-(2) .................................................................................................7

20 U.S.C. §1002(c)(1) ......................................................................................................24

20 U.S.C. §1002(c)(1)-(2) ..................................................................................................7

20 U.S.C. §1015a(*l*)(1) ...................................................................................................... 22, 23

20 U.S.C. §1015a(k)(D) ............................................................................................................ 23

20 U.S.C. §1036(e)(1) ............................................................................................................... 26

20 U.S.C. §1085 ........................................................................................................................ 22

20 U.S.C. §1085(a)(2) ............................................................................................................... 22

20 U.S.C. §§1085(b)-(c) (1992) ................................................................................................. 6

20 U.S.C. §1085(c) (1970) ......................................................................................................... 6

20 U.S.C. §1085(m)(1) .............................................................................................................. 22

20 U.S.C. §1087dd(e)(1) ........................................................................................................... 22

20 U.S.C. §1088(b) (1994) ......................................................................................................... 7

20 U.S.C. §1088(b)(1) ............................................................................................................ 7, 23

20 U.S.C. §1088(b)(5) ................................................................................................................. 7

20 U.S.C. §1088(c) (1994) ......................................................................................................... 7

20 U.S.C. §1088(c)(3) ................................................................................................................. 7

20 U.S.C. §1088(e)(1) (1994) ..................................................................................................... 7

20 U.S.C. §1098e ...................................................................................................................... 40

20 U.S.C. §1098e(b)(7) .............................................................................................................. 22

20 U.S.C. §1099c(a) .................................................................................................................. 20

20 U.S.C. §1134c(a) .................................................................................................................. 26

20 U.S.C. §1135c(d)(2) .............................................................................................................. 26

20 U.S.C. §1161g(d)(5) .............................................................................................................. 26

20 U.S.C. §2008(a) .................................................................................................................... 26

20 U.S.C. §5605(a)(2) ................................................................................................................ 26

Pub. L. No. 64-347, 39 Stat. 929 (1917) .............................................................................. 4, 28

Pub. L. No. 78-346, 58 Stat. 284 (1944) ................................................................................... 4

Pub. L. No. 85-864, 72 Stat. 1580 (1958) ............................................................ 4, 28

Pub. L. No. 89-287, 79 Stat. 1037 (1965) ............................................................ 5, 6

Pub. L. No. 89-329, 79 Stat. 1219 (1965) ............................................................ 5

Pub. L. No. 90-575, 82 Stat. 1014 (1968) ............................................................ 6

Pub. L. No. 102-325, 106 Stat. 448 (1992) .......................................................... 6, 7

Pub. L. No. 110-315, 122 Stat. 3078 (2008) ........................................................ 8

**Regulations**

34 C.F.R. §600.2 ....................................................................................................... 9

75 Fed. Reg. 43,616 (July 26, 2010) ............................................................... 9, 10, 40

76 Fed. Reg. 34,386 (June 13, 2011) ......................................................... 9, 10, 30, 31

79 Fed. Reg. 64,890 (Oct. 31, 2014) ............................................................ 11, 31, 38

83 Fed. Reg. 40,167 (Aug. 14, 2018) ................................................................... 12

84 Fed. Reg. 31,392 (July 1, 2019) ................................................................. *passim*

88 Fed. Reg. 32,300 (May 19, 2023) ............................................................... *passim*

88 Fed. Reg. 70,004 (Oct. 10, 2023) .............................................................. *passim*

89 Fed. Reg. 13,059 (Feb. 21, 2024) .................................................................... 43

**Other Authorities**

Beth Almeida et al., Ctr. for Am. Progress, *Fact Sheet: The State of Women in the Labor Market 2023* (Feb. 6, 2023), https://rb.gy/5ah4rp ............................................. 35

American Heritage Dictionary of the English Language (1969) .............................. 20

Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much? Defining Benchmarks for Manageable Student Debt*, College Board (2006), https://rb.gy/zcsl1r ............. 10, 38, 39

*Black's Law Dictionary* (5th ed. 1979) ................................................................. 21

*Black's Law Dictionary* (11th ed. 2019) ............................................................... 21

David Carleton, *Landmark Congressional Laws on Education* (2002) .................... 4, 28

Linda E. Coco, *Mortgaging Human Potential*, 42 Sw. L. Rev. 565 (2013) ......................................................................................... 4

Defs.' Cross-Mot. for Summ. J., *Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015) ...................................................................7

Defs.' Reply in Supp. of Cross-Mot. for Summ. J., *Ass'n of Priv. Colleges & Universities v. Duncan*, No. 11-cv-1314 (D.D.C. filed Feb. 2, 2012) ......................................11

Dep't of Educ., *2022 Program Performance Data Description*, https://rb.gy/zqc5ec (last visited Mar. 20, 2024)...................................................................................................18

Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 17, 2023), https://rb.gy/uyl2xk .................................................................................15

Dep't of Educ., *The Federal Role in Education* (last modified June 15, 2021), https://rb.gy/2ud2gi ..............................................................................................4

Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* (1898) .....................4

H.R. Rep. No. 89-308 (1965) ........................................................................ 6, 27

*IRS Announces Delay for Implementation of $600 Reporting Threshold for Third-Party Payment Platforms' Forms 1099-K* (Dec. 23, 2022), https://rb.gy/qrvtt1 ...........................32

IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation* (Nov. 21, 2023), https://rb.gy/6jkx6k ...........................................................32

Sharon Lurye & Collin Binkley, *AP Analysis: Most Beauty School Programs Would Be In Jeopardy Under US Proposal* (May 18, 2023), rb.gy/p6m31n .............................18

Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257 (1999) ...................4

Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* (2023), https://rb.gy/r2e256 ...........................................................................................38

O*Net OnLine, *See All Occupations*, https://rb.gy/14qgm0 (last visited Mar. 20, 2024) ......................................................................................9

Off. of the Tex. Governor, *Governor Abbott Issues Executive Order, Implements Statewide Essential Services and Activities Protocols* (Mar. 31, 2020), https://rb.gy/7hswe2 ...............................................................37

Oxford English Dictionary (online ed.).......................................................... 20, 21

Press Release, Illinois, *Gov. Pritzker Announces Statewide Stay At Home Order to Maximize COVID-19 Containment, Ensure Health Care System Remains Fully Operational* (Mar. 20, 2020), https://rb.gy/j259zd............................................................37

Qnity Institute, *A Career in Pro Beauty* (2023) ...............................................36

Random House Dictionary of the English Language
(2d ed. unabridged, 1987) ................................................................................... 20, 21

S. Rep. No. 89-758 (1965) ................................................................................... 6, 27

U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2021* (Mar. 2023),
https://rb.gy/ju086j ..............................................................................................36

U.S. Census Bureau, *Quick Facts: Indiana*, https://rb.gy/87nxxr
(last visited Mar. 20, 2024) ....................................................................................37

U.S. Census Bureau, *Quick Facts: Wisconsin*, https://rb.gy/lwcgmt
(last visited Mar. 20, 2024) ....................................................................................37

Webster's New International Dictionary (2d ed. unabridged, 1954) ................................. 20, 21

## INTRODUCTION

This lawsuit concerns the most recent and most unlawful attempt yet in the Department of Education's on-again, off-again regulatory quest to prevent for-profit schools from participating in federal financial-aid programs. The rule at issue—known as the "gainful employment" rule—is projected to affect nearly every program at every one of the thousands of for-profit schools around the Nation. But it is expected to deliver the biggest blow to cosmetology (or beauty) schools, including those operated by Plaintiffs here: Ogle School Management, LLC (Ogle) and Tricoci University of Beauty Culture, LLC (Tricoci). Indeed, nearly all cosmetology programs subject to the rule and with sufficient data for its application—all but 13—are expected to fail the tests that it creates and lose the ability to process federal student aid as a result, thus making it exceptionally difficult for many of them to operate and serve their students. The rule thus all but disables programs that provide substantial earnings boosts in a matter of months to students who are overwhelmingly female and minorities from participating in federal-loan programs that Congress expressly expanded to include vocational training. Simply put, the Department's gainful-employment rule is the poster child of regulatory over-reach, and this Court should grant a preliminary injunction as soon as possible—and no later than May 20, 2024 (60 days from the date of this filing).

The primary statute at issue here is the Higher Education Act of 1965 (HEA). Title IV of the HEA authorizes the federal government's student-aid programs, and schools can participate in Title-IV programs and process federal student aid only after qualifying as "eligible" under Title IV. Congress has expressly provided that, so long as they satisfy certain conditions, for-profit schools are among the schools that can secure such eligibility. Subject to enumerated exceptions, one of those conditions is that for-profit schools must "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," with "eligible program" in turn defined as "a program of training to prepare students for gainful employment in a recognized profession." For almost the entire first half-century of the HEA's existence, the Department enforced that language consistent with its ordinary meaning: For-profit schools simply had to provide instruction designed to get those who are currently enrolled in the program ready for a paying job in an acknowledged

vocational field, such as cosmetology, as opposed to providing more general instruction in the liberal arts or humanities.

But during the Obama Administration, the Department purported to discover a lurking "ambiguity" in the HEA's long-extant "gainful employment" language and deployed it against for-profit schools. Thus, in 2011, the Department promulgated a rule (2011 Rule) invoking *Chevron* that sought to strip programs at for-profit schools of Title-IV eligibility based on various novel tests. One of those tests included a metric—inspired by mortgage-underwriting practices having nothing to do with the HEA—that sought to assess the debt-to-annual-earnings ratio of program graduates several years after they leave school. That same test also included another metric—inspired by an academic paper that never mentioned the HEA—that sought to assess the debt-to-discretionary-earnings ratio of those same graduates. After for-profit schools successfully challenged the 2011 Rule, the Department tried again in 2014 with another rule (2014 Rule), which again invoked *Chevron* to establish a regime that disqualified programs from Title IV based on their alumni's debt-to-earnings ratios. But after cosmetology schools successfully challenged that rule too, the Department relented. In 2019, the Department promulgated a rule (2019 Rule) rescinding the 2014 Rule and, in the process, admitted that it had "incorrectly described congressional intent" with its gainful-employment regulations and had engaged in "regulatory overreach." Accordingly, the Department swore off the "fundamentally flawed" regulatory effort that began in 2011.

Or so it seemed. In 2023, the Department reversed course and boldly announced—twice-bitten but not at all shy—that it would adopt the "strongest-ever" gainful-employment rule. Last October, the Biden Administration's Department did exactly that when it promulgated the rule at issue here (2023 Rule). The 2023 Rule establishes two tests that supposedly enforce the HEA's gainful-employment language. The first test is familiar: Relying on the same sources that inspired the Department's *Chevron*-dependent 2011 and 2014 Rules—sources that the Department repudiated in 2019—the first test seeks to examine whether more than half of program graduates who are three years removed from school devote more than 8% of their annual earnings or more than 20% of their discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to

pay down their student-loan debt each year.  The second test, however, surfaces for the first time in the HEA's 60-year history:  It examines whether the median program graduate who is three years removed from school (regardless of whether she has voluntarily exited the labor force by that time) fails to outearn the median high school graduate in her state aged 25-34 who never enrolled in post-secondary education (but only if that median high school graduate is in the labor force and regardless of how dissimilar his job is to the program graduate's).

Failing the Department's tests produces dire consequences.  If a program fails either test just once, schools must warn current and prospective students that a loss of Title-IV aid is on the horizon—warnings that the Department believes may prompt transfers and non-enrollments.  And if a program fails either test in two out of three years, it is disqualified from Title-IV programs altogether. Failing the 2023 Rule's tests, moreover, is no remote possibility; it is a virtual certainty for programs providing valuable training to minority women.  Indeed, the Department's own data revealed that, of the hundreds of cosmetology programs nationwide subject to the 2023 Rule, virtually every one of them (save a baker's dozen) would fail one or both of the tests.  Those failing programs include those operated by Plaintiffs, which—for decades—have well prepared students in Texas, Illinois, Indiana, and Wisconsin for well-paying and flexible opportunities in salons.  And given that over 90% of Plaintiffs' students rely on Title-IV aid, the 2023 Rule will fundamentally disrupt operations.

The Court should preliminarily enjoin the 2023 Rule.  The rule goes far beyond the Department's statutory authority and is arbitrary and capricious to boot.  And the Court should provide that relief *before* Plaintiffs are irreparably harmed by this irreparably flawed rule.  Although sanctions like warnings and Title-IV disqualification are a year or two away, the 2023 Rule already requires schools to collect and provide to the Department an enormous range of information by the end of July 2024 to enable the agency to compute its misguided metrics.  And the Department itself believes that schools will have to initiate those compliance efforts promptly because they are exceptionally time-consuming.  Because of sovereign immunity, those compliance costs are unrecoverable once incurred. The Court thus should grant a preliminary injunction, and do so no later than May 20, 2024, to prevent Plaintiffs from suffering irreparable harm in service of a profoundly unlawful rule.

## STATEMENT OF THE CASE

### A.        Historical & Statutory Background

The federal government has provided financial support for education, including career and technical education, for more than a century.  In 1917, for example, Congress enacted the Smith-Hughes Act—"the Magna Carta of vocational education," David Carleton, *Landmark Congressional Laws on Education* 63 (2002) (Carleton)—which provided federal subsidies to states to fund the salaries of certain teachers so long as "the controlling purpose of such education shall be to fit for useful employment" "persons over fourteen years of age who have entered upon or who are preparing to enter upon" work in the given field.  Pub. L. No. 64-347, §§2-3, 10-11, 39 Stat. 929, 930-31, 934 (1917). In other words, the Smith-Hughes Act sought to encourage preparation for remunerative—*i.e.*, gainful—employment.  *See, e.g.*, Samuel Fallows, *A Complete Dictionary of Synonyms & Antonyms* 121, 206 (1898) (describing "useful" as synonymous with "remunerative" and "gainful").

After World War II, the federal government began "provid[ing] financial support *directly* to students" to "allow[] them to attend institutions of higher learning."  Linda E. Coco, *Mortgaging Human Potential*, 42 Sw. L. Rev. 565, 582 (2013) (emphasis added).  The GI Bill, for instance, offered subsidies for veterans to attend the institution of their choice, including for-profit schools.  *See* Pub. L. No. 78-346, 58 Stat. 284 (1944).  Although some unscrupulous "fly-by-night" for-profit schools "cropped up" "to take advantage of public dollars," Martha Minow, *Reforming School Reform*, 68 Fordham L. Rev. 257, 265 n.18, 266 n.23 (1999), the GI Bill proved a resounding success, sending millions of veterans to college, *see* Dep't of Educ., *The Federal Role in Education* (last modified June 15, 2021), https://rb.gy/2ud2gi.  And Congress created similarly targeted programs for students in the 1950s—*e.g.*, "national defense fellowships" for certain students at qualifying institutions, so long as they did "not engag[e] in gainful employment other than part-time employment by such institution in teaching, research or similar activities" during the fellowship period.  Pub. L. No. 85-864, §§401-05, 72 Stat. 1580, 1590-91 (1958).

By the 1960s, Congress determined that offering federal student aid to a much broader swath of the population would best serve the national interest.  To that end, Congress enacted two statutes

in 1965 that sought to benefit students at different types of schools.  The first relevant statute—the HEA—declares that its purpose is "[t]o strengthen the educational resources of our colleges and universities and to provide financial assistance for students in postsecondary and higher education." Pub. L. No. 89-329, 79 Stat. 1219, 1219 (1965).  To accomplish that objective, in Title IV of the HEA, Congress established a variety of "loan" and "grant" programs.  To participate in those programs and process federal student aid, the HEA imposed various requirements on schools.  Among other things, a school had to satisfy the definition of "eligible institution" under Title IV, *id.* §427(a)(1), and the statute defined that term in relevant part as "a public or other nonprofit institution" that "admits as regular students only persons having a certificate of graduation from a school providing secondary education," *id.* §435(a)(1), (4).  Those eligible institutions generally had to "provide[] an educational program for which it awards a bachelor's degree or provides not less than a two-year program which is acceptable for full credit toward such a degree." *Id.* §435(a)(3).  But the HEA also stated that eligible institutions included "any school which provides not less than a one-year program of training to pre-pare students for gainful employment in a recognized occupation." *Id.* §435(a).  Accordingly, under the original HEA, public or nonprofit institutions could participate in Title-IV programs regardless of whether their students chose to enroll in liberal-arts or humanities programs, or instead chose to enroll in vocational programs designed to prepare them for gainful employment in a particular field.

Congress enacted the second relevant statute—the National Vocational Student Loan Insur-ance Act of 1965 (NVSLIA)—as a complement to the HEA.  Pub. L. No. 89-287, 79 Stat. 1037 (1965). The NVSLIA sought "[t]o establish a system of loan insurance and a supplementary system of direct loans to assist students to attend post-secondary business, trade, technical, and other vocational schools." *Id.* at 1037.  Like the HEA, the NVSLIA required schools that wished to participate in these programs to satisfy the definition of "eligible institution."  *Id.* §8(a)(1).  But the NVSLIA defined that term differently from the HEA, stating that an eligible institution is "a business or trade school, or technical institution or other technical or vocational school," that provides "a program of postsec-ondary vocational or technical education designed to fit individuals for useful employment in recog-nized occupations." *Id.* §17(a)(2).  And the NVSLIA also stated that eligible institutions could "admit[]

as regular students only persons who have completed or left elementary or secondary school." *Id.* §17(a)(1). Thus, unlike the HEA, which categorically disqualified for-profit schools and categorically denied student aid to all non-high-school graduates, the NVSLIA expanded the institutions at which students could receive federal student aid "as widely as possible" and provided a pathway for the "large numbers of actual and potential students who have left elementary or secondary school" to "attain the goals they have established for themselves." S. Rep. No. 89-758, at 3, 12 (1965); *see also* H.R. Rep. No. 89-308, at 9 (1965). At the same time, Congress endeavored to protect the public fisc by "explicitly eliminat[ing] from eligibility" the bad-actor "'fly by night' institutions of the post-World War II era"— an objective that Congress achieved by inserting an additional "eligibility feature" into the definition of "eligible institution," *see* NVSLIA §17(a)(3), "which require[d] an institution to have been in existence for 2 years." S. Rep. No. 89-758, at 7; *see also* H.R. Rep. No. 89-308, at 9.

That two-track system did not last long. In 1968, Congress repealed the NVSLIA and "merge[d]" it with the HEA. Pub. L. No. 90-575, 82 Stat. 1014, 1023 (1968). In the revised version of the HEA, Congress renamed as "institution[s] of higher education" the public and nonprofit schools that qualified as eligible institutions under the original HEA, while renaming as "vocational school[s]" the schools that qualified as eligible institutions under the NVSLIA. *Id.* §116(a). Although the merger allowed for-profit schools that provided career and technical education to qualify as eligible for Title-IV programs for the first time, the revised HEA otherwise maintained the same eligibility features that existed pre-merger. Thus, the schools now known as "vocational schools" could qualify as eligible institutions under the HEA if (among other things) they provided programs "designed to fit individuals for useful employment in recognized occupations," "admit[ted] as regular students only persons who have completed or left elementary or secondary school," and "ha[d] been in existence for two years." 20 U.S.C. §1085(c) (1970).

For almost 25 years, Congress left this statutory scheme largely untouched. *See, e.g.*, 20 U.S.C. §§1085(b)-(c) (1992). In 1992, however, Congress acted again. Specifically, in the Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 (1992), Congress removed the term "vocational school" from the HEA and replaced it with two other terms: "proprietary institution of higher

6

education" (covering for-profit schools focused on career and technical education) and "postsecond-ary vocational institution" (covering public and nonprofit schools focused on career and technical education). *Id.* §481; *see* 20 U.S.C. §§1088(b)-(c) (1994).

While Congress tweaked the Title-IV eligibility requirements for these schools, it left in place much of what already existed. For example, whereas "vocational schools" previously had to provide programs "designed to fit individuals for *useful* employment in recognized occupations," the 1992 amendments stated that "proprietary institutions of higher education" and "postsecondary vocational institutions" had to "provide an eligible program of training to prepare students for *gainful* employ-ment in a recognized occupation," with "eligible program" similarly defined as "a program of training to prepare students for *gainful* employment in a recognized profession." *Id.* §§1088(b)(1), (c)(1), (e)(1)(A)(i) (1994) (emphasis added). As the Department has explained, there is "not" a "substantive" difference between the "useful employment" phraseology and the "gainful employment" phraseology. Defs.' Cross-Mot. for Summ. J. 17, *Ass'n of Priv. Sector Colleges & Univs. v. Duncan*, No. 14-cv-1870 (D.D.C. filed Mar. 6, 2015), Dkt.18. Furthermore, whereas "vocational schools" could "admit[] as regular students only persons who have completed or left elementary or secondary school," the 1992 amendments similarly allowed "proprietary institutions of higher education" and "postsecondary vo-cational schools" to "admit[] as regular students persons who are beyond the age of compulsory school attendance in the State in which the institution is located," regardless of whether they actually graduated from high school (though proprietary institutions of higher education could admit high school graduates too). 20 U.S.C. §§1088(b)-(c) (1994). And just as "vocational schools" had to "ha[ve] been in existence for at least 2 years," the 1992 amendments said the same thing about "proprietary institution[s] of higher education" and "postsecondary vocational schools," *see id.* §§1088(b)(5), (c)(3), thus ensuring that fly-by-night schools could not proliferate.

Today, "proprietary institutions of higher education" and "postsecondary vocational schools" can secure and maintain Title-IV eligibility by meeting these same basic requirements and certain other ones. *See* 20 U.S.C. §§1002(b)(1)-(2), (c)(1)-(2), 1088(b)(1)(A)(i). And in recognition of the fact that for-profit schools are capable of providing something other than career and technical training,

Congress in 2008 provided an additional option by which a for-profit school could establish Title-IV eligibility: by "provid[ing] a program leading to a baccalaureate degree in liberal arts," so long as the school held accreditation since 2007 and provided the program since 2009. *Id.* §1002(b)(1)(A); *see* Pub. L. No. 110-315, 122 Stat. 3078, 3086 (2008).

### B.    Regulatory Background

As the statutory history reveals, for nearly 60 years, Congress has made clear that for-profit schools could qualify as eligible for federal student aid, including Title-IV aid, if they offer programs of training to prepare students for gainful/useful employment in recognized occupations or professions. For nearly 50 of those years, it never occurred to the Department that this statutory language did more than help differentiate vocational training from more general, liberal-arts programs and could be used to render schools or programs ineligible if their students did not, in fact, obtain that employment after graduation (let alone if their alumni did not meet certain financial benchmarks several years after leaving school), especially when eligibility and excessive default rates were addressed elsewhere. *See* pp.22-23, *infra.* Instead, the Department consistently maintained that the "statutorily intended goal or result" is simply "preparation for gainful employment in such an occupation," "not that such a goal or result be potentially derived or incidentally available at the conclusion of the program." *In re Acad. For Jewish Educ.*, Dep't of Educ., 1994 WL 1026087, at *2-*3 (Mar. 23, 1994); *see* Compl. ¶¶42-43.

For decades, schools organized their operations in reliance on this commonsense understanding of the HEA. Plaintiffs here are illustrative. Ogle opened its first school in Arlington, Texas in 1973 and has since expanded to nine campuses across the Dallas/Fort Worth, San Antonio, and Houston areas. Ex.A ¶¶5-6. At each one, Ogle has always designed its programs to prepare its students—who are 98% female (which is common at cosmetology schools) and largely identify as members racial-minority groups (currently 72% are Black/African American or Hispanic)—for careers in the beauty industry by offering salon-modeled, student-centered training and development. *See* Ex.A ¶¶7, 13. Likewise, after Tricoci opened its first school in Chicago, Illinois in 2004, it expanded to 15 campuses across Illinois, Indiana, and Wisconsin. *See* Ex.B ¶¶5, 7. At each one, Tricoci has designed its programs so that its students—who have a similar demographic profile to those at Ogle—have the tools

necessary for paid employment in professional salons. *See* Ex.B ¶¶6, 13. Because the Department could not seriously dispute that Plaintiffs provided programs of training to prepare students for gainful employment in recognized occupations[1] (and satisfied all other eligibility requirements), they had no trouble securing Title-IV eligibility. *See* Ex.A ¶10; Ex.B ¶10.

***The 2011 Rule:*** The Department radically shifted course in 2010, when it proposed its first gainful-employment rule, *see* 75 Fed. Reg. 43,616, 43,620 (July 26, 2010), which it later finalized in 2011. In the 2011 Rule, the Department—invoking the HEA's "gainful employment" language, which it now described as "subject to many different views and interpretations"—declared that it would determine whether programs at for-profit schools and certificate programs at public and nonprofit schools could still qualify as Title-IV-eligible based on two tests that purported to measure the ability of program graduates "to repay their [student] loans." 76 Fed. Reg. 34,386, 34,388, 34,393 (June 13, 2011). The first test, which examined debt-to-earnings ratios using a dataset that included only those earnings reported by taxpayers, assessed whether program graduates in their first few years after graduation had an "annual loan payment" at or below 30% of "discretionary income" (defined as those earnings above 150% of the federal poverty guideline) or at or below 12% of "annual earnings." *Id.* at 34,400, 34,450. The second test assessed whether program graduates had a "loan repayment rate" of "at least" 35%. *Id.* The Department then declared that, if programs failed both of these tests in three out of the four most recent fiscal years, they would lose Title-IV eligibility, while also having to warn students if they failed just once or twice. *See id.* at 34,388.

The Department then offered additional insight into its novel debt-to-earnings test. The metric examining the ratio of debt to discretionary income, the Department stated, is "based on research conducted by economists Sandy Baum and Saul Schwartz," who issued a paper in 2006 titled "How Much Debt Is Too Much? Defining Benchmarks for Manageable Student Debt"—a paper that never

---

[1] Plaintiffs use the terms "cosmetology" and "cosmetologists" as shorthand for all beauty programs and professionals. Employment in this sector is a "recognized occupation." *See, e.g.,* 34 C.F.R. §600.2 (defining "Recognized occupation" to include "[a]n occupation … Identified by … an Occupational Information Network O*Net-SOC code"); O*Net OnLine, *See All Occupations,* https://rb.gy/14qgm0 (last visited Mar. 20, 2024) (listing "Hairdressers, Hairstylists, and Cosmetologists" under O*Net-SOC Code 39-5012.00).

mentioned the HEA or its gainful-employment language.  75 Fed. Reg. at 43,620; *see* Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much?  Defining Benchmarks for Manageable Student Debt*, College Board (2006), https://rb.gy/zcsl1r (Baum & Schwartz).   After Baum and Schwartz considered the "various possible approaches to setting benchmarks for reasonable student debt levels," including those proposed in "[t]he European literature on overindebtedness," they settled on the "somewhat arbitrary" ceiling of 20% of discretionary income ("defined as income exceeding 150 percent of the poverty level for a single person") as the appropriate one.  Baum & Schwartz 4, 11-12.  In doing so, Baum and Schwartz explained that the theretofore-most-common benchmark for assessing excessive debt—when non-mortgage-related debt exceeds 8% of annual earnings—has "no particular merit or justification" in the student-loan context and that its "shortcomings" are readily "apparent."  *Id.* at 2-3.  As they emphasized, the 8% threshold "arose from mortgage underwriting standards"—*i.e.*, the rule of thumb that mortgage debt should not exceed 28% of annual earnings and that total debt should not exceed 36% of annual earnings, leaving 8% for non-mortgage-related debt—and does not reflect "the experience of young people who have recently left school" and who typically lack mortgages.  *Id.*

After providing that background, the Department declared that it had chosen the debt thresholds of 30% of discretionary earnings and 12% of annual earnings—which are "50%" higher than those discussed by Baum and Schwartz—because it is purportedly "unambiguous" that "debt levels are excessive" at those levels.  75 Fed. Reg. at 43,620.  And in response to the concern that debt-to-earnings measures based on reported income are misleading in cash- and tip-heavy sectors like cosmetology, the Department noted that any program that failed the debt-to-earnings test could submit "alternative earnings data."  76 Fed. Reg. at 34,421, 34,425, 34,428-29.

In addition to generating widespread and bipartisan criticism, *see* Compl. ¶49, the 2011 Rule promptly generated a legal challenge from for-profit schools, which argued, among other things, that the Department exceeded its statutory authority and had engaged in arbitrary-and-capricious conduct.  *See Ass'n of Priv. Colleges & Universities v. Duncan*, No. 11-cv-1314 (D.D.C. filed July 20, 2011) (*APSCU I*), Dkt.1.  In defending its rule, the Department insisted that the HEA's gainful-employment language

is "ambiguous" and therefore asked the court to "defer[]" to its interpretation of it under step two of the framework announced in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), while further claiming that its rule passed muster in all other respects.  Defs.' Reply in Supp. of Cross-Mot. for Summ. J. at 4 & n.2, *APSCU I* (D.D.C. filed Feb. 2, 2012), Dkt.20.  The district court obliged and held that the Department's interpretation deserved *Chevron* deference.  *See APSCU I*, 870 F.Supp.2d 133, 146 (D.D.C. 2012).  But the court proceeded to hold that "[t]he debt repayment standard … was not based upon any facts at all" and thus failed arbitrary-and-capricious review—and that the loan-repayment-rate test could not "be severed from the other debt measures," including the debt-to-earnings measures.  *Id.* at 154.  Accordingly, the court set aside the 2011 Rule in its entirety.

**The 2014 Rule:**  Instead of appealing, the Department embarked on a new rulemaking process, which resulted in a new gainful-employment rule in 2014.  *See* 79 Fed. Reg. 64,890 (Oct. 31, 2014).  While the Department abandoned its loan-repayment-rate test, it doubled-down on the proposition that the HEA's gainful-employment language meant that the Title-IV eligibility of school programs could hinge on their graduates' debt-to-earnings ratios.  Again invoking "research conducted by economists Sandy Baum and Saul Schwartz" as well as "mortgage industry practices," the Department proclaimed that programs would fail its new rule—requiring schools to issue warnings to students before their programs eventually lost Title-IV eligibility—if graduates had a median annual loan payment above 30% of discretionary earnings and 12% of annual earnings, with the earnings figures again coming from earnings reported to the federal government by taxpayers.  *See id.* at 64,919.  But, acknowledging the "underreporting" problem, the Department allowed schools whose programs failed the debt-to-earnings test to initiate an "alternate earnings appeal" in which the Department could consider either state earnings data (if they existed) or earnings data that the school collected through a graduate survey (if schools could somehow gather such data).  *Id.* at 64,955, 65,010.

The 2014 Rule prompted three legal challenges.  In two cases, the courts agreed with the Department that it should resolve the statutory question in the agency's favor under *Chevron* step two and then rejected every other challenge.  *See Ass'n of Priv. Sector Colls. & Univs. v. Duncan (APSCU II)*, 110 F.Supp.3d 176, 184-204 (D.D.C. 2015), *aff'd*, 640 F.App'x 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colls.*

*v. Duncan*, 107 F.Supp.3d 332, 344-69 (S.D.N.Y. 2015). But the Department had less success in the third lawsuit, which focused on the distinct problems that the 2014 Rule posed for cosmetology schools. That suit, brought by the American Association of Cosmetology Schools (AACS), challenged both the Department's decision to rely on federal earnings data and the Department's stringent alternate-earnings-appeal process.[2] *See AACS v. DeVos*, No. 17-cv-263 (D.D.C. filed Feb. 10, 2017). There, the district court concluded that the Department's "wooden use" of federal earnings data "is problematic," as the Department "openly acknowledged that underreporting is an issue" in the cosmetology sector. *AACS v. DeVos*, 258 F.Supp.3d 50, 63, 73 (D.D.C. 2017). And the court determined that the Department's alternate-earnings-appeal process did not mitigate the problem, as the Department had "unjustifiably made appeals difficult to mount." *Id.* at 61, 64. Given these concerns, the court determined that cosmetology schools "need not secure any specific amount of survey responses or state-sponsored data to raise an appeal." *Id.* at 76-77. The Department did not seek review of that decision and never fully implemented the rule.

*The 2019 Rule:* By 2018, the Department announced its intent to rescind the 2014 Rule, *see* 83 Fed. Reg. 40,167 (Aug. 14, 2018), and followed through in 2019, *see* 84 Fed. Reg. 31,392 (July 1, 2019). In doing so, the Department "recognize[d]" that it had "incorrectly described congressional intent" in the HEA and had "engaged in regulatory overreach" with its gainful-employment regulations. *Id.* at 31,402. For decades, the Department observed, "the term 'gainful employment' has been widely understood to be a descriptive term that differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities," as Congress "reaffirmed" in the Higher Education Opportunity Act of 2008, which "allowed a small number of proprietary institutions" to secure Title-IV eligibility by "offer[ing] baccalaureate degrees in liberal arts" instead of career-focused programs. *Id.* at 31,401. The Department emphasized that, "[d]espite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define

---

[2] AACS has also challenged the 2023 Rule. *See AACS v. U.S. Dep't of Educ.*, No. 23-cv-1267 (N.D. Tex. filed Dec. 22, 2023). Plaintiffs agree with the arguments made there.

the term using threshold debt-to-earnings ratios." *Id.* at 31,401-02.

The Department also stressed that "Congress has elected to address concerns about unmanageable student loan debt" in other deliberate ways. *Id.* at 31,401. The Department noted, for example, that Congress has "provid[ed] numerous extended repayment and income-driven repayment programs that reduce monthly and annual payments and provide loan forgiveness if, after 20 (or in some cases 25) years of income-driven repayment, an outstanding loan balance remains." *Id.* The Department further highlighted that Congress required the Department to "restrict[] title IV eligibility to those institutions, including proprietary institutions, that pass the CDR [cohort default rate] test," which measures the percentage of graduates who default on loans. *Id.* at 31,403. And the Department found it odd to interpret gainful-employment language that applies only to a subset of schools as a covert congressional effort to ensure that borrowers can repay their loans, since "Congress intends for all Federal student loan borrowers to repay their loans." *Id.* at 31,401. In short, the Department explained that it would return to "enforc[ing] the law … in the same way it enforced it between 1968 and 2011": by "disallow[ing] proprietary institutions, other than those exempted by the above-mentioned provision of the [Higher Education Opportunity Act], to offer general studies, liberal arts, humanities, or other programs not intended to prepare students for a named occupation." *Id.*

Apart from finding the 2014 Rule *ultra vires*, the Department found the debt-to-earnings tests in that rule "fundamentally flawed." *Id.* at 31,438. The Department observed that the 8% ratio assessing debt-to-annual-earnings "is not appropriate to use in determining a program's continuing eligibility in title IV programs," as it is "a mortgage standard and one that 'has no particular merit or justification' for use in establishing student borrowing limits"—as Baum and Schwartz conceded. *Id.* at 31,407; *see id.* at 31,426. Turning to the 20% ratio assessing debt-to-discretionary-earnings, the Department explained that it had "failed to provide a sufficient, objective, and reliable basis" for it. *Id.* at 31,407. The Department deemed that metric irrational given that the Department's own income-based repayment plans "established 10 percent as the debt-to-discretionary income threshold that is used to determine a borrower's monthly payment obligation," which "render[ed] the 20 percent debt-to-discretionary income threshold in the 2014 Rule obsolete since no borrower would ever be required

to pay more than 10 percent of their discretionary income." *Id.*

The Department added that it "does not believe that it should sanction institutions" because of incorrect federal earnings data or "for aspects of student debt and earning outcomes that are outside of the institution's control." *Id.* at 31,409. For instance, the Department noted that, in "heavily tip-influenced professions, such as cosmetology," not all income is reported to the government—which is "not the fault of institutions"—and that underreporting "renders the earnings portion of the D/E calculation subject to significant errors." *Id.* at 31,409-10. Moreover, the Department recognized that individuals leave the workforce or work part-time for varied and valid reasons—*e.g.*, "to care for children [or] other family members"—and described "[p]enalizing programs" because students choose those options as "absurd." *Id.* at 31,410, 31,413. The Department observed that, "because the GE regulations do not calculate D/E rates until years after a student is admitted," those regulations effectively required schools "to predict macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future in order to establish a price that will guarantee passing D/E rates"—"a nearly impossible task." *Id.* at 31,417.

The Department further lamented that "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups." *Id.* at 31,414. Relatedly, the Department noted that, because many affected "programs serve high proportions of women and minorities," a regime that "would eliminate these programs could reduce postsecondary opportunities, thereby contributing to the earnings and opportunity gap." *Id.* In particular, the Department acknowledged that cosmetology programs suffered under its prior regime: "[C]osmetology … programs were disproportionately represented among the programs that failed the D/E rates measure," but these are "'bright outlook' occupations," so "GE-related program closures could reduce availability of … programs needed to fill high-demand occupations." *Id.* at 31,400 (footnote omitted). For all these reasons, the Department "determined that the 2014 Rule is fundamentally flawed and … should not serve as the basis for high stakes sanctions that negatively impact institutions and students." *Id.* at 31,426.

### C.     The Challenged 2023 Rule

Last year, the Department reviewed all this prior history and reached the stunning conclusion

that it was time to promulgate "the strongest-ever Gainful Employment (GE) rule." Dep't of Educ., *Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt* (May 17, 2023), https://rb.gy/uyl2xk. The Department thus issued a proposed rule spanning over 200 pages of the Federal Register, *see* 88 Fed. Reg. 32,300 (May 19, 2023), and gave interested parties just 30 days to comment—the shortest period possible, *see* 5 U.S.C. §553(d). A host of commenters, including Plaintiffs, moved quickly to denounce the proposed rule as *ultra vires* and arbitrary and capricious, and they warned that it would have a devastating impact on for-profit-schools, especially cosmetology schools, *see* Ex.A-1 (Ogle comments); Ex.B-1 (Tricoci comments); Ex.C (AACS comments). Undeterred, the Department promulgated the final rule in October 2023 with virtually no changes. *See* 88 Fed. Reg. 70,004 (Oct. 10, 2023).

The 2023 Rule's centerpiece is "an accountability and eligibility framework for gainful employment programs" that "reinstates" certain features of the 2014 Rule—*i.e.*, features that the Department itself had rejected as unlawful and irrational in the 2019 Rule—while also introducing a completely unprecedented feature. *Id.* at 70,005. The 2023 Rule thus has two distinct tests. The first test marks the Department's third attempt to determine whether the HEA's gainful-employment language is satisfied utilizing complex debt-to-earnings ratios: "[B]ased on research conducted by economists Sandy Baum and Saul Schwartz" and "mortgage-underwriting standards," the Department's first test assesses whether the share of annual earnings that the median graduate in a two- or four-year cohort period needs to devote to paying down her debt (which the Department amortizes over a 10-year period for the types of certificate programs offered by cosmetology schools) is less than or equal to 8%, or less than or equal to 20% of discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline). *See id.* at 70,020, 70,124. The second test is entirely novel: Dubbed the "earnings premium," it purports to examine whether at least half of program graduates (regardless of whether they have voluntarily elected to opt out of the labor force in the years after graduation) have higher earnings than at least half of high school graduates in the state between the ages of 25 and 34 who never enrolled in postsecondary education (but only if those high school graduates have opted in to the labor force and no matter what jobs they have). *See id.* at 70,124-25.

The tests come with certain limits in terms of time and scope. In most circumstances, the Department will conduct these tests three years after the students have graduated from their programs, and "[t]he first official rates … will, for most programs, be based on students who completed a program in award years 2018 and 2019, measuring their earnings outcomes in 2021 and 2022." *Id.* at 70,037, 70,099. The Department expects to release its first test results in 2025. *See id.* at 70,160. But because the Department lacks the requisite information to conduct its tests, the 2023 Rule also requires schools to comply with an onerous information-gathering and reporting requirement. *See id.* at 70,191. The first reporting deadline is July 31, 2024,[3] but the Department anticipates that schools will initiate the compliance process "months" beforehand.[4] *Id.* at 70,064. That said, there are limits to the types of information that the Department considers relevant. For example, the 2023 Rule refuses to account for numerous exogenous factors that may depress earnings, such as economic "recessions," "the COVID-19 pandemic," or graduates who "choos[e] not to work full time" or opt out of the labor force—even though the Department acknowledged that graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job," *id.* at 70,035, 70,045, 70,099, and that the pandemic likely impacted earnings in "the beauty industry," *id.* at 70,094.

Failing the 2023 Rule's tests can cause dire consequences. If a program fails either the debt-to-earnings or earnings-premium tests just once, the school must issue a warning to all students enrolled or interested in a program alerting them that the program may lose its Title-IV eligibility the following year. *See id.* at 70,052, 70,084, 70,193. Such warnings, the Department anticipates, may prompt students "to transfer to another program or choose not to enroll in such a program." *Id.* at 70,078. Then, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title-IV programs entirely.[5] *See id.* at 70,052, 70,084.

---

[3] The reporting deadline is October 1 in future years.

[4] The 2023 Rule's effective date is July 1, 2024.

[5] The 2023 Rule also establishes a "financial value transparency framework"—*i.e.*, a website—that utilizes the same school-reported information to calculate the same debt-to-earnings and earnings-premium figures for all Title-IV-eligible programs, not just gainful-employment programs. 88 Fed. Reg. at 70,005. But "the financial value transparency metrics do not impact program eligibility for non-GE programs." *Id.* at 70,065.

In promulgating the 2023 Rule, presumably as a hedge against the possible demise of *Chevron*, the Department purported to discover crystal clarity in the HEA's text where it first saw nothing and later perceived ambiguity. On its theory, the debt-to-earnings and earnings-premium tests are "consistent with the ordinary meaning of the operative words in the statute," and "all indications of Congress's intent" confirm that "a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt"—as defined by mortgage underwriters and a 2006 academic paper heedless of the HEA—or "if they earn no more than comparable high school graduates." *Id.* at 70,012. The Department "recognize[d]" that these purported clues escaped its attention for decades, but deemed it irrelevant that it had "initially refrained from issuing regulations" comparable to the 2023 Rule. *Id.* at 70,014.

Notwithstanding the Department's confidence that the 2023 Rule is consistent with "all indications of Congress's intent," *id.* at 70,007, 70,012, it acknowledged that it could not actually apply its understanding of the statute to all schools covered by the gainful-employment language. For instance, because "[t]he Department must have student outcomes data to measure program performance, which can only come after a period of time," "new programs" could qualify as Title-IV-eligible—meaning that the Department would have to certify that those programs are preparing students for gainful employment in a recognized occupation—even though the Department could not apply the tests that purportedly capture Congress' intent vis-à-vis that language. *Id.* at 70,018. In addition to exempting newer schools, the Department also stated that, because it lacked "confiden[ce]" in the data for U.S. Territories and the Freely Associated States (the Marshall Islands, Micronesia, and Palau), it had no choice but to "exempt" every school in those locations from the 2023 Rule. *Id.* at 70,027-28. And "to protect the privacy of individuals who complete smaller programs," the Department concluded that it could not legitimately apply its tests to programs with fewer than 30 graduates in a four-year cohort period. *Id.* at 70,046. That 30-graduate threshold, the Department admitted, meant that approximately 74% of gainful-employment programs are not covered by its rule. *Id.* at 70,127, 70,046.

The Department further recognized that the 2023 Rule has imperfections even when applied to programs that actually remain subject to it—including cosmetology programs. For example, when

applying the debt-to-earnings and earnings-premium tests, the Department announced that it would use a dataset that includes only those earnings reported by taxpayers to the federal government, and it expressed a "preference for … IRS data," *id.* at 70,045, even though it acknowledged that this data contained "statistical noise" for privacy reasons, which creates a "risk of inaccurate determinations," *id.* at 70,095.  The Department recognized that cosmetology professionals' reported earnings often do not reflect actual earnings.  The Department emphasized one recent study (which examined only the underreporting of tips) that indicated that federal earnings data are off-the-mark by 8-10% (while acknowledging but downplaying other studies placing the figure as high as 60%).  *See id.* at 70,042 & n.139.  Despite that problem, the Department declared that it would exclusively rely on federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting."  *Id.* at 70,042, 70,090.

By any calculus, the 2023 Rule is almost certain to devastate cosmetology schools.  Third-party analyses estimate that approximately two-thirds of for-profit cosmetology programs would fail one or both of the tests in the 2023 Rule.  *See* Sharon Lurye & Collin Binkley, *AP Analysis: Most Beauty School Programs Would Be In Jeopardy Under US Proposal* (May 18, 2023), rb.gy/p6m31n.  The Department's own data present an even starker picture.  As part of its regulatory-impact analysis, the Department posted a program-level dataset approximating the (otherwise-nonpublic) "administrative systems the Department uses to administer the Title IV, HEA programs along with earnings data produced by the U.S. Treasury."  88 Fed. Reg. at 32,410.  The Department describes this dataset as "the best possible [public] depiction of the rule's impact given the data currently available to the Department."  Dep't of Educ., *2022 Program Performance Data Description* 1, https://rb.gy/zqc5ec (last visited Mar. 20, 2024).  And according to this dataset, of the 1,270 cosmetology programs currently eligible for Title-IV funding, *only 13* would satisfy the 2023 Rule.  The majority of current programs—639 programs enrolling 80% of students attending such programs, *compare* 88 Fed. Reg. at 70,140 (Table 4.18), *with id.* at 70,138 (Table 4.16)—would fail.  The remaining programs would duck the rule because they are too new or

too small (or located in the Territories or Freely Associated States).[6]

The programs offered by Plaintiffs here, however, are among the hundreds of programs iden-
tified by the Department as failing programs. *See* Ex.A ¶22; Ex.B ¶22. Thus, as long as the 2023 Rule
remains standing, Plaintiffs' programs are almost certain to lose access to the Title-IV aid on which
over 90% of their students rely, even though the vast majority of graduates from those programs are
sufficiently well-prepared to pass state licensure exams. *See* Ex.A ¶¶15, 24; Ex.B ¶¶15, 24. More
immediately, in the months between now and this coming July, Plaintiffs will have to exert substantial
unrecoverable efforts and expenditures to compile and supply the Department with the very infor-
mation that the agency will use to smother them. *See* Ex.A ¶¶25-36; Ex.B ¶¶25-37.

## ARGUMENT

A preliminary injunction is warranted where the movant shows "(1) a likelihood of success on
the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction
is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an
injunction will not disserve the public interest." *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022).
Each of those factors is amply satisfied here.

## I.    Plaintiffs Are Likely To Succeed On The Merits.

The likelihood-of-success-on-the-merits factor is generally considered "the most important"
factor, *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023), and Plaintiffs are exceedingly likely to
succeed on the merits. The 2023 Rule is *ultra vires*, as the HEA's gainful-employment language has
nothing to do with debt-to-earnings ratios among program alumni or their earnings relative to high
school graduates, and it is arbitrary and capricious on multiple levels.

### A.    The 2023 Rule is *Ultra Vires*.

1.    Title IV of the HEA states that "institutions of higher education" must "qualify[]" in

---

[6] The dataset is available at https://rb.gy/80w20a (go to "General Information," then expand "Fed-
eral Register Notices and Fact Sheets" and select "GE Data 3"); an accompanying code sheet explain-
ing the column labels is available at the same location (select "GE Data 2"). To obtain the figures
referenced above, filter column "inGE" to "1," column "cipdesc" to "Cosmetology and Related Per-
sonal Grooming Services," and column "cred_lvl" to "UG Certificates."

order to "participat[e] in programs under this subchapter"—*i.e.*, Title IV. 20 U.S.C. §1099c(a). The HEA then explains that, "for purposes of student assistance programs" described in Title IV, the term "institution of higher education" includes a "proprietary institution of higher education," which is in turn defined in pertinent part as one that "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§1002(a), (b)(1)(A)(i). And the HEA then defines "eligible program" using materially identical language: "a program of training to prepare students for gainful employment in a recognized profession." *Id.* §1088(b)(1)(A)(i).

The Department recognizes that "the HEA does not more specifically define" what it means to provide a program of training to prepare students for gainful employment in a recognized occupation or profession. 88 Fed. Reg. at 70,008. Thus, "the ordinary meaning of the words control." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023). To determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries." *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). And when such sources reveal that statutory text is "unambiguous," the interpretive exercise not only "begins" with that text, but "ends" there too. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018).

That straightforward approach applies here. The term "program" means a "plan of action to accomplish a specified end."[7] The term "training" means "[s]ustained instruction and practice (given or received) in an art, profession, occupation, or procedure, with a view to proficiency in it."[8] The term "prepare" means to "get ready."[9] The term "student" means "a person formally engaged in learning, esp. one enrolled in a school or college."[10] The term "gainful employment" means "work

---

[7] The Random House Dictionary of the English Language 1546 (2d ed. unabridged, 1987) (Random House); *see also* Oxford English Dictionary (online ed.) (OED) (defining program as "a planned series of activities or events"); Webster's New International Dictionary 1977 (2d ed. unabridged, 1954) (Webster's New International) (defining "program" as "a syllabus").

[8] OED; *see also* Webster's New International 2687 (defining "training" as "education; discipline"); The American Heritage Dictionary of the English Language 1361 (1969) (American Heritage) (defining "train" as "to make proficient with specialized instruction and practice").

[9] Random House 1527; *see also* American Heritage 1053 (defining prepare as "to make ready").

[10] Random House 1888; *see also* American Heritage 1279 (defining student as "[o]ne who attends a school").

that a person can pursue and perform for money."[11]  The term "recognized" means "[a]cknowledged; accepted; known; identified."[12]  And the terms "occupation" and "profession" both mean a "vocation."[13]  The relevant statutory language thus means that, as one of the conditions to qualify as Title-IV-eligible, for-profit schools must provide a plan of instruction that is designed get those who are currently enrolled in the program ready for a paying job in an acknowledged vocational field.

That unambiguous meaning makes this case extraordinarily easy on the merits.  After all, the 2023 Rule is premised on the Department's understanding that the gainful-employment language means something entirely different—namely, that it empowers the Department to sanction programs at for-profit schools, including by prohibiting them from participating in Title IV altogether, if (1) the median program graduate devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt or (2) the median program graduate (regardless of whether she has voluntarily exited the labor force) earns less than the median high school graduate in the state aged 25-34 who never enrolled in postsecondary education (but only if that high school graduate is in the labor force).  To state the obvious, that interpretation is radically divorced from the statutory text.  Indeed, most of what the 2023 Rule addresses is covered more directly (and less onerously) by different statutory provisions, *see* pp.22-23, *infra*, and has nothing to do with the bedrock requirement that the program provide vocational training, rather than a liberal-arts degree.  It follows that the 2023 Rule is "not in accordance with law" and "in excess of statutory … limitations," requiring this Court to "hold [it] unlawful and set [it] aside."  5 U.S.C §706(2)(A), (C).

---

[11] *Black's Law Dictionary*, Employment (11th ed. 2019) (defining "gainful employment"); *see also* OED (defining "gainful" as "leading to pecuniary gain; lucrative; remunerative"; defining "pecuniary" as "[c]onsisting of money"; defining "lucrative" as "profitable"; defining "remunerative" as  "bring[ing] financial remuneration; profitable"; defining "remuneration" as "money paid for work or a service; payment; pay"); *Black's Law Dictionary* 610, 855 (5th ed. 1979) (defining "gainful employment" as "any calling, occupation, profession or work which one may profitably pursue"; explaining that "profitable" means "lucrative" or "bearing or yielding a revenue or salary").

[12] OED; *see also* Webster's New International 2079 (defining "recognize" as "to acknowledge formally").

[13] Webster's New International 1684; *see* Random House 1339 (same); *see also* OED (profession).

2.      None of the reasoning that the Department provided in the 2023 Rule compels a contrary conclusion.  Departing from its prior view when promulgating the 2011 and 2014 Rules that the gainful-employment language is "ambiguous," *see* pp.11-12, *supra*, the Department first posited that it is "consistent with the ordinary meaning of the operative words in the statute … to conclude that a program does not prepare students for gainful employment in a recognized occupation if typical program graduates are left with unaffordable debt"—as informed by "mortgage-underwriting stand-ards" and a 2006 academic paper that did not even purport to interpret the HEA—or "if they earn no more than comparable high school graduates."  88 Fed. Reg. at 70,012, 70,020.  But that interpre-tation simply "rewrite[s] the law that is the sole source of [the Department's] authority," *Chamber of Com. v. DOL*, 885 F.3d 360, 373 (5th Cir. 2018), which says nothing at all about program "graduates," their "debt" levels, how much debt qualifies as "unaffordable," or how much program graduates should "earn" in relation to "high school graduates" in the state between the ages of 25 and 34.

Confirming that the Department reads far too much into far too little, other provisions in the HEA demonstrate that, when Congress wanted to address post-graduate debt and earnings, it knew precisely how to do so.  For example, Congress has provided in the "cohort default rate" provisions that institutions are "ineligib[le]" under Title IV if a certain percentage of their graduates have exces-sively "high default rates" on their student debt—*i.e.*, if they do not have sufficient earnings to cover their debt.  20 U.S.C. §§1085(a)(2)(A), (B)(iv), (m)(1).  Congress has also provided that a borrower can qualify for debt relief when "the borrower's debt burden equals or exceeds 20 percent of such bor-rower's gross income."  *Id.* §1087dd(e)(1).  And Congress has also provided that a borrower can qualify for debt relief if she has an "economic hardship," *id.* §1098e(b)(7)(B)(5), which is a term that requires the Department to consider "the borrower's income and debt-to-income ratio," *id.* §1085.

Nor is that all.  Congress has also required the Department to develop a "College Navigator" website that makes available information regarding each school that "participates in programs under [Title] IV."  *Id.* §1015a(*i*)(1).  In particular, Congress has mandated the disclosure of information re-garding "cost of attendance," the "average annual grant amount … awarded," the "average annual amount of Federal student loans provided through the institution," and "[a] link to the appropriate

section of the Bureau of Labor Statistics website that provides information on regional data on start-ing salaries in all major occupations"—in other words, information regarding debt and post-graduate earnings. *Id.* §1015a(*l*)(1)(N), (O), (P), (W). And Congress has also instructed the Department to conduct regular surveys of financial-aid recipients that "describe the debt burden of such loan recipi-ents," "their capacity to repay their education debts," and the "impact of such debt burden on the recipients' … post-graduation plans." *Id.* §1015a(k)(D).

Congress thus has "shown elsewhere in the same statute" that it "knows" how to use language addressing the subjects that the 2023 Rule addresses. *Jama v. ICE*, 543 U.S. 335, 341 (2005). But Congress "did not do so here"—*i.e.*, in the basic language differentiating vocational training from liberal-arts degrees—"and the contrast is telling." *United States v. Koutsostamatis*, 956 F.3d 301, 309 (5th Cir. 2020). These other provisions thus confirm that, "[i]f Congress had wanted the provision" at issue "to have th[e] effect" that the Department ascribes to it—that schools must not only provide training for a useful occupation, but guarantee that alumni meet specific benchmarks related to debt and earnings—"it could have" (and would have) "said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022).

The Department nevertheless posited that the words "'train' and 'prepare'" support its inter-pretation of the statute, since those are terms that "'suggest elevation to something more than just any paying job.'" 88 Fed. Reg. 70,012. But those terms actually suggest adding to a skill base, such that a student could obtain a license to provide a service, rather than having anything to do with debt burdens or relative income. And there is no need for guesswork about the type of paying jobs for which schools must prepare their students in this context: paying jobs in a "recognized occupation" or "profession." 20 U.S.C. §§1002(b)(1)(A)(i), 1088(b)(1)(A)(i). Nothing about those terms (or any others) suggests that they allow for complex evaluations of post-graduate debt relative to post-grad-uate earnings, or for an assessment of post-graduate earnings relative to the earnings of high school graduates between the ages of 25 and 34.

The Department disagreed in the 2023 Rule, insisting that "success in the job market" is "an indication of whether those students were, in fact, adequately prepared" and that "examining GE

programs' outputs in terms of earnings and debts is consistent with the HEA." 88 Fed. Reg. at 70,012 (alteration omitted). That premise simply does not hold up—and the Department's own reasoning proves as much. Even the 2023 Rule recognized that a host of factors impact graduates' employment and earnings, including that (1) graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job;" (2) others "choos[e] not to work full-time" and instead work "part-time;" (3) "systemic discrimination" against "some groups" "may affect their earnings after graduation"; and (4) unpredictable events like "recessions" and once-in-a-century "pandemic[s]" can depress earnings too. *Id.* at 70,035, 70,031, 70,045, 70,099. But none of those factors means that a program does not provide training for gainful employment. Indeed, a program that provides training for an occupation that is flexible or susceptible to economic downturns still prepares its participants for gainful employment. And it is hard to imagine that Congress envisioned the gainful-employment language as a license for the Department to sanction school programs—including by disqualifying them from Title-IV participation, a "consequence" that the Department concedes is "undeniably serious," *id.* at 70,083—simply because those schools fail to accomplish the "nearly impossible task" of "predict[ing] macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future." 84 Fed. Reg. at 31,417. "Congress does not 'hide elephants in mouseholes'"—"particularly" when the "consequences … 'are undeniably significant.'" *Chamber of Com.*, 885 F.3d at 376.

The Department's theory that the "ordinary meaning" of the operative statutory text supports an assessment of post-graduate earnings and debt runs into more problems when considering how much territory that theory fails to cover. For example, Congress made clear that for-profit schools offering gainful-employment programs could secure Title-IV eligibility even if they have existed for only two years. *See* 20 U.S.C. §§1002(b)(1)(E), (c)(1)(C). But as the Department admits, it is impossible to conduct the supposedly statutorily required assessment of post-graduate earnings and debt in that short two-year period, even though those programs must provide training for gainful employment to qualify at all. *See* 88 Fed. Reg. at 70,018 ("The Department must have student outcomes data to measure program performance, which can only come after a period of time."). As the Supreme Court

has explained, "[b]asic principles of statutory interpretation require that we construe [statutory provisions] in harmony, not set them at cross-purposes." *Jones v. Hendrix*, 599 U.S. 465, 478 (2023). The Department's view that the "ordinary meaning" of the statutory text necessitates an evaluation of earnings and debt among program alumni several years after graduation—and its acknowledgment that it cannot conduct such an assessment vis-à-vis newer programs that it nonetheless treats as Title-IV eligible—is at war with that elementary rule. 88 Fed. Reg. at 70,012. The HEA's gainful-employment requirement is a universal threshold requirement that applies to *every* gainful-employment program, not relatively mature ones. Thus, the Department's admission that it cannot apply the 2023 Rule to programs lacking a multi-year "track record" of post-graduate debt and earnings data for their students, *id.* at 70,018, is an admission that the Department is measuring something that the operative text simply does not contemplate. Moreover, given Congress' recurring concern with fly-by-night operations, *see* pp.4, 7, *supra*, the rule's implicit preference for programs with *less* of a track record is not just atextual, but illogical.

　　Newer programs are not even the only ones exempted from what is supposed to be a universal requirement. To the contrary, the Department is incapable of applying its reading of the statute to *any* program in any U.S. Territory or any Freely Associated State. *See id.* at 70,027. Worse still, *any* program with fewer than 30 graduates in a two- or four-year cohort period is exempted too. *See id.* at 70,028. The net effect is that *74% of all gainful-employment programs* would fall through the cracks under the Department's interpretation of the statute's threshold gainful-employment requirement. *See id.* at 70,0127. That eye-popping figure only reinforces the conclusion that the Department's action is inconsistent with the statute: Congress enacted statutory language that is supposed to apply to 100% of gainful-employment programs; the Department's concession that it is capable of applying its interpretation of the statutory language only to a paltry 26% of such programs is powerful evidence that it has veered far off course. *Cf. Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008) (referencing the "well-established maxim that statutes should be construed to avoid an absurd result").

　　The broader context of the HEA also undermines the Department's interpretation of the gainful-employment language. As the Department highlighted in the 2019 Rule, Congress in 2008

amended the HEA to clarify that a for-profit school could obtain Title-IV eligibility in certain cases even if it "provides a program leading to a baccalaureate degree in liberal arts." 20 U.S.C. §1002(b)(1)(A)(ii). That amendment thus "reaffirm[s]" that the gainful-employment language is meant to "differentiate[] between programs that prepare students for named occupations"—*i.e.*, a paying job in a specific field—"and those that educate students more generally in the liberal arts and humanities." 84 Fed. Reg. at 31,401-02.

And if any doubt about the meaning of "gainful employment" remained, still other provisions eliminate it. Indeed, Congress used the term "gainful employment" in numerous *other* provisions in Title 20, and not a single one suggests that Congress had complicated debt and earnings metrics rather than something far more basic in mind. Indeed, those provisions are coherent only if "gainful employment" means a paying job—and not even an especially *high*-paying job. Congress has consistently and repeatedly used gainful-employment language in a way that suggests that even low-paying, part-time student employment is nonetheless gainful employment.[14] *See, e.g.*, 20 U.S.C. §1036(e)(1)(B)(ii) (allowing schools to give grant money to certain students so long as they are not "engaged in gainful employment, other than part-time employment related to teaching, research, or a similar activity"); *id.* §1134c(a) (similar); *id.* §1135c(d)(2) (similar); *id.* §1161g(d)(5)(B) (similar); *id.* §2008(a) (similar); *id.* §5605(a)(2)(B) (similar). The Supreme Court has warned against "assum[ing] that Congress silently attaches different meanings to the same term in the same or related statutes." *Azar v. Allina Health Servs.*, 139 S.Ct. 1804, 1812 (2019). The 2023 Rule requires the Court to make just such an assumption.

Unable to draw support from the HEA's text and structure, the Department ultimately resorted to the "legislative history"—specifically, the Senate and House reports that accompanied the NVSLIA, which later merged with the HEA. 88 Fed. Reg. at 70,012. Of course, "legislative history can never defeat unambiguous statutory text." *United States v. Palomares*, 52 F.4th 640, 646 (5th Cir. 2022). Regardless, the cited legislative reports affirmatively undermine the Department's position.

---

[14] This understanding is reflected in the original 1965 version of the HEA too. *See, e.g.*, HEA §527, 79 Stat. at 1260 (authorizing fellowships on the condition that the recipient "is not engaging in gainful employment other than such part-time employment in teaching, research, or similar activities related to his training as has been approved by the Commissioner").

Among other things, those legislative reports discuss the importance of making federal student aid available to the "large numbers of actual and potential students who have left elementary or secondary school, but who later realize the importance of advancing or establishing skills through attendance at a vocational school," S. Rep. No. 89-758, at 3; *see* H.R. Rep. No. 89-308, at 2—not exactly a pillar of support for the proposition that eligible institutions must guarantee that program graduates outearn those who actually completed high school.  Furthermore, those legislative reports describe how "the definition of 'eligible institution'" under the NVSLIA, which later made its way into the HEA, "was intended" to "be as liberal as possible" and that Congress effectuated that intent through language explaining that eligible institutions must provide "a program of postsecondary vocational or technical education designed to fit individuals for *useful* employment in recognized occupations."  S. Rep. No. 89-758, at 12 (emphasis added); *see* H.R. Rep. No. 89-308, at 9.  No ordinary user of the English language would say that preparing students for "useful employment" entails an assessment of debt-to-earnings ratios or comparisons to the earnings of an age-restricted pool of high school graduates.  And as the Department has already conceded, the NVSLIA's "useful employment" language and the HEA's "gainful employment" language are not substantively different.  *See* p.7, *supra*.  In reality, nothing in the legislative reports suggests that Congress viewed the "useful employment" language as anything other than a modest provision intended to ensure that schools provided students with vocational training.

Not only does the legislative history undermine the Department's position, but so do other features of the historical record.  Most obviously, for nearly half-a-century after the HEA's enactment, the Department never suggested that the statute's gainful/useful employment language meant that it could "tie program eligibility to whether GE programs provide education and training to their title IV, HEA students that lead to earnings beyond those of high school graduates and sufficient to allow students to repay their student loans."  88 Fed. Reg. at 70,005.  Instead, the Department understood that the statutory language simply called for an assessment into whether the "preparation" is "for a specific area of employment."  *Id.* at 70,018 (discussing *In re Acad. For Jewish Educ.*, 1994 WL 1026087)).  While the Department evidently believes that this half-century "initial[]" period of regulatory restraint

poses no obstacle to the 2023 Rule and its focus on "outcome-based measures," *id.* at 70,014, 70,018, the Supreme Court begs to differ.  As the Supreme Court has repeatedly and recently admonished, the fact that an agency "never before adopted" a particular interpretation of a statute in the previous "half century" is a "telling indication" that a regulation suddenly embracing that interpretation is "beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *see also Biden v. Nebraska*, 143 S.Ct. 2355, 2372 (2023); *West Virginia v. EPA*, 597 U.S. 697, 725 (2022).

There are other telling indications here too.  Long before the HEA's enactment, Congress repeatedly deployed gainful/useful employment language, including in the statute considered the "Magna Carta of vocational education," Carleton 63, and it always did so in a way that meant a paying job—not a job that required a comparison of pay in relation to other factors like debt loads.  In fact, early statutes like the Smith-Hughes Act and National Defense Education Act involved subsidies or stipends that did not even result in debt for their beneficiaries.  *See, e.g.*, 39 Stat. at 930-31, 934; 72 Stat. at 1590-91; p.4, *supra*.  That is significant, as courts "normally presume that the same language in related statutes carries a consistent meaning." *United States v. Davis*, 139 S.Ct. 2319, 2329 (2019).

The Department also posited that its new interpretation of the statutory text is consistent with the broader "purposes" of the HEA, such as "taxpayer protection."  88 Fed. Reg. at 70,015.  But as the Department recognized in the 2019 Rule, "Congress intends for all Federal student loan borrowers to repay their loans," so gainful-employment language that applies only to a fraction of schools is a poor fit to accomplish taxpayer-protection goals.  84 Fed. Reg. at 31,398, 31,401.  And other statutory provisions—like the cohort-default-rate provisions—are more specifically directed at that problem.  *See id.* at 31,401, 31,403.  Thus, there is no reason to repurpose the gainful-employment language in a way that penalizes programs that pass the cohort-default-rate test with flying colors.  In reality, as the Department observed in 2019, the "purpose of title IV, HEA programs"—and the gainful-employment language in particular—is "to expand opportunity to low-income students."  *Id.* at 31,398.  A rule that devastates programs that boost the employment prospects of minority women in ways that give them flexibility to work part-time as their family responsibilities morph manifestly frustrates that purpose.

Finally, while the Department may prefer to ignore these insuperable problems because "past judicial decisions" addressing the 2011 and 2014 Rules allowed it to stretch statutory language, that argument is distinctly unavailing.  88 Fed. Reg. at 70,013 & n.63.  Those out-of-circuit decisions engaged in just the sort of "reflexive deference" under *Chevron* that is no longer in vogue.  *Voices for Int'l Bus. & Educ., Inc. v. NLRB*, 905 F.3d 770, 780 (5th Cir. 2018) (Ho, J., concurring).  The bottom line is that the HEA's language is clear—and clearly against the Department.  *Chevron* thus cannot save the Department (even if it remains good law).  *But see Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. argued Jan. 17, 2024) (considering whether to overrule *Chevron* or narrow its scope); *Relentless, Inc. v. Dep't of Com.*, No. 22-1219 (U.S. argued Jan. 17, 2024) (same).[15]

All tools of statutory interpretation thus point the same way:  The 2023 Rule is *ultra vires*, as the HEA's gainful-employment language is simply concerned with whether schools are providing instruction designed to get currently enrolled students ready for a paying job in an acknowledged vocational field—not with the debt-to-earnings ratios of program alumni who are three years removed from graduation or their earnings relative to high school graduates who work in entirely different sectors and may have done so for the better part of two decades.

### B.    The 2023 Rule Is Arbitrary And Capricious.

The 2023 Rule is not only *ultra vires*, but also arbitrary and capricious.  The APA provides that courts shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. §706(2)(A).  Agency action thus must "be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  That standard is "searching and careful," *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021), and has "serious bite," *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).  To satisfy it, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of*

---

[15] The Department also briefly suggested that other statutory provisions support the 2023 Rule, such as provisions authorizing promulgation of "necessary or appropriate" rules.  88 Fed. Reg. at 70,007. But it is neither necessary nor appropriate to promulgate a "gainful employment" rule that countermands Congress' understanding of "gainful employment."

*U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Thus, "[i]llogic and inconsistency" or "shortcomings in the agency's explanations" doom the agency action. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014, 1018 (5th Cir. 2019).

The 2023 Rule is arbitrary and capricious in at least four ways. First, it illogically relies on concededly inaccurate earnings data. Second, it illogically penalizes schools for factors beyond their control. Third, its debt-to-earnings test utilizes illogical percentage thresholds. Fourth, it does not adequately substantiate benefits despite the enormous costs that it imposes.

### 1.   The Rule Illogically Relies on Concededly Inaccurate Earnings Data

The first problem with the 2023 Rule is the Department's illogical decision to use concededly inaccurate earnings data. As noted, under the 2023 Rule, the Department will strip programs at for-profit schools of Title-IV eligibility if, in two out of three consecutive years, (1) the median program graduate devotes more than 8% of annual earnings or more than 20% of discretionary earnings to pay down student-loan debt, or (2) the median program graduate earns less than the median high school graduate in the state aged 25-34 who never enrolled in postsecondary education. 88 Fed. Reg. at 70,008. And the 2023 Rule requires programs to provide warnings to current and prospective students if they fail either metric once. *See id.* The Department therefore finds itself in a position similar to the one that it occupied vis-à-vis the 2011 and 2014 Rules: subjecting programs to draconian sanctions based on tests that use post-graduate earnings data as a necessary and critical input.

Under those prior regimes, the Department relied on datasets that included only those earnings reported by taxpayers to the federal government. But the Department understood that many professionals who work in cash- and tip-heavy fields—especially "cosmetology"—do not actually report all their earnings to the federal government. 76 Fed. Reg. at 34,424-25. Indeed, in recent years, the Department has "openly acknowledged that underreporting is an issue, even identifying cosmetology schools by name," and that studies (including one from a Stanford economist) estimated that "both tip income and self-employment income are, on average, underreported by around 60%." *AACS*, 258 F.Supp.3d at 59-60, 63. In an implicit acknowledgement of this serious problem, both the 2011 and 2014 Rules gave schools whose programs failed the Department's earnings-based tests

an opportunity to provide alternative and more accurate earnings data. *See* 76 Fed. Reg. at 34,428-29; 79 Fed. Reg. at 65,010. But that proved insufficient; after cosmetology schools challenged that alternative-earnings-appeal process, a court concluded that the Department acted arbitrarily and capriciously because it "narrowly circumscribed" that process—*i.e.*, the Department "inexplicably requir[ed] high response rates to submit state-sponsored or survey-based alternate earnings calculations." *AACS*, 258 F.Supp.3d at 56.

But rather than scrap the inaccurate data or improve the appeals process this time around, the Department has doubled-down on the use of inaccurate data and scrapped the appeals process altogether. The Department has proclaimed that it will obtain the earnings data necessary to conduct its debt-to-earnings and earnings-premium tests from "a Federal agency with earnings data," and its "current preference" is to use IRS earnings data—data that already has privacy-protective "statistical noise" baked into it, which means that it contains errors to the point that any program "could be erroneously declared ineligible" under Title IV. 88 Fed. Reg. at 70,045, 70,096-97. And although it is beyond debate that all federal earnings data contains *additional* inaccuracies since it does not account for income underreporting in the cosmetology sector, the Department has nonetheless declared that it will *not* provide *any* "opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting." *Id.* at 70,042. The end result is that the Department is embarking on its most "wooden" and "problematic" use of federal earnings data yet. *AACS*, 258 F.Supp.3d at 73. The Department, the courts, and other parties have spent the last decade "detailing how bad" federal earnings data are when it comes to cosmetologists, but now the Department is insisting that it will rely solely on that data with their "conceded defects"—all while eliminating every mechanism that it previously thought necessary to avoid intolerably inaccurate results. *Sw. Elec. Power Co.*, 920 F.3d at 1016. That is precisely the sort of "illogic" that requires a court to set agency action aside under the APA. *Chamber of Com.*, 885 F.3d at 382.

The Department's strained efforts in the 2023 Rule to justify its puzzling choice are meritless. The Department began by arguing that cosmetologist professionals who fail to report their earnings to the federal government are subject to "considerable legal penalties." 88 Fed. Reg. at 70,041. That

is true but irrelevant, as the data universally attest that the possibility of those considerable penalties does not deter underreporting.  As a court explained in rejecting the identical argument in litigation over the 2014 Rule, the fact that "underreporters are subject to civil and criminal penalties" if they are caught underreporting is a "non sequitur," as such penalties have demonstrably failed to cure the underreporting problem in the past.  *AACS*, 258 F.Supp.3d at 63-64.  The Department tried to evade that conclusion here by arguing that "circumstances have changed" due to "the increasing prevalence of electronic payment methods" and the fact that "third-party settlement organizations" (*e.g.*, Venmo) will have to abide by a 2021 statute requiring them to issue "1099-K" tax forms to those who receive over $600 in payments via the platform.  88 Fed. Reg. at 70,041.  That argument is a non-starter.  At the outset, the Department offered no evidence that cosmetologists are increasingly using these digital methods to accept payment.  *But see Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("We do not defer to the agency's conclusory or unsupported suppositions.").  And to the extent that cash remains prev-alent in some communities, while Venmo-adoption becomes near-universal in others, that will just skew the data further.  In all events, the IRS has consistently *delayed* the implementation of the $600-and-above reporting threshold, such that it has never taken effect to date and will not take effect until 2025 at the earliest.  *See* IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation* (Nov. 21, 2023), https://rb.gy/6jkx6k; IRS, *IRS Announces Delay for Implementation of $600 Reporting Threshold for Third-Party Payment Platforms' Forms 1099-K* (Dec. 23, 2022), https://rb.gy/qrvtt1.  Given that the Depart-ment will examine earnings data from as early as 2021 and that a program can lose Title-IV eligibility with just two consecutive years of failing scores, *see* 88 Fed. Reg. at 70,099, 70,123, the Department's argument that future reporting may be more accurate is essentially a confession of error.

The Department's other arguments fare no better.  For instance, the Department noted that it uses such data for "determining Pell grant and other aid eligibility, as well as monthly loan payments on income-driven repayment plans."  *Id.* at 70,041.  But using inaccurate data for multiple purposes does not make the data any less inaccurate, especially when the consequences of it in this context are draconian and have a disproportionate effect on programs that equip students for gainful employment.

Separately, the Department argued that its "experience with the earnings appeal process … cautions against making accommodations for the possibility of income underreporting" since cosmetology schools supposedly reported "implausibly high earnings" in those appeals, as purportedly confirmed by a more "recent study" disputing the study finding a 60% underreporting rate. *Id.* at 70,041-42 & n.139. But the obvious tonic for implausibly high earnings estimates is a process that allows for the establishment of more plausible estimates, not eliminating an appeals process altogether.

Taking another tack, the Department observed that the 2023 Rule assesses "graduates' earnings … longer after when they graduate" as compared to the 2014 Rule, which will purportedly provide a "safeguard[] against potential underestimates of earnings." 88 Fed. Reg. at 70,042. The Department, however, offered no evidence to support its supposition that cosmetologist professionals suddenly underreport a lower amount of their income once they are three years removed from graduation. *Cf. Wages*, 16 F.4th at 1137 (finding "conclusory" and "unsupported" reasoning is "wholly insufficient"). Indeed, logic would suggest that longer-tenured workers in a tip-driven occupation receive larger tips, which would only exacerbate the underreporting problem.

Finally, the Department suggested that it wanted to "avoid the perverse incentives that would be created by making the rule's application more lenient for programs in proportion to how commonly their graduates unlawfully underreport their incomes." 88 Fed. Reg. at 70,042. But those perverse incentives do not operate on the institutions, which hardly control how their alumni account for their earnings years after graduation. As the 2019 Rule explained, it is "not the fault of institutions" that graduates underreport income, as schools "do not complete tax returns" for graduates and "cannot guarantee accurate reporting." 84 Fed. Reg. at 31,409. The Department did not explain why a different conclusion is warranted now. If anything, the fact that "graduates' earnings will be measured *longer* after when they graduate" under the 2023 Rule, 88 Fed. Reg. at 70,042 (emphasis added), would suggest that schools have even *less* influence.

In short, the Department's decision to rely exclusively on federal earnings data "runs counter to" the critical limitations associated with that data, *State Farm*, 463 U.S. at 43, and the repeated "shortcomings in the agency's explanations" confirm that its "paradoxical" action cannot stand, *Sw. Elec.*

*Power Co.*, 920 F.3d at 1016, 1018.

### 2.      The Rule Illogically Penalizes Schools for Factors Beyond Their Control

The Department's decision to use earnings-based tests flunks arbitrary-and-capricious review by punishing schools for factors outside their control.  Indeed, the 2023 Rule brands a school program a "failure" just because certain groups of alumni have debt-to-earnings ratios that exceed 8% of annual earnings or 20% of discretionary earnings, or if their annual earnings do not exceed those of high school graduates in the state between the ages of 25 and 34.  88 Fed. Reg. at 70,012.  The 2023 Rule thus hinges on the theory that schools are responsible for their former students' post-graduate "financial outcomes," including everything from their earnings to whether they remain in the workforce.  *Id.* at 70,011.  That makes no sense.

The Department itself reached just that conclusion in the 2019 Rule.  As the Department explained then, schools do "*not* have the ability to control for the many variables that impact earnings." 84 Fed. Reg. at 31,409 (emphasis added).  "[S]ome students take time out of employment or elect part-time work over full-time work to care for children, care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices," all of which can negatively affect individual earnings.  *Id.* at 31,413.  Moreover, "historical and continuing discrimination has unfairly depressed the earnings of historically disadvantaged groups," such as "women and minorities."  *Id.* at 31,414.  And "macroeconomic" events like "the Great Recession"—which are "outlier events" and by definition unpredictable—"can have a considerable impact on D/E rates outcomes" and impose "downward pressure on wages."  *Id.* at 31,410-11.  The Department thus concluded in the 2019 Rule that "[p]enalizing" and "sanction[ing] institutions for aspects of student debt and earning outcomes that are outside of the institution's control" is "absurd."  *Id.* at 31,409-10.

The 2023 Rule embraces that absurdity, as both the debt-to-earnings and earnings-premium tests entail an assessment of post-graduate earnings and demand ignorance of all surrounding context. Thus, for example, the 2023 Rule assigns responsibility to schools even if those graduates "choose" not to work at all or "choos[e] not to work full-time," 88 Fed. Reg. at 70,035, 70,045, or if there are

events like the COVID-19 pandemic that depress earnings, *see, e.g.*, *id.* at 70,065, 70,092.  That approach is "seemingly illogical"—because it is illogical.  *Sw. Elec. Power Co.*, 920 F.3d at 1013-14.

The Department's unsuccessful effort to explain its about-face in the 2023 Rule proves the point.   In response to commenters from the cosmetology sector, the Department explicitly "acknowledge[d] that many workers may choose to pursue occupations with work schedules that suit their lives" and "recognize[d]" that graduates "often … choose to leave the labor force for reasons that do not reflect their ability to find a job."  88 Fed. Reg. at 70,035, 70,044-45.  But the Department concluded that it would interpret the reduced or even nonexistent earnings of these graduates as proof of the school's failure to prepare its students for gainful employment in the cosmetology sector.  *See id.*  The Department did so because it "believe[d]" that "students typically have a strong interest in being employed in the three-year window directly after graduation."  *Id.* at 70,045.  And it found this approach especially appropriate in the context of the earnings-premium test because "some" high school graduates also work part-time.  *Id.* at 70,044.

That reasoning is fatally flawed.  First, it bears emphasizing that women are far more likely than men to not work or to work-part time for family-related reasons.  *See, e.g.*, Beth Almeida et al., Ctr. for Am. Progress, *Fact Sheet:  The State of Women in the Labor Market 2023* (Feb. 6, 2023), https://rb.gy/5ah4rp ("A massive gender gap exists in the share of women and men who are either not working or working part time because of child care or family reasons.").  And the Department conceded that this dynamic holds true in the overwhelmingly female cosmetology sector, observing that "many" cosmetologists "often" make rational decisions to work fewer hours or not to work at all *for reasons that have nothing to do with the preparation for gainful employment that they received years prior.*  Indeed, one of the attractive hallmarks of cosmetology as an occupation is the ability to work part-time and accommodate competing needs of family.  *See, e.g.*, Ex.A-1 at 3 (Ogle explaining in regulatory com-ments that its graduates "often choose to work part-time"); Ex.B-1 at 3 (Tricoci offering similar com-ment).  Those hallmarks are fully present in the first three years after graduation, and the Department offered no contrary data.  To concede these basic facts about the occupation yet conclude that these graduates' reduced or nonexistent earnings reflect institutional failure reflects just the sort of "internal

inconsistency" that is "characteristic of arbitrary and unreasonable agency action." *Sw. Elec. Power Co.*, 920 F.3d at 1014.

Moreover, the Department itself also cited studies emphasizing that "[t]here aren't many industries where an employee has as much choice about the number of hours they work" as cosmetology, with 99% of employers offering "some or total schedule flexibility"—*i.e.*, "the ability to choose the hours an employee works"—and only 3.5% of service providers working 40 hours or more each week. Qnity Institute, *A Career in Pro Beauty* 11 (2023) (cited at 88 Fed. Reg. at 70,042 n.139). Given these facts, comparing cosmetologists to a male-heavy group in which only "some" people are working part-time (and numerous others are working 9-5 jobs with fundamentally different salary arcs) is a classic apples-to-oranges comparison that produces arbitrary results and reflects arbitrary reasoning.

And even if one credits the Department's unsupported theory that "typical" graduates of gainful-employment programs desire some employment three years after graduation, the rational way to assess how those graduates are faring is to look only at *those graduates*, not graduates who "choose to leave the labor force." 88 Fed. Reg. at 70,045. Indeed, the earnings-premium test itself involves an evaluation of *only* those high school graduates in the state aged 25-34 who are "in the labor force." *Id.* at 70,061. The Department never explained why that same type of approach—which at least eliminates the most skewed data—is inappropriate vis-à-vis graduates of gainful-employment programs.

There is more. The Department recognized that "systemic discrimination may affect the need for some groups of students to borrow and may affect their earnings after graduation." *Id.* at 70,031; *see also, e.g.*, U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2021* (Mar. 2023), https://rb.gy/ju086j (statistics confirming that women and minorities earn less). The Department nevertheless forged ahead with tests that incorporate such discriminatory effects because "demographics *alone*" do not explain income. 88 Fed. Reg. at 70,031, 70,145, 70,140 (emphasis added). But the Department tellingly did not deny that the 2023 Rule is holding income-suppressing factors like race and gender against schools—nor could it do so with a straight face. Tricoci offers a particularly vivid example of this dynamic: Although its graduates are almost exclusively female (96%) and a substantial majority identify as racial minorities (63%), *see* Ex.B ¶13, the 2023 Rule pits their earnings

against a heavily-male group of high school graduates in states that (like Indiana and Wisconsin) that are well over 80% white—and then brands Tricoci a failure if its graduates fail to outearn the latter. *See* U.S. Census Bureau, *Quick Facts:  Indiana*, https://rb.gy/87nxxr (last visited Mar. 20, 2024); U.S. Census Bureau, *Quick Facts:  Wisconsin*, https://rb.gy/lwcgmt (last visited Mar. 20, 2024).  That is no less absurd today than in 2019.  "It is illogical for the rule … to accept" the reality that schools are not responsible for historical discrimination that reduces earnings while "simultaneously" sanctioning schools for those reduced earnings.  *Chamber of Com.*, 85 F.4th at 778.

The Department lastly sought to downplay the impact of macroeconomic conditions on the theory that the earnings-premium test "is well suited to adjust to State or national disruptions to the labor market," ostensibly because "[t]he earnings of high school graduates" will purportedly fluctuate in sync with the earnings of graduates of gainful-employment programs.  88 Fed. Reg. at 70,058.  That assertion is perplexing:  Not every business that employs high school graduates had to shut down at the beginning of the COVID-19 pandemic, but virtually every cosmetology salon did.  *See, e.g.*, Off. of the Tex. Governor, *Governor Abbott Issues Executive Order, Implements Statewide Essential Services and Activities Protocols* (Mar. 31, 2020), https://rb.gy/7hswe2 (explaining the Texas governor's "directive" to "avoid" "visiting" "cosmetology salons"); Press Release, Illinois, *Gov. Pritzker Announces Statewide Stay At Home Order to Maximize COVID-19 Containment, Ensure Health Care System Remains Fully Operational* (Mar. 20, 2020), https://rb.gy/j259zd (similar in Illinois).  Moreover, as the Department's focus on the earnings-premium test implicitly confirms, the debt-to-earnings test is undeniably *ill*-suited to adjust to disruptions in the labor market.  As the 2019 Rule noted when addressing a comparable debt-to-earnings test, it "do[es] not calculate D/E rates until years after a student is admitted," so "an institution must be able to predict macro-economic conditions, future earnings, and various other factors … well in to the future in order to establish a price that will guarantee passing D/E rates"— and that is "a nearly impossible task."  84 Fed. Reg. at 31,417.  The Department has no answer to that considerable problem, further underscoring that the Department has fallen well short of its obligation to "articulate[] a satisfactory explanation for its action."  *Sw. Elec. Power Co.*, 920 F.3d at 1013.

### 3.       The Rule Uses Illogical Debt-to-Earnings Thresholds

Although the Department's reliance on fatally flawed *earnings* data dooms both the 2023 Rule's debt-to-*earnings* test and its *earnings*-premium tests, the debt-to-earnings test suffers from additional flaws: The Department failed to "adequately justify" its use of the 8% and 20% thresholds. *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

In seeking to rationalize the 8% threshold in the 2023 Rule, the Department stated only that it is "grounded in mortgage-underwriting standards" and then incorporated its explanation for that threshold from the proposed rule. 88 Fed. Reg. at 70,020. The proposed rule in turn said:

> The acceptable threshold of 8 percent for the annual D/E rate used in the proposed regulations has been a reasonably common mortgage-underwriting standard, as many lenders typically recommend that all non-mortgage loan installments not exceed 8 percent of the borrower's pretaxed income. Studies of student debt have accepted the 8 percent standard and some State agencies have established guidelines based on this limit. Eight percent represents the difference between the typical ratios used by lenders for the limit of total debt service payments to pretaxed income, 36 percent, and housing payments to pretax income, 28 percent.

88 Fed. Reg. at 32,326. The Department did not deign to support this statement with any citations, but the Department's explanation is a copy-and-paste of the one that it provided in the 2014 Rule. *See* 79 Fed. Reg. at 16,443. And that 2014 Rule provided just one citation to support the use of an 8% threshold:  the 2006 paper from Baum and Schwartz. *See id.* at nn.50-51 (citing Baum & Schwartz 2-3). But the Baum and Schwartz paper comes nowhere close to justifying an 8% threshold. That is because Baum and Schwartz reviewed the existing studies and then stated that "[t]he shortcomings" of the 8% threshold "are apparent" and that it has "no particular merit or justification," since it does not reflect "the experience of young people who have recently left school,"  Baum & Schwartz 3— young people who likely do not even have a mortgage, *see, e.g.*, Nat'l Ass'n of Realtors, *2023 Profile of Home Buyers & Sellers* 7 (2023), https://rb.gy/r2e256 ("The typical first-time buyer was 35 years old this year[.]"). All that explains why the Department emphasized in the 2019 Rule that the Baum and Schwartz paper "*does not support the eight percent threshold*, but instead *clearly refutes it* for the purpose of establishing manageable student loan debt." 84 Fed. Reg. at 31,426 (emphases added). That is also

why the Department said in the 2019 Rule that it "has no empirical basis for the 8 percent threshold and will … no longer use it to determine title IV program eligibility." *Id.* at 31,407.  And if the concern is "manageable debt," default rates are a far better measure, albeit one that the statute addresses separately and that Plaintiffs easily pass.  *See* p.22, *supra*; Ex.A ¶18; Ex.B ¶18.

The 2023 Rule does not explain why the previously rejected 8% threshold is suddenly "acceptable."  88 Fed. Reg. at 32,326.  That is plainly a "shortcoming[] in the agency's explanation."  *Sw. Elec. Power Co.*, 920 F.3d at 1018; *see also Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 935 (5th Cir. 1998) ("When an agency adopts a regulation based on a study that is not designed for the purpose and is limited or criticized by its authors on points essential to the use sought to be made of it the administrative action is arbitrary and capricious and a clear error in judgment." (alteration omitted)).  And that shortcoming alone dooms the debt-to-earnings test since that test could not "function sensibly" without the 8% threshold.[16]  *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).

But the 20% threshold is equally problematic.  At the outset, even Baum and Schwartz deemed that figure "somewhat arbitrary," Baum & Schwartz 12—hardly a promising starting point for an agency purporting to engage in "nonarbitrary" conduct, 88 Fed. Reg. at 70,012.  Baum and Schwartz also made clear that their somewhat-arbitrary 20% threshold "should be used thoughtfully with modification for family size" (among other variables).  Baum & Schwartz 12.  But the 2023 Rule does nothing of the sort.  Rather, the Department has adopted an approach that assesses debt *only* in relation to the earnings of the "*graduates*" themselves.  88 Fed. Reg. at 70,005 (emphasis added).  As the 2019 Rule highlighted, this mystifying approach means that programs can fail the 20% threshold even if their graduates' "household earnings" are more than "adequate to support a family without needing the graduate to work outside of the home"—*e.g.*, $1 million/year.  84 Fed. Reg. at 31,410.  Five years ago, the Department found it "absurd" to embrace a test with those sorts of results.  *Id.*  The Department fails to offer a reasoned explanation why it should indulge such absurdities now.

---

[16] The Department included a severability provision in the 2023 Rule in an attempt to ensure that either the debt-to-earnings test or the earnings-premium test could survive if a court invalidated only one of them.  *See* 88 Fed. Reg. at 70,007 n.25; 88 Fed Reg. at 32,341-42.  But the Department never suggested that the debt-to-earnings test could survive without both the 8% and 20% thresholds.

The 20% threshold is nonsensical for another reason.  Pursuant to express statutory authority, *see* 20 U.S.C. §1098e, the Department has promulgated regulations that allow borrowers to enter into income-driven repayment programs that cap monthly payments at 5% or 10% of discretionary income (depending on the type of credential for which they obtained student loans), with discretionary income defined as earnings above 225% of the federal poverty guideline.  75 Fed. Reg. at 43,820.  As a result, an individual who makes up to $32,805, or a family of four with household income of $67,500, will not have to make any monthly student-loan payments at all, and earnings in excess of those thresholds are capped well below 20% of discretionary income.  *See id.* at 43,881.  And these borrowers can also have their loans forgiven after a maximum of 20 or 25 years (again depending on the credential) after making yearly payments that do not exceed 5% or 10% of discretionary income.  *See id.* at 43,856.  So, as the 2019 Rule explained (when the then-extant income-driven-repayment regulations capped the repayment obligation at 10% of discretionary income and defined discretionary income as earnings above 150% of the federal poverty guideline), a 20% threshold is "obsolete since no borrower would ever be required to pay more than 10 percent of their discretionary income"—*i.e.*, "[t]he GE regulations essentially held GE programs to a student loan repayment standard that no student would be held to by law or regulation."  84 Fed. Reg. at 31,407, 31,438.  That reasoning applies *a fortiori* today, when even *more* income is shielded from repayment and the repayment rate on eligible income is, if anything, even *lower*.  And amortizing all student loans associated with "certificate" programs over a 10-year period, as the 2023 Rule does, only compounds the problems, 88 Fed. Reg. at 70,124, as those borrowers will in fact have the ability to amortize their loans over another decade or more.

While the Department at least acknowledged the existence of its income-based-repayment programs in the 2023 Rule, it deemed them irrelevant on the ground that such "after-the-fact protections do not address underlying program failures to prepare students for gainful employment in the first place"—*i.e.*, the so-called failure to ensure that graduates have "earnings that would leave [them] in a position to pay off their debt without having to rely on payment programs like income-driven repayment plans."  88 Fed. Reg. at 70,050.  But that is just another way of saying that schools are 100% responsible for alumni earnings and that alumni who qualify for income-driven-repayment programs

are confirmation of institutional ineptitude. The Department understood in the 2019 Rule that "it cannot be said that a borrower in an IDR plan is one who has been harmed by his or her program or institution," including because "borrowers" themselves "may elect to pursue a lower paying job in order to benefit from IDR-derived loan forgiveness." 84 Fed. Reg. at 31,400. Yet again, the Department failed to provide a reasoned explanation why a different analysis applies now.

The debt-to-earnings ratio is arbitrary and capricious at a more fundamental level as well. The principal reason to worry about that ratio is that students might default on their loans, but other statutory provisions either measure that concern directly—*e.g.*, the cohort default rates—or ameliorate it—*e.g.*, by providing debt relief. *See* p.22, *supra*. But employment remains gainful even if the training is relatively costly vis-à-vis the earnings potential of the occupation. To the extent that the Department is trying to shape broader work patterns by steering vocational students into more remunerative occupations, it is operating well outside its lane. And to the extent that it purports to know better than individual students who make judgments about what kind of employment would be enjoyable or fit their lifestyles, the Department is indulging in a paternalism that runs counter to the basic Title-IV framework.

### 4.    The  Rule's Cost-Benefit Analysis Is Illogical

Last but certainly not least, the Department's cost-benefit analysis is irrational. Cost-benefit analysis is an "'important aspect of the problem'" when agencies regulate, and an agency thus must "adequately substantiate[]" "benefits" that 'bear a rational relationship to the … costs imposed.'" *Chamber of Com.*, 85 F.4th at 777. The Department flouted that obligation here too.

The costs that the 2023 Rule imposes on cosmetology schools are difficult to overstate. As noted, *see* p.18, *supra*, the Department itself estimates that over 50% of all cosmetology programs (which enroll over 80% of all students who attend such programs) would fail one or both tests. Other estimates indicate that fully two-thirds of for-profit cosmetology schools would fail one or both of those metrics. *See* p.18, *supra*. And all this will happen even though the federal government itself predicts that the cosmetology sector will "grow 8 percent from 2022 to 2032, faster than the average for all occupations." U.S. Bureau of Labor Statistics, *Occupational Outlook Handbook: Barbers, Hairstylists,*

*and Cosmetologists* (last modified 6, 2023), https://rb.gy/rlhhuo.

In the 2023 Rule, the Department purported to "accept the need for quality programs in the fields of cosmetology and esthetics, as well as people to train those entering these occupations." 88 Fed. Reg. at 70,092. But the Department insisted that the 2023 Rule posed no threat because, according to its "estimate," the "average institution" that awards cosmetology certificates "awarded about 38 percent of its credentials to students who did not receive any Federal aid," and "[t]here is a difference between an institution losing access to title IV, HEA funds and closing." *Id.* at 70,086, 70,093. But even assuming that the Department's 38% estimate is correct (and it is wrong by orders of magnitude with respect to Plaintiffs), the Department did not explain how a school could stay afloat after a precipitous loss of nearly two-thirds of its business.

In reality, the extraordinarily high costs associated with the 2023 Rule are undeniable, requiring the Department to establish commensurate benefits. It did not do so. The best argument that the Department mustered is that the benefits will outweigh the costs because students will transfer to "high-performing programs" that do "not fail the D/E rates or EP measure," and graduates of those programs will eventually earn greater income, which will lead to higher tax revenue for the federal government as well as state and local governments. *Id.* at 70,017, 70,152. But the majority of the cosmetology programs in the Department's dataset are likely to lose Title-IV eligibility, and the Department offered zero evidence that the remaining minority can accommodate the thousands of students currently attending "failing" programs. *See id.* at 70,138, 70,140. Making matters worse, the Department did not actually evaluate the overwhelming majority of gainful-employment programs— a whopping 74%—because of an insufficient "n-size." *See id.* at 70,127. So, even assuming that those other programs have capacity (and will resist the temptation to cap enrollment to avoid coming within range of the Department's lethal tests), the Department has no idea at all whether those schools are even *worse* than those that the Department now considers failures. Courts "do not defer to the agency's conclusory or unsupported suppositions." *Texas*, 10 F.4th at 555. Just so here.[17]

---

[17] The numerous defects with the debt-to-earnings and earnings-premium tests apply equally to the financial value transparency framework, as that framework uses the same tests. *See* p.16 n.5.

*       *       *

In sum, the ordinary meaning of the gainful-employment language offers no support for the Department's debt-to-earnings and earnings-premium tests, and the 2023 Rule is arbitrary and capricious several times over. Plaintiffs are more than likely to succeed on their challenge.

## II. Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction.

The irreparable-harm analysis is equally straightforward. "Complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). That is because "federal agencies generally enjoy sovereign immunity for any monetary damages," so regulated parties cannot recover costs once incurred. *Wages*, 16 F.4th at 1142. And that is also because, "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts.'" *Texas*, 829 F.3d at 433-34. As long as the "alleged compliance costs" are "'more than de minimis,'" nothing more is required. *Rest. L. Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023).

Plaintiffs will plainly suffer the irreparable harm absent a preliminary injunction. To comply with the 2023 Rule, schools must find, compile, and prepare an enormous of information about current and former students each year so that the Department can compute the unlawful tests at issue here. *See* 88 Fed. Reg. at 70,191. And the first reporting deadline is imminent: Before July 31, 2024, schools will have to collect all such data for the "second through seventh award years prior to July 1, 2024." *Id.* Unsurprisingly, then, the Department has conceded that schools "will incur costs" to "comply" with the 2023 Rule's reporting requirement, including in the "months" before the reporting deadline. *Id.* at 70,153, 70,063. Those costs are far more than de minimis. The Department has estimated that complying with the initial July 31 reporting requirement *alone* will consume "5.0 million hours" among "4,518" schools, producing a financial toll in excess of $244 million. *Id.* at 70,153-54; *see id.* at 70,009 (identifying "the additional reporting required by institutions" as one of "[t]he primary costs of the final regulations related to the financial value transparency and GE accountability require-ments"); *see also* 89 Fed. Reg. 13,059, 13,060 (Feb. 21, 2024).

It is easy to see why the Department is projecting such astronomical compliance costs. Tricoci is a case in point. Almost all of the information that the Department is requesting Tricoci to report by July 31 is stored on an antiquated system that will force Tricoci employees to engage in an exceptionally tedious, manual process in which they will attempt to retrieve information for over 17,000 students. *See* Ex.B ¶31; *cf.* 88 Fed. Reg. at 70,153 (acknowledging that "some institutions may still have data entry processes that are very manual in nature"). Tricoci will also have to obtain and report loan information for each student by scouring a federal database that does not organize that information by school or program—*i.e.*, Tricoci employees will have to search the database student-by-student. *See* Ex.B ¶32. All told, Tricoci anticipates that it will likely have to expend well over 1,000 hours seeking to comply with the July 31 reporting deadline (which explains the need for a preliminary-injunction decision by May 20). *See* Ex.B ¶¶35, 37. And Ogle likewise anticipates that it will have to devote more-than-de-minimis resources to comply with the reporting requirement too. *See* Ex.A ¶¶34-35. "No mechanism here exists for [Plaintiffs] to recover the compliance costs they will incur if the [2023] Rule is invalidated on the merits." *Texas*, 829 F.3d at 434. That is irreparable harm.

## III.    The Remaining Factors Likewise Support A Preliminary Injunction.

The public interest and balance of equities also militate in favor of a preliminary injunction. The "public interest is in having governmental agencies abide by the federal laws that govern their existence and operations," *Texas*, 10 F.4th at 559 (brackets omitted), and the Department "has no interest in the perpetuation of unlawful agency action," *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022); *see also Clarke v. CFTC*, 74 F.4th 627, 643-44 (5th Cir. 2023) ("[T]he public interest is served when administrative agencies comply with their obligations under the APA."). And because the public-interest factor supports a preliminary injunction, so too does the balance-of-equities factor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the public-interest and balance-of-equities factors "merge when the Government is the opposing party").

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for a preliminary injunction and do so no later than May 20, 2024.

Respectfully submitted,

Paul D. Clement, VA Bar #37915
  (pro hac vice forthcoming)
Andrew C. Lawrence, VA Bar #99830
  (pro hac vice forthcoming)
Kevin Wynosky*, PA Bar #326087
  (pro hac vice forthcoming)
Chadwick J. Harper*, DC Bar #90003325
  (pro hac vice forthcoming)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com
chad.harper@clementmurphy.com

\*Supervised by principals of the firm who are
  members of the Virginia bar

s/Cole Ramey
Cole Ramey, TX Bar #16494980
Christin Jones, TX Bar #24070017
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7126
cramey@ktslaw.com
cjones@ktslaw.com

*Counsel for Plaintiffs*

March 20, 2024

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | |
| v. | ) ) ) | No. _____ |
| U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the United States Secretary of Education, | ) ) ) ) ) | |
| *Defendants.* | ) ) ) | |

## DECLARATION OF JOHN BLAIR

I, John Blair, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer (CEO) of Ogle School Management, LLC (Ogle), which owns Ogle School Hair Skin Nails, a for-profit beauty school in Texas.

2.      I have worked at Ogle for 16 years and have served as CEO since 2013.

3.      Given my position as Ogle's CEO, I am familiar with the beauty industry generally and with Ogle's programs and students specifically.

4.      I am also familiar with the Department of Education's 2023 "gainful employment" rule (2023 Rule), *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023), and its expected effects on Ogle.  Among other things, I helped prepare a June 2023 comment letter that Ogle submitted during the rulemaking proceedings for the 2023 Rule.  That comment letter is attached to this declaration as Exhibit A-1.

## I.      Background of Ogle's History & Operations

5.      Shelton Ogle—a well-known hairstylist who began his career at a young age as the grandson of a well-known local barber—opened the first Ogle campus in Arlington, Texas in 1973.

6.      In the 50 years that have passed since the first school opened, Ogle has expanded to nine campuses in the Dallas/Ft. Worth, San Antonio, and Houston areas.  At those campuses, Ogle

offers two programs: cosmetology and esthetics. Our cosmetology program primarily focuses on hair care, cutting, styling, and coloring, though it also introduces students to basic manicure, pedicure, and skin care techniques. By contrast, our esthetics program focuses on skin care, makeup, and hair removal.

7. Ogle's mission is to prepare committed students for rewarding careers in the beauty industry through salon-modeled, student-centered training and development of the highest caliber. Ogle models its campuses after successful salons to help students learn how to get a head start when they enter the profession.

8. Ogle and its programs are licensed by the Texas Department of Licensure and Regulation, which specifies course curriculum and minimum hours needed for licensure.

9. Ogle is accredited by the National Accrediting Commission of Career Arts and Sciences, a nationally recognized accrediting agency that is on the Department of Education's list of "Institutional Accrediting Agencies"—*i.e.*, accrediting agencies that are "recognized by the Secretary [of Education] as reliable authorities concerning the quality of education or training offered by the institutions of higher education or higher education programs they accredit." Dep't of Educ., *Accreditation in the United States* (last modified Jan. 16, 2024), https://rb.gy/459xfu.

10. The Department of Education recognizes Ogle as an eligible institution for purposes of the student aid programs administered under Title IV of the Higher Education Act (HEA). That recognition reflects the Department's understanding that Ogle provides at least one eligible program of training to prepare students for gainful employment in a recognized occupation. In fact, the Department recognizes both of Ogle's programs as Title IV eligible programs.

11. Ogle's programs are popular. In 2023, for example, Ogle enrolled a total of 3,723 students across both of its programs and produced 2,413 graduates (with 1,315 graduates in the esthetics program and 1,098 graduates in the cosmetology program). As a result, Ogle's programs regularly satisfy the 2023 Rule's "n-size" requirement—*i.e.*, having at least 30 completers in a program over a two- or four-year cohort period.

2

12.    The overwhelming majority of Ogle's students—91.4%—use Title IV aid to fund their education.

13.    Ogle's students are predominantly from historically disadvantaged groups. Ogle's students are almost exclusively female (98%). Ogle's students also largely identify as members of racial minorities. Currently, 38% identify as Black/African-American, and 34% identify as Hispanic. Furthermore, almost 80% of Ogle's students receive Pell grants, which are reserved for students with exceptional financial need.

14.    Ogle's students are also young, with a median age at graduation of 24.

15.    Ogle is proud of its record of preparing its students for rewarding careers in the beauty and wellness industry (although Ogle of course cannot control whether students in fact decide to pursue such careers after graduating). Our most recent cohort of students had an 81.80% graduation rate; 83.08% were placed within their field of study; and 98.65% of students who sat for state licensure exams passed.

16.    Upon graduating from Ogle, the average student has $7,436 in student-loan debt, and the average payment for those loans, amortized over a 10-year period, is $83 per month.

17.    This relatively low debt burden provides Ogle graduates with the flexibility to tailor their career paths to fit their personal ambitions. Although some Ogle students seek to enter the beauty and wellness industry as their full-time occupation, other students have different goals. For instance, some graduates choose to work only part-time in the beauty and wellness industry to accommodate family obligations or other responsibilities. Other graduates may choose to leave the work force altogether for similar reasons.

18.    Despite these varying paths, Ogle's graduates default on their student loans relatively infrequently. The Department of Education has never declared Ogle ineligible to participate in Title IV programs because of its "cohort default rates," since Ogle's rates are always well below the levels that Congress has deemed unreasonable. *See* 20 U.S.C. §1085(a)(2)(A), (B)(iv), (m)(1).

19.    This indicates that the great majority of Ogle graduates have sufficient funds to pay down their student loans. However, Ogle does not know how many of its graduates report all of their

earnings to the federal government, as Ogle does not prepare its graduates' tax returns. But as Ogle explained to the Department of Education during the notice-and-comment period for the 2023 Rule, it is well-recognized that, as a general matter, the beauty industry continues to suffer from underreported earnings by workers, many of whom transact business in cash, accept cash tips, and operate their own businesses.

## II.    The 2023 Rule's Expected Effects on Ogle

20.    Although Ogle has well prepared thousands of students for gainful employment in the beauty and wellness industry for over half-a-century, the 2023 Rule will severely complicate Ogle's ability to continue doing so in the future.

21.    According to my understanding, the 2023 Rule establishes two tests. The "debt-to-earnings" test examines whether the median program graduate who is three years removed from graduation devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt each year. The "earnings-premium" test examines whether the median program graduate who is three years removed from graduation, even if she has opted out of the labor force by that time, earns less than the median high school graduate in the labor force aged 25-34. If a program fails either one of these tests just once, the school must issue a warning to students enrolled or interested in a program alerting them that the program may lose its Title IV eligibility the following year. Then, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title IV programs entirely.

22.    Ogle does not have access to the data that the Department of Education will use to assess the earnings of Ogle's graduates moving forward. Nor does the 2023 Rule provide any mechanism for Ogle to review that data for accuracy. But the Department publicly released an illustrative dataset with 2019 data during the proceedings for the 2023 Rule,[1] and it shows that most

---

[1] The dataset is available at https://rb.gy/80w20a (go to "General Information," then expand "Federal Register Notices and Fact Sheets" and select "GE Data 3"). An accompanying code sheet explaining the column labels is available at the same location (select "GE Data 2").

cosmetology and personal grooming programs nationwide will fail one or both of the 2023 Rule's tests. In fact, of the programs that met the 2023 Rule's "n-size" requirement, the dataset revealed that all but 13 cosmetology and personal grooming programs nationwide would fail one or both of the 2023 Rule's tests. Furthermore, the dataset showed that all of Ogle's programs—spanning Ogle's Arlington, Fort Worth, and Hurst main campuses, which have branch campuses—would fail the earnings-premium measure based on 2019 data.[2]

23.     Failing even one of the 2023 Rule's tests just once would significantly disrupt Ogle's operations. If Ogle is required to issue warnings to all current and prospective students emphasizing that their program may soon lose Title IV eligibility, there is a material risk that student retention and matriculation rates will decline as a result. The Department of Education agrees with that assessment. As the Department explained in the 2023 Rule, "[s]ome students who receive a warning may decide to transfer to another program or choose not to enroll in such a program," and "it may be more difficult for programs that must issue student warnings to attract and retain students." 88 Fed. Reg. at 70,078.

24.     Ogle would suffer an even more significant blow if, as expected, its programs are prohibited from participating in Title IV programs. That is because 91.4% of Ogle's students rely on Title IV aid to fund their education, and nearly 74% of Ogle's revenue comes from Title IV funding.

25.     The 2023 Rule also imposes substantial burdens on Ogle that are even more immediate. To compute the metrics used in the two tests established by the 2023 Rule, the Department is requiring schools to provide it with the following information for "each student":

      a.     Information needed to identify the student and the institution;

      b.     The date the student initially enrolled in the program;

---

[2] The Department of Education's dataset evaluated programs by utilizing "OPEID" numbers—*i.e.*, Office of Postsecondary Education Identification numbers. OPEIDs identify schools with "program participation agreements" with the Department, which are necessary for schools to participate in Title IV programs. Ogle has three OPEIDs because it has three main campuses, and the Department's dataset identified all three as failing the earnings-premium measure.

      c.       The student's attendance dates and attendance status (*e.g.*, enrolled, withdrawn, or completed) in the program during the award year;

      d.       The student's enrollment status (*e.g.*, full time, three-quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;

      e.       The student's total annual cost of attendance (COA);

      f.       The total tuition and fees assessed to the student for the award year;

      g.       The student's residency tuition status by State or district;

      h.       The student's total annual allowance for books, supplies, and equipment from their COA under HEA section 472;

      i.       The student's total annual allowance for housing and food from their COA under HEA section 472;

      j.       The amount of institutional grants and scholarships disbursed to the student;

      k.       The amount of other State, Tribal, or private grants disbursed to the student; and

      l.       The amount of any private education loans disbursed to the student for enrollment in the program that the institution is, or should reasonably be, aware of, including private education loans made by the institution.

*Id.* at 70,191 (discussing 34 C.F.R. §668.408(a)(2)).

26.     Furthermore, if the student completed or withdrew from the program during the award year, the school must also provide the following additional information:

      m.       The date the student completed or withdrew from the program;

      n.       The total amount the student received from private education loans, as described in 34 C.F.R. §668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;

o.   The total amount of institutional debt, as described in 34 C.F.R. §668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;

p.   The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;

q.   The total amount of the allowances for books, supplies, and equipment included in the student's Title IV COA for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and

r.   The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program.

*Id.* (discussing 34 C.F.R. §668.408(a)(3)).

27.   On top of that, the school must also provide:

s.   Any other information that the Secretary of Education requires the institution to report.

*Id.* (discussing 34 C.F.R. §668.408(a)(4)).

28.   The first reporting deadline for the 2023 Rule is July 31, 2024.  By that date, schools will have to provide the aforementioned information for the "second through seventh award years prior to July 1, 2024."  *Id.*  In subsequent years, the reporting deadline is October 1.  *Id.*

29.   Although the Department of Education promised to "provide institutions with guidance and training on the new reporting requirements, provide a format for reporting, and enable [its] systems to accept reporting from institutions beginning several months prior to the July 31, 2024, deadline so that institutions have sufficient time to submit their data for the first reporting period," the Department has not yet done so.  88. Fed. Reg. at 70,061.

30.   Nevertheless, Ogle anticipates that, between now and July 31, 2024, it will have to expend significant resources to comply with the onerous reporting requirement.

31.     Because the 2023 Rule requires schools to report student information dating back as early as 2017, complying with the initial reporting requirement will force Ogle employees to engage in a tedious, manual process in which they will have to retrieve information for over 15,000 students.

32.     In addition, obtaining the student-debt information that the 2023 Rule requires schools to report will likewise require searching for individual student information seriatim on the National Student Loan Data System.

33.     Across all schools, the Department of Education has estimated a substantial "time cost of these reporting requirements": "5.0 million hours initially and then 1.4 million hours annually after the first year," which will impose a financial cost on schools in excess of $244 million initially and in excess of $70 million after the first year.   *Id.* at 70,153; *see also* 89 Fed. Reg. 13,059, 13,060 (Feb. 21, 2024) (Department offering similar estimate more recently).

34.     At the institutional level, the Department of Education estimates that, on average, "proprietary 2-year" schools will have to devote approximately 186 hours to comply with the 2023 Rule's reporting requirement before July 31, 2024.  *See* 88 Fed. Reg. at 70,153 (Table 5.3.1).

35.     I have no reason to doubt that Ogle's compliance costs will meaningfully deviate from the Department's estimate.

36.     It is my understanding that, because the defendants in this action enjoy sovereign immunity, Ogle is unable recover these compliance costs once incurred.

*      *      *

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2024.

_____

John Blair

# Exhibit A-1

# OGLE SCHOOL
## HAIR · SKIN · NAILS

2208 W. Park Row, Suite 100 Arlington, TX 76013     817-277-6341     FAX: 855-683-4581

VIA REGULATIONS.GOV

June 20, 2023

The Honorable Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington, D.C.  20202

**RE:     Docket ID ED-2023-OPE-0089**

Dear Secretary Cardona:

Ogle School Hair Skin Nails ("Ogle") respectfully provides this comment to the U.S. Department of Education (the "Department") regarding the Notice of Proposed Rule Making ("NPRM") regarding the Financial Value Transparency and Gainful Employment ("GE Rule"), Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit ("ATB") published by the Department in the federal register on May 19, 2023 (Docket ID ED-2023-OPE-0089).

The GE Rule would establish both Financial Value Transparency and a GE Rule.  We agree with the Department that Financial Value Transparency should be provided by all programs across all sectors of higher education.  However, we have concerns over the purported justification for the proposed rule change, the accuracy of the earnings data used, the appropriateness of the Earnings Premium ("EP") metric, the effect this regulation will have on the education of barbers and cosmetologists in Texas and nationwide, as well as the impact on the labor markets for those professions.   We further believe that the Department failed to meet its minimum obligations under the Administrative Procedures Act ("APA") in issuing the NPRM.  Accordingly, the Department should rescind the proposed rule.

## I.     BACKGROUND

Shelton Ogle opened the first Ogle campus in 1973 in Arlington, Texas.  At the time, Mr. Shelton was a well-known hairstylist who began his career at a young age as the grandson of a well-known local barber.  In the fifty years that have passed since the first school opened, Ogle has expanded to nine schools in the Dallas/Ft. Worth, San Antonio, and Houston areas.  Ogle School prepares committed students for rewarding careers in the beauty industry through salon-modeled, student-centered training and development of the highest caliber.  Ogle models its campuses after successful salons to help students learn how to get a head start when they enter the profession.  We accept shared accountability with our students for completion, licensure, and placement in the field.

DM1\14232568.3

Ogle currently has 2,180 students across its nine campuses in Texas. Seventy-nine percent of our current students received Pell Grants. Our students have high completion and placement rates. Across our system, those rates are as follows (as reported to the National Accrediting Commission of Career Arts and Sciences ("NACCAS") in our most recent annual report): 85% graduation rate and 71% placement rate. Our licensure pass rate is likewise high—1,458 students sat for the state licensure exam and 1,442 students passed, equating to a 99% licensure rate.

Our students can expect to have reasonable amounts of debt and payments on that debt after they leave school. Our median debt for students is $7,917 (Esthetics) and $9,606 (Cosmetology) and the average monthly payment is $88 (Esthetics) and $107 (Cosmetology). We are proud of what our students have achieved in these areas. We believe that through hard work and shared accountability, we can help our students become successful professionals. Unfortunately, the rule proposed in the NPRM will likely result in the failure of all or nearly all of our cosmetology and esthetics programs. For this reason, we provide the following comment on the rule.

## II.    FINANCIAL VALUE TRANSPARENCY AND GAINFUL EMPLOYMENT

### A.    The Proposed Earnings Metric Represents an Unjustified Rule Change and is Justified by Inaccurate Government Data

The Department justifies the proposed changes to the GE Rule – namely the addition of the EP metric and conditioning continued program eligibility on passing the GE metrics as necessary to ensure program quality and to protect consumers. This justification, however, is poorly supported and does not consider any actual facts specific to any program or as set forth by any state, professional boards, or accreditors.

For example, all cosmetology professionals in the United States must be licensed by state boards for the protection of the public. In Texas, the Texas Department of Licensure and Regulation ("TDLR") sets the conditions of licensure, including testing and education. TDLR likewise licenses cosmetology education schools. It specifies course curriculum and minimum hours needed for licensure. It reviews school applications for initial licensure and renewal on a regular basis. TDLR conducts in-person inspections of facilities and responds to complaints from students and the general public. TDLR also meets the Department's requirements as a state licensing authority.

TDLR, by itself, provides sufficient assurance of program quality, but in Ogle's case, NACCAS also accredits us. NACCAS's Standards of Accreditation include measures of program quality, including outcome measures. Ogle consistently meets these measures. NACCAS accepts and investigates complaints and has minimum requirements for program content, quality, and delivery. NACCAS enforces its Standards through the initial and re-accreditation process, regular site visits, and monitoring of programs through annual reports and other submissions by institutions. Together, TDLR and NACCAS represent sufficiently strong guarantors of program quality such that the proposed GE Rule would not meaningfully improve

DM1\14232568.3

programs.  Simply put, the proposed use of the GE metric as a program quality measure and eligibility criteria is unnecessary.[1]

We further object to several key components of the proposed rule because it relies on earnings data that the Department admits is inaccurate.  First, the lack of ability of schools to review the earnings data for accuracy is fundamentally unfair.  Schools are unable to review the data cannot ensure that it accurately reflects the earnings of their graduates.  It also deprives them of the ability to understand how the earnings data is calculated and whether the methodology is appropriate.

Lack of access to data further prevents schools from making changes that could improve outcomes.  For example, schools will only be informed of the aggregated median income amount.  However, without visibility to the data spread for earners, schools cannot know where individuals fall on the spectrum of income.  If a handful of graduates are skewing the data high or low, then schools should know this so they can focus more on equity in outcomes and placement.  The Department's proposal does nothing to address this.  This is particularly the case with our graduates, who often choose to work part-time, or outside commercial establishments, which will likely reduce their reported salaries (although such outcomes are consistent with their goals).

The proposed GE Rule also relies on inaccurate government data as a basis for its EP Measure.  The Department proposes to use one of several government sources to benchmark earnings, without committing to use one source or another.  The Department states that it is doing this to correct the inaccurate earnings data issue.  The Department does not, however adequately explain why this change would increase accuracy.  To the contrary, this makes the situation worse.  The multiple agencies that collect the data use different methods for collection and processing of data.  This means that institutions and the public will have less visibility into what the earnings data actually represents and its suitability for the intended purpose – to influence prospective students in making decisions on which educational programs to pursue. Moreover, it is unclear how the Department will select what data to use and whether there are safeguards to ensure the Department will not arbitrarily select data to use.  Additionally, the use of some of these data sources may violate either the Futures Act, 26 U.S.C. § 6103 or the Privacy Act of 1974, 5 U.S.C. § 552A.

The Department has admitted in the past that government data for graduates of cosmetology programs is inaccurate for several reasons, including the underreporting of tip and cash income and the prevalence of graduates who are self-employed.  Cash tipping or cash compensation of beauty professionals is commonplace in the industry.  It is well-known that

---

[1] To the contrary, the proposed rule is unhelpful as a guide for program quality.  Its reliance on inaccurate government earnings data as a threshold for eligibility is misleading to the public and to policy makers.  Further, its use of data from the past means that institutions cannot analyze and respond to the data, even if it was accurate.  It is simply a punitive rule that hurts students and institutions.

such cash transactions, often inadvertently, are not fully reported to government sources.[2] Moreover, the fact is that licensed beauty professionals have the ability to start their own businesses, either as a salon, a standalone booth rental, or even in their own homes in many cases. This results in not only the underreporting of income, but also in the deduction of business expenses from overall reported income to government sources such as the IRS.

Furthermore, the failure to provide any process to challenge inaccurate data represents a deprivation of due process and introduces more risk of data inaccuracy. Of course, the right to an appeal is a pillar of American law and a hallmark of the federal administrative process. It ensures parties are treated fairly and that closer cases receive the additional attention needed to ensure the correctness of any decision. In addition, given the information is being provided to the public to be relied on in making education decisions, the public has an interest as well in the information being accurate. Earnings appeal data, such as was gathered in connection with earnings appeals under prior iterations of the GE Rule, may be different from government data on earnings for many reasons. First, agencies use different methodologies for collecting and reporting data. Second, the beauty industry continues to suffer from underreported earnings by workers, many of whom transact business in cash, accept cash tips, and operate their own businesses. This results in a macro-level underreporting of income. The Department has erroneously suggested that the IRS's lowering of the reporting threshold for requiring form 1099-k to be issued under the American Rescue Plan Act ("ARPA") addresses this issue. Under this IRS plan, previously characterized cash transactions conducted through apps and other alternate banking methods will be reported on a 1099-k if they exceed $600. However, the IRS has not yet implemented this rule, which has been delayed. We note also that IRS funding for enforcement has been reduced by Congress as part of the debt ceiling increase. At this stage, any change to the IRS practice in this area will not be effective in time to have any impact on the collection of earnings data for the proposed rule.

Accordingly, the Department should provide visibility to earnings data by picking one source of data, and reinstate the ability of schools to review and challenge data, including the use of an earnings appeal as provided in prior versions of the GE Rule.

### B.      The EP Measure is an Arbitrary Metric and Fails to Account for Student Demographics

The Department states that the goal of the EP Measure is to compare the earnings of those who attend an educational program against those who just complete high school. The metric compares the median annual earnings of the Title IV recipients who completed the program three years after completions, to the median earnings of high school graduates between the ages of 25 and 34. If a program graduate earns more than a high school graduate, then the Department posits that he/she has "gained" financially. The EP Measure excludes from high school graduate earnings those who are not in the workforce (rendering the number higher than if they were included). The high school earnings are drawn from Census Bureau data in the state in

---

[2] Dr. Cellini acknowledged this in her reports and has even proposed an adjustment to income for cosmetology programs in light of the issue. *Hair and Taxes: Cosmetology Programs, Accountability Policy, and the Problem of Underreported Income* Cellini & Blanchard, George Washington University (2022).

which the institution is located, or nationally if less than half of the students are located in the same state as the institution.

The EP Measure is an arbitrary threshold against which to compare our student program completers that is not related to the demographics of our student population.  The Department along with other federal government agencies, has recognized that a wage disparity exists between women and men, and between women of color and men.  For example, the population of Ogle School is far more heavily female and minority than the overall population of Texas.

**System-Wide Race Identified by Ogle School Students vs. Texas**

| Race Identified by Student | Percentage of Student Population | Texas[3] |
|---|---|---|
| African American | 38.81% | 12.1% |
| Hispanic/Latino | 32.52% | 30.7% |
| White | 19.08% | 69.16% |
| Asian | 1.19% | 4.94% |
| American Indian or Alaska Native | 0.50% | 0.48% |
| Native Hawaiian or other Pacific Islander | 0.23% | 0.09% |
| Two or more races | 5.51% | 6.98% |

**System-Wide Gender Identified by Ogle School Students vs. Texas**

| Gender Identified by Student | Percentage of Student Population | Texas[4] |
|---|---|---|
| Female | 98% | 50.34% |
| Male | 2% | 49.66% |

Given the federal recognition of the wage disparity between men and women and between racial and ethnic groups, it seems wholly inconsistent to hold programs accountable for

---

[3] World Population Review, Texas Population 2023, (June 14, 2023), https://worldpopulationreview.com/states/texas-population

[4] *Id.*

overcoming societal wage disparities.  Consequently, we suggest that the Department eliminate or revise the EP Measure to control for both gender and race.

The EP Measure also does not account for differences in age or years of work experience. The average age of graduates from our programs is 26 (Esthetics) and 27 (Cosmetology).  This means that the Department expects, on average, graduates who have been working for roughly 2-3 years in their chosen field (and are aged 29 or 30), to have achieved salaries of people that have been in the work force between 7 (age 25) and 16 (age 34) years out of high school.  Those individuals counted in the EP Measure data will have much more time to begin their working careers.  As such, it is wholly unfair to have a measure that compares the salaries of recent graduates of our programs with people that have been working for so long.

Further, this measure also does not consider differences between the salary curve and other disparities between various professions.  For example, it does not consider the time it takes professionals in the beauty industry to build their business or book of clients.  It is widely recognized that beauty professionals earn far-higher wages once they establish business or have a stable book of clients – both of which take time and does not occur in the first three years after graduation.  Moreover, by comparing the salaries of one program to a wage rate that includes people of various professions provide an "apples to oranges" comparison.  A cosmetologist's salary should not be compared to a metric that includes people working in the petroleum industry for over 10 years in Texas, or other professions that do not need a post-secondary degree and are very well compensated.  It might make more sense for the Department to compare the salaries achieved by program graduates with the salaries in the profession as reported by the Bureau of Labor Statistics (at the 10th percentile, which is generally reflective of new employees).

The Department's own projections show more than two-thirds of all barbering and cosmetology programs – regardless of whether the schools are organized as for-profit, non-profit or public institutions – fail the new EP metric.  Moreover, the vast majority of those programs that "pass" are merely too small to have sufficient data to be evaluated.  Given the Department's data on salaries for these professions, it is highly unlikely any of them would pass if measured.  This illustrates the unfairness of comparing the salaries related to one profession with salaries from high school graduates generally.  It has nothing to do with the program or the institution and everything to do with society at large.  By prohibiting would-be barbers and cosmetologists from accessing Title IV funding from the vast majority of barbering and cosmetology programs throughout the country, it will have dramatic effect on the labor situation in these fields.  The Department has not said it intends the GE rule to dissuade people from going into various professions – but given its construction, that is the actual effect.

 Accordingly, in addition to controlling the EP Measure for race, gender and years of work history, we suggest it be controlled on a programmatic/professional basis.

## III.    FINANCIAL RESPONSIBILITY, CERTIFICATION AND ADMINISTRATIVE CAPABILITY CONCERNS

While Ogle has significant concerns regarding the GE Rule and the Department's reliance on inaccurate income data, Ogle is further concerned that the NPRM further burdens

institutions with vague, duplicative, and irrational additional regulations under the proposed financial responsibility, certification and administrative capability rules.

Violation of the GE Rule carries its own consequences. Tying failing GE programs to financial responsibility, certification and administrative capability unreasonably and unfairly stacks multiple adverse consequences on institutions for the same violation, which will lead to institutional failures. Moreover, the proposed amendments to financial responsibility and administrative capability are overbroad and/or vague.

### A.    The Proposed Financial Responsibility Amendments are Overbroad

The Department proposes, under the draft of Section 668.171(c)(1), various discretionary and mandatory triggers requiring an institution to provide financial assurance measures, including letters of credit. These triggering events are overboard and not directly related to an institution's financial responsibility.

For example, the discretionary trigger for a citation issued by a state licensing agency poses particular difficulties for cosmetology schools. Cosmetology schools are licensed and regulated by state boards of cosmetology—in Texas, TDLR. These boards regularly inspect the school's salon facilities and may issue citations for relatively minor health and safety code issues, such as failure to store clean and disinfected tools in a particular area. As this minor infraction is technically a citation issued by a state licensing agency, it could result in a discretionary trigger imposed on Ogle although the citation has no relationship to our financial responsibility.

### B.    The Proposed Administrative Capability Regulations are Vague

The proposed amendments to 34 C.F.R. § 668.16 unfairly utilize vague new terms to gauge administrative capability.

For example, institutions must provide "adequate" career services. The Department states that the term "adequate" will not be the same for all institutions, which leaves the Department with too much discretion and no notice to institutions as to what is required to comply with the rule. This vague term is even more problematic for cosmetology schools as many graduates seek self-employment upon graduation.  The Department must set forth specifically how it will evaluate adequacy in terms of a significant number of students who do not utilize career services to locate employment in traditional salons and instead pursue self-employment in booth rentals, starting their own salons, or other forms of flexible or part-time work.

For all these reasons, we ask that the Department rescind the proposal and maintain the current regulations regarding administrative capability, certification and financial responsibility.

## IV.    PROCEDURAL IRREGULARITIES VIOLATE THE ADMINISTRATIVE PROCEDURES ACT

At several points during this rulemaking process, the Department has violated the requirements of the Administrative Procedures Act ("APA").  It has done so by failing to: give cosmetology schools representation at the negotiating table during NEGREG, sufficiently

consider the EP Measure, engage in in-person negotiation, and provide a sufficient comment period.

To begin, the Department inexplicably failed to appoint a negotiator representing cosmetology schools for NEGREG. It was required to do so. The beauty and wellness education sector is by far the most impacted by this rulemaking. The industry's trade association, the American Association of Cosmetology Schools ("AACS") submitted proposed negotiators, but the request was denied. Cosmetology schools and their students have unique issues that should have been represented during this process given the dramatic, adverse impact of the proposed rule on these schools. The Department's failure to include a negotiator from the sector has led to a rule that disproportionately impacts these programs and has prejudiced these schools, including Ogle.

Cosmetology and Esthetics are our only programs and without them, Ogle will be unable to stay in business. Other colleges offering GE programs do not face this challenge because they can offer a catalog of programs. Cosmetology schools cannot offer other kinds of programs because they are outside of our state approval/licensure and outside the scope of our accreditor.

In addition, the Department and the negotiators failed to consider the EP Measure adequately. The EP Measure was not fully discussed during the negotiated rulemaking. The Department combined the gainful employment rulemaking with six other major topics, when in the past the Department gave entire negotiating sessions to a single GE topic. Worse, the EP Measure was not part of the initial proposal by the Department. Instead, it was introduced at the last moment and was barely discussed or vetted by the committee. Under these circumstances, it cannot be said that the proposal was properly considered as required by the APA.

Further, despite the fact that the pandemic was in end-stage, the Department declined to conduct negotiations in person. Use of remote negotiations via videoconference was not justified and a departure from precedent. It precluded effective participation of the public at a time when public health concerns did not require it. Masks were widely available and vaccinations were common. Less restrictive means were available to the Department to conduct the negotiations to provide for health and safety, including social distancing, use of masks, and ensuring those present were vaccinated. In-person negotiation presented minimal to no health risk, with the benefit of providing for full public participation that is allowed in an in-person session.

Finally, the allowance of 30 days to comment on the rule is simply not enough. Several others, including the American Council on Education and AACS, have raised this concern but the Department has ignored those requests for additional time. In other negotiations, the Department allowed the public 45 to 60 days to comment on the proposed rule. Here, the Department has only allowed for 30 days. The proposed rule is a complex measure that requires analysis of multiple data sources. The sources relied upon by the Department contain significant disparities and are highly-prejudicial to cosmetology programs.

DM1\14232568.3

## V.    CONCLUSION

Thank you for your careful consideration of the issues we have raised in this comment. We appreciate the opportunity to comment on the proposed rule package.  We agree with and support the Department's efforts to increase transparency and accountability for all institutions and programs.  However, in light of our concerns, we ask that the Department rescind the proposed rule to allow for further consideration and dialogue about the impact on cosmetology programs. Additionally, we wish to expressly incorporate by reference the comments submitted by AACS to the NPRM.  We ask that the Department consider and respond to the issues raised in this comment and that of AACS.

Sincerely,

John Blair
CEO
Ogle School Hair Skin Nails

9

# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC, | ) ) ) | |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) ) | No. _____ |
| U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the United States Secretary of Education, | ) ) ) ) ) | |
| *Defendants*. | ) ) ) ) | |

## DECLARATION OF NATE SWANSON

I, Nate Swanson, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Executive Officer (CEO) of Tricoci University of Beauty Culture, LLC (Tricoci), a for-profit beauty school.

2.      I have served as Tricoci's CEO since March 2020.

3.      Given my position as Tricoci's CEO, I am familiar with the beauty industry generally and with Tricoci's programs and students specifically.

4.      I am also familiar with the Department of Education's 2023 "gainful employment" rule (2023 Rule), *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023), and its expected effects on Tricoci. Among other things, I helped prepare a June 2023 comment letter that Tricoci submitted during the rulemaking proceedings for the 2023 Rule. That comment letter is attached to this declaration as Exhibit B-1.

## I.      Background of Tricoci's History & Operations

5.      Marico Tricoci—a renowned hair stylist who emigrated to the United States from Italy—founded Tricoci in Chicago, Illinois in 2004.

6.      Mr. Tricoci founded the school with a mission to provide an advanced education to students that would produce salon-ready professionals upon graduation.

7.      Since its founding two decades ago, Tricoci has expanded considerably.  Today, Tricoci offers five educational programs—in cosmetology, esthetics, barbering, manicuring, and instructor training—at 15 campuses across Illinois, Indiana, and Wisconsin.

8.      Tricoci is licensed by the states in which it operates, and each of our programs is licensed by the relevant state boards of cosmetology and barbering.

9.      Tricoci is accredited by the National Accrediting Commission of Career Arts and Sciences, a nationally recognized accrediting agency that is on the Department of Education's list of "Institutional Accrediting Agencies"—*i.e.*, accrediting agencies that are "recognized by the Secretary [of Education] as reliable authorities concerning the quality of education or training offered by the institutions of higher education or higher education programs they accredit."  Dep't of Educ., *Accreditation in the United States* (last modified Jan. 16, 2024), https://rb.gy/459xfu.

10.      In 2008, the Department of Education first certified Tricoci as an eligible institution for purposes of the student aid programs administered under Title IV of the Higher Education Act (HEA).  That certification remains in effect today and reflects the Department's present understanding that Tricoci provides at least one eligible program of training to prepare students for gainful employment in a recognized occupation.  In fact, the Department currently recognizes each of Tricoci's programs as Title IV eligible programs.

11.      Tricoci's programs are popular.  In 2023, for example, Tricoci enrolled a total of 4,878 students across all of its programs and produced 2,019 graduates (with 582 graduates in cosmetology and 1,279 graduates in esthetics).  As a result, Tricoci's programs regularly satisfy the 2023 Rule's "n-size" requirement—*i.e.*, having at least 30 completers in a program over a two- or four-year cohort period.

12.      The overwhelming majority of Tricoci's students—92%—use Title IV aid to fund their education.

13.     Tricoci's students are predominantly from historically disadvantaged groups.  Tricoci's students are almost exclusively female (96%).  Tricoci's students also largely identify as members of racial minorities.  Currently, 38% identify as Black/African-American, and 25% identify as Hispanic.

14.     Tricoci's students are also young, with a median age at graduation of 23.

15.     Tricoci is proud of its record of preparing its students for rewarding careers in the beauty and wellness industry (although Tricoci of course cannot control whether students in fact decide to pursue such careers after graduating).  Our most recent cohort of students had an 83.7% graduation rate; 83.4% were placed within their field of study; and 86.1% passed their state licensure exams.

16.     Upon graduating from Tricoci, the average student has $6,696.94 in student-loan debt, and the average payment for these loans, amortized over a 10-year period, is $65.18 per month.

17.     This relatively low debt burden provides Tricoci graduates with the flexibility to tailor their career paths to fit their personal ambitions.  Although some Tricoci students seek to enter the beauty and wellness industry as their full-time occupation, other students have different goals.  For instance, some graduates choose to work only part-time in the beauty and wellness industry to accommodate family obligations or other responsibilities.  Other graduates may choose to leave the work force altogether for similar reasons.

18.     Despite these varying paths, Tricoci's graduates default on their student loans relatively infrequently.  The Department of Education has never declared Tricoci ineligible to participate in Title IV programs because of its "cohort default rates," since Tricoci's rates are always well below the levels that Congress has deemed unreasonable.  *See* 20 U.S.C. §1085(a)(2)(A), (B)(iv), (m)(1).  For example, in FY2018—before the Department suspended loan repayments in light of the COVID-19 pandemic—Tricoci had a cohort default rate of 7.5% (in-line with the national average of 7.3%), and in FY2017, Tricoci had a cohort default rate of 8.2% (below the national average of 9.7%).

19.     These statistics indicate that the great majority of Tricoci graduates have sufficient funds to pay down their student loans.  However, Tricoci does not know how many of its graduates report all of their earnings to the federal government, as Tricoci does not prepare its graduates' tax

3

returns.  But as Tricoci explained to the Department of Education during the rulemaking proceedings, it is well-recognized that, as a general matter, beauty and wellness professionals underreport income because they are compensated or tipped in cash.

## II.    The 2023 Rule's Expected Effects on Tricoci

20.    Although Tricoci has well prepared thousands of students for gainful employment in the beauty and wellness industry for two decades, the 2023 Rule will severely complicate Tricoci's ability to continue doing so in the future.

21.    According to my understanding, the 2023 Rule establishes two tests.  The "debt-to-earnings" test examines whether the median program graduate who is three years removed from graduation devotes more than 8% of her annual earnings or more than 20% of her discretionary earnings (defined as annual earnings above 150% of the federal poverty guideline) to pay down her student-loan debt each year.  The "earnings-premium" test examines whether the median program graduate who is three years removed from graduation, even if she has opted out of the labor force by that time, earns less than the median high school graduate in the labor force aged 25-34.  If a program fails either one of these tests just once, the school must issue a warning to students enrolled or interested in a program alerting them that the program may lose its Title IV eligibility the following year.  Then, if a program fails the same metric in two out of three consecutive years, it is disqualified from Title IV programs entirely.

22.    Tricoci does not have access to the data that the Department of Education will use to assess the earnings of Tricoci's graduates moving forward.  Nor does the 2023 Rule provide any mechanism for Tricoci to review that data for accuracy.  But the Department publicly released an illustrative dataset with 2019 data during the proceedings for the 2023 Rule,[1] and it shows that most cosmetology and personal grooming programs nationwide will fail one or both of the 2023 Rule's tests.  In fact, of the programs that met the 2023 Rule's "n-size" requirement, the dataset revealed that

---

[1]  The dataset is available at https://rb.gy/80w20a (go to "General Information," then expand "Federal Register Notices and Fact Sheets" and select "GE Data 3").  An accompanying code sheet explaining the column labels is available at the same location (select "GE Data 2").

all but 13 cosmetology and personal grooming programs nationwide would fail one or both of the 2023 Rule's tests. Furthermore, the dataset showed that virtually all of Tricoci's programs would fail the 2023 Rule's metrics based on 2019 data.[2]

23.    Failing even one of the 2023 Rule's tests just once would significantly disrupt Tricoci's operations. If Tricoci is required to issue warnings to all current and prospective students emphasizing that their program may soon lose Title IV eligibility, there is a material risk that student retention and matriculation rates will decline as a result. The Department of Education agrees with that assessment. As the Department explained in the 2023 Rule, "[s]ome students who receive a warning may decide to transfer to another program or choose not to enroll in such a program," and "it may be more difficult for programs that must issue student warnings to attract and retain students." 88 Fed. Reg. at 70,078.

24.    Tricoci would suffer an even more significant blow if, as expected, its programs are prohibited from participating in Title IV programs. That is because 92% of Tricoci's students rely on Title IV aid to fund their education, and 74% of Tricoci's revenue currently comes from Title IV funding.

25.    The 2023 Rule also imposes substantial burdens on Tricoci that are more immediate. To compute the metrics used in the two tests established by the 2023 Rule, the Department is requiring schools to provide it with the following information for "each student":

  a.    Information needed to identify the student and the institution;

  b.    The date the student initially enrolled in the program;

  c.    The student's attendance dates and attendance status (*e.g.*, enrolled, withdrawn, or completed) in the program during the award year;

---

[2] The Department of Education's dataset evaluated programs by utilizing "OPEID" numbers—*i.e.*, Office of Postsecondary Education Identification numbers. OPEIDs identify schools with "program participation agreements" with the Department, which are necessary for schools to participate in Title IV programs. Tricoci has 11 OPEIDs that correspond to different campuses, and some of those campuses have branch campuses. The Department identified 10 of Tricoci's OPEIDs as failing one or more of the 2023 Rule's tests. The Department stated that it had no data for the eleventh OPEID.

      d.      The student's enrollment status (*e.g.*, full time, three-quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;

      e.      The student's total annual cost of attendance (COA);

      f.      The total tuition and fees assessed to the student for the award year;

      g.      The student's residency tuition status by State or district;

      h.      The student's total annual allowance for books, supplies, and equipment from their COA under HEA section 472;

      i.      The student's total annual allowance for housing and food from their COA under HEA section 472;

      j.      The amount of institutional grants and scholarships disbursed to the student;

      k.      The amount of other State, Tribal, or private grants disbursed to the student; and

      l.      The amount of any private education loans disbursed to the student for enrollment in the program that the institution is, or should reasonably be, aware of, including private education loans made by the institution.

*Id.* at 70,191 (discussing 34 C.F.R. §668.408(a)(2)).

      26.      Furthermore, if the student completed or withdrew from the program during the award year, the school must also provide the following additional information:

      m.      The date the student completed or withdrew from the program;

      n.      The total amount the student received from private education loans, as described in 34 C.F.R. §668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;

      o.      The total amount of institutional debt, as described in 34 C.F.R. §668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;

p.     The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;

q.     The total amount of the allowances for books, supplies, and equipment included in the student's Title IV COA for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and

r.     The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program.

*Id.* (discussing 34 C.F.R. §668.408(a)(3)).

27.     On top of that, the school must also provide:

s.     Any other information that the Secretary of Education requires the institution to report.

*Id.* (discussing 34 C.F.R. §668.408(a)(4)).

28.     The first reporting deadline for the 2023 Rule is July 31, 2024. By that date, schools will have to provide the aforementioned information for the "second through seventh award years prior to July 1, 2024." *Id.* In subsequent years, the reporting deadline is October 1. *Id.*

29.     Although the Department of Education promised to "provide institutions with guidance and training on the new reporting requirements, provide a format for reporting, and enable [its] systems to accept reporting from institutions beginning several months prior to the July 31, 2024, deadline so that institutions have sufficient time to submit their data for the first reporting period," the Department has not yet done so. 88 Fed. Reg. at 70,061.

30.     Nevertheless, Tricoci anticipates that, between now and July 31, 2024, it will have to expend enormous resources to comply with the onerous reporting requirement.

31.     While Tricoci transitioned to a student-information system that is somewhat more user-friendly during the 2022-2023 award year, all student information prior to that award year is stored on an antiquated system. Because the 2023 Rule requires schools to report student information dating back as early as 2017, complying with the initial reporting requirement will force Tricoci

7

employees to engage in a tedious, manual process in which they will have to retrieve information for over 17,000 students.  *Cf. id.* at 70,153 (Department acknowledging that "some institutions may still have data entry processes that are very manual in nature and generating the information for their programs could involve many more hours and resources").

32.     In addition, obtaining the student-debt information that the 2023 Rule requires schools to report will likewise require searching for individual student information seriatim on the National Student Loan Data System.

33.     Across all schools, the Department of Education has estimated a substantial "time cost of these reporting requirements":  "5.0 million hours initially and then 1.4 million hours annually after the first year," which will impose a financial cost on schools in excess of $244 million initially and in excess of $70 million after the first year.  *Id.* at 70,153; *see also* 89 Fed. Reg. 13,059, 13,060 (Feb. 21, 2024) (Department offering similar estimate more recently).

34.     At the institutional level, the Department of Education estimates that, on average, "proprietary 2-year" schools will have to devote approximately 186 hours to comply with the 2023 Rule's reporting requirement before July 31, 2024.  *See* 88 Fed. Reg. at 70,153 (Table 5.3.1).

35.     Given the challenges associated with data collection at Tricoci, this institutional-level figure likely underestimates the amount of time that Tricoci employees will have to expend.  Even if Tricoci employees devote just 5 minutes to collecting the requisite information for each of the 17,000 students at issue, that would equate to over 1,400 hours.

36.     It is my understanding that, because the defendants in this action enjoy sovereign immunity, Tricoci is unable recover these compliance costs once incurred.

37.     To plan accordingly, Tricoci needs a ruling on the preliminary injunction motion no later than May 20, 2024.

\*     \*     \*

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 19, 2024.

*Nate Swanson*
_____

Nate Swanson

# Exhibit B-1

VIA REGULATIONS.GOV

June 20, 2023

The Honorable Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington, D.C.  20202

> **RE:**    **Public Comment re Financial Value Transparency and Gainful Employment,
> Financial Responsibility, Administrative Capability, Certification
> Procedures, and Ability to Benefit Docket ID ED-2023-OPE-0089**

Dear Secretary Cardona:

Tricoci University of Beauty Culture ("Tricoci") respectfully provides this comment to the U.S. Department of Education (the "Department") concerning the above referenced Notice of Proposed Rule Making ("NPRM").

## I.    INTRODUCTION.

We support the Department's efforts with regard to program transparency, particularly with regard to applying program transparency to all programs and institutions of higher education.  We believe it is important for students to have information about student outcomes, including student debt and loan payments.  However, we object to the many serious flaws in the proposed GE Rule.  Most significantly, we believe that the rule is fatally flawed due to its reliance on flawed income data, the lack of any appeal for institutions, and its general failure overall to take into account the unique circumstances that impact students in our field. Accordingly, we urge the Department to withdraw the proposed rule and rethink its approach to Gainful Employment to account for the needs of our students, institutions, and the communities they serve.

In our comment below, we provide important background information about our institution and students; constitutional, legal and procedural concerns; identify issues relating to the measurement of graduate earnings in the Debt to Earnings metric ("D/E metric") and the Earnings Premium measure ("EP measure"); and set forth our concerns related to Financial Responsibility, Administrative Capability, and Certification Procedures.  We thank the Department in advance for its careful consideration of and response to each of these issues, all of which have the net effect of jeopardizing access to an important vehicle for economic mobility for our students: education in the field of beauty and wellness.

## II.    BACKGROUND OF TRICOCI AND ITS STUDENT COMMUNITY.

Tricoci was founded in 2004 by Mario Tricoci, a renowned hair stylist who emigrated to the United States from Italy. Mr. Tricoci founded the schools with a mission to provide advanced

education to students, which would produce salon-ready professionals upon graduation. Today, Tricoci offers educational programs in cosmetology, barbering, aesthetics, manicuring, and instructor training in its 15 locations in Illinois, Indiana, and Wisconsin. We provide this comment with the perspective of operating our schools, our experience with staff and students, and our general views and experience in the beauty and wellness profession.

The National Accrediting Commission of Career Arts & Sciences ("NACCAS") accredits our institutions. We are likewise licensed by the states in which we operated in and our programs are approved in each state by the boards of cosmetology and barbering.

Our students come from diverse backgrounds and life experience. The majority of our students are women, currently 96% of our total student population. We also have high representation of diverse and students of color, as reflected on IPEDS. Currently, the racial composition of our student body is 33% Black/African American, 33% White and 26% Hispanic. Our students also tend to be young. The average age of our graduates in 2022 was 24.

We strive to provide the best quality education possible to the students we serve. We are proud of our graduation, placement and licensure rates. Our most recent cohort of students had an 84.99% graduation rate, were placed within their field of study at 73.11%, and were licensed at the rate of 86.36%. In addition, our most recent 3-year cohort default rate (2019) was 2.7%. This is in line with the national average of 2.3%. Our students leave school on average with $6,687.89 in student debt. The average monthly payments for these loans is $66.92 per month. While these outcomes and our student success measures are impressive, our programs will largely fail the proposed GE Rule.

## III.     THE PROPOSED GE RULE IS LEGALLY INFIRM.

### A.     The Department's Flawed Approach to Negotiated Rulemaking Violates the Administrative Procedures Act.

The Department failed to follow the requirements of the Administrative Procedures Act ("APA") when conducting the Negotiated Rulemaking leading to this NPRM. It did so in several important ways. First, it failed to include a representative from the cosmetology and barbering schools. Second, it failed to adequately discuss or consider the EP metric. Third, it insisted on conducting negotiations remotely, despite the lack of public health justifications. Fourth, the Department failed to give sufficient time for the public notice and comment period. Taken together, or even considered individually, these flaws violate the APA and require withdrawal of the proposed rule.

In selecting negotiators for negotiated rulemaking, the Department states that it,

> [S]olicits nominations for negotiators to represent the constituencies who will be significantly affected by the regulations. The Department identifies in the Notice the constituencies it believes will be significantly affected.

See, https://www2.ed.gov/policy/highered/reg/hearulemaking/hea08/neg-reg-faq.html (emphasis added).

The Department's data indicates that more than 2/3 of cosmetology and barbering programs will lose eligibility to participate in Title IV, HEA programs under the proposed rule. Clearly, these programs will be "significantly affected" by it. Despite this, the Department chose not to include a representative of cosmetology or barbering schools. Instead, the Department chose only one non-federal negotiator, who had no experience in the area. And, it ignored a request from the American Association of Cosmetology Schools ("AACS")—the national industry trade association representing beauty and wellness schools—to have a representative at the table.

The extremely high rate of failure of cosmetology and barbering programs reflects the shortcomings of the Department here. Beauty and barbering schools have unique issues that demand consideration. For example, beauty professionals must build a client base to maximize earnings. This takes longer than graduates of other career focused programs, who can begin work at a high wage immediately after graduation. Additionally, high percentages of beauty and wellness professionals have flexible and part-time work schedules. This issue is exacerbated by the demographics of cosmetology and barbering institutions, which are heavily women. Indeed, a review of the student population at Tricoci indicates that when compared to the overall demographics in the state where our locations operate, women -- including women of color-- are over represented in our institutions. The lack of a negotiator from this sector had a disparate impact on these students. In prior negotiations, the Department recognized the unique needs of our sector and included a representative.

The Department also violated the APA by failing to adequately consider the EP measure during Negotiated Rulemaking. The EP measure is a new, theoretical approach to evaluating whether a program leads to "gainful employment" by comparing the earnings of program graduates (three years after graduation) to the earnings of high school graduates between the ages of 25 and 34. Such a metric has never been tried before and has only been the subject of academic work.[1] It was not part of the initial rulemaking package proposed as part of the Negotiated Rulemaking. And, the Department allowed for almost no discussion of the issue. Given the significance of this new metric in the proposed rule, the Department's failure to give it adequate consideration violates the APA.

Likewise, the Department should not have conducted the Negotiated Rulemaking via remote technology instead of conducting it in person. This was a significant departure from prior negotiations. It precluded the effective participation of the public in the rulemaking. The Department cited the COVID-19 pandemic as justification. But, at the time of the negotiations, the pandemic was near an end. Less restrictive means were available to allow the negotiations to take place in person, such as personal protective equipment, social distancing, and vaccinations. These simple safety measures would have posed minimal risks to health and allowed the negotiations to be conducted in person.

---

[1] We note that Stephanie Cellini, the chief architect of this theory, submitted her work on this subject only shortly before the session in which it was discussed. It does not appear that her work has been subject to peer review, nor is all the data she relied upon available for review. The Department cites to her work repeatedly in the NPRM, but we believe it is not reasonable to do so under these circumstances.

Finally, the 30-day comment period allowed by the Department is simply insufficient. The proposed rule relies on complicated data from multiple sources that require lengthy analysis. Much of this data was not available until the publication in the NPRM. Even then, the various data sets produced to support, for example, the graduate earnings measures are inconsistent and conflicting. Given the profound impact this proposed rule will have on student access and institutions, the Department should have allowed for more time. We are aware that several institutions and associations, including AACS and the American Council on Education asked for more time, but those requests were ignored. This gives the appearance that the Department is more concerned with completing the GE Rule before the next election cycle than in propounding a rule that is accurate and truly serves the needs of students. We ask the Department to explain why it has not given more time for the notice and comment period.

The Department's failure to adhere to the requirements of the APA before releasing this NPRM requires that the proposed rule be withdrawn to correct these deficiencies.

**B.      The Proposed GE Rule Represents an Unjustified Regulatory Change.**

The Department proposes a new version of the GE Rule that is a radical departure from the prior version. It has provided no justification for the change in approach, which appears to be driven entirely by a political agenda.

The current iteration of the rule is a disclosure mechanism that provides valuable information to students and stakeholders. The proposed rule transforms this into an eligibility metric. The Department has not adequately explained the need for this change.

In addition, this change is unnecessary in light of other eligibility criteria and existing program quality metrics. It also fails to consider the role of state regulators who license and approve these programs, prescribe curriculum, and set the conditions for the state-licensed occupations for which these programs prepare students. Each of these individually and collectively serve as quality controls for cosmetology and barbering programs. These programs do not require another federal control for program quality.

The Department's change also creates unnecessary risk and unstable regulatory environment for both students and schools. Students need and deserve predictability when choosing their careers and educational programs that lead to them. By changing the rules so quickly and frequently, the Department is creating an environment of instability and uncertainty for students, making their decisions harder, not easier.

For schools, the repeated changes to the GE Rule, without sufficient justification, demonstrates that it is being done on a political whim. The Department fails to acknowledge the enormous time and resources that schools invest to develop, administer, and deliver high quality education to students. The Department should not change the existing rule without a substantial justification, which is absent here. In light of this, the Department should refrain from making this change and instead continue to administer the current GE disclosure metric.

### C.       The Proposed Rule Raises Constitutional Questions.

The proposed GE Rule raises questions concerning Free Speech, Due Process, Equal Protection, and Takings Clauses of the Constitution.

The GE Rule represents an unlawful restriction on free speech because it would restrict the communication and receipt of education.  The Department's data shows that more than 2/3 of cosmetology and barbering programs will close as a result of the rule.  Additionally, if the small cohort exception was removed from the rule, data indicates that only 13 programs nationwide would pass.  This translates to almost 100% of programs failing the GE Rule. From this, it is apparent that the Department is targeting cosmetology and barbering education.  This violates the guaranty of free speech under the First Amendment to the Constitution.  Even if cosmetology schools continued to operate without federal financial aid, the student body we currently serve—predominantly women, including women of color—would be unable to freely choose which educational institution to attend without access to Title IV finding, restricting their receipt of education.

The GE Rule also violates the constitutional guaranty of Due Process for several reasons. First, there is no ability to review cohort or earning data used in the metric for accuracy. Yet this data is used to terminate participation in Title IV HEA programs.  As discussed in detail in Section IV, this is particularly problematic for cosmetology schools given that beauty and wellness professionals typically underreport income because they compensated or tipped in cash. Second, schools cannot review or make corrections to cohort or earnings determinations reached by the Department.  This deprives schools of the ability to review and challenge data relied upon by the Department in its decision making.  Third, the rule fails to disclose the data and sources of earnings that will be relied on in the rule, which prevents meaningful evaluation of those sources. While the Department has alluded to earnings data from multiple government sources, it will not identify the source of the data actually used to determine if a program passes or fails the D/E metric.  Fourth, the proposed rule does not allow for any meaningful appeal of the D/E determination.  In previous iterations of the rule, the Department allowed for an earnings appeal which would permit schools to contest the reliance on earnings data that the Department has admitted is flawed.  The Department levels unjustified skepticism of the results of those appeals in the NPRM.  However, the Department established the rules by which those appeals were submitted, including the use of government auditing standards to ensure accuracy.[2]

In light of the disparate impact on cosmetology and barbering programs, the GE Rule violates the Equal Protection clauses of the Fifth and Fourteenth Amendments to the Constitution.  Both guarantee that the federal government will not enact or enforce a law or regulation that discriminates against individuals on the basis of a protected classification, including gender and race.  The GE Rule's disproportionate impact on our programs, which enroll high numbers of women and people of color, violates the Equal Protection Clause.  It also

---

[2] While the judge in the matter of AACS v. DeVos found that the specific earnings appeal mechanism in the prior rule was unworkable, it clearly could be modified to comply with the law.  For example, the Department could use an earnings appeal that required schools to submit a statically significant number of responders to the appeal cohort as opposed to requiring 100% response rate.  Changes such as this would allow for schools to have appropriate due process rights in the GE Rule.

denies Equal Protection by using the EP metric as a condition of program participation.  The EP metric is generalized to the population in the state where the program is located.  The data does not control for disparities in the earnings of women or people of color, as compared to others.  The failure to account for this earnings disparity means that those in protected classes who enroll or seek to enroll in these programs will lose access to FSA programs based on a metric that has a discriminatory adverse impact.  This denies them, and the school, Equal Protection under the law.

Finally, the proposed rule violates the Takings Clause of the Constitution.  Institutions have a property interest in agreements with the Department of Education.  The unjustified imposition of this rule violates the constitutional prohibition on taking private property without due process.

### D.      The Proposed Rule Exceeds the Secretary's Authority and Violates the Futures Act.

The proposed rule violates federal law in several respects.  First, it exceeds the Secretary's authority.  The Secretary is prohibited by law from asserting federal control over education.  20 U.S.C. § 1232(a).  Specifically, the Secretary may not "[e]xercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution . . . ."  The proposed rule disproportionately impacts cosmetology and barbering schools by causing their programs to fail at extremely high rates.  This is effectively an assertion of control over the "curriculum, program of instruction, administration" of these institutions and exceeds the Secretary's authority.

The proposed rule also appears to violate federal law with regard to the collection and use of earnings data for students.  While it is not entirely clear where the Secretary will obtain income data for students, one potential source includes the IRS.  If that is the case, then the collection of such data would violate the Futures Act amendments to the Internal Revenue Code.  See, 26 U.S.C. § 6103.  Federal law limits the Department's access to IRS data to specific uses, not including the administration of program eligibility or as conceived in the GE Rule.

## IV.    The Proposed GE Rule Relies on Inaccurate Earnings Data and an Untested EP Measure.

The earnings data that the Department proposes to use for the D/E metric and EP measure are flawed and cannot support reasoned rulemaking.  The Department relies upon earnings data that it concedes is inaccurate, derived from sources that are demographically mismatched, and that fails to account for factors unique to cosmetology and barbering professions related to the COVID-19 pandemic.

The Department admits that government data sources on earnings of beauty professionals is flawed.  Such data is known to be inaccurate because it underreports tip income and cash payment for services, fails to recognize that many beauty professionals operate small businesses.  It appears that, to the extent the earnings data is derived from IRS sources, the Department is relying on Adjusted Gross Income ("AGI"), which is income net of deductions, including

business expenses.  Further, the metric does not account or adjust for flexible and part-time workers.

    Better and more accurate sources of data exist for these purposes.  For example, institutions can collect earnings data directly from graduates or employers.  We are aware that the Department has been presented with data from the Qnity Study, which shows that reliable earnings data can be collected directly from employers and other private sector sources.  The Qnity Study shows that wages in beauty and wellness professions are significantly higher than the government data relied on by the Department.  The Department could require that the HEA data could be audited by independent auditors to ensure accuracy.  Additionally, the Department could allow for an earnings appeal, as it did under the prior version of the rule.  This would allow institutions to show that government data is inaccurate and that the programs prepare students for meaningful and remunerative professions.

    We offer the results of our Earnings Appeal from the prior iteration of the GE Rule to support this approach.  The results are attached as Appendix A.  They show that the government's earnings data was not accurate and that Tricoci's programs passed the prior GE metric when accurate data was used.  Our Earnings Appeal was conducted according to the Department's standards and audited by an independent auditor.  While the Department has alleged these appeals are unreliable in the NPRM, it has failed to point to any evidence that is the case.  We are confident that the data in our Earnings Appeal is accurate and reflects our graduates true earnings at that time.

    In addition to relying on inaccurate government data to measure earnings for the D/E metric, the data relied upon by the Department for the EP measure is not well matched for the beauty and barbering programs it seeks to regulate.  The earnings data does not control for the overrepresentation of women and persons of color in our programs.  The United States government, including the Department, recognizes that a genuine earnings disparity exists between the general population and women and people of color.  By applying a generalized earnings metric, such as the EP measure, that does not control for these disparities, the Department is restricting access to Title IV HEA programs for these students using a flawed measure.

    The EP measure also does not account for age differences.  The proposed EP measure compares graduates of programs three years after completion to high school graduates between the ages of 25 and 34 as reported by the Census Bureau.  The average age of our graduate is 24.  This means they are 6 years out of high school.  The individuals in the EP measure are between 7 and 14 years out of high school.  This means that they will have had 1-13 years more to develop their earnings potential than our average graduate.  Beauty and barbering graduates require more than three years to develop their clientele and recognize their earnings potential.  The EP measure must be adjusted to control for variables and demographics including gender, race, and age.

    Finally, the data relied upon by the Department fails to account for the impact of the COVID-19 pandemic on graduate earnings.  While the data used in the NPRM is from the years immediately preceding the pandemic, when the rule is applied pandemic era data will be used to determine earnings.  In the beauty and barbering sector in particular, this data is inaccurate due to

the wide-scale closures of personal services businesses during the pandemic. Additionally, the states of Illinois and Indiana operated under mask mandates, social distancing requirements, and building capacity restrictions, which severely limited the types of services that could be provided as well as the number of guests that salons and spas could permit onsite. The proposed rule makes no attempt to control for this, nor the temporary reduction in demand for personal services due to fears of contracting the virus in public places. Additionally, the COVID-19 pandemic impacted the ability of students to sit for licensure exams, which frequently require that students do a practical examination, involving the providing of personal services in front of state regulators and test examiners who evaluate student performance. This caused a delay in the availability of licensure for graduates of these programs and precluded them from entering the workforce in an otherwise timely manner.

The Department should not proceed with a GE Rule that relies on flawed government earnings data to calculate the D/E metric. It should instead adopt an accurate earnings metric or, at the very least, permit appeals of D/E calculations. Moreover, the Department should control the EP measure to ensure that it accurately reflects the demographics of the students from our programs, including factors such as gender, race, and age. Finally, the Department must not rely on pandemic-era data that show dramatically lower earnings due to the closure of personal services businesses during the pandemic and delays to graduate completion, licensure, and placement that inhibited or delayed their earnings potential.

## V.     THE PROPOSED AMENDMENTS TO THE FINANCIAL RESPONSIBILITY REGULATIONS EXCEED THE SECRETARY'S AUTHORITY, ARE VAGUE, AND OVERBROAD

The NPRM proposes a number of discretionary and mandatory triggering events that lead to the imposition of financial assurance measures, i.e., letters of credit ("LOC"), on institutions. As described in the NPRM, these triggering events exceed the Secretary's authority, are overbroad, lack clarity, create financial instability in institutions, and will lead to other unintended consequences. The Department should rescind or revise these accordingly.

The Department states that the goal of the NPRM with regard to financial responsibility is two-fold. First it is to enhance the Department's ability to identify events or conditions that place institutions' financial health at significant risk. Second, it is to allow the Department to seek additional financial protections from those institutions. To do this, the Department proposes that when certain risk factor occur, the Department may seek a LOC from the institution. For those events that are "mandatory" triggers, the Department will impose an automatic 10% letter of credit for each event. These LOCs are cumulative. No appeal is possible from the imposition of a letter of credit.

The regulations proposed in the NPRM on financial responsibility exceed the authority of the Secretary as enumerated in the HEA. Congress allowed the Secretary to determine the financial responsibility of institutions of higher education. The statute provides that the Secretary may consider several factors in making this determination. These include whether the institution has sufficient resources to: deliver services promised to students, provide required administrative support, and otherwise meet its financial obligations. 20 U.S.C. § 1099c(c)(1).

8

The new triggers proposed under the NPRM are based on events outside this authority. The automatic triggers listed in the NPRM conclude, without support, that these events automatically mean that an institution is not financially responsible. Because they are mandatory, these triggering events violate the Congressional mandate imposed on the Secretary. *See* Id. Contrary to the requirements of the HEA, this Secretary would not conduct any analysis or factual investigation to determine if any of the triggering events will actually cause an institution to not be financially responsible. For example, one of the proposed triggers involves civil litigation against institutions, which would automatically trigger the imposition of a 10% letter of credit, regardless of the merits of the lawsuit or the impact on the institution's finances. The Secretary would not evaluate those claims or determine if they are covered by third parties, such as insurance, or if they are frivolous. Instead, a letter of credit would be imposed without undertaking any analysis whatsoever. This is an impermissible abdication of the Secretary's responsibilities under the HEA.

The automatic triggers are also too broad. For example, without any limitation, a government investigation of an institution constitutes an automatic trigger. There is no consideration of the scope of the investigation or whether it actually poses a risk to the institution. And, the overbroad nature of the automatic triggers can lead to multiple triggering events at the same time (and the imposition of multiple LOCs).

Many of them are also duplicative of other program or institutional eligibility requirements. For example, violations of the GE Rule, CDRs, and the 90/10 rule, all carry their own consequences. They do not require the additional sanction of the imposition of a LOC. Further, these requirement don't necessarily reflect the financial responsibility of the institution. For example, CDR rates may reflect an overall infirmity in the economy or other issue unrelated to the institution that impacts graduates ability to repay.

Finally, the imposition of automatic triggers gives claimants and government agencies too much leverage in bringing claims or investigations. It also discourages institutions from reaching settlements because entering into a settlement is also a potentially triggering event. Discouraging parties from reaching a settlement violates public policy favoring the informal resolution of disputes.

The remaining discretionary triggers are both too broad and give too much discretion to the Secretary to impose an LOC. Some examples of the discretionary triggers include judgments in civil cases, a "significant fluctuation in Pell grants or direct loans, a "high" drop-out rate for students, or being cited by a state licensing agency. This last example is particularly difficult for cosmetology and barbering schools because they are regulated by state boards of cosmetology and/or barbering. These boards issue health and safety citations for relatively minor matters such as students' stations being untidy, hair being found in drawers or sinks, and other similar health and safety code issues. These could be the basis for a discretionary trigger, but bear no relationship to the institution's financial responsibility.

The stackable nature of the LOCs will not provide financial assurance, but rather will cause institutions to fail. Banks and other financial institutions require 100% cash collateral (plus a large fee) for proprietary institutions to post LOCs in favor of the Department. This means that if an institution faces multiple LOCs, it could have to post amounts that equal to or

exceed 100% of their annual Title IV aid. This is simply unworkable. And, even if the LOCs only restrict some fraction of that amount, the LOC will tie up working capital that could otherwise be used to improve the institution or assist students. These and many other unforeseen consequences of imposing stackable LOCs will lead to institutional closures, not financial guarantees for the Department.

For all these reasons we ask that the Secretary reconsider the mandatory and discretionary triggers and withdraw the rule pending further review.

## VI.   THE PROPOSED AMENDMENTS TO THE ADMINISTRATIVE CAPABILITY REGULATIONS ARE VAGUE, LACK CONNECTION TO THE STANDARD AS SET FORTH IN STATUTE, AND UNNECESSARY.

The Department's proposed amendments to 34 C.F.R. § 668.16 (administrative capability) are problematic for several reasons. First, the terms used are vague and standardless, preventing institutional compliance. Second, they are unconnected from the concept of administrative capability as defined in the HEA. Third, the proposed changes are unnecessary and intrude into the traditional roles of accreditors and state licensors.

The NPRM uses vague terms to impose two new and confusing administrative capability requirements: "adequate" financial aid counseling and career services. For "adequate" financial aid, the Department proposes counsel students and families to accept the "most beneficial" types of financial aid assistance and provide additional information including the cost of attendance, sources and amounts of aid separated by the type, the net price, and instructions and applicable deadlines for accepting, declining, or adjusting awards, among other things. While these updated requirements align with the College Financing Plan, institutions are not required to use any particular form or provide any specific language. This leads the institutions guessing what would constitute "adequate" financial aid counseling.

Requiring institutions to provide "adequate" career services is similarly troubling. The Department states that "adequate" career services will be evaluated in light of: the share of students enrolled in the institution in gainful employment programs, the numbers of staff employed in the career services department, the services that were promised to students, and the prevalence of the institution's partnerships with employers. The Department admits it will not apply the same standard to all institutions. This leaves too much to the discretion of the Department and is too difficult for institutions to understand what is required.

For cosmetology and barbering schools, this problem is exacerbated by the types of employment or work that our graduates do. Our graduates do not just work in salons and barbershops. They also seek work in self-employment and by starting their own businesses (including their own salons and booth-rentals). Employment opportunities exist at chain salons or other W-2 traditional employers for those who want them, but the fact remains that many students simply do not want to work in a traditional employer-employee setting. This makes it challenging to know how the Department would evaluate the career services requirement for our schools.

Both of these new standards go well beyond what is intended in the HEA by "administrative capability." But, the NPRM drifts even further afield by linking passage of the proposed GE Metric to administrative capability: the Department proposes that a failure of GE will lead to an administrative capability finding. Tying these two concepts together is unwarranted. The Department has stated that the GE Metric is a program quality measure; this is not the same as demonstrating administrative capability. The Department has not explained how these two concepts are related. Also, by tying administrative capability to GE, the Department will be unnecessarily stacking adverse consequences on schools. A single year GE failure will lead to a finding of lack of administrative capability, which can carry penalties, fines, placement on HCM2 or even loss of program participation.

Finally, adding these additional requirements to administrative capability is not necessary. These services are already evaluated by Tricoci's accreditor, who sets standards for financial counseling and placement. The Department's experience in this area is limited and duplicative of what is already required. It will not increase the value to students to add another government regulation in this area.

## VII.   CERTIFICATION PROCEDURE CONCERNS

The Department proposes to amend 34 C.F.R. §§ 668.13 and 668.14 with regard to certification procedures and program participation agreements. We have two concerns here.

First, the Department proposes to eliminate the "150% Rule" that allows students to be eligible for federal student aid in clock-hour programs up to 150% of the state minimum clock hours required for licensure, with some limited exception for students in narrowly defined metropolitan areas. The elimination of this additional access to federal student aid will harm students and limit portability of education for programs with licensed outcomes.

For example, we currently offer esthetics programs in Indiana and in Wisconsin that would need to be shortened by 50 or 150 clock hours. This would eliminate access to federal student aid for students to these programs in an area where students frequently cross the border into neighboring Illinois in order to become licensed.

Critically, if students cannot take these additional hours in our programs, they will be forced to transfer to another institution. Unfortunately, nearly all schools have restrictions on the number of transfer hours they will accept from another school, typically in the 30% – 50% range. As such, rather than just finishing the final 50 – 150 hours, students could need to retake 50% or more of their total program hours (375 – 750 hours or more) in order to graduate.

It will also reduce the amount of hands-on training that students receive while enrolled in school, which we believe will lead to lower state licensure pass rates and students who are less prepared to enter the workforce. We urge the Department to allow students to continue to have access to federal student aid programs at a level of 150% of the state minimum clock hours for licensure.

The NPRM also proposes to amend the certification procedures for the Secretary to allow the Secretary to consider so-called supplemental performance measures. These will include withdrawal rates, D/E rates, EP measures, licensure pass rates, and the amount an institution

11

spends on recruiting, advertising and other pre-enrollment matters.  The proposed rule would allow the Secretary to condition or determine participation of the institution based on these factors.

We are concerned that the additional considerations for the Secretary are exceptionally vague.  They give the Secretary too much discretion in deciding whether to recertify or conditionally certify an institution for participation.  There is simply no way for an institution to know in advance of the certification process how the Secretary will evaluate these various metrics.  This is particularly true with the evaluation of the amount spent on instruction and other services, including recruiting.  It appears to be a standardless measure that is prone to arbitrary application.

The Department does not have the authority to condition approval based on these various factors.  Moreover, even if the Department did have such authority, it must provide schools with more guidance on how to comply.  Finally, these additional "considerations" are simply unnecessary in light of the multitude of other oversight authority that governs the certification process.  These additional rules will simply create unnecessary additional burden on institutions.

## VIII.   CONCLUSION

Please accept our thanks for the opportunity to comment on the proposed rule package.  We agree with and support the Department's efforts to increase transparency and accountability for all institutions and programs.  However, for the reasons discussed above, we ask that the Department revise the proposed GE Rule in accordance with our recommendations.  Finally, we wish to expressly incorporate by reference the comments submitted by the American Association of Cosmetology Schools ("AACS") to the NPRM.  We ask that the Department consider and respond to the issues raised in this comment and that of AACS.

Sincerely,


Nate Swanson
CEO

# Exhibit C



_Via eRulemaking Portal at www.regulations.gov_

June 20, 2023

Hon. Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

**Re:    Comment – American Association of Cosmetology Schools**
   **Docket ID ED-2023-OPE-0089**

Dear Secretary Cardona:

On behalf of the American Association of Cosmetology Schools ("AACS"), our member institutions and, most importantly, the tens of thousands of students that our specialized schools prepare annually for rewarding, professional careers in the multibillion-dollar beauty and wellness industry, we submit these comments in response to the above-referenced Notice of Proposed Rulemaking ("NPRM" or "Proposed Rule") regarding Financial Value Transparency, Gainful Employment ("GE"), Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit ("ATB").[1]

AACS is proud to represent a passionate, creative, unique, and diverse community, with characteristics that are valuable to both higher education and our economy. We have carried that message to the Department for over a decade now as it has sought to define two words - "gainful employment" - in the context of Title IV, Higher Education Act ("Title IV") program eligibility.

In 2014, we raised serious concerns with the Department regarding the then-Gainful Employment rule ("2014 GE Rule"),[2] specifically regarding the unreliability of graduate earnings data used to formulate and calculate Debt-to-Earnings ("D/E") rates. Unfortunately, our concerns have not been addressed. In fact, nearly all of the issues we raised in 2014 remain unresolved. Moreover, the Department has doubled down on the problematic aspects of the GE rule – including its dependence on unreliable earnings data – by removing the previous D/E alternate earnings appeal and adding a new, untested, stand-alone GE metric: the Earnings Premium ("EP") measure.

---

[1] Financial Value Transparency, Gainful Employment ("GE"), Financial Responsibility, Administrative Capability, Certification Procedures, and Ability to Benefit ("ATB"),  88 Fed. Reg. 32300 (proposed May 19, 2023) (to be codified at 34 CFR 600, 668).

[2] This comment incorporates by reference AACS's public comments filed May 27, 2014, regarding Docket ID ED-2014-OPE-0039, _available at_ regulations.gov.



It is our hope that before the Department promulgates a Final Rule, it will give close attention to the fact that AACS members:

- Are accredited institutions required to comply with rigorous placement, graduation and licensure passage rates (unlike community colleges, most private non-profit institutions, and unaccredited institutions), with an average graduation rate of 76 percent and an average job placement rate above 71 percent;
- Are predominately small institutions (with a median annual enrollment of 150 students per institution) operating as small businesses and run by families or individual owners (75 percent of our school owners have only one campus);
- Educate primarily women (who make up 90 percent of cosmetology program enrollment);[3]
- Provide education and training that allows graduates to have flexible work hours, start their own businesses, and support their families' climb up the economic ladder;
- Have an average annual tuition (for the longest program) of $15,953;
- Have program graduates with an average median debt of $8,900;
- Have program graduates with an average loan payment of $59/month;
- Are required to measure program length by state mandated clock hour minimums which vary from state to state;
- Have curriculum largely dictated by state educational and/or state cosmetology boards;
- Provide the training required by states for graduates to be state licensed to work as cosmetologists, barbers, hairstylists, skin care specialists, nail technicians, massage therapists, and related beauty and wellness occupations;
- Graduate 78 percent of the licensed workers needed to fill jobs at spas, salons and other personal services establishments;
- Support a beauty and wellness industry in the United States with an economic impact of at least $91 billion annually and that employs more than 2.3 million workers annually; and
- Educate students for in-demand occupations directly tied to the skills taught at our schools, including, but not limited to —
    - barbering, hair, and cosmetology specialists for whom employment demand is projected to grow by 11 percent (much faster than average) from 2021 to 2031;[4]
    - skin care specialists (estheticians) for whom employment demand is projected to grow 17 percent (much faster than average) from 2021 to 2031; [5]

---

[3] 88 Fed. Reg. at 32432 (stating that women comprise 90% of all cosmetology program enrollments).

[4] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook: Barbers, Hairstylists, and Cosmetologists (last modified Sept. 13, 2022), https://www.bls.gov/ooh/personal-care-and-service/barbers-hairstylists-and-cosmetologists.htm.

[5] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook: Skincare Specialists (last modified Sept. 13, 2022), https://www.bls.gov/ooh/personal-care-and-service/skincare-specialists.htm.



- o   manicure and pedicure specialists for whom employment demand is projected to grow 22 percent (much faster than average) from 2021 to 2031;[6] and
- o   massage therapists for whom employment demand is projected to grow 20 percent (much faster than average) from 2021 to 2031.[7]

Given the clear workforce need for our graduates and our strong student outcomes, AACS and its member schools are astonished that the Department would expend significant federal taxpayer resources to negotiate and publish a Proposed Rule that threatens to eliminate nearly 80 percent of cosmetology programs and 76 percent of enrollment in undergraduate certificate programs offered by our schools.[8] In doing so, the Department will effectively eliminate private, for-profit cosmetology programs as a choice for hundreds of thousands of students interested in working in the beauty and wellness industry.[9] Sadly, this would be the most significant impact of the Proposed Rule while not accomplishing *any* of the Department's stated goals.

*First*, as outlined in its Press Release, the Department states that its Proposed Rule is "part of the Administration's ongoing commitment to fixing a broken student loan system."[10]  In reality, the student loan system will not be "fixed" by eliminating up to 2/3 or more of enrollments in short-term, low-debt cosmetology certificate programs.[11] Graduate programs, not certificate programs,

---

[6] U.S. Bureau of Labor Statistics, Occupational Handbook: Manicurists and Pedicurists (last modified Oct. 4, 2022), https://www.bls.gov/ooh/personal-care-and-service/manicurists-and-pedicurists.htm

[7] U.S. Bureau of Labor Statistics, Occupational Handbook: Massage Therapists (last modified Oct. 6, 2022), https://www.bls.gov/ooh/healthcare/massage-therapists.htm?ref=nf.

[8] 88 Fed. Reg. at 32422 (Table 3.10 – 76% of undergraduate certificate programs by CIP covering cosmetology related programs would fail D/E or EP metric); *id.* at 32432 (Table 3.24).

[9] Michael Brickman, *Biden Doubles Down on 'Accountability' that Could Wipe Out Career Pathways*, Wash. Exam'r (Jun. 7, 2023), https://www.washingtonexaminer.com/restoring-america/equality-not-elitism/biden-doubles-down-on-accountability-that-could-wipe-out-career-pathways; U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

[10] Press Release, U.S. Dep't of Educ., Department of Education Releases Proposed Rules on Accountability for Certificate and For-Profit Programs and Transparency into Unaffordable Student Debt (May 17, 2023), https://www.ed.gov/news/press-releases/department-education-releases-proposed-rules-accountability-certificate-and-profit-programs-and-transparency-unaffordable-student-debt.

[11] Katharine Meyer, *The Causes and Consequences of Graduate School Debt*, Brookings Inst. (Oct. 4, 2022), https://www.brookings.edu/blog/brown-center-chalkboard/2022/10/04/the-causes-and-consequences-of-graduate-school-debt/; 88 Fed. Reg. at 32427 (stating that 36.2% of cosmetology certificate programs fail GE, representing up to 2/3 of all cosmetology program enrollments); 88 Fed. Reg. at 32435 ("The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from 34 percent under the lowest threshold up to 66 percent under the highest threshold").



are the predominant source of ever-increasing student loan debt.[12] This rule eliminates primarily undergraduate certificate programs, the lowest source of student loan debt.[13]

*Second*, the Department states that the Proposed Rule delivers "on the Administration's promise to ensure quality and accountability in postsecondary education." In fact, the Proposed Rule will not ensure quality and accountability because it will allow most certificate GE programs offered at public and private non-profit institutions and non-GE programs to be exempt from any loss of Title IV participation, even though such exempt programs often lead to higher levels of debt and low earnings. The rule will exempt most community college and private non-profit certificate programs in the cosmetology field due to those institutions' low number of program graduates.[14] The proposed GE Rule lacks any rational basis because it measures neither quality nor accountability, since it leads to the closure of mostly of private, for-profit cosmetology programs that perform better than public and private non-profit options.

Based on data provided by the Department, certificate programs offered by private, for-profit schools have, on average, lower default rates[15] than comparable programs offered by public and private non-profit institutions, and low student debt.[16] It is misleading, therefore, for the Department to state that "[f]ailure rates are significantly lower for public certificate programs (4.3 percent of enrollment is in failing programs) than for proprietary (50 percent of enrollment is in failing programs) or non-profit (43.6 percent of enrollment is in failing programs) certificate programs" when a vast majority of private non-profit and public undergraduate certificate

---

[12] U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, One Year After a Bachelor's Degree: A Profile of 2015–16 Graduates , Table 5.1 (2020), https://nces.ed.gov/fastfacts/display.asp?id=900.

[13] U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, Digest of Education Statistics (2021), https://nces.ed.gov/fastfacts/display.asp?id=900; U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

[14] 88 Fed. Reg. at 32416 ("[GE rate calculation] [c]overage is typically higher in the proprietary sector—we are able to compute D/E or EP metrics for programs accounting for about 87.0 percent of enrollment in proprietary undergraduate certificate programs. Comparable rates are 61.5 percent and 21.4 percent of enrollment in the non-profit and public undergraduate certificate sectors, respectively"). Further, 50.8% of private, for-profit undergraduate certificate programs have measurable data, while only 12.4% of private non-profit and 4.7% of public undergraduate certificate programs have sufficient data to calculate D/E and EP rates. Lack of data is primarily based on 2 year and 4 year graduate cohorts not exceeding 30 graduates.

[15] *Id.* at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"); *id.* at 32425 ("The overall 3- year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools"). This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.

[16] 88 Fed. Reg. at 32402 (Table 1.8 states that average debt for private, for-profit undergraduate certificates is $8,857, which compares favorably with average debt for private, non-profit undergraduate certificate programs of $9,367).

4



programs are simply not large enough to be measured.[17] The Department further states that, "[a]cross all proprietary certificate and degree programs, 33.6 percent of enrollment is in programs that fail one of the two metrics, representing 22.1 percent of programs" but fails to adequately explain to the public the context: many private non-profit and public undergraduate programs are simply too small to measure.[18]

*Third*, the Department states that the Proposed Rule will "drive improvements in value at career training programs" by permitting institutions to "reform … programs to deliver better value to students." For AACS schools, the Proposed Rule will not allow program reform. Our programs are based on state-mandated minimum hours and curriculum, which cannot be changed significantly, have overlapping CIP codes, and are specialized in one industry. The Proposed Rule is structured such that our schools cannot offer programs substantially similar to a failing program. Therefore, many of our schools will have to close if one or more significant programs loses Title IV eligibility, unlike most other institutions that can and do offer a wide variety of programs and can more easily shift program offerings.

*Fourth*, the Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt." For cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[19] Further, cosmetology programs offered by these alternative institutions suffer from the same problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community colleges.[20]

---

[17] *Id.* at 32420-21.

[18] *Id.*

[19] *Id.* at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").

[20] *Id.* 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not large enough to be measured, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions to cosmetology programs offered at public and private non-



*Fifth*, the Department states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings … [or] online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[21] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training.[22] The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[23] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to take our place in supplying 78% of the graduates hired by employers.[24]

*Additionally*, the Department has proposed a number of further changes to regulations concerning financial responsibility, administrative capability, certifications procedures, and ATB programs that further harm our members. The proposed changes to financial responsibility and administrative capability convert the GE Rule from a programmatic eligibility metric to an institutional eligibility criteria by creating new standards that impose multiple letters of credit and other adverse consequences for failing the GE Rule for even one year. Further, the Department proposes to eliminate the "150% rule" by which students could be eligible to participate in Title IV programs for up to 150% of the minimum clock hours required for licensure in the state in which they attend school or a neighboring state. The proposed rule would restrict the hours to 100% of the hours in the state in which students are enrolled in a Title IV program, with limited exceptions for certain metropolitan areas. These changes will harm students who rely on the additional program hours to guarantee license portability and access to short term programs that would otherwise not qualify them for student aid.

As a whole, the Proposed Rule is arbitrary, capricious, and illegal as applied to AACS schools. As a matter of policy, the Proposed Rule is also contrary to the interests of the very populations the White House and the Department seek to serve and promote: small businesses, diverse populations (our student bodies are composed of higher than average percentages of low-income

---

profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[21] *Id.* at 32434.

[22] Nor is distance learning permitted by state laws and accreditors who require hands on learning of this skill set.

[23] 88 Fed. Reg. at 32434.

[24] Qnity Inst., A Career in Pro Beauty: Compensation Study, Data & Insights (2023), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=216592.



[Pell Grant eligible], female, Black, Hispanic, Asian Pacific American, and LGBTQ+ individuals) and educational models that fill a clear workforce skills gap.

AACS remains committed to working with the Department to develop fair and equitable regulations that protect the integrity of the student loan program, increase accountability, provide clearer consumer disclosures and maintain access for underserved students. There are some aspects of the Proposed Rule that AACS can support, and we note them in our section-by-section comments attached to this cover letter, we strongly oppose proposals that would disproportionately and negatively impact AACS schools and the students they serve, unless and until the Department incorporates changes that address our specific concerns.

Lastly, it should be noted that on May 26, 2023, AACS formally requested an extension of the 30-day public comment period. The Proposed Rule covers six new areas of rulemaking. The GE proposal alone is estimated to result in 80% or more of undergraduate cosmetology certificate programs failing the GE Rule, likely leading to a large number of our member schools closing.[25] The stakes could not be higher -- the proposals represent an existential threat to our association, our school members, our current and future student career choices, employers reliant on our graduates, and the health of the beauty and wellness industry as a whole. The short comment period presents an undue burden on this small association and its predominantly small institution membership.  It has prejudiced our ability to fully respond to a rule that will disproportionately impact our programs. We reserve the right to object to additional aspects of the NPRM that may not be covered in this comment due to time and resource constraints.

Sincerely,

Cecil Kidd
Executive Director

---

[25] 88 Fed. Reg. at 32432 (Table 3.24).



**TABLE OF CONTENTS**

**I.**   **Executive Summary and Directed Requests**

**II.**   **General Response**

    A.    History of the GE Rule and Related Litigation

    B.    About AACS and AACS Schools

    C.    Department Bias

    D.    Data Flaws and Limitations

**III.**   **Section by Section Comments to Proposed Rule**

    A.    Financial Value Transparency

    B.    Gainful Employment

    C.    Financial Responsibility

    D.    Administrative Capability

    E.    Certification

    F.    Ability to Benefit

**IV.**   **Conclusion**



## I.      Executive Summary and Directed Requests

**Financial Value Transparency ("FVT")**: AACS supports the goal of increased transparency for *all* higher education programs through the Financial Value Transparency disclosure proposal. We cannot support the FVT disclosures for cosmetology-related programs, however, unless and until the unreliability of federal agency earnings data for our program graduates is addressed. Until then, the Department should not publish either D/E or EP rates for cosmetology programs or, in the alternative, should restore a fair and workable alternate earnings appeal to permit our schools to challenge earnings data prior to any D/E or EP disclosure for our programs.

**Gainful Employment ("GE")**: AACS strongly opposes the GE accountability framework that would lead to loss of Title IV program eligibility based on failure of either the EP or D/E metric. Unreliable federal agency earnings data renders these metrics unfair, arbitrary and illegal as applied to AACS member programs.

Directed Requests – FVT and GE:

1.      For both the FVT and GE regulations, for the D/E rate, we request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[26] or, in the alternative, cease publication of a Final Rule on Gainful Employment (Subpart S) until it conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates; and

2.      We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

**Financial Responsibility, Administrative Capability and Certification**:  Based on our opposition to the GE Rule, AACS opposes provisions of these proposed regulations that would have a disproportionate, punitive impact on our members by means of new provisions tied to GE program performance under the GE Rule. As a result of the projected number of failing GE programs for AACS member schools, any changes to the Financial Responsibility, Administrative Capability, or Certification regulations that penalize institutions for failing GE programs or require a proportion of non-failing GE programs will disproportionately and negatively impact our schools' ability to continue as Title IV certified institutions of higher education, and lead to institutional closures. We also oppose the Department's Certification proposal that would reduce Title IV eligible program length to 100% of a state's minimum training hours required for a state licensed occupation.

---

[26] *Am. Ass'n of Cosmetology Sch.'s v. DeVos*, 258 F. Supp. 3d 50, 63 (D.D.C. 2017).



**Ability to Benefit**: AACS supports the consensus rule but has recommendations on implementation of the Department's plan to verify compliance of career pathway programs to avoid disruption to current career pathway offerings by our member schools.

## II.       General Response

###        A.       *History of the GE Rule and Related Litigation*

The Department has, for more than a decade, been attempting to regulate program eligibility by defining the terms "gainful employment" as used in the Higher Education Act of 1965, as amended ("HEA").  Over the course of three presidential administrations and in response to legal actions, the Department has frequently changed its definition of the term.  At some times, it has used the GE Rule as a program eligibility threshold. At other times, it has rejected that and chosen instead to rely on it only as a disclosure to provide additional information to students.  In the current version, the Department has pivoted again. The rule has become a political football. The Department now proposes to use the GE Rule to gauge *institutional* eligibility by tying the metric to certification, administrative capability and financial responsibility standards, the violation of any of which could lead to immediate loss of Title IV participation.  The result has been a checkered history of interpretation, with frequent and dramatic changes to the agency's interpretation of statutory language that is untied to congressional intent or authority and devoid of reasoned based rulemaking.

After the Department published its first GE Rule in 2010-11 (the "2011 GE Rule"), the Association of Private Sector Colleges and Universities ("APSCU") brought a successful action to vacate the 2011 GE Rule's debt-measuring, reporting and disclosure, and program approval provisions.[27]  Much of the case focused on the Department's two metrics for measuring whether programs led to "gainful employment":  debt-to-income tests (comparing student loan debt to both "disposable income" and annual salary), and a debt repayment rate (based on the percentage of students who had completed the program and who were current on their student loans).  Under the debt-to-income test, a program would not meet its standard if graduates' loan payments exceeded 30 percent of their disposable income and 12 percent of annual earnings.  With respect to the debt repayment rate, a GE program would fail that standard unless 35 percent or more of program graduates were current on their student loans.  The debt repayment rate standard was based on a finding that approximately one quarter of proprietary programs could not meet the 35 percent benchmark.

Reviewing the Department's justification for these metrics, the court found that while the Department had shown a "rational connection" between the facts before it (namely, expert testimony, studies, and industry standards) and the debt-to-income tests, the debt repayment rate standard was "not based upon any facts at all."[28]  The Department cited no expert studies or industry standards to support its decision to set the required debt repayment rate at 35 percent.

---

[27] *Ass'n of Private Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 144 (D.D.C. 2012) ("APSCU 2012").

[28] *Id.* at 154.



Rather, the Department "merely … pick[ed]" a number that, in its opinion, would not jeopardize too many schools' participation in the Title IV programs, but would not be so weak as to appear overly lenient.[29]   The court held that this "was not reasoned decision making," particularly because the Department's "explanation could be used to justify any [debt repayment] rate …."[30] Because the debt repayment rate was crucial to most other provisions of the 2011 GE Rule, the court struck down nearly every part of it.[31]

In 2014, the Department tried again (the "2014 GE Rule").  This time it was met with challenges in federal district courts in New York and the District of Columbia.[32]  Under the 2014 GE Rule, the Department abandoned a debt repayment standard; instead, it relied exclusively on debt-to-income tests similar to the 2011 GE Rule.  While both courts upheld the 2014 GE Rule, the decisions cited the importance of using the best available data; the need fully respond to commenters' concerns about data underlying its regulatory actions; and the importance of avoiding "unproven metrics" to determine program eligibility.[33]

The 2014 GE rule was not without faults, however, and was partially vacated following a 2017 Administrative Procedure Act ("APA") challenge by AACS.[34]  Pursuant to the 2014 GE rule, the Department's presumptive source of income data was from the Social Security Administration ("SSA"), which relies on individuals to accurately report their income.  In *AACS vs. DeVos*, the plaintiff established that workers in certain industries, such as cosmetology, are often self-employed, paid partially or entirely in cash, receive high levels of unreported or underreported tip income, and frequently under-report their total income.[35]  As a result, for cosmetology schools, the SSA's data are not accurate for the debt-to-income tests, a fact that the court noted the Department had admitted.[36]

During the comment period for the 2014 GE Rule, several commenters raised this issue, but the Department refused to adopt other proposed data sources (e.g., Bureau of Labor Statistics surveys).  It instead defended its use on two grounds:  first, that there are civil and criminal penalties for under-reporting income and, second, that the 2014 GE rule's "alternate earnings appeal" process gave the cosmetology schools an opportunity to provide other data to use in lieu of the SSA data—specifically, "state-sponsored" earnings data or school-administered surveys of

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 158.

[32] *See* Ass'n of Proprietary Colls. v. Duncan, 107 F. Supp. 3d 332 (S.D.N.Y.  2015); Ass'n of Private Sector Colls. & Univs. v. Duncan, 110 F. Supp. 3d 176 (D.D.C. 2015) ("APSCU II").

[33] *Ass'n of Proprietary Colls. v. Duncan* at 368; *APSCU II* at 176, 195.

[34] Am. Ass'n of Cosmetology Sch.'s. v. DeVos, 258 F. Supp. 3d 50 (D.D.C. 2017) ("AACS").

[35] *AACS* at 59-60.

[36] *Id.* at 71.



all, or very nearly all, of a program's graduates.[37]  Commenters, however, had explained to the Department that many states do not have "state-sponsored" earnings data and that "it is difficult to gather accurate earnings data for self-employed, heavily cash-earning individuals" that would satisfy the Department's 100-percent survey response rate requirement.[38]

The court sided with AACS, noting that the Department had "never explained how it came up with survey-response or state-based data requirements."[39]  The court held that the Department had assumed that cosmetology programs "would be able to effectively use the alternate-earnings appeal process," but it failed to affirmatively justify that assumption.[40]  The court also pointed out the Department's flawed reliance on civil and criminal penalties for under-reporting income, given that those penalties "existed before and after the [2014 GE rule] took effect, and the DOE regulations did not add any additional deterrent for under-reporting."[41]  While the court allowed the 2014 GE rule to stand, it relieved AACS of the "onerous regulatory prerequisites" of the alternate earnings appeal process.[42]

In 2019, the Department published a notice suspending the 2014 GE Rule and proving notice of its intent to revisit and revise the regulations.  More litigation ensued.[43]  Plaintiffs in this case sought to vacate the rescission of the 2014 GE rule, but the court dismissed most of their claims for lack of standing.[44]  In 2022, the court ordered the case held in abeyance due to the Department's stated intention to "initiat[e] … new rulemaking processes on the same topics addressed" by the 2019 rescission.[45]

The Department then engaged in further rule making which resulted in the current iteration of the GE Rule (the "2019 GE Rule").  The Preamble to the 2019 GE Rule noted the many infirmities of the 2014 GE Rule.  The final rule repealed those portions of the rule that made GE a condition of program participation and, instead, implemented the rule as a programmatic disclosure.

Now, the Department has pivoted again with the current NPRM and, as discussed in these comments, continues to seriously miss the mark.

---

[37] *Id.* at 58, 60.

[38] *Id.* at 61-62.

[39] *Id.* at 58.

[40] *Id.* at 74-75.

[41] *Id.* at 73.

[42] *Id.* at 76-77.

[43] Am. Fed'n of Teachers v. DeVos, 484 F. Supp. 3d 731 (N.D. Cal. 2020).

[44] *Id.* at 731, 746, 748, 750.

[45] Am. Fed'n of Teachers v. Cardona, 2022 WL 1471388, 1, 2 (N.D. Cal. May 10, 2022).



B.    *About AACS and AACS Schools*

AACS is a private non-profit trade association founded in 1924 that represents the interests of over 600 accredited institutions of higher education that educate students for occupations in the beauty and wellness industry. Since AACS's establishment, we estimate that AACS members have graduated tens – if not hundreds - of thousands of students who have been prepared to take the state licensing examinations. Passing state licensing exams is required for graduates to work in the state-licensed occupations that feed into the robust spa, salon and wellness industry in the United States that, just for employment-based salons alone (not including graduates working as independent business owners), contributed $34.5 billion in taxable revenues in 2019. This figure was down to $25.6 billion or 26% in 2020 due to reduced services by spa and salon employers during the pandemic, which is an important fact based on the Department's proposal to use 2021 and 2022 earnings in the first GE metrics against which our school member programs would be measured.[46]

A majority of our member schools participate in Title IV programs allowing students in financial need who choose to attend one of our schools to receive Title IV loans and grants for eligible programs. The student population is comprised of a majority of non-traditional, diverse students seeking alternative unique career pathways. Across the industry, a majority of the worker population is 25 years of age or older, independent of any parental financial support and have families to support. We additionally have predominantly female student population, and a higher than average percentage of LGBTQ-identified students.

Our graduates work at spas, salons and other businesses as cosmetologists, estheticians, barbers, massage therapists, and entrepreneurs. Employer demand for our graduates is high, with very positive projections for occupational growth.[47] AACS schools generate 78% of the graduates who work in spas, salons, and as solo businesses in this field. Our graduates also start their own small businesses as the owners of salons and spas (including booth renters), and can, over time, work as management or executive employees in beauty and wellness based businesses.

In the NPRM, the Department fails to account for the unique nature of AACS member schools, which are predominantly small businesses (with a median enrollment of 150 students annually per institution) and specialized in cosmetology-related programs (cosmetology, barbering, nail tech, massage therapy, hair, make up and skin care, among others). For example, the NPRM contains no discussion of the impact of the GE Rule specifically on cosmetology schools as a subset of certificate granting institutions. Cosmetology programs offered by proprietary institutions are unique because the institutions are specialized. They are unlike community colleges and private non-profit institutions that may offer one or more cosmetology related programs among many other types of programs.  The result of the Department's failure to

---

[46] Professional Beauty Association, 2022 Economic Snapshot of Salon Industry (Oct. 2022), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=212246 .

[47] *See* supra notes 3-6.

13



address our member school interests results in a disparate and catastrophic impact on this subset of certificate granting institutions, foreclosing options for students who choose this career path.

C.      *Evidence of Department Bias Against Cosmetology Schools and Programs*

In AACS's public comments to the 2014 GE Rule, we addressed concerns about bias of the Department against for-profit institutions generally.[48] It appears that bias has now evolved to target primarily cosmetology schools, including AACS schools, specialized in offering programs in the beauty and wellness sector.

1.      Exclusion from Negotiating Table

On December 8, 2021, the Department announced its intention to establish a negotiated rulemaking committee to propose a package of rules for Title IV programs.[49] As stated in the notice in the Federal Register, "the committee will include representatives of organizations or groups with interests that are significantly affected by the subject matter of the proposed regulations."[50] The Department identified the relevant constituencies with substantial interests impacted in the rulemaking.[51] Our membership – small institutions of a specialized nature - were unrepresented at the negotiating table to voice our concerns and help shape the rule.

The failure of the Department to take our concerns into consideration started early and tainted the entire rulemaking process as it applies to our membership.  At the request of AACS, at the start of the Institutional and Programmatic Eligibility negotiated rulemaking, the primary negotiator for the one seat for proprietary institutions of higher education made a motion to add a seat at the negotiating table for AACS member and then President, Michael Halmon of American Institute for Beauty for the purpose of representing small (less than 450 student enrollment) proprietary institutions of higher education (our average institution size is 150 or less in enrollment).

The Department led the voting to reject this motion, despite Department precedent for allowing such a "small school" seat to take into account the unique impacts on small business proprietary school operators and despite the fact that public institutions had seats for both 2-year and 4-year institutions. Once excluded from the negotiating table, AACS tried to engage in the process by meeting with Department officials for listening sessions, providing information and data, and meeting with the White House Office of Information and Regulatory Affairs ("OIRA"), but none

---

[48] American Association of Cosmetology Schools, Comment Letter on Proposed Rule on Program Integrity: Gainful Employment (May 29, 2014), https://www.regulations.gov/comment/ED-2014-OPE-0039-1899.

[49] 86 Fed. Reg. 69607 (Dec. 8, 2021) (to be codified at 34 CFR 600, 668).

[50] *Id.*

[51] *Id.*



of the concerns or data provided to the Department were addressed in the Proposed Rule.[52] AACS was further hindered from participating by the Department's decision to conduct the negotiation by remote video conference, instead of in-person. AACS objected to this decision at the time. Although the President had not yet rescinded the public health emergency, the COVID-19 pandemic was clearly ebbing and did not represent the threat to public health and safety that it once did. Less restrictive health measures were available to allow the traditional, in-person negotiations to proceed, including masks, social distancing, vaccines, and rapid testing. Under these circumstances, depriving AACS and the public the opportunity to attend an in-person negotiation was unjustified. AACS was substantially prejudiced as a result. In-person negotiations have, in the past, allowed AACS to "work the room" by speaking to negotiators during breaks or when asking to be heard during discussion. The absence of these formal and informal modes of communication prevented AACS from participating.

The absence of a representative from the cosmetology school sector was significant for several reasons. First, the 2014 GE Rule had been rolled back by the Trump Administration after the Department was enjoined by Judge Rudolph Contreras in the case of *AACS v. DeVos*. Second, the Department has had a long history of acknowledging that there are flaws with earnings for cosmetology school graduates.[53] As the Department admits in the NPRM, few other schools or sub-sectors of private, for-profit schools have these same challenges.[54] The negotiators representing proprietary institutions were Bradley Adams, South College, and alternate Michael Lanouette, Aviation Institute of Maintenance, Centura College and Tidewater Tech. Although highly qualified negotiators, neither of these individuals had the cosmetology sector experience needed to represent our schools.

In contrast to the schools of the proprietary school negotiators, programs offered by AACS members are different in that they: (1) predominantly lead to licensed occupations; (2) have curriculum length and content that is regulated by the states, which impacts the cost of tuition and ability to modify programs; (3) have graduates requiring "ramp up" time to build a clientele before maximizing their income; (4) have graduates who work disproportionately flexible (less than full time) schedules, operate as independent business owners and operate cash-based businesses, all of which can impact earnings (a critical issue of this rulemaking); and (5) have students and graduates who are overwhelmingly women and disproportionately minority (so their interests were not represented and this impacts the income measure). Given these concerns, the Department's decision to leave the AACS representative out of the negotiations was not just

---

[52] *See* Office of Mgmt. & Budget, Completed Meeting, EO 12866 (Mar. 10, 2023), https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=false&rin=1840-AD57&meetingId=189773&acronym=1840-ED/OPE.

[53] *Am. Ass'n of Cosmetology Sch.'s v. DeVos* (stating that the Department itself explicitly acknowledged the problem of underreporting of income, finding that tips make up "about half of earnings in service occupations such as cosmetology."); *see* Program Integrity: Gainful Employment, 79 Fed. Reg. 64,890, 64955 (Oct. 31, 2014) (to be codified at 34 C.F.R. pt. 600, 668).

[54] 88 Fed. Reg. at 32366.



questionable, it violates the Administrative Procedure Act (APA), the Equal Protection and Due Process Clauses of the Constitution and invalidates the Proposed Rule.

### 2.    Prejudicially Short Comment Period

On May 26, 2023, AACS formally requested an extension of the 30-day public comment period. The Proposed Rule covers six new areas of rulemaking. The GE proposal alone is estimated to result in 80% or more of undergraduate cosmetology certificate programs failing the GE Rule, likely leading to a large number of our member schools closing.[55] The stakes could not be higher -- the proposals represent an existential threat to our association, our school members, our current and future student career choices, employers reliant on our graduates, and the health of the beauty and wellness industry as a whole. The short comment period presents an undue burden on this small association and its predominantly small institution membership.  It has prejudiced our ability to fully respond to a rule that will disproportionately impact our programs.

The APA requires that the process for negotiated rulemaking adequately represent parties that will be impacted by a proposed rule.[56]  The Department failed to meet this standard when selecting negotiators for the Institutional and Programmatic Eligibility portion of the Negotiated Rulemaking process. In particular, the Department failed to seat the nominee from AACS who could represent both small for-profit institutions and the interests of our unique sub-sector of higher education so impacted by this rule.

The APA states that an agency is required to provide a period of at least 30 calendar days for the submission of public comments.[57] Agencies have discretion to extend the public comment period to sixty days or longer for complex rulemakings.[58]

The Department published the official NPRM on May 19, 2023, which consisted of a 212 page NPRM containing high-level, data-driven arguments and proposed regulations not included in the original rule package. On May 25, 2023, AACS submitted a letter to the Department requesting an extension of the public comment period.[59] In its letter, AACS explained that additional time was necessary to properly respond to the proposed changes. AACS cited that the Department had previously provided forty-five (45) days to submit public comments to the 2010 Gainful Employment NPRM[60] and sixty (60) days to submit public comments to the 2014

---

[55] 88 Fed. Reg. at 32432 (Table 3.24).

[56] 5 U.S.C. § 565; 20 U.S.C. § 1098a.

[57] 5 U.S. Code § 564.

[58] Federal Register, A Guide to the Rulemaking Process (last visited Jun. 17, 2023), https://www.federalregister.gov/uploads/2011/01/the_rulemaking_process.pdf.

[59] Letter from Am. Ass'n of Cosmetology to Dep't of Educ. (May 25, 2023).

[60] Program Integrity: Gainful Employment, 75 Fed. Reg. 43615 (proposed on July 26, 2010) (to be codified at 34 C.F.R. 668), https://www.federalregister.gov/documents/2010/07/26/2010-17845/program-integrity-gainful-employment.



Gainful Employment NPRM.[61] The Department denied this request for an extension of the public comment period. This deprived AACS of a sufficient amount of time to properly analyze and respond to the NPRM.

### 3.   Value of Appeal Data Improperly Dismissed

As part of its rationale for not permitting an alternate appeals process in the proposed version of the GE Rule, the Department states that the alternate earnings data for cosmetology programs that schools filed under previous alternate earnings appeals as permitted in the 2014 GE Rule was "implausibly high."[62] The implication is that cosmetology schools "gamed" or otherwise manipulated graduate earnings to ensure a program passed the GE rates on appeal. This ugly and biased implication is unsubstantiated and, itself, implausible. The 2014 GE rule, under then § 668.406, required an institution's chief executive officer to attest that the survey was conducted in accordance with the survey standards in an Earnings Survey Form provided by the Department, and that the mean or median earnings used to recalculate the D/E rates was accurately determined from the survey results.

In addition, the 2014 GE Rule required an examination-level attestation engagement report prepared by an independent public accountant or independent governmental auditor, as appropriate, that the survey was conducted in accordance with the requirements set forth in the NCES Earnings Survey Form. The attestation had to be conducted in accordance with the attestation standards contained in the Government Accountability Office's Government Auditing Standards promulgated by the Comptroller General of the United States and with procedures for attestations contained in guides developed by and available from the Department of Education's Office of Inspector General. The appeal process also required institutions to file supporting documentation with the Secretary. What the Department is implying, then, is that school owners, accountants, and graduates conspired to manipulate the appeals process to ensure passing rates on appeal. The Department has provided no evidence that any such improper conduct occurred.

Yet, the Department relies on this unsupported belief in its rationale for not restoring the alternate earnings appeal. The Department notes that "past data submitted as part of the alternate earnings appeals" was one of the factors that led it not to include an alternate earnings appeal.[63] The implication is that the Department does not believe in the veracity of the alternate appeals data provided by institutions and believes institutions gamed the process, but without presenting any evidence that any wrongdoing occurred.[64] The Department has not considered the possibility that the alternate earnings appeals survey data filed and approved by the Department contained

---

[61] Program Integrity: Gainful Employment, 79 Fed. Reg. 16426 (proposed on Mar. 25, 2014) (to be codified at 34 C.F.R. 600, 668), https://www.federalregister.gov/documents/2014/03/25/2014-06000/program-integrity-gainful-employment.

[62] 88 Fed. Reg. at 32346.

[63] Id. at 32335.

[64] Id. at 32346 ("In addition, institutions had incentives to collect and show data that cast their programs in the best light within the administrative proceedings, whatever the applicable standard for reviewing appeals.").



*accurate information* that actual earnings for graduates far exceeded, in some cases, earnings data in the Social Security Administration database then relied upon as the sole source of graduate earnings data in the 2014 GE Rule. Instead, the Department dismisses that higher data as "implausible."

Specifically, the Department states: "One analysis of alternative earnings data, provided by cosmetology schools as part of the appeals process for GE debt-to-earnings thresholds under the 2014 Prior Rule, found that the average approved appeal resulted in an 82 percent increase in calculated earnings income relative to the numbers in administrative data. Results like that appear to be implausibly high …"[65] The Department then concludes that "at this stage that it seems likely that the use of alternative earnings estimates, typically generated from student surveys, could yield a substantial overestimate of income above that of unreported tips."[66] Again, the premise that use of an alternate earnings appeal leads to an *overestimate* of income illustrates the Department's bias that appeals data cannot be true data but without presentation of any actual evidence of wrongdoing.

Further, the Department improperly concludes that schools that filed a notice of their intent to file an alternate earnings appeal, but then did not later file one, could not establish higher earnings than in the SSA database. That is an unfounded conclusion on which to deny an appeals process. The Department states: "The difference between the 882 programs for which institutions submitted notices of intent to appeal when compared to the 341 appeals that were actually submitted suggests that institutions may often have concluded that the alternative earnings appeal process did not warrant the necessary investment of time and effort—or perhaps the initially supposed difference in graduates' earnings was not as significant as anticipated."[67] This specious conclusion disregards that the first version of the 2014 GE Rule appeal process required *100% of the graduate cohort* to respond to the earnings survey, which was struck down by the court in *AACS vs. DeVos* because it violated the APA. In addition, the 2014 GE Rule required advance notice of intent to appeal in order to *preserve* the right to file an alternate earnings appeal, so many schools likely rationally filed a notice of intent to preserve their right to appeal in case they later decided to do so.

Finally, the Department cannot conclude that alternate appeals data was "implausibly high" and statistically unreasonable unless the original earnings data was reliable and of high quality. The high rate of successful appeals was either because the supporting data was *wrong*, or the appeal information was wrong. In the 2014 GE Rule, the Department did not say the SSA information was the most reliable source of data, but rather pointed to the IRS as the best source but not available at that time. It is safe to conclude, then, that it is possible that the SSA information was wrong and that the appeal information was right. If the Department is confident about the

---

[65] *Id.*

[66] *Id.*

[67] *Id.* ("Those other considerations include the Department's observations of the information provided in the earlier alternate earnings appeals process, which likewise suggest that the appeals had little value in improving the assessment of whether programs' ''true'' debt-to-earnings (or earnings) levels met the GE criteria").



quality of the federal earnings data in the GE Rule, there should be no reason to disallow a fair and workable challenge to that data. Administrative burden alone is simply not enough to violate due process and ensure a correct GE Rule outcome. The Department's unwillingness to restore an alternate earnings appeal is illegal, as it is based largely on its biased and unsupported views of the integrity of data in the prior appeals process.

### 4.    Cosmetology Programs Are Not Just Collateral Damage

The Department has prioritized the finalization of its 14-year odyssey to establish a GE Rule over ensuring accurate outcomes for GE rates for cosmetology programs. The Department states that the matter of unreliable earnings data "should be kept in perspective" because tip income "is not typical in every occupation and profession in which people work after graduating."[68] Apparently, because this issue only impacts "cosmetology, massage therapy, bartending, acupuncture, animal grooming, and tourism/travel services," it does not need to be addressed, even though the Department acknowledges that unreported income could constitute at least 8 percent of earnings.[69] The Department is "not convinced" that the problem is such that the Department should make any attempt to account for it, despite that incredibly damaging impact this decision will have on AACS members and the students they serve.[70]

The Department also states that they would not want to "incentivize institutions to discourage accurate reporting of earnings among program graduates."[71] The implication that our members coordinate with graduates to break tax laws is unacceptable. The Department goes on to state that, "making special accommodations only for programs where under-reporting of earnings is suspected would differentially reward such programs and potentially create adverse incentives for programs to encourage such behavior."[72]  By stating that accounting for under-reporting would "reward" programs ignores that AACS schools merely seek a level playing field that results in more accurate GE rates, not special treatment. Also, to state that acknowledging underreporting through a proxy increase or other mechanism would encourage continued under-reporting is nonsensical. AACS schools do not have control over their graduates' tax returns. AACS schools want their graduates to comply with all tax reporting laws and many provide financial management training relevant to entrepreneurs. To imply without any evidence that AACS schools are coordinating with graduates to encourage illegal behavior is, again, an unacceptable way to make policy.

The Department acknowledges that under-reporting exists as a real problem.[73]  It states: "[t]his is not to deny that some fraction of income will be unreported despite legal duties to report, but

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.* at 32335.

[73] *AACS* at 63.



instead to recognize as well that legal demands and other relevant circumstances have changed" because "arguments on unreported income have become less persuasive to the Department."[74] In determining not to offer an alternate earnings appeal, the Department again cites concerns about the honesty of schools subject to the GE Rule. Specifically, it states "[a]lternate sources such as graduate earnings surveys … could more easily be manipulated to mask poor program outcomes."[75]

By choosing to ignore well-known flaws in federal earnings databases as they relate to the earnings of many of our graduates,[76] doubling down on that omission by removing any means to appeal earnings data, establishing a new EP metric tied solely to earnings that decimates our programs, and incorporating institutional consequences for GE program GE rate failure - including warnings after one failing year and new administrative capability, certification and financial responsibility enforcement authority now tied to failing GE programs– AACS schools will be severely harmed after the GE Rule goes into effect. Failing to provide a meaningful earnings data appeal process violates fundamental due process. The fact that the Department has concluded that the GE metric should not address a real problem of earnings data unreliability indicates significant bias by the Department against these programs and the students served by them.

      5.    <u>Gender and Race Bias in Earnings Data Used in GE Rates</u>

As discussed in detail in Section II.D, both the D/E and EP metrics in the GE Rule are improperly weighted toward white and male earnings and do not account for systemic wage discrimination experienced by women and minorities.

      6.    <u>Retroactivity, Transition and Pandemic Earnings Bias</u>

The GE rule is based on prior years' debt and earnings data. For the first set of D/E rates, earnings data for pandemic calendar years 2021 and 2022 would be used for individuals who graduated in the 2017-2018 and 2018-2019 award years respectively, which would be part of the standard 2-year cohort for all programs evaluated in 2024-2025. Earnings data for pandemic calendar year 2020 would also be used for individuals who graduated in the 2016-2017 award year as part of the expanded 4-year cohort for programs with less than 30 Title IV completers in the 2-year cohort.

Our graduates go to work in a hands-on industry at spas, salons and other personal services establishments where they provide hair, massage, skin, nail and other services requiring direct human contact. The coronavirus pandemic significantly impacted employers of our graduates. According to the Professional Beauty Association, just the employment-based (W-2 issuing)

---

[74] 88 Fed. Reg. at 32355.

[75] *Id.* at 32366.

[76] *AACS* at 63 (stating that the Department itself explicitly acknowledged the problem of underreporting of income, finding that tips make up "about half of earnings in service occupations such as cosmetology."); *see also* 79 Fed. Reg. at 64955; 88 Fed. Reg. at 32366.



segment of the salon industry posted total revenue of $25.6 billion in 2020, down nearly 26% from a level of $34.5 billion in 2019.[77] This effect continued into 2021 and 2022. It is unfair and illegal for the Department to use pandemic impacted earnings years for the GE regulations for cosmetology school graduates. In addition, many graduates were delayed in working during the pandemic because of delays in cosmetology boards scheduling exams.

The use of pandemic-era earnings data is all the more concerning because the Proposed Rule removes zone and transition provisions contained in previous versions of the GE Rule. Like the Proposed Rule, under the 2014 GE Rule, a program would fail if its annual earnings rate exceeded 8 percent and its discretionary income rate exceeded 20 percent. However, in the 2014 GE Rule, the Department included a "zone" status that allowed a program additional time to come into compliance if its annual earnings rate was between 8 percent and 12 percent or its discretionary income rate was between 20 percent and 30 percent. In the Proposed Rule, the Department keeps the D/E thresholds at 8 percent and 20 percent, but removes the zone status and any transition period.  This is a material change for AACS members because their programs are more likely to fail the GE Rule (now with the required passage of both D/E and EP metrics) and there is no zone or transitional status but instead immediate Title IV consequences (warnings after 1 year of failure and loss of program eligibility after failing two of three consecutive years).

The Department's removal of the 2014 GE Rule zone and transition framework falls disproportionally on AACS member programs. If nearly 80% of our cosmetology certificate programs are expected to fail GE metrics, that will happen as soon as late 2024/early 2025. At that time, due to changes in the Administrative Capability, Financial Responsibility, and Certification rules, AACS schools will immediately have institutional Title IV eligibility issues, leading to potential school closures.

D.    *Data Flaws and Limitations*

The data provided by the Department is flawed, incomplete and/or materially limited in scope such that it cannot reliably sustain the GE and other proposals. AACS recommends, therefore, that:

(1) For both the FVT and GE regulations, for the D/E rate, the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[78] or, in the alternative, cease publication of a Final Rule on Gainful Employment (Subpart S) until it conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income,

---

[77] Professional Beauty Association, 2022 Economic Snapshot of Salon Industry (Oct. 2022), https://www.reginfo.gov/public/do/eoDownloadDocument?pubId=&eodoc=true&documentID=212246 .

[78] *AACS* at 63.

21



racial and gender wage discrimination, and other factors impacting our program graduates; and

(2)    The Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

We note below the deficiencies in the data provided that support the need for further study and analysis prior to implementing a GE Rule.

> 1.    <u>The Department Has Not Provided Information to Support its Conclusions</u>

The Regulatory Impact Analysis ("RIA") in the NPRM is predicated on the 2022 Program Performance Data ("2022 PPD" or "PPD") published by the Department on May 17, 2023. This data varies significantly from the previously published data in April 2022,[79] and from the data posted to the College Scorecard website. In reviewing the data, it has been difficult, if not impossible, for researchers to replicate and understand the PPD data and analysis provided in the NPRM.  The Department has, in fact, admitted that the PPD data has limitations. In the 2022 PPD Description, the Department states:

> "Due to data limitations, the Department calculated the median earnings data for a different cohort of program completers than the one used to calculate median debt. Earnings were measured for Title IV students completing their credential in either award years 2014-2015 or 2015-2016. Students in most programs would thus have their earnings captured in the third calendar year following the end of the award year in which they completed—calendar years 2018 and 2019, respectively. Median cumulative debt was measured for completers, including non-borrowers, in the 2015-2016 or 2016-17 award year. The Department measured their debt levels in 2016 dollars (adjusting by the CPI) and used this as an estimate for the debt levels of the AY2015 and AY2016 completers assuming debt levels remained unchanged in real terms between these cohorts."[80]

The Department asserts that this methodology provides the most recent and complete program-level debt and earnings data available. The methodology of using mismatched cohorts and data adjustments, however, does not produce results that properly reflect or project the outcomes of the rule. As a result, institutions cannot meaningfully plan for and project programmatic results. The use of the 4-digit CIP code in the data set is just one key example. It is deeply concerning

---

[79] *See* U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22: GE Info Rate April 2022 (Apr. 2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/geinforateapril2022.xlsx.

[80] U.S. Dep't of Educ., 2022 Program Performance Data Description (2022), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/nprm-2022ppd-description.pdf.



that the Department would utilize data that is insufficient, incomplete, or inaccurate to analyze the impact of the rule and reach its conclusions.  It also renders the RIA legally insufficient.

In addition, there are several unexplained variables.  For example, the PPD 2022 data contains a subset of the programs listed in the College Scorecard with no clear explanation of why this subset was chosen. The College Scorecard has more than 222 thousand programs, of which more than 37,000 appear to have sufficient data for GE calculations. The PPD 2022 has just over 150 thousand programs, of which just over 26 thousand have sufficient data for GE calculations.

We also note that in review of the data sources provided by the Department, there are significant variances.[81] The EP measure is based on data with inconsistent scope, in particular by comparing a program's cohort earnings to a State-aggregated Earnings Threshold (ET) metric. Each program has unique demographics that have a large bearing on earnings, such as the percentage of female vs. male learners; yet the EP measures aggregates all demographics beyond state and age and educational attainment for high school earnings.

The table below shows the three-year non-enrolled median earnings for female (EARN_NOMALE_NE_MDN_3YR) and male (EARN_MALE_NE_MDN_3YR) sub-cohorts, based on College Scorecard Most Recent field of study data for all undergraduate certificate disciplines (2-digit CIP). Across all disciplines, male completers earned 29% more than female completers, $29,803 vs. $23,021. These earnings disparities not accounted for in the EP are likely to have significant impacts on passage of the EP measure for predominantly female cosmetology programs.

---

[81] *See* U.S. Dep't of Educ., Negotiated Rulemaking for Higher Education 2021-22 (last visited Jun. 17, 2023), https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html?src=rn; *see also* U.S. Dep't of Educ., Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB) (last visited Jun. 17, 2023), https://www.regulations.gov/docket/ED-2023-OPE-0089/document.



## Gender

| Discipline1 | Median Female 3Yr Median NE Earnings | Median Male 3Yr Median NE Earnings |
|---|---|---|
| Grand Total | **$23,021** | **$29,803** |
| Null | | |
| AGRICULTURE, AGRICULTURE OPERATIONS, AND RELAT.. | $9,298 | $40,299 |
| ARCHITECTURE AND RELATED SERVICES | | |
| AREA, ETHNIC, CULTURAL, AND GENDER STUDIES | | |
| BASIC SKILLS | $18,402 | $28,746 |
| BIOLOGICAL AND BIOMEDICAL SCIENCES | | |
| BUSINESS, MANAGEMENT, MARKETING, AND RELATED .. | $21,779 | $26,959 |
| CITIZENSHIP ACTIVITIES | | |
| COMMUNICATION, JOURNALISM, AND RELATED PROGR.. | $19,958 | $25,353 |
| COMMUNICATIONS TECHNOLOGIES/TECHNICIANS AND .. | $21,040 | $16,195 |
| COMPUTER AND INFORMATION SCIENCES AND SUPPOR.. | $22,519 | $35,730 |
| CONSTRUCTION TRADES | $32,168 | $35,537 |
| EDUCATION | $21,043 | $30,562 |
| ENGINEERING | | $40,455 |
| ENGINEERING TECHNOLOGIES/TECHNICIANS | $16,647 | $32,462 |
| ENGLISH LANGUAGE AND LITERATURE/LETTERS | $15,389 | $24,495 |
| FAMILY AND CONSUMER SCIENCES/HUMAN SCIENCES | $16,300 | |
| FOREIGN LANGUAGES, LITERATURES, AND LINGUISTICS | | |
| HEALTH PROFESSIONS AND RELATED CLINICAL SCIENCES | $25,155 | $27,413 |
| HEALTH-RELATED KNOWLEDGE AND SKILLS | $23,550 | $24,399 |
| HIGH SCHOOL/SECONDARY DIPLOMAS AND CERTIFICAT.. | | |
| HISTORY | | |
| INTERPERSONAL AND SOCIAL SKILLS | | |
| LEGAL PROFESSIONS AND STUDIES | $34,036 | |
| LEISURE AND RECREATIONAL ACTIVITIES | | |
| LIBERAL ARTS AND SCIENCES, GENERAL STUDIES AND .. | $28,359 | $32,762 |
| LIBRARY SCIENCE | | |
| MATHEMATICS AND STATISTICS | | |
| MECHANIC AND REPAIR TECHNOLOGIES/TECHNICIANS | $26,385 | $35,140 |
| MILITARY TECHNOLOGIES | | |
| MULTI/INTERDISCIPLINARY STUDIES | | |
| NATURAL RESOURCES AND CONSERVATION | | $47,284 |
| PARKS, RECREATION, LEISURE, AND FITNESS STUDIES | $21,689 | $25,664 |
| | | |
| PERSONAL AND CULINARY SERVICES | $17,349 | $15,343 |
| PERSONAL AWARENESS AND SELF-IMPROVEMENT | | |
| PHILOSOPHY AND RELIGIOUS STUDIES | | |
| PHYSICAL SCIENCES | | |
| PRECISION PRODUCTION | $31,482 | $35,063 |
| PSYCHOLOGY | | |
| PUBLIC ADMINISTRATION AND SOCIAL SERVICE PROFES.. | $36,377 | |
| RESERVE OFFICER TRAINING CORPS (JROTC, ROTC) | | |
| RESIDENCY PROGRAMS | $28,178 | $40,759 |
| SCIENCE TECHNOLOGIES/TECHNICIANS | $37,892 | |
| SECURITY AND PROTECTIVE SERVICES | $22,809 | $46,098 |
| SOCIAL SCIENCES | $44,646 | $69,251 |
| THEOLOGY AND RELIGIOUS VOCATIONS | $18,405 | $28,994 |
| TRANSPORTATION AND MATERIALS MOVING | $28,749 | $38,675 |
| VISUAL AND PERFORMING ARTS | $28,228 | $25,573 |



2.     Gender and Race

Given that our graduates are comprised of 90% women, including white, Black, Hispanic and Asian Pacific American women,[82] we are concerned that the Department has not given enough attention to whether discrimination based on gender, gender identity, or race and ethnicity could influence program outcomes for programs that disproportionately enroll members of these groups. The Department states that its "analyses, and an ever-increasing body of academic research, strongly rebut the claim that differences across programs are solely or primarily a reflection of the demographic or other characteristics of the students enrolled."[83]

Even after claiming that programs with higher percentages of female and minority graduates are not disproportionately negatively impacted by the GE Rule, the Department implies that even if there was that impact, it is the result the Department wants. They state: "consistent with recurring allegations in student complaints and qui tam lawsuits (a type of lawsuit through which private individuals who initiate litigation on behalf of the government can receive for themselves all or part of the damages or penalties recovered by the government), through our compliance oversight activities including program reviews, the Department has concluded that many institutions aggressively recruit individuals with low income, women, and students of color into programs with substandard quality and poor outcomes and then claim their outcomes are poor because of the ''access'' they provide to such individuals."[84] The Department, however, has not provided any evidence in the NPRM of the complaints, lawsuits, compliance issues, or aggressive recruitment or how they relate to "poor outcomes," or even what they mean by "poor outcomes."

The Department then notes that even if the programs women and minority students are enrolled in fail GE, "more than 90 percent of students enrolled in failing programs have at least one non-failing option within the same geographic area, credential level, and broad field. These alternative programs usually entail lower borrowing, higher earnings, or both."

However, for cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[85] Further, cosmetology programs offered by these alternative institutions suffer from

---

[82] 88 Fed. Reg. at 32432 (for undergraduate certificate programs for cosmetology, 80% are failing programs. Of completers of these programs, 90% are women. Of these women, 15% are Black, 19% Hispanic, 5% are Asian, and 50% are white.  For undergraduate certificate programs for somatic body work, 61% of programs fail. Of completers for these programs, 75% are women. Of these women, 10% are Black, 12% are Hispanic, 3% are Asian, and 42% are white).

[83] Id. at 32309.

[84] Id.

[85] Id. at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students



the same problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community college cosmetology programs.[86]

The chart below shows the percentage of cosmetology programs for each state, both at the associate's and undergraduate certificate level, that pass the proposed Gainful Employment tests. The color of each state represents the ratio of programs passing the Earnings Premium measure and the circle in each state represents the ratio of programs passing the Debt-to-Earnings metric. Data comes from the College Scorecard Most Recent program file.

---

transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").

[86] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") This is also not true. The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions) to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.



State View of GE Pass Ratios for Cosmetology
State color = EP Embed circle color = DTE
Based on College Scorecard



Pass DE Ss Ratio

39%          100%

Pass EP Ss Ratio

0%          50%

As illustrated, nearly all measured cosmetology programs fail EP not matter what type of institution offers the program.

The Department also states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings [or in] online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[87] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training.

The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[88] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to replace our members in supplying 78% of the graduates hired by employers.

---

[87] *Id.* at 32434.

[88] *Id.*



Further, it is well established that women, minorities, and groups bearing other socioeconomic characteristics are subjected to wage discrimination in the United States that would impact measured earnings for programs with a high proportion of female and minority graduates. At many career schools, enrollments in certain types of programs skew significantly toward one gender or another. For example, cosmetology programs tend to favor women, while automotive and trades programs tend to favor men. Minority populations at career schools in certain markets can be very high by virtue of their location and the communities they serve. Any D/E rate or earnings premium measure that does not recognize and adjust for these differences will yield unequal effects because of gender, racial/ethnic, and similar earnings disparities.[89]   It will also limit access to those students based on those very characteristics.

The Federal agency data fails to account for gender and other work-related disparities. A large number of cosmetologists work flexible hours, which significantly dilutes annual earnings. Cosmetology is a female dominated industry. [90] According to a recent study, 89% of graduates are female and 85% of salon owners have at least one female owner.[91] The Federal agency data further fails to account for gender-pay gaps, which is substantial. According to a recent Bureau of Labor Statistics ("BLS") Report, "[i]n 2021, women who were full-time wage and salary workers had median usual weekly earnings that were 83 percent of those of male full-time wage and salary workers."[92]

[89] Anthony Carnevale, et al., *How Racial and Gender Bias Impede Progress toward Good Jobs*, GEO. UNIV. CTR. ON EDUC. & THE WORKFORCE,  (2022) https://cewgeorgetown.wpenginepowered.com/wp-content/uploads/chase-uncertain_pathway_2-fr.pdf.

[90] Qnity Institute, A Career in Pro Beauty: Compensation Study.

[91] *Id.*

[92] U.S. Bureau of Labor Statistics, BLS Reports: Highlights of Women's Earnings in 2021 (Mar. 2023), https://www.bls.gov/opub/reports/womens-earnings/2021/home.htm#:~:text=Women%20ages%2025%20to%2034,See%20tables%201%20and%2012.



Chart 2. Median usual weekly earnings of women and men who are full-time wage and salary workers, by age, 2021 annual averages

When adding race to the equation, the income variances are even more stark. "Among women, Whites ($925) earned 81 percent as much as Asians ($1,141), Blacks ($776) earned 68 percent, and Hispanics ($718) earned 63 percent." Another variable that the Department must consider is the fact that women trend to lower paid occupations. For example, "[i]n 2021, 32 percent of women worked in low wage occupations, compared with 21 percent of men."[93] The income variances are a factor the Department must consider and address.  Failure to properly address these underlying and historic wage variances creates a rule that has a disparate impact based on gender and race. For cosmetology schools, that enroll a significant majority of women, sometimes up to 99% of the student body, the structural pay inequities are significant.

---

[93] *Id.*



It is critically important that the Department better understand the flaws in the earnings used in the FVT and GE frameworks before applying it to cosmetology programs for disclosure purposes or implementing a GE accountability framework. Failure to do so will disproportionately impact female, Black, Hispanic and low income students who attend cosmetology programs. As the Department itself notes, "programs that fail at least one GE metric have a higher share of students that are female, higher share of students that are Black or Hispanic, lower student and family income, and higher share of students that have ever received the Pell Grant."[94]

In addition, AACS schools admit a high proportion of Pell Grant eligible students, and traditional "value" criteria may not be indicative of the benefits students receive by attending an inclusive, diverse institution and the continuing challenges many face with earnings in the workplace driven by racism, sexism or other factors.[95] Equal earning power from a credential is not a reality, and earnings alone cannot capture value to all students. Foreclosing access to programs through a D/E or EP metric that does not account for challenges with debt, repayment rates, and earnings for low income students would have harmful, unintended consequences. Any measure of value must take into account the composition of the student body of an institution and adjust for programs with a high percentage of Pell eligible students. In addition, earnings should be measured over 10 years, or at 5-10-15 year increments to truly gauge lifetime value. We note that

---

[94] 88 Fed. Reg. at 32429, 32432 (stating that "programs failing the EP threshold have a higher share of female students").

[95] *See, e.g.,* Am. Ass'n of Univ. Women, The Simple Truth About the Gender Pay Gap: 2022 Update (2022), https://www.aauw.org/app/uploads/2022/12/SimpleTruth_12.22_2.1-002.pdf.



the Georgetown Center for Education and the Workforce recommends a 10 year horizon to measure ROI.[96]

Earnings could also be benchmarked against earnings from similar programs across all sectors, rather than benchmarked against an arbitrary measure such as high school graduate earnings. Comparison between like programs, not comparison among entirely different programs, would provide more transparency to students looking for information about specific fields of study.

We also share Rep. Scott's questions about how earnings growth is measured.[97] The NPRM would measure graduate earnings three years after program completion as reported in federal databases. The EP measure would compare the median of those reported earnings against the median of high school graduates for a given program graduate cohort. The GE Rule does not measure earnings at the time a student enrolls in the program against earnings three years after. As Mr. Scott states, "that would address some of the problems." What Mr. Scott was alluding to is measuring social mobility – are low-income students obtaining positive earnings gains by attending the program, based on their own earnings history. This is not measured by the GE Rule. Rather, as Under Secretary Kvaal replied, "the proposal looks at earnings compared to high school graduates in the same state." Others also have concerns that "focusing on earnings can obscure realistic outcomes for groups vulnerable to pay disparities, like Black graduates and women."[98] As stated by Martin van der Werf at Georgetown University's Center for Education and the Workforce, "you wouldn't want lawmakers or institutional leaders to only use earnings data to make decisions about program cuts .. It's just one factor."[99]

Measuring earnings based on pre-enrollment vs. post-graduate earnings is more closely tied to social mobility and takes into account personalized factors that can impact market earnings. Before implementing the EP metric or the GE accountability framework, the Department should study the issue of earnings bias built into the data utilized by the Department in the Proposed Rule.

---

[96] Anthony Carnevale, Ban Cheah and Martin Van Der Werf, Ranking ROI Of 4,500 US Colleges And Universities, Georgetown Univ. (2019), https://cew.georgetown.edu/cew-reports/collegeroi/.

[97] *See* Breaking the System Part II: Examining the Implications of Biden's Student Loan Policies for Students and Taxpayers: Hearing Before the H. Comm. on Educ. and the Workforce, 118th Cong. (May 23, 2023),

 https://edworkforce.house.gov/calendar/eventsingle.aspx?EventID=409169 .

[98] Liam Knox, *Measuring Outcomes in Income*, Inside Higher Ed (May 4, 2023), https://www.insidehighered.com/news/students/careers/2023/05/04/measuring-outcomes-income (also quoting a non-profit university President who states: "Earnings data is inherently skewed against graduates who are Black, Hispanic or women … [t]o understand the data as it relates to a student body, an observer would have to go probing and actually now about wage discrimination, race and gender discrimination and so forth, to factor into the calculations.").

[99] *Id.*



3.    Age

The average age of an AACS school student is 25 years old. We object to the Department using Census Bureau data in the EP portion of the FVT and GE Rule to arrive at median annual earnings of students with a high school diploma or GED. In the NPRM, the EP is measured based on the "median earnings for working adults aged 25–34, who either worked during the year or indicated they were unemployed when interviewed, with only a high school diploma (or recognized equivalent) (1) in the State in which the institution is located; or (2) nationally, if fewer than 50 percent of the students in the program are located in the State where the institution is located while enrolled."

In the Preamble, the Department states that the EP measure "is computed as the median annual earnings among respondents aged 25–34 in the American Community Survey who have a high school diploma or GED, but no postsecondary education, and who are in the labor force when they are interviewed, indicated by working or looking for and being available to work."[100] The American Community Survey is an annual survey conducted by the United States Census Bureau.[101] According to the American Community Survey, the labor force includes individuals who are classified as either "employed" or "unemployed." The term "unemployed," as used in the Survey, includes:  All civilians 16 years old and over who (1) were neither "at work" nor "with a job but not at work" during the reference week, and (2) were actively looking for work during the last 4 weeks, and (3) were available to accept a job. Also included as unemployed are civilians who did not work at all during the reference week, were waiting to be called back to a job from which they had been laid off, and were available for work except for temporary illness.[102] Thus, the EP measure would indeed exclude all individuals who either were unavailable to accept a job or who were not actively looking for employment. The Department indicates that, for each program, the Earnings Threshold used would be for the State in which the institution is physically located. However, "if fewer than 50 percent of the students in a program are located in the State where the institution is located, the earnings premium calculation would compare the median earnings of the program's completers to the median earnings nationally…"[103]

The D/E Annual Earnings rate is based on the actual earnings of all of the program's graduates, without regard to whether they are seeking employment. Thus, the Annual Earnings calculation includes program graduates who may not need to work because their household income is sufficient to support their lifestyle, or who have determined to (or have no choice but to) remain home to care for children or other loved ones, or who for any other reason are not actively seeking employment. In contrast, the EP measure would exclude all of these individuals, as it

---

[100] 88 Fed. Reg. at 32413.

[101] For purposes of calculating the EP, the Department will use the "median annual earnings of students with a high school diploma or GED using data from the Census Bureau." Proposed § 668.404(b).

[102] *Definition – "Unemployed,"* U.S. CENSUS BUREAU, https://www.census.gov/glossary/#term_Laborforce?term=Unemployed.

[103] 88 Fed. Reg. at 32333.



only includes individuals who "were actively looking for work during the last 4 weeks" and "were available to accept a job." It also is the case that, under the Proposed Rule, the Annual Earnings is based on the actual earnings of all of the program's graduates, as measured approximately three years following completion of their program. Because most career school graduates are not employed in their career prior to completing their program, it is likely the case that most graduates will have been employed in their career, at best, for three years when their earnings are measured. In contrast, the EP measure includes earnings data for individuals between the ages of 25 and 34. Understanding that most persons graduate from high school at around 18 years of age, individuals included in the EP measure may have been employed in their current career for as many as 16 years.

### 4. Small Cohort Exclusions

We are concerned that the exclusion of D/E rates for a program with fewer than 30 students completing during a two-year or four-year cohort period actually rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low graduation rates to escape the FVT disclosures because D/E and EP rates cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

In addition, the small cohort exclusions obscure the fact that there are few alternative cosmetology programs to replace failing programs. As part of its rationale for accepting high rates of certificate program failures, the Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt." For cosmetology programs, alternative programs are unavailable nearby either because community colleges or private nonprofit institutions do not offer them or, for such institutions that offer them, their graduation rates are so low that they are exempted from the GE Rule or will not have the capacity (or funds) to expand cosmetology program offerings.[104] Further, cosmetology programs offered by these alternative institutions suffer from the same problems with unreliable federal earnings data and if such programs had graduate cohorts large enough to be measured, by the GE Rule, they fail the EP just like AACS member programs, often with higher default rates than our schools as demonstrated by the Department's own data.[105]

---

[104] *Id.* at 32442-43 ("Costs to State and Local Governments" State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs").

[105] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the



Based on data provided by the Department, certificate programs offered by private, for-profit schools have, on average, lower default rates[106] than comparable programs offered by public and private non-profit institutions, and low median debt.[107] It is misleading, therefore, for the Department to state that "[f]ailure rates are significantly lower for public certificate programs (4.3 percent of enrollment is in failing programs) than for proprietary (50 percent of enrollment is in failing programs) or non-profit (43.6 percent of enrollment is in failing programs) certificate programs" when a vast majority of private non-profit and public undergraduate certificate programs are simply not large enough to be measured.[108] The Department further states that, "[a]cross all proprietary certificate and degree programs, 33.6 percent of enrollment is in programs that fail one of the two metrics, representing 22.1 percent of programs" but fails to adequately explain to the public the context: many private non-profit and public undergraduate programs are simply too small to measure.[109]

Using College Scorecard data, the views below show program payment-in-default rate at 3 years on the vertical axis and a GE Failure Score on the horizontal axis (annual median cohort debt payments minus allowable debt payments based on DTE minus Earnings Premium - essential DTE failure amount plus EP failure amount on an annual basis). Payment default rates are reported in discrete bands, which are represented as the midpoint of each band, leading to a quantum effect of only specific levels of payment default rates.

---

same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not above 30 completers, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions) to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[106] *Id.* at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"). The Department states: "The overall 3- year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools," *Id.* at 32425. This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.

[107] *Id.* at 32402 (Table 1.8 states that average debt for private, for-profit undergraduate certificates is $8,857, which compares favorably with average debt for private, nonprofit undergraduate certificate programs of $9,367).

[108] *Id.* at 32420-21.

[109] *Id.*



If Gainful Employment metrics were a significant predictor of student defaulting on loan payments, you would see a reasonably tight linear grouping from bottom left to top right, assuming that Gainful Employment metrics are a predictor of student defaulting on loan payments.

The view below shows all Undergraduate Certificate programs that have valid data and have a valid UnitID.  There is some correlation but no tight grouping, meaning that GE metrics are not a *significant* predictor of default rates.



This view limits the data to Cosmetology programs. Again, there is no tight grouping.





5.     Low Income (Pell Grant eligible) Student Access

AACS schools enroll a high percentage of Pell Grant eligible (low income) students. The Proposed Rule does not protect these students. In its Press Release, the Department states that its Proposed Rule is "part of the Administration's ongoing commitment to fixing a broken student loan system." In reality, the student loan system will not be "fixed" by eliminating up to 2/3 or more of enrollments in short-term, low debt cosmetology certificate programs.[110] This rule eliminates primarily undergraduate certificate programs, the lowest source of student loan debt.[111]

---

[110] Katharine Meyer, *The Causes and Consequences of Graduate School Debt*; 88 Fed. Reg. at 32427 (36.2% of cosmetology certificate programs fail GE, representing up to 2/3 of all cosmetology program enrollments); 88 Fed. Reg. at 32435 ("The share of enrollment in undergraduate proprietary certificate programs that would fail ranges from 34 percent under the lowest threshold up to 66 percent under the highest threshold").

[111] *Id.* at GE Data Set 3, https://www2.ed.gov/policy/highered/reg/hearulemaking/2021/index.html.

36



In addition, as stated, low income students will not have other available options to obtain federal aid for a cosmetology program. The Department cites a report stating that the need for cosmetology programs can be met by unaccredited, non-Title IV cosmetology schools.[112]

The below graphic illustrates all undergraduate certificates of cosmetology with valid zip codes The color code:

- Red = fails Gainful Employment due to Earnings Premium < 0 (adjusted by state) based on College Scorecard analysis
- Yellow = passes by exclusion
- Green = passes Gainful Employment due to Earnings Premium > 0 (adjusted by state) based on College Scorecard analysis

The distance Red -> closest Yellow is the distance from a failing program to one that passes by exclusion. The distance Red -> closest Green is the distance from a failing program to one that passes GE by Earnings Premium.

The size of each circle is based on the second-year cohort IPEDS2.

The first view is of the continental United States.

---

[112] Stephanie Cellini and Bianca Onwukwe, *Cosmetology Schools Everywhere Most Cosmetology Schools Exist Outside of the Federal Student Aid System*, George Wash. Univ. (Aug. 2022), https://www.peerresearchproject.org/peer/research/body/PEER_Cosmetology_B.pdf.



## Cosmetology Map



Earnings Premium

-$1     $1

For large swaths of the mountain states as well as parts of the Southeast, the closest EP passing program may be many hundreds of miles away.

If we zoom in on western Missouri, for instance, we can get a better sense of both distances:



## Cosmetology Map



**Earnings Premium**

-$1                    $1

The distance from Springfield, MO (two larger circles lower Missouri) to Neosho, MO (yellow dot southwest corner of Missouri) is nearly 80 miles. That would be the distance to the closest 'pass by exclusion' program.

A worse case is in South Dakota. The closest pass by exclusion program to Rapid City's failing program is Torrington, Wyoming, 200+ miles away.



Cosmetology Map



Earnings Premium
-$1       $1

The Department states that the Proposed Rule will "drive improvements in value at career training programs" by permitting institutions to "reform … programs to deliver better value to students." For AACS schools, the Proposed Rule will not allow program reform. Our programs are based on state-mandated minimum hours and curriculum which cannot be changed significantly, have overlapping CIP codes, and are specialized in one industry. The Proposed Rule is structured such that our schools cannot offer programs substantially similar to a failing program. Therefore, many of our schools will simply close if one or more significant programs loses Title IV eligibility, unlike most other institutions that can and do offer a wide variety of programs and can more easily shift program offerings.

The Department states that if a school cannot improve its programs "the vast majority of students who enroll in a failing GE program already have better options available to them in a similar field nearby or, in many cases, at the same institution" and that "[o]n average, these alternative options leave graduates with 43% higher earnings and 21% less debt." As illustrated, for cosmetology programs, alternative programs are unavailable nearby either because community colleges or private non-profit institutions do not offer them or, for such institutions that offer them, they graduate so few students in those programs that they are exempted from the GE Rule or will not have the capacity (or funds) to expand specialized cosmetology program offerings.[113] Further, cosmetology programs offered by these alternative institutions suffer from the same

---

[113] 88 Fed. Reg. at 32442-43 ("Costs to State and Local Governments: State and local governments may experience increased costs as enrollment in well-performing programs at public institutions increases as a result of some students transferring from programs at failing programs, including those offered by for-profit institutions. The Department recognizes that a shift in students to public institutions could result in higher State and local government costs.").



problems with unreliable federal earnings data that plague the D/E and EP rates, and if such programs had graduate cohorts large enough to be measured by the GE Rule, they would certainly fail the EP just like AACS member programs and measured non-profit and community colleges.[114]

The Department states that for students who would have enrolled in a cosmetology program that becomes unavailable due to failing, such individual "might opt for an associate degree program that shows higher earnings … [or in] … online/distance programs now available in most fields of study, from both traditional schools and primarily on-line institutions."[115] This rationale does not work for cosmetology programs for which only a certificate level credential is needed to work in the field and fully online program "innovation" is not a realistic option for such hands-on training. Indeed, remote training is not authorized – in many cases by state law governing license requirements.  The Department acknowledges that "[u]ndergraduate certificate programs in cosmetology represent the largest group of programs without nearby passing options in the same four-digit CIP code, in large part because many of these programs do not pass the GE metrics" but relies on students being able to attend non-Title IV cosmetology programs.[116] The Department relies on questionable data from California and Texas, and ignores the fact that in a vast number of states there are insufficient size-exempt public or unaccredited private cosmetology program options to take our place in supplying 78% of the graduates hired by employers.

As a result, the GE Rule will leave low income women and minority students without options to obtain federal aid to attend cosmetology programs.  To protect low income student access, the Department could bifurcate Direct Loan eligibility from Pell Grant eligibility to allow low income students to continue to access a failing program if they choose to do so.

---

[114] *Id.* at 32435 ("Encouragingly, many passing programs exist in the same subject, level, and market that result in much higher earnings than programs that fail"). This cannot be true, as cosmetology programs that fail GE primarily do so based on the EP. Community college and private non-profit cosmetology programs would be vulnerable to the same earnings data flaws if their graduate cohorts were large enough to be measured. If they were not, those programs would survive the GE Rule and result in the exact outcome the Department is trying to avoid – Title IV eligibility  for low earning programs. *Id.* at 32469 ("The proposed regulation improves program quality in the undergraduate certificate sector in particular, which, as documented above, disproportionately enrolls low-income students.") This is also not true. The Proposed Rule presumes that students will move from failing cosmetology programs (primarily now offered at private, for-profit institutions to cosmetology programs offered at public and private non-profit institutions. The latter programs have a high percentage of certificate programs not measured by the GE Rule due to small cohort size, so moving a student from a failing proprietary school cosmetology program to an unmeasured public or private non-profit cosmetology program does not "improve program quality" for low income students. Instead, it hides poor performing programs under the GE Rule from low income students and, in this case, predominantly women.

[115] *Id.* at 32434.

[116] *Id.*



6.  Earnings

The Proposed Rule provides that "[t]he Department would obtain from a Federal agency with earnings data, the most currently available median annual earnings of the students during the cohort period."[117]  This overly broad statement gives the Department too much discretion to obtain data from a variety of agencies meeting the definition and then choosing the one that best fits its goals or intent.  The data obtained from various agencies could vary significantly and where one agency could support a passing score, another might not.  This is emphasized in the rationale for Section 668.405 in which the Department admits it does not specify the source but wants to maintain flexibility.  It is ambiguous to say the Department will determine the specific source considering factors as data availability, quality and privacy.  There is no discussion about which of those factors would be considered relevant and more important.  For example, the SSA data was used in the past and the Department now points to the IRS because of quality.

In addition, under the rationale for Section 668.405, the Department states: "It is unlikely that any earnings appeal process would generate a better estimate of graduates' median earnings.  To date, the Department has identified no other data source that could be expected to yield data of higher quality and reliability than the data available to the Department from the IRS".[118]  If this is the case, why does the Department first ask for flexibility on its source?  Why would any other source be considered?  What happens to the ability of appeals if the Department opts for another source that might be less reliable but more available?  If the justification for not having an appeal is that the IRS data is high enough quality to render an appeals moot, does that justification apply to all agencies as there is no provision to allow for an appeals if the Department moves to another agency that the Department is admitting here would have information that is of less quality.

This issue underscores the highly negative impact of the Department's proposal to prevent institutions from having access to the earnings data and denying them any right of appeal.  Institutions must have access to the earnings data so that they can correctly evaluate the data used to evaluate their performance.  It would permit them to ensure the most appropriate data set is used.  It also allows them to adjust programs to increase outcome performance.  It underscores the need for appeal because if the Department applies the wrong data to an institution and that causes the institution to fail the GE metric, the Department's decision must be subject to review.  Fundamental due process demands both transparency as to the earnings data and the ability of institutions to effectively appeal.

a.  Tip Income

As discussed in Section II.A, a result of the 2011 GE Rule, 2014 GE Rule and *AACS vs. DeVos*, the Department is well aware of the issue of under-reporting of tip income for graduates from

---

[117] *Id.* at 32332.

[118] *Id.* at 32336.

42



cosmetology programs. Yet, the Department has refused to restore an alternate earnings appeal or to take any other steps to recognize flaws in this data.

The Department's reference to the implementation of 1099-K reporting for cash transactions as solving earnings data problems for tip reporting is not persuasive. These forms will be dependent on companies actually issuing them, and the IRS itself has struggled with the rule so much that they delayed implementation of the lower reporting threshold until 2023 so that they could issue additional guidance and allow for a transition period this year. It will also be up to taxpayers to report whether 1099-K funds are business-related or non-business amounts. In fact, the Department is getting ahead of itself by asserting that this untested transitional change in cash transaction reporting will ultimately resolve most problems with unreported income.

b.     Independent employment income

With regard to the Treasury data used to approximate cohort graduate earnings, at this point analysts have concluded that that data appears to be using Adjusted Gross Income not W-2 earnings. The NPRM 2022 PPD seems to show best case for the Department's methods, but the 2021 earnings will make the failures much worse. The Future Act, Public Law 116-91, is the main vehicle for Department and IRS data sharing for certain uses, including FAFSA. It is not clear that the Department has authority under the Future Act to use IRS data for the GE rule, as the law does not mention use of IRS data for Title IV accountability purposes.

Regarding debt payments, the only data for 10-year amortization debt payments are "NSLDS pooled AY2018-19, AY2019-20 cohort." This does not include the cohort pool used for the earnings calculation – AY2015-16. This is not a reasonable comparison, yet is the basis for the GE Rule and its regulatory impact analysis.

The Department does not specifically state what data points from the IRS it would obtain as earnings data. We can only assume it will use the same data point as the FAFSA as it points out that income adjustment to IRS earnings are not used in other parts of the Title IV programs.

For the "income" number it appears the Department would use Adjusted Gross Income (AGI) from 1040 Line 11 as a whole and then the amount on the W-2, Schedule 1 line 3 (net Schedule C income or loss), schedule 1 line 6 (Farm income or loss) and Schedule K-1 Box 14 (Code A). There are significant issues, alone, with net income of a schedule C, F, or K-1. In each of those cases, the data point is the *net income of the business*. This does not align with the stated goals of the Department in obtaining quality data that truly assesses the *earnings* of graduates. The biggest problem is that tax earnings do not represent real earnings as emphasized by the fact that tax basis financial statements do not comply with U.S. GAAP. The accounting profession is very aware of the significant differences in financial results between the two. The goal of U.S. GAAP is to provide true, accurate, and reliable data. The goal of tax basis accounting is to present financial results by applying specific tax laws, rules and regulations. A simple example is depreciation. U.S. GAAP requires straight line depreciation in determining the expense each



year. U.S. tax laws allow for various accelerated methods, including a provision (Section 179) that allows for the full expensing of an asset that GAAP would require to be expensed over a period of time. The difference in the timing of depreciation would greatly affect the earnings reported. Financial institutions recognize the issues with tax basis accounting and often make a number of adjustments to those numbers to obtain a better reflection of the financial results of a business in order to determine if it should issue a loan, for example.

The difference in tax versus GAAP earnings as it relates to the calculation is exacerbated by short timeframe the Department wants to look at. In choosing year 3 of employment, the Department has elected a period of time where most individuals who work independently are still considered to be in the "start-up" phase. In this phase, the owner is still making investments to the business with expenses eligible for the tax benefits such as accelerated depreciation. These individuals may be building a client base, investing in equipment, furnishings, or other activities that would take advantage of the tax codes. In fact, most are going to have minimal income because of those investments (and the tax laws that provide them with the ability to expense them quickly). No one in the accounting industry would assume that tax basis financials are representative of earnings and would be shocked to see them treated in an earnings calculation. As a result, the GE rule is biased against self-employed graduates and under-reports graduate earnings overall by not taking into account entrepreneurs. In addition, it is unclear in the earnings data how many high school graduates are working in W-2 generating positions versus owning a business.

In short, the Department does not have all the necessary data to truly determine earnings in order to sustain the GE accountability framework, in particular the EP measure. Rather than looking to determine how to best get accurate earnings numbers, the Department is taking a shortcut and pulling basic numbers from the IRS and claiming that as a thorough depiction of earnings for graduates. Therefore, it is essential that there be an earnings appeals process to help determine the most accurate and reliable earnings information that may be missing in the databases on which the Department relies.

### 7.    Geographic Location

Because Annual Earnings is based on the actual earnings of a program's graduates, it often will be the case that it reflects earnings in concentrated geographic regions. In contrast, the EP measure will represent median earnings at the State level. Thus, the earnings of graduates who reside in a rural area of a state would be compared to a state-wide earnings number that incorporates individuals living in wealthier regions of the State.

The Department's current proposal fails to accommodate or otherwise account for wage differences across geographies. Institutions in rural markets may not be able to reduce the costs associated with delivering their programming enough to offset local earnings depression. In many cases, program length and content are dictated by State agencies (cosmetology boards, nursing boards) or programmatic accreditors, and the costs associated with facilities and equipment are largely fixed, without regard to the location of the school. Here again, without any accommodation for the impact of geographic location on reported earnings, institutions housed



in rural and socioeconomically depressed markets will suffer. These, of course, are the very markets where students are most in need of programming that leads to upward socioeconomic mobility.

> 8.   Other Data Issues

We further note, that there are structural inequities in the calculation that impair the adequacy of the data, such as disabled graduate workers who choose not to or cannot work full time and other factors that impact earnings and integration with changes to the IDR and IBR programs. Any fair rule must properly account for these factors on income and debt management calculations.

## III.   Section-by-Section Comments to Proposed Rule

> A.   *Financial Value Transparency – Subpart Q - §§ 668.401-409*

AACS supports the transparency goals of the FVT framework in Subpart Q, but we have concerns with the D/E and EP measures used to calculate both the FVT disclosures and the GE framework because the earnings data used in both the FVT and GE components of the Proposed Rule are fatally flawed for cosmetology programs.[119] In the NPRM, the Department proposes a two-pronged approach to measuring the value of Title IV-eligible programs.  First, all types of institutions (proprietary, public and nonprofit) offering any Title IV program would be subject to a new Financial Value Transparency ("FVT") disclosure regime under a new 34 C.F.R. Subpart Q (§§ 668.401-409) that would result in posting of Debt-to-Earnings ("D/E") rate and Earnings Premium ("EP") measure for every Title IV eligible program, whether such program is a GE or non-GE program.  For both GE and non-GE programs, the Department will collect data, calculate results, and post results on both D/E and EP, and require student acknowledgments for non-GE programs where programs fail the D/E rate.  Second, the Department establishes a Title IV accountability framework under a new Subpart S, applicable to only GE programs, as discussed in Section IV.

This section provides our comments on the D/E rate and EP as contained in the FTV framework in Subpart Q and also utilized for GE program under Subpart S.

## §§ 668.401(b), 668.401(c) – D/E Rates

*Under the Department's FTV framework under Subpart Q, the Secretary assesses a Title IV program's debt-to-earnings rates ("D/E rates") and Earnings Premium ("EP") measure. 668.401(a). For each award year, the Secretary calculates two D/E rates for each eligible program: the discretionary debt-to-earnings rate and the annual debt-to-earnings rate. 668.401(b). A program passes the D/E rates if— (i) Its discretionary debt-to-earnings rate is less than or equal to 20 percent; (ii) Its annual debt-to-earnings rate is less than or equal to 8 percent; or (iii) The denominator (median annual or discretionary earnings) of either rate is zero and the numerator (median debt payments) is zero. 668.401(c)(1). A program fails the D/E*

---

[119] *Id.* at 32460.



*rates if— (i) Its discretionary debt-to-earnings rate is greater than 20 percent or the income for the denominator of the rate (median discretionary earnings) is negative or zero and the numerator (median debt payments) is positive; and (ii) Its annual debt-to-earnings rate is greater than 8 percent or the denominator of the rate (median annual earnings) is zero and the numerator (median debt payments) is positive.  See § 668.401(c)(2).*

AACS Comment: For the D/E rate in both the FVT and GE frameworks, we request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*. As even the Department admits in the NPRM, there is at least an 8% underreporting issue with cosmetology program earnings, but we believe the figure to be closer to 20%.[120] The Department has failed to make any adjustments to earnings based on underreporting. The Department has also failed to provide any mechanism for AACS schools to present an alternate earnings appeal. As stated by the Department in 2019, to remedy the underreporting issue impacting a program's D/E rates, the 2014 GE Rule offered an alternate earnings appeal process.[121] At that time, the Department noted that adjusting the appeals process due to the ruling in *AACS vs. DeVos* was administratively burdensome but that rescission of the entire GE Rule would remedy the problem of accounting for under-reporting. As a result, the Department has not fully addressed how to account for the issue of underreporting and other weaknesses in federal agency earnings data if it moves forward once more with a GE Rule.

For the reasons cited in Section II.C. and II.D., the earnings data used for the D/E metric are not reliable for the programs offered by AACS schools. The Department also needs to ensure that the D/E metric does not *mislead* the public. Information must be provided to the public about these programs in a manner that does not result in exacerbating supply shortages for trained graduates in these fields or creating political incentives to limit these programs. The Department needs to evaluate the economic impact of institutions deciding to make these programs non-Title IV eligible based on low financial value metrics (or GE metrics): will only the wealthiest students be able to pursue these credentials, while students needing Title IV aid will not have access? That result flies in the face of the purpose of the Title IV program to level the playing field for low and moderate income individuals by providing aid and thus access to a program of their choice.

The Department stated in its 2019 GE Rescission that it should not sanction institutions for aspects of student debt and earning outcomes that are outside of the institution's control and agreed that the exclusion of tip-based income— especially in heavily tip-influenced professions, such as cosmetology—some self-employment income, and household income from the D/E rates measure renders the earnings portion of the D/E calculation subject to significant errors.[122]

---

[120] *Id.* at 32366.

[121] Rescission of Gainful Employment, 84 Fed. Reg. 31392, 31410 (July 1, 2019) (to be codified at 34 C.F.R. 600, 668).

[122] *Id.* at 31409-10.



## 668.401(d) – Earnings Premium

*For each award year, the Secretary calculates the earnings premium measure for an eligible program. 668.401(d). A program passes the earnings premium measure if the median annual earnings of the students who completed the program exceed the earnings threshold. 668.401(e)(1). A program fails the earnings premium measure if the median annual earnings of the students who completed the program are equal to or less than the earnings threshold. 668.401(e)(2).*

AACS Comment: We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

The Earnings Premium is based on flawed earnings data for the reasons discussed in Section II.

## § 668.403(b) – Deduction of Institutional Grants and Scholarships

*The Secretary calculates the annual loan payment for a program by— (1)(i) Determining the median loan debt of the students who completed the program during the cohort period, based on the lesser of the loan debt incurred by each student as determined under paragraph (d) of this section or the total amount for tuition and fees and books, equipment, and supplies for each student, less the amount of institutional grant or scholarship funds provided to that student; (ii) Removing, if applicable, the appropriate number of largest loan debts as described in § 668.405(d)(2); and (iii) Calculating the median of the remaining amounts. See § 668.403(b).*

AACS Comment: We support the proposal allowing a deduction from "tuition, fees, books equipment and supplies" the amount of any institutional grant or scholarship funds provided to a student. This will incentivize institutions to continue offering, or offer for the first time, significant aid to assist students with the cost of attendance.

## § 668.403(c) – Federal Agency Earnings Data

*For annual earnings, the Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under paragraph (e) of this section; and (2) The Secretary uses the median annual earnings to calculate the D/E rates. 668.403(c).*

AACS Comment: For the reasons cited in Section II.C. and II.D. regarding earnings data flaws, we object to the use of Federal agency earnings data in D/E and EP measures as utilized in the FVT and GE regulations. We request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos* or, in the alternative, conduct a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting,



independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates.

## § 668.403(f) – Small Cohort Size Exclusion

*The Secretary does not issue D/E rates for a program under § 668.406 if—*

*(1) After applying the exclusions in paragraph (e) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or (2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (c) of this section.* <u>See § 668.403(f).</u>

<u>AACS Comment</u>: For the reasons provided in Section II.C.3., we are concerned that the exclusion of D/E rates for a program with fewer than 30 students completing during a two-year or four-year cohort period rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low graduation rates to escape the FVT disclosures because D/E and EP rates cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

Graduation rates are a critical program level value metric. As the Department states, "[i]mproved completion rates also have broader societal benefits, such as increased tax revenue because college graduates, on average, have lower unemployment rates, are less likely to rely on public benefit programs, and contribute more in tax revenue through higher earnings."[123] Ensuring students graduate is an important part of any program. The Department should consider a separate FVT metric based solely on program level graduation rates, so that students are aware when a program does poorly at graduating students and thus is excluded from calculating D/E and EP rates. For too long, too many institutions from all sectors have failed in graduating students at high enough rates, leaving students with debt and limited value from incomplete postsecondary education.

Nowhere in the FVT framework does the Department recognize programs with higher graduation rates, particularly for Pell eligible and minority students. The Department also does not take into account the longer term benefits of obtaining a credential, including improving the likelihood of having a good job by age 30.[124] Measuring the progress of low income or students of color in improving their economic mobility through enrollment in a program (i.e., "social mobility") is currently measured by varying approaches.  U.S. News and World Report measures social mobility based simply on Pell Grant eligibility and graduation rates. Measuring graduation rates

---

[123] 88 Fed. Reg. at 32446.

[124] Anthony P. Carnevale et al., What Works: Ten Education, Training, and Work-Based Pathway Changes that Lead to Good Jobs, Geo. Univ. (2023), https://cew.georgetown.edu/wp-content/uploads/cew-ten_pathway_changes-fr.pdf.



by Pell Grant eligibility demonstrates value, as noted by the Department, in increasing lifetime earnings and reducing the risk of unemployment.

### § 668.404(a), (b) – Earnings Premium Measure

*Except as provided under 668.404(d), for each award year, the Secretary calculates the earnings premium measure for a program by determining whether the median annual earnings of the title IV, HEA recipients who completed the program exceed the earnings threshold. 668.404(a). The Secretary obtains from a Federal agency with earnings data, under § 668.405, the most currently available median annual earnings of the students who completed the program during the cohort period and who are not excluded under 668.404(c); and (2) The Secretary uses the median annual earnings of students with a high school diploma or GED using data from the Census Bureau to calculate the earnings threshold described in § 668.2. 668.404(b)(1). The Secretary determines the earnings thresholds and publishes the thresholds annually through a notice in the Federal Register. See § 668.404(b)(2).*

AACS Comment: We request that the Department rescind its proposal to establish a new, untested Earnings Premium measure, both in the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing of an earnings-only value metric for higher education programs.

For the reasons cited in Section II, we object to the lack of transparency in the EP measures regarding the source of the data that will be used by the Department. The lack of transparency both with the source of data and the inability to appeal such earnings data makes it impossible for institutions to accurately or reliably predict whether their programs will pass the EP measure. Particularly for GE programs subject to loss of Title IV, removal of the zone and transitional rates in the prior GE Rule means that the EP metric could lead immediately to warnings followed by loss of Title IV eligibility without sufficient prior notice. Further, we object to the Department using Census Bureau data to arrive at median annual earnings of students with a high school diploma or GED using individuals age 25-34.  Such a measure fails to account for demographic differences between cosmetology program students and the general public.

### § 668.404(d)- Small Cohort Size Exclusion

*The Secretary does not issue the earnings premium measure for a program under § 668.406 if— (1) After applying the exclusions in paragraph (c) of this section, fewer than 30 students completed the program during the two-year or four-year cohort period; or (2) The Federal agency with earnings data does not provide the median earnings for the program as provided under paragraph (b) of this section. See § 668.404(d).*

AACS Comment: Similar to our comment for § 668.403(f), we are concerned that the exclusion of an EP measure for a program rewards public and private non-profit programs with poor graduation rates. We are disappointed that the FVT does not take into consideration graduation rates as measure of program performance. This oversight allows programs with very low



graduation rates to escape the FVT disclosures because EP measure cannot be calculated because graduation rates are so low that not more than 30 students complete in a 2 or 4 year cohort.

The Department should consider a separate FVT metric based solely on program level graduation rates, so that students are aware when a program does poorly at graduating students and thus is excluded from calculating D/E and EP rates. [125]

### § 668.405(b)-(d) – Federal agency earnings challenge

*The Secretary uses the administrative data to— (1) Compile a list of students who completed each program during the cohort period. The Secretary—(i) Removes from those lists students who are excluded under §§ 668.403(e) or 668.404(c); (ii) Provides the list to institutions; and (iii) Allows the institution to correct the information about the students on the list, as provided in paragraph (a) of this section; (2) Obtain from a Federal agency with earnings data the median annual earnings of the students on each list, as provided in paragraph (c) of this section; and (3) Calculate the D/E rates and the earnings premium measure and provide them to the institution. See § 668.405(b).*

*For each list submitted to the Federal agency with earnings data, the agency returns to the Secretary— (1) The median annual earnings of the students on the list whom the Federal agency with earnings data has matched to earnings data, in aggregate and not in individual form; and (2) The number, but not the identities, of students on the list that the Federal agency with earnings data could not match. See § 668.405(c).*

*If the Federal agency with earnings data includes reports from records of earnings on at least 30 students, the Secretary uses the median annual earnings provided by the Federal agency with earnings data to calculate the D/E rates and earnings premium measure for each program. 668.405(d)(1). If the Federal agency with earnings data reports that it was unable to match one or more of the students on the final list, the Secretary does not include in the calculation of the median loan debt for D/E rates the same number of students with the highest loan debts as the number of students whose earnings the Federal agency with earnings data did not match. For example, if the Federal agency with earnings data is unable to match three students out of 100 students, the Secretary orders by amount the debts of the 100 listed students and excludes from the D/E rates calculation the three largest loan debts. See § 668.405(d)(2).*

---

[125] 88 Fed. Reg. at 32401-02 (Table 1.8 states that public undergraduate certificate programs have an average cohort default rate of 16.9% while private, for-profit undergraduate certificate programs have a lower average cohort default rate of 14.2%); *id.* at 32424 ("Many institutions have few programs that are subject to the accountability provisions of GE, either because they are nonproprietary institutions with relatively few certificate programs or because their programs tend to be too small in size to have published median debt or earnings measures"). The Department states: "The overall 3-year program default rate is 12.9 percent but is higher for certificate programs and for programs offered by proprietary schools," *id.* at 32425. This is misleading because both statements are not simultaneously true for certificate programs. As evidenced by Table 1.8, default rates at proprietary undergraduate certificate programs are *lower* than public undergraduate certificate programs.



**AACS Comment**: We request that the Department restore the alternate earnings appeal contained in the 2014 GE Rule as amended in response to the federal court order in *AACS v. DeVos*[126] or, in the alternative, conducts a thorough study of reasonable solutions to addressing the unreliability of our schools' program earnings caused by tip income under-reporting, independent employment tax treatment impacting net income, racial and gender wage discrimination, and other factors impacting our program graduates. The EP measure should be rescinded in both the FVT and GE regulations, until the Department has conducted further study on the risks and costs of establishing an earnings-only value metric for higher education programs.

The Department does not provide a means for institutions to review or challenge Federal agency earnings data used in the D/E or EP rates, or allow appeal of same. The Department should restore the Alternate Earnings Appeal contained in the 2014 GE Rule to permit institutions to provide other, credible sources of alternate graduate earnings data. The appeal should be modified to account for the flaws identified by the Court, specifically by allowing institutions to file an appeal with a statistically significant response rate that is less than 100% of the program cohort.

## § 668.408(a) – Information reporting

*In accordance with procedures established by the Secretary, an institution must report to the Department—*
*(1) For each GE program and eligible non-GE program—*
*(i) The name, CIP code, credential level, and length of the program;*
*(ii) Whether the program is programmatically accredited and, if so, the name of the accrediting agency;*
*(iii) Whether the program meets licensure requirements or prepares students to sit for a licensure*
*examination in a particular occupation for each State in the institution's metropolitan statistical area;*
*(iv) The total number of students enrolled in the program during the most recently completed award year, including both recipients and nonrecipients of title IV, HEA funds; and*
*(v) Whether the program is a medical or dental program whose students are required to complete an internship or residency, as described in the definition of ''cohort period'' under § 668.2.*
*(2) For each student—*
*(i) Information needed to identify the student and the institution;*
*(ii) The date the student initially enrolled in the program;*
*(iii) The student's attendance dates and attendance status (e.g., enrolled, withdrawn, or completed) in the program during the award year; and*
*(iv) The student's enrollment status (e.g., full time, three quarter time, half time, less than half time) as of the first day of the student's enrollment in the program;*

---

[126] *AACS* at 63.



*(v) The student's total annual cost of attendance;*
*(vi) The total tuition and fees assessed to the student for the award year;*
*(vii) The student's residency tuition status by State or district;*
*(viii) The student's total annual allowance for books, supplies, and equipment from their cost of attendance under HEA section 472;*
*(ix) The student's total annual allowance for housing and food from their cost of attendance under HEA section 472;*
*(x) The amount of institutional grants and scholarships disbursed to the student;*
*(xi) The amount of other State, Tribal, or private grants disbursed to the student; and*
*(xii) The amount of any private education loans disbursed, including private education loans made by the institution;*
*(3) If the student completed or withdrew from the program during the award year—*
*(i) The date the student completed or withdrew from the program;*
*(ii) The total amount the student received from private education loans, as described in § 668.403(d)(1)(ii), for enrollment in the program that the institution is, or should reasonably be, aware of;*
*(iii) The total amount of institutional debt, as described in § 668.403(d)(1)(iii), the student owes any party after completing or withdrawing from the program;*
*(iv) The total amount of tuition and fees assessed the student for the student's entire enrollment in the program;*
*(v) The total amount of the allowances for books, supplies, and equipment included in the student's title IV Cost of Attendance (COA) for each award year in which the student was enrolled in the program, or a higher amount if assessed the student by the institution for such expenses; and*
*(vi) The total amount of institutional grants and scholarships provided for the student's entire enrollment in the program; and*
*(4) As described in a notice published by the Secretary in the **Federal Register**, any other information the Secretary requires the institution to report.*

See § 668.408(a).

AACS Comment: We support the Department's approach to require institutions offering both GE and non-GE programs to provide a wide variety of information to the Department. It is our hope that with more robust data collection, the Department will make more information available to the public at the program level regardless of institution type.

We also recommend that the Department disclose on the FVT website:

- Program level on-time graduation rates
- Program level on-time graduation rates for Pell eligible students
- Program level on-time graduation rates for Black, Hispanic or other students of color
- Amount of state subsidies for public institution programs. State tax subsidies that support public programs should be evaluated, along with Title IV investments, to



better understand "public investment" in a program relative to cost, debt and earnings. Comparing public and non-profit schools to proprietary schools gives the public and non-profit institutions an unfair advantage over proprietary schools. Public institutions are supported by state appropriations and grants leading to lower tuition. Non-profit institutions benefit from non-profit tax status and tax deductible donations that can support operating revenues and lower tuition for high need students. These are taxpayer funded benefits that must be taken into consideration. The American Institute for Research study showed the proprietary sector's strong R.O.I. for the American taxpayer.  See, e.g., https://www.air.org/news/press-release/taxpayer-subsidies-most-colleges-and-universities-average-between-8000-more.

- The Department should also identify access institutions that serve high proportion of low income students and disclose that information on the FVT website. For example, a prestigious non-profit institution with 5% of its program enrollment comprised of Pell eligible students with a 95% graduation rate is not more valuable than a for-profit institution with 80% of its program comprised of Pell eligible students with a 60% graduation rate. The former is doing little to improve social mobility except for an elite few, while the latter is making a material difference to low income students. An institution that can offer a program that graduates Pell eligible student population at a higher than average rate, and that demonstrates average or better debt levels across the programs should be applauded, not shamed on such lists. Recognizing different student profiles by either weighing more heavily at-risk student outcomes, producing separate metrics for certain students (such as those eligible to receive Pell Grants), or a combination of both, is a reasonable approach. *See* https://www.newamerica.org/education-policy/reports/searching-accountability-higher-education-balanced-framework-goals-metrics/priming-the-pump-guiding-principles

We believe this information could help the Department make any needed future adjustments to the D/E and EP rates to ensure that clear and accurate information is provided to students.

## § 668.409 - Severability

*The regulations provide for Subpart Q that if any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the part and this subpart, and the application of this subpart's provisions to any other person, act, or practice, will not be affected thereby. See § 668.409.*

AACS Comment: The Department indicates that the FVT provisions in Subpart Q are entirely severable from Subpart S (GE) and any other subpart of the NPRM. For that reason, the Department has the flexibility to remove Subpart S (GE) while still meetings its goals.

B.   *Gainful Employment – Subpart S - §§ 668.401-409*



From the date of its enactment in 1965, the HEA has required all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, to "prepare students for gainful employment in a recognized occupation." However, at no time has the Department been directed or authorized by Congress to develop a system for measuring whether programs were satisfying this "gainful employment" standard. In defining the term now, the Department has exceeded its authority under the HEA.

As stated in Section III.A., the Department has taken a two-pronged approach to measuring the value of Title IV-eligible programs but the result is arbitrary and capricious. For GE programs only, the D/E and EP metrics would result – after one year of program failure of either metric – mandatory student warnings for all enrolled students and the public, and loss of Title IV eligibility for a program if the program fails the D/E or EP metric in two out of three consecutive years.

Overall, the proposed GE accountability framework is substantially similar to the most recent discussion draft and would require that covered GE programs pass both the D/E and the EP metric. Subpart S applies to all GE programs offered by for-profit, proprietary institutions, as well as to most non-degree (certificate) programs offered by public and private nonprofit institutions.

In our view, two separate tracks, and potentially two different value measurements, will be unfair, inequitable and very confusing for students, the ultimate stakeholder. As discussed in Section III.A., we support the Department's effort to move forward with a Financial Value Transparency framework, but only if issues related to AACS school member program earnings are resolved in the D/E metric and the EP measure is rescinded pending further study on the risks of an earnings-only Title IV metric.

As discussed in detail in Section II.C. and II.D., AACS has significant concerns about the underlying metrics used to measure both D/E and EP. The EP and earnings threshold are based on earnings data that is inaccurate, biased and inconsistent. We are further concerned that the Department has not definitely identified the "Federal agency with earnings data" or provided evidence of a Memorandum of Understanding ("MOU") with any agency. With regards to the definition of student, we recommend that the Department expand the definition to include all students who *are eligible* for title IV funds, versus student *who received* title IV funds.

### § 602(a) – New GE Program Definition

*The Proposed Rule would establish new criteria for GE programs to be considered Title IV eligible programs. Specifically, a GE program would be Title IV eligible if it provides training that prepares students for gainful employment in a recognized occupation only if the program— (1) Satisfies the applicable [GE program] certification requirements in § 668.604; (2) is not a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated; and (3) is not a failing program under the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated. See § 602(a).*



<u>AACS Comment</u>: The HEA requires that a program offered by a proprietary institution or vocational institution to provide training that prepares students for gainful employment in a recognized occupation. The Department points to Sections 102(b) and (c), as well as Section 101(b)(1) for authority to apply the GE Rule and associated sanctions to certain programs. As described in the NPRM:

> "Sections 102(b) and (c) of the HEA define, in part, a proprietary institution and a postsecondary vocational institution as one that provides an eligible program of training that prepares students for gainful employment in a recognized occupation. Section 101(b)(1) of the HEA defines an institution of higher education, in part, as any institution that provides not less than a one-year program of training that prepares students for gainful employment in a recognized occupation. The statute does not further specify this requirement, and through multiple reauthorizations of the HEA, Congress has neither further clarified the concept of gainful employment, nor curtailed the Secretary's authority to further define this requirement through regulation."[127]

We disagree that the Department has the authority under Sections 101 and 102 of the HEA to promulgate the GE Rule and apply it selectively to certain institutions.

The Subpart S accountability regime also illegally and without any statutory support differs from the 2014 GE Rule in that it would require a GE program to pass BOTH a D/E metric and the new EP threshold metric which is based solely on earnings.

### § 602(b)-(e) – Rates Not Calculated

*If the Secretary does not calculate or issue D/E rates for a program for an award year, the program receives no result under the D/E rates for that award year and remains in the same status under the D/E rates as the previous award year. See § 602(b). If the Secretary does not calculate D/E rates for the program for four or more consecutive award years, the Secretary disregards the program's D/E rates for any award year prior to the four-year period in determining the program's eligibility.[128] If the Secretary does not calculate or issue earnings premium measures for a program for an award year, the program receives no result under the earnings premium measure for that award year and remains in the same status under the earnings premium measure as the previous award year.[129] If the Secretary does not calculate the earnings premium measure for the program for four or more consecutive award years, the*

---

[127] 88 Fed. Reg. at 32307.

[128] *See* Proposed § 668.602(c).

[129] *See* Proposed §668.602(d).



*Secretary disregards the program's earnings premium for any award year prior to the four-year period in determining the program's eligibility.*[130]

<u>AACS Comment</u>: In reviewing the 2022 Program Performance Data ("PPD"), it is clear that a significant number of programs do not meet the n>30 cohort requirements and are therefore excluded from the calculation. In reviewing the cosmetology specific data, nearly 1/3 of the programs pass as a result of insufficient cohort size.  Further, as described in detail in the RIA, the Department estimates that only 75 percent of GE enrollment and 15 percent of GE programs would have sufficient n-size to have metrics computed with a two-year cohort. An additional 8 percent of GE enrollment and 11 percent of GE programs would be likely to have metrics computed using a four-year completer cohort.[131]

Based on the Department's own calculations, only 26 percent of programs would be measured. The proposed calculation regulation, therefore, results in arbitrary results where a significant margin of  GE programs (certificate level) offered by private nonprofit and public institutions have less than 30 graduates in a two or four year cohorts and therefore are exempt from having any GE rates calculated for accountability purposes.

### § 603(a) – Consequence of Failing GE Rates

*If a GE program is a failing program under the D/E rates measure in § 668.402 in two out of any three consecutive award years for which the program's D/E rates are calculated, or the earnings premium measure in § 668.402 in two out of any three consecutive award years for which the program's earnings premium measure is calculated, the program becomes ineligible and its participation in the title IV, HEA programs ends upon the earliest of—*

> *(1) The issuance of a new Eligibility and Certification Approval Report that does not include that program;*
> *(2) The completion of a termination action of program eligibility,  if an action is initiated under subpart G of this part; or*
> *(3) A revocation of program eligibility,  if the institution is provisionally certified.*[132]

<u>AACS Comment</u>: We object to the consequences associated with a voluntary wind down of a program. Institutions that seek to close or wind down a program should be allowed to continue participation on a limited basis for currently enrolled students. We also believe that failing programs should only lose access to the Direct Loan program, not Pell Grants, and that all students in a failing GE program should have access to Title IV aid throughout the completion of their program.

---

[130] *See* Proposed § 668.602(e).

[131] 88 Fed. Reg. at 32355.

[132] *See* Proposed § 668.603(a).



### § 603(b) – Appeal

*If the Secretary initiates a program eligibility termination action, the institution may initiate an appeal under subpart G of this part if it believes the Secretary erred in the calculation of the program's D/E rates under § 668.403 or the earnings premium measure under § 668.404. Institutions may not dispute a program's ineligibility based upon its D/E rates or the earnings premium measure except as described in this paragraph (b). See 603(b).*

AACS Comment: We note that this appeal process differs drastically from the 2014 GE Rule which provided for an Alternate Earnings Appeal, and that Department would curtail the discretion of the hearing official to do anything other than determine that the Department failed in the actual D/E or EP rate calculation as a matter of math – earnings information may not be challenged at all through this appeals process.

AACS opposes the elimination of the Alternate Earnings Appeal. We are of the strong opinion that the earnings appeal is essential to the due process concerns related to the earnings data. In response to the 2014 GE Rule, AACS filed a lawsuit against the Department as related to the alternate earnings appeal. In that case, the Court held that the "Department of Education's overall methodology for determining a program's average income is arbitrary and capricious."[133] The Court ruling was narrowly tailored to the concerns around the methodology. We recommend, and would support, an earnings appeal process that "removes barriers to appeal, making it more widely available for programs subject to the regulations"[134] as described by the Court.

In a related proposed amendment, the Department would *require* that a hearing official terminate the eligibility of a GE program that fails to meet the required GE metrics, unless the hearing official concludes that the Secretary erred in the calculation.

### § 603(c)(2)-(3) Ineligible GE programs.

*An institution may not seek to reestablish the eligibility of a failing GE program that it discontinued voluntarily either before or after D/E rates or the earnings premium measure are issued for that program, or reestablish the eligibility of a program that is ineligible under the D/E rates or the earnings premium measure, until three years following the earlier of the date the program loses eligibility under Section 603(a) or the date the institution voluntarily discontinued the failing program.[135] An ineligible program, or a failing program that an institution voluntarily discontinues, remains ineligible until the institution establishes the eligibility of that program under § 668.604(c).[136]*

---

[133] *AACS* at 73.

[134] *Id.* at 56.

[135] *See* Proposed § 668.603(c)(2).

[136] *See* Proposed § 668.603(c)(3).



**AACS Comment**: AACS has significant concerns about the reinstatement provisions.  As we discussed throughout this comment, cosmetology schools are unique in the fact that they offer limited programs that are almost always within the same four digit CIP code.  We note that as with the 2014 GE Rule, the Department indicates that this prohibition would cover any "substantially similar program," as well, which is defined as any program with "the same 4-digit CIP prefix and credential level."[137] This creates an undue burden on institutions, like cosmetology programs, that provide specialized education in a narrow field.

### § 604(a) to (d) Certification

*Except as provided in paragraph (a)(2) of this section, an institution must provide to the Secretary no later than December 31 of the year in which this regulation takes effect, in accordance with procedures established by the Secretary, a certification signed by its most senior executive officer that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. The Secretary accepts the certification as an addendum to the institution's program participation agreement with the Secretary under § 668.14[138] If an institution makes the certification in its program participation agreement pursuant to paragraph 604(b) of this section between July 1 and December 31 of the year in which this regulation takes effect, it is not required to provide the transitional certification under this paragraph.[139] As a condition of its continued participation in the title IV, HEA programs, an institution must certify in its program participation agreement with the Secretary under § 668.14 that each of its currently eligible GE programs included on its Eligibility and Certification Approval Report meets the requirements of paragraph (d) of this section. An institution must update the certification within 10 days if there are any changes in the approvals for a program, or other changes for a program that render an existing certification no longer accurate.[140] An institution establishes a GE program's eligibility for title IV, HEA program funds by updating the list of the institution's eligible programs maintained by the Department to include that program, as provided under 34 CFR 600.21(a)(11)(i). By updating the list of the institution's eligible programs, the institution affirms that the program satisfies the certification requirements in paragraph (d) of this section. Except as provided in paragraph (c)(2) of this section, after the institution updates its list of eligible programs, the institution may disburse title IV, HEA program funds to students enrolled in that program.[141]*

**AACS Comment**: Newly added 34 C.F.R. § 668.604 would require transitional certifications for existing GE programs, as well as certifications when seeking recertification or the approval of a new or modified GE program. Given the undefined variables in the GE Rule and the projected

---

[137] 88 Fed. Reg. at 32345.

[138] *See* Proposed § 668.604(a)(1).

[139] *See* Proposed § 668.604(a)(2).

[140] *See* Proposed § 668.604(b).

[141] *See* Proposed § 668.604(c)(1).



timing for institutional reporting and Department notification to institutions, we are concerned that institutions may be required to certify a GE program prematurely. We recommend that his section be amended to allow a more fulsome transition period. As currently drafted, an institution would need to provide a transitional certification no later than December 31 of the year in which the regulation takes effect (likely, by December 31, 2024), as an addendum to the institution's PPA with ED. Failure to complete the transitional certification would result in discontinued participation in the Title IV, HEA programs.[142]

## **Student Warnings§ 605(a) to (h)**

*The institution must provide a warning with respect to a GE program to students and prospective students for any year for which the Secretary notifies an institution that the GE program could become ineligible under this subpart based on its final D/E rates or earnings premium measure for the next award year for which D/E rates or the earnings premium measure are calculated for the GE program.[143]*

*If a student or prospective student receives a warning under paragraph (a) of this section with respect to a GE program, but does not seek to enroll until more than 12 months after receiving the warning, the institution must again provide the warning to the student or prospective student, unless, since providing the initial warning, the program has passed both the D/E rates and earnings premium measures for the two most recent consecutive award years in which the metrics were calculated for the program.[144]*

*The institution must provide in the warning—*

*(1) A warning, as specified by the Secretary in a notice published in the Federal Register, that— (i) The program has not passed standards established by the U.S. Department of Education based on the amounts students borrow for enrollment in the program and their reported earnings, as applicable; and (ii) The program could lose access to Federal grants and loans based on the next calculated program metrics;*

*(2) The relevant information to access the disclosure website maintained by the Secretary described in § 668.43(d);*

*(3) A statement that the student must acknowledge having seen the warning through the disclosure website maintained by the Secretary described in § 668.43(d) before the institution may disburse any title IV, HEA funds;*

*(4) A description of the academic and financial options available to students to continue their education in another program at the institution, including whether the students could transfer*

---

[142] *See* 88 Fed. Reg. at 32346-47.

[143] *See* Proposed § 668.605(a).

[144] *See* Proposed § 668.605(b)



*credits earned in the program to another program at the institution and which course credits would transfer, in the event that the program loses eligibility for title IV, HEA program funds;*

*(5) An indication of whether, in the event that the program loses eligibility for title IV, HEA program funds, the institution will—(i) Continue to provide instruction in the program to allow students to complete the program; and (ii) Refund the tuition, fees, and other required charges paid to the institution by, or on behalf of, students for enrollment in the program; and*

*(6) An explanation of whether, in the event that the program loses eligibility for title IV, HEA program funds, the students could transfer credits earned in the program to another institution in accordance with an established articulation agreement or teach-out plan or agreement.[145]*

*In addition to providing the English-language warning, the institution must also provide translations of the English language student warning for those students and prospective students who have limited proficiency in English.[146]*

*An institution must provide the warning required under this section in writing, by hand delivery, mail, or electronic means, to each student enrolled in the program no later than 30 days after the date of the Secretary's notice of determination under § 668.406 and maintain documentation of its efforts to provide that warning. The warning must be the only substantive content contained in these written communications.[147]*

*An institution must provide the warning as required under this section to each prospective student or to each third party acting on behalf of the prospective student at the first contact about the program between the institution and the student or the third party acting on behalf of the student by— (i) Hand-delivering the warning as a separate document to the prospective student or third party individually, or as part of a group presentation; (ii) Sending the warning to the primary email address used by the institution for communicating with the prospective student or third party about the program, provided that the warning is the only substantive content in the email and that the warning is sent by a different method of delivery if the institution receives a response that the email could not be delivered; or (iii) Providing the warning orally to the student or third party if the contact is by telephone.[148] An institution may not enroll, register, or enter into a financial commitment with the prospective student with respect to the program earlier than three business days after the institution delivers the warning as described in paragraph (f) of this section.[149]*

---

[145] *See* Proposed § 668.605(c).

[146] *See* Proposed § 668.605(d).

[147] *See* Proposed § 668.605(e).

[148] *See* Proposed § 668.605(f)(1).

[149] *See* Proposed. § 668.605(f)(2).



*An institution may not disburse title IV, HEA funds to the student until the student completes the acknowledgment described in paragraph (c)(3) of this section, as administered and collected through the disclosure website maintained by the Secretary described in § 668.43(d).*[150]

*The provision of a student warning or the acknowledgment described in paragraph (c)(3) of this section does not mitigate the institution's responsibility to provide accurate information to students concerning program status, nor will it be considered as evidence against a student's claim if applying for a loan discharge.*[151]

<u>AACS Comment</u>: We oppose the proposed warnings in § 605(a) to (h) on the grounds that they are an unconstitutional violation of the First Amendment and will cause irreparable harm to programs. The First Amendment equally protects the right to speak freely and the "right to refrain from speaking at all." [152] The proposed GE Rule violates the First Amendment because it compels an institution to give voice to the government's non-factual perspective regarding a student's ability to find employment and to repay his debt. Such non-factual compelled speech cannot withstand either strict or intermediate scrutiny.

B.    <u>Subpart S is Contrary to Law</u>

Below, we provide our comments as to why Subpart S is contrary to law and should be rescinded.

1.    *Administrative Procedures Act*

The Federal Administrative Procedure Act[153] requires that agency actions satisfy an arbitrary-and-capricious standard. For the notice and comment rulemaking process, this standard requires that an agency to give "reasoned consideration to all the material facts and issues."[154] Reasoned consideration is satisfied by demonstrating a "rational connection between the facts found and the choice made."[155] An agency fails to satisfy the standard if it does not consider all of the facts

---

[150] *See* Proposed § 668.605(g).

[151] *See* Proposed. § 668.605(h).

[152] Wooley v. Maynard, 430 U.S. 705, 714 (1977) ("The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'"); *see* Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n, 475 U.S. 1, 16 (1986) ("For corporations as for individuals, the choice to speak includes within it the choice of what not to say."); R.J. Reynolds Tobacco Co. v. FDA, 696 F.3d 1205, 1211 (D.C. Cir. 2012) ("Both the right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind protected by the First Amendment") (quotations omitted); Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67, 71 (2d Cir. 1996) ("The right not to speak inheres in political and commercial speech alike and extends to statements of fact as well as statements of opinion.") (citations omitted).

[153] 5 U.S.C. § 706(2)(A).

[154] Greater Bos. Television Corp. v. FCC, 444 F.2d 841, 851 (1970).

[155] Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 43 (1983).



and issues.[156] An agency additionally fails to satisfy the standard if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[157] The APA instills an affirmative duty to act in a rational manner in the agency, which requires the agency to address all essential factual assumptions.[158] Discretion is afforded to an agency to sacrifice "some measure of 'fit' for administrability" if it provides sufficient justification for treating certain actors differently than others.[159]

In this instance, the Department failed to provide any justification for the significant departure from the 2019 rescission.  In fact, the only justification the Department asserts in the NPRM is that there is a difference in the "Department's reasoning at the time."[160] This is insufficient. Further, the Department fails to meet the standards for significant rule changes that require the Department provide rationale for the change from the prior rule.

### 2. *Section 498 of the Higher Education Act*

The Department states that the GE rule is supported by the Department's statutory responsibilities to observe eligibility limits in the HEA. Specifically, the Department asserts that Section 498 of the HEA requires institutions to establish eligibility to provide Title IV, HEA funds to their students. Eligible programs must also meet program eligibility requirements for students in those programs to receive title IV, HEA assistance.[161] The Department states that since the inception of the Higher Education Act (HEA) in 1965, all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, have been required to "prepare students for gainful employment in a recognized occupation."[162]

As we have previously asserted in response to each of the GE NPRM's, and we assert again now, the Department does not have the statutory authority to attach an accountability framework to the phrase "gainful employment." Since 1965, the HEA has required all programs offered by proprietary institutions, and all non-degree programs offered by public and private non-profit institutions, to "prepare students for gainful employment in a recognized occupation."[163] However, at no time has the Department been directed or authorized by Congress to develop a

---

[156] *See* N.Y. Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177 (D.C. Cir. 2004).

[157] *Motor Vehicle Mfrs. Ass'n* at 43.

[158] Am. Mar. Ass'n v. U.S., 766 F.2d 545, 567-568 (D.C. Cir. 1985).

[159] Leather Indus. of Am., Inc. v. Env't Prot. Agency, 40 F.3d 392, 403 (D.C. Cir. 1994).

[160] 88 Fed. Reg. at 32307.

[161] *Id.* at 32321-22.

[162] *See* Pub. L. No. 89-329 (Nov. 8, 1965).

[163] *Id.*



system for measuring whether programs were satisfying this "gainful employment" as a standard for program participation. In the 2019 rescission, the Department observed that "[d]espite numerous reauthorizations of the HEA between 1964 and 2008, Congress never attempted to define 'gainful employment' based on a mathematical formula nor did it attempt to define the term using threshold debt-to-earnings ratios."[164]

Moreover, with regard to cosmetology programs in particular, these programs have been eligible to participate in Title IV since the enactment of the HEA, provided that they met all the other eligibility criteria. Yet, with the publication of the current NPRM, the Department has proposed a rule that will close almost all of them based on the Department's newest interpretation of the GE Rule. The Department has provided no evidence to support this dramatic change in regulation and departure from prior law.

In prior iterations of the GE Rule, the Courts have deferred to the Department based on the *Chevron Doctrine*. In light of the recent *West Virginia* case, however, the Court must re-evaluate the agency deference afforded the Department. Under *Chevron,* the Court looked to determine that the Department had general authority to regulate and that the terms in question were ambiguous. After *West Virginia,* for cases involving a major question, as is the case here, the Department must point to clear language that signals specific Congressional intent.[165]

In the NPRM, the Department cites a range of broad statutory authorities as the basis for its proposal, but nowhere does it point to specific authorization from Congress to define the phrase "gainful employment" or to embed an accountability framework into the definition of these "two words."

### 3. The Gainful Employment Rule Violates First Amendment Right to Speech.

The First Amendment states that "Congress shall make no law…abridging the freedom of speech."[166] Courts apply a heightened standard of scrutiny when statutes or regulations burden free speech rights.[167] When the content of the speech is regulated, a "strict scrutiny" standard applies.[168] Regulations that burden speech based on the identity or type of speaker is a content-based restriction subject to this strict scrutiny standard.[169] Governmental action impacting speech based on content "must serve a compelling state interest that is narrowly tailored to meet

---

[164] 84 Fed. Reg. at 31411.

[165] W. Va. v. Env't Prot. Agency, 142 S.Ct. 2587, 2609 (2022).

[166] U.S. Const. Amend. I.

[167] *Id.*

[168] Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer, 961 F.3d 1062, 1068 (9th Cir. 2020).

[169] *Id.* at 1068, 1070.



that interest."[170]  The means chosen by the government to carry out its purported interest must be "the least restrictive means" to satisfy such interest.[171]

Vocational training is a category of speech that is entitled to First Amendment protection.[172] Laws—either statutes or regulation- that treat vocational programs differently based on content will be reviewed under a "strict scrutiny" standard.[173]  The GE Rule violates the First Amendment by interfering with the free speech rights of cosmetology students and schools. The rule interferes with the free speech rights of students by preventing them from receiving education in this space.  Likewise, the rule interferes with the free speech rights of cosmetology schools by preventing them from communicating the education to students.

As drafted, the GE Rule would potentially cause the closure of some cosmetology schools if significant GE programs become Title IV ineligible. Students attending these schools would be denied the opportunity to seek an education in the cosmetology field.   The GE Rule also violates the free speech rights of schools by regulating the type of speech or speakers in two different ways. First, the GE Rule only requires for-profit institutions and certificate programs at public and non-profit institutions to be sanctioned for failure to comply with the GE Rule, not other types of institutions that offer the same type of curriculum. Cosmetology programs, as vocational programs, are subjected to sanctions, potentially resulting in a loss of Title IV eligibility for failure to comply with the threshold metrics of the GE Rule. For this reason, the Department is specifically burdening a type of institution and the "speech" or programs that are typically taught at these institutions.

Second, the rule singles out a particular type of institution, i.e. cosmetology schools. The Department may claim that the rule is facially neutral with respect to the type of programs that will lose Title IV eligibility.  However, facially neutral laws violate the First Amendment when they have the effect of burdening a particular type of speech in effect.[174] Compliance with the GE Rule is conditioned on satisfying two metrics: the D/E Rate and the Premium Earnings. These metrics are fatally flawed, as they relate to cosmetology and barbering programs.  The earnings data used for both fails to account for the underreporting of income, which the Department admits is prevalent in the beauty and wellness industry. While acknowledging these flaws, the Department has failed to address this topic in the formulation of the metrics. This has resulted in the GE Rule imposing eligibility metrics that disproportionately burden a particular type of school— cosmetology schools—and simultaneously a particular type of speech—the delivery of beauty and wellness education. Therefore, the rule would be subject to the strict scrutiny standard of review, if challenged in court.

---

[170] *Id.* at 1068.

[171] Sable Commc'ns of Cal. v. FCC, 492 U.S. 115, 126 (1989).

[172] *Pac. Coast Horseshoeing Sch., Inc.* at 1069.

[173] *Id.*

[174] *See* Turner Broad. Sys. v. FCC, 512 U.S. 622, 647 (1994).



Further, the Department has not provided a "compelling state interest that is narrowly tailored to meet that interest."[175] The Department justifies the GE Rule on the ground that providing that "given the high cost of education and correspondingly high need for student debt, students, families, institutions, and the public have an acute interest in ensuring that higher education investments are justified through positive repayment and earnings outcomes for graduates."[176] The Department acknowledges that it previously (in the 2019 Rule) "eliminated any accountability framework in favor of non-regulatory updates to the College Scorecard on the premise that transparency could encourage market forces to bring accountability to bear"[177] but seeks now to discredit the value of market forces. We disagree. Required disclosures regarding student debt provide students critical information they need, and use, to make decisions about postsecondary enrollment. We note that in the context of the FVT, these same market forces are deemed sufficient. The Department should rescind the Subpart S provisions in favor of the Subpart Q framework.

The GE Rule fails the strict scrutiny standard as the Department's methods are not the least restrictive means to fulfill its purpose. The Department's purpose in enacting the accountability measures is to ensure that all Title IV programs lead to gainful employment. The Department has a number of less restrictive options that would satisfy this purpose, including simply retaining the Subpart Q framework. The Department's suggestion that "market forces" are insufficient fails to satisfy the standard of "strict scrutiny" and, therefore, the GE Rule violates the First Amendment.

4.      *The Gainful Employment Rule Violates the Due Process Clause*

a.      <u>Protectable Property Interest</u>

The proposed GE Rule violates the Due Process Clause because it strips access to Title IV funding from institutions that have a legitimate claim of entitlement to it. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[178] The Fifth Amendment applies the Due Process Clause to the Federal Government.[179] A property interest is not defined in the Constitution. Independent sources of law assist in identifying property interests. A public benefit falls within the category of "property interest" when an individual has a "legitimate claim of entitlement to it."[180] To determine whether a party has satisfied this definition of a property interest, a court will consider "'whether the statutes and regulations governing the distribution of benefits,' state or federal, 'meaningfully channel official discretion

---

[175] *See Pac. Coast Horseshoeing Sch., Inc.* at 1068 (defining strict scrutiny).

[176] 88 Fed. Reg. at 32307.

[177] *Id.*

[178] U.S. Const. Amend. V.

[179] *Id.*

[180] Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577 (1972).



by mandating a defined administrative outcome."[181] A property interest is present when the regulatory scheme provides "fixed eligibility criteria" to receive benefits.[182] No property interest is present when the regulatory scheme provides the government with significant discretion over the eligibility.[183]

In *Association of Proprietary Colleges v. Duncan*, the District Court found that a for-profit school did not have a property interest in the Title IV federal aid program. The District Court cited the following factors in its decision: (1) the institutions were not direct recipients of the federal funding, but instead third-party recipients; (2) the Department maintains significant discretion to determine the eligibility of the Title IV federal aid program; and (3) the Department possesses a reserved right to withhold funding from for-profit institutions. The Department should recognize, however, that the court's analysis in that case was flawed.

An institution of higher education is not a third-party recipient in the Title IV federal aid program. The financial assistance provided to a student is distributed for purposes, and under the condition, that the student apply the funding towards enrollment at an eligible institution. The institution itself is a focal aspect of Title IV of the Higher Education Act, discussed at length throughout the regulation with various chapters dedicated to the eligibility and other aspects of an institution's participation in the federal aid program. Describing an institution as a "third-party recipient" of the Title IV program funds demonstrates a misunderstanding of the federal aid process, and the institution's role in higher education.

Additionally, 20 U.S.C. § 1094(c)(1)(F) creates a constitutionally protected property interest. It provides for "the limitation, suspension, or termination of the participation in any program under this subchapter of an eligible institution, or the imposition of a civil penalty under paragraph (3)(B) whenever the Secretary has determined, after reasonable notice and opportunity for hearing."[184] The District Court's emphasis that the Department has discretion to remove Title IV eligibility in emergency circumstances, fails to include the subsection that in these circumstances, "the Secretary shall provide the institution an opportunity to show cause, if it so requests, that the emergency action is unwarranted."[185] For this reason, 20 U.S.C. § 1094(c)(1)(F) exemplifies that an institution has protected property interest in federal aid distributed in the Title IV federal aid program. For these reasons, an institution of higher education has a property interest in the benefits provided in the Title IV federal aid program and is entitled to a hearing and notice prior to the deprivation of this property interest.

---

[181] *Ass'n of Proprietary Colls. v. Duncan* at 347.

[182] *Id.*

[183] *Id.*

[184] 20 U.S.C. § 1094(c)(1)(F).

[185] 20 U.S.C. § 1094(c)(1)(G)(iii).



b.    Protectable Liberty Interest

The Proposed GE Rule deprives AACS member schools of their liberty interest without Due Process of the law. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[186] The Fifth Amendment applies the Due Process Clause to the Federal Government.[187] The Supreme Court has not provided a concrete definition of a liberty interest within the confines of the Due Process Clause. However, it has been accepted that a private party has a liberty interest in its reputation and name.[188] To constitute a liberty interest, a private party must have suffered reputational harm coupled "with the deprivation of a more tangible interest."[189]

AACS member schools will suffer severe reputational harm with additional financial injury resulting from its inability to comply with the proposed GE Rule, therefore satisfying the stigma-plus analysis of a liberty interest. Section 668.605 of the Proposed Rule provides that an institution is required to issue warnings to current and prospective students following the failure to satisfy the Gainful Employment metrics.[190] Noncompliant institutions will additionally have to provide students with an acknowledgement form stating that the student is aware of the institution's status. The reputational harm that the institutions will suffer is based on non-compliance with metrics that unfairly target cosmetology institutions. The metrics fail to accurately depict the actual earnings and incurred debt of cosmetology graduates and, in addition, employ irrational comparisons that do not assess whether an institution has fulfilled its obligations. The reputational damage that the schools will suffer for failure to comply with the GE Rule will lead to serious financial injury. Prospective students will drop out of the school in order to pursue "more secure" options. Current students will seek to transfer to "safer" institutions or "safer" career opportunities. This satisfies the requirement that the schools suffer reputational harm with financial injury. Therefore, AACS member schools have a constitutionally protected liberty interest in the continued participation in federal funding programs under the Higher Education Act.

c.    Procedural Violations

The proposed GE Rule violates the Due Process Clause because it would deprive AACS members of their federal student aid interests without sufficient notice and opportunity to be heard. The amount of process required depends on the interests of the parties involved.[191] In determining the amount of process to be provided, the courts will analyze three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous

---

[186] U.S. Const. Amend. V.

[187] *Id.*

[188] Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 177 (2d Cir.1991).

[189] Patterson v. City of Utica, 370 F.3d 332, 330. (2d Cir. 2004).

[190] Proposed § 668.605.

[191] Logan v. Zimmerman Brush Co., 455 U.S. 422, 434 (1982).



deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[192]

AACS member schools have a significant interest in continued participation in the federal student aid program. If the current language of the proposed GE Rule remains intact, nearly 80% AACS member cosmetology programs will fail the metrics. A failure to satisfy the metrics for two out of three years will result in a loss of Title IV eligibility. Nearly all cosmetology and barbering schools offer no programs outside of its cosmetology-related or barbering offerings. Therefore, the inability to comply with the Proposed GE Rule will result in the entire school losing its Title IV eligibility. As we have stated, AACS member schools have a student population that is largely comprised of low-income students that rely on federal aid in order to enroll in the institution. If AACS members are ineligible to participate in Title IV federal aid programs, the schools will suffer significant revenue declines without transition time to adjust program offerings and locations to operate as non-Title IV institutions.

The demographic and economic backgrounds of the majority of the student population indicate that the schools will not survive without federal student aid. Additionally, the risk of an erroneous deprivation of this property interest through the procedures used is extremely high. As stated in this Public Comment, the proposed GE Rule relies on flawed federal agency data that fails to accurately indicate whether cosmetology programs comply with the accountability metrics. The reliance on this flawed data will result in the forced closure of the institutions and, therefore, the risk of the deprivation of the property interest is significant.

    d.    Substantive Violations

The Proposed Gainful Employment Rule violates the Due Process Clause because it relies on flawed federal agency data. The Due Process Clause prohibits the deprivation of liberty or property without due process of law.[193] An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between facts found and the choice made.'" [194]

The proposed GE Rule establishes two metrics that an institution is required to comply with to maintain Title IV eligibility: (1) the D/E Rate and (2) the Premium Earnings Threshold. The D/E Rate was originally introduced in the 2011 Gainful Employment Rule. The D/E Rate is used to ensure that a graduate of a GE Program will earn a sufficient income to repay their federal loans. The D/E Rate is broken into two distinct measures: (1) the annual earnings rate, which is the "proportion of annual earnings that students who complete the program are devoting to annual

---

[192] Matthews v. Eldridge, 424 U.S. 319, 334 (1976).

[193] U.S. Const. Amend. V.

[194] Wildwest Institute v. Kurth, 855 F.3d 955 (9th Cir. 2017) (quoting *Burlington Truck Lines, Inc v. United States*, 371 U.S. 156 (1962)).



debt payments"[195] and (2) the discretionary rate income, which is "the proportion of annual discretionary income that students who complete the program are devoting to annual debt payments."[196] The D/E Rate is calculated using earnings data derived from a Federal agency, such as the Treasury Department, including the Internal Revenue Service (IRS), the Social Security Administration (SSA), the Department of Health and Human Services (HHS), and the Census Bureau.[197] The earnings would be calculated for either the two-year or four-year cohort.

The Federal agency earnings data fails to accurately reflect the annual or discretionary earnings of a graduate from a cosmetology-related program. In *AACS v. DeVos*, the District Court for the District of Columbia found that "graduates of certain programs – including cosmetology programs – underreport their income with far greater frequency than graduates of other programs."[198] The District Court cited that the Department itself has acknowledged the issue of underreporting, stating that "about half of earnings in service occupations such as cosmetology."[199] Additional evidence was submitted to the District Court confirming the large impact of underreported tip income and self-employment income reported to the Internal Revenue Agency. Dr. Eric Bettinger, a professor at Stanford University, published a report finding that "tip income and self-employment income are, on average, underreported by around 60%."[200] Russell George, Treasury Inspector General of the Tax Administration, previously testified to the House Budget Committee that "self-employed individuals who formally operate . . . businesses . . . are estimated to report only about 68 percent of their income for tax purposes" and "self-employed individuals operating businesses on a cash basis report just 19 percent of their income to the IRS."[201]

The District Court concluded by agreeing with the Department and AACS that the earnings data relied upon by the Department was inaccurate to a material degree, which made the availability of an effective appeal mechanism all the more necessary. In the Proposed Rule, the Department proposes to eliminate the Earnings Appeal altogether, but continues to rely upon the same flawed government data. This violates AACS members' substantive due process rights.

### C.   Financial Responsibility

The NPRM begins its discussion of the proposed changes to the regulations regarding the financial responsibility provisions set forth at §§ 668.15, 668.23, and 668, subpart L §§ 171, 174, 175, 176 and 177. For the reasons set forth below, we express our dissatisfaction with the Department's addition of § 668.171(c)(2)(iii). The proposed amendments to the Financial

---

[195] 88 Fed. Reg. at 32344.

[196] *Id.*

[197] 88 Fed. Reg. at 32328.

[198] *AACS* at 73.

[199] *See* 79 Fed. Reg. at 64955.

[200] *AACS* at 59-60 (quoting Decl. of Katherine Brodie at 493, ECF No. 8–4).

[201] *AACS* at 60 (quoting Decl. of Katherine Brodie at 1258, ECF No. 8–4).



Responsibility Regulations that impose new mandatory and discretionary "triggers" are written in over-broad terms, lack definitional clarity and, by going well beyond seeking to safeguard Title IV funds by ensuring institutional financial responsibility, in many instances would create financial instability in and of themselves, as well as cause many other unintended consequences.

We recommend that the Department omit the triggering events analyzed below as each fails to have any bearing on financial responsibly and the Department's proposal does not sufficiently explain the reasoned analysis conducted for the regulatory changes.

### § 668.171(c)(2)(iii)

*The Department adds a mandatory trigger for institutions that have received at "least 50% of its Title IV, HEA program funds in its most recent completed fiscal year from GE programs that are 'failing'" the Gainful Employment framework.[202]*

AACS Comment:

As stated before, the APA requires an agency to provide "reasoned consideration to all the material facts and issues" in accordance with its rulemaking authority.[203] The agency must provide sufficient evidence to demonstrate a rational connection between the evidence asserted and the action.[204]

A similar mandatory trigger was included in the 2016 Final Borrower Defense Regulations and later removed in the 2019 Final Borrower Defense Regulations.[205] The Department has asserted that the mandatory trigger provides it with financial protection from institutions that fail the Gainful Employment framework: "this trigger is necessary because the potential loss of revenue from failing GE programs would have a negative impact on the institution's overall financial stability when it represents such a significant share of the institution's revenue."[206] The Department further states that it established a threshold of 50% as that percentage "reasonably related to the required financial protection of 10 percent of the institution's Title IV, HEA funding."[207]

The Department fails to provide reasoned analysis and evidence for the addition of this mandatory trigger. The imposition of a potentially debilitating mandatory LOC in these events, without a determination by the Secretary either (1) that the institution is not able to rectify the triggering event, or (2) that the triggering event in fact will have an immediate impact on the

---

[202] 88 Fed. Reg. at 32358.

[203] *Greater Bos. Television Corp.* at 851.

[204] *Motor Vehicle Mfrs. Ass'n* at 43.

[205] 88 Fed. Reg. at 32358.

[206] *Id.*

[207] *Id.* at 32359.



institution's financial responsibility, could serve to *cause* a precipitous financial crisis at the institution whether one would otherwise not be present. The Department must thoroughly analyze the financial implications and other unintended consequences of the imposition of this trigger and its impact on schools and its enrolled students.

## § 668.171(c)(2)(ix)

*The Department adds a mandatory trigger for when an institution loses eligibility to participate in another Federal education assistance program due to administrative action.*

AACS Comment:

The Department claims that this trigger is necessary because institutions that have lost eligibility from another Federal education assistance program must have a weakness that contributed to this action. The Department additionally claims that the loss of eligibility will have financial repercussions from the impact on the loss of revenue.

The Department has not provided any evidence absent a general claim that the loss of eligibility "generally" indicates that the institution has a weakness resulting in this action. Its failure to specifically reference how this trigger indicates financial irresponsibility is indicative of the lack of reason that the Department put forth. The loss of eligibility may be unrelated to administrative or financial capabilities issues and/or may be financially immaterial to the institution. This mandatory trigger requires a detailed factual analysis to determine the financial impact, if any, and the financial magnitude, of the actions or activities that constitute this trigger.

## 68.171(d)(7)

*The following situation constitutes a discretionary triggering event:*

- *An institution discontinues academic programs enrolling more than 25 percent of students at the institution;*

AACS Comment:

The Department has added this trigger in response to the concern that the closure of significant programs at an institution will result in the forced closure of the institution. The Department stated that the 25 percent threshold is representative of an institution's financial stability to withstand the closure of a program.[208] The Department further provides that its concern with the occurrence of this event warrants a closer analysis of the institution because this discretionary trigger "would allow us to capture the situation where an institution closed all of its programs in a given degree level, only to later shutter the entire institution."[209]

---

[208] 88 Fed. Reg. at 32364.

[209] *Id.*



As stated above, the Department has not sufficiently explained the connection between this discretionary trigger and the financial responsibility of the institution. The Department has not provided any evidence or rational basis for its conclusion that the 25% threshold is indicative of an institution's financial stability to withstand the closure of a program. This Department proposes this arbitrary threshold as a discretionary trigger. The financial responsibility of the institution is not at risk and the magnitude of the penalty – 10% LOC – far exceeds the materiality of the underlying event. This trigger will have a significant impact on cosmetology schools, as such schools do not offer a significant amount of programs outside of cosmetology programs. The closure of one of its programs may constitute this discretionary trigger, however, the event is not indicative of the financial stability of the institution.

### 68.171(d)(8)

*The following situations constitute a discretionary triggering event:*

- *An institution closes more than 50 percent of its locations; or*
- *An institutions closes its locations which enroll more than 25 percent of its students.*

AACS Comment:

The Department has added this trigger in response to the concern that the closure of significant programs at an institution will result in the forced closure of the institution. The Department stated that it has anecdotes of an institution closing a portion of its locations, and then subsequently closing the entire institution. In the negotiated rulemaking process, a negotiator asserted that the closing of branch locations often times results in the strengthening of an institution's finances. The Department responded to this assertion stating that in those cases, the consequences of the discretionary trigger would not result in further escalation because the institution is financially stable. In its justification for the threshold for institutions that close locations which enroll more than 25 percent of its students, the Department simply provides that its determination was "for the same reasons that it selected that level for the discontinuation of academic programs."[210]

The Department has not provided a sufficient rationale for the establishment of this discretionary trigger. The Department has additionally not provided any evidence that the closure of the 50 percent of branch locations, or locations which enroll more than 25 percent of its students, will result in financial instability. In addition, the Department acknowledged that these events often have the opposite effect and positively impact an institution. For the 25 percent threshold, the Department did not provide any analysis or rationale. It has not been established that the financial responsibility of the institution is at risk and the significance of the penalty – 10% LOC – far exceeds the materiality of the underlying event. This trigger will have a significant impact on cosmetology schools, as such schools do not offer a significant number of programs outside

---

[210] *Id.*



of cosmetology programs. The closure of one of its programs may constitute a discretionary triggering event, however, the event is not indicative of the financial stability of the institution.

### 68.171(d)(10)

*The Department adds a discretionary trigger for when an institution loses eligibility to participate in another Federal education assistance program due to administrative action.*

AACS Comment:

The Department provides that its justification for this trigger is the same as was used for § 668.171(c)(2)(ix).

The Department has not provided any evidence absent a general claim that the loss of eligibility "generally" indicates that the institution has a weakness resulting in this action. Its failure to specifically reference how this trigger indicates financial irresponsibility is indicative of the lack of reasoned analysis. The loss of eligibility may be unrelated to administrative or financial capabilities issues and/or may be financially immaterial to the institution. This discretionary trigger requires a detailed factual analysis to determine the financial impact, if any, and the financial magnitude, of the actions or activities that constitute this trigger.

### D. Administrative Capability

The NPRM proposes to amend and augment the administrative capability requirements contained in current § 668.16. As described below, the Department has failed to satisfy the statutory requirements for a permissible rule change.

### § 668.16(t)

*The Department includes this provision providing that an administratively capable institution is required to derive at least half of its total Title IV funds in the most recent award year from programs that are in compliance with Subpart S of Part 668. In addition, an administratively capable institution is required to have at least half of the fulltime equivalent Title IV students enrolled in programs that are in compliance with Subpart S of Part 668.*

AACS Comment: The standard for a permissible rule change under the APA is that the agency provide "reasoned consideration to all the material facts and issues."[211] An agency satisfies this standard by providing "rational connection between the facts found and the choice made."[212] The Department seeks to revise 668.16 to condition the administrative capability of an institution on the institution deriving at least half of its Title IV revenues from programs that meet the GE Rule or having a majority of full-time students enrolled in programs that meet the GE Rule. The Department justifies the enactment of this provision on the basis that "an institution that obtains

---

[211] *Greater Bos. Television Corp.* at 851.

[212] *Motor Vehicle Mfrs. Ass'n* at 43.



most of its revenue from, or enrolls most of its Title IV-eligible students in, failing GE programs would lack administrative capability."[213]

The Department has failed to provide substantial evidence necessary to support the need for the changes proposed and there is a lack of rational connection between the compliance requirement identified and an institution's ability to provide the education offered and effectively administer the financial aid program. The Department previously acknowledged that the Gainful Employment framework is designed to assess the financial value of a program, not the administrative capability of the institution offering it.[214] There is simply no basis to conclude that high D/E rates or low earnings would indicate an inability to successfully administer the Title IV programs. For these reasons, the Department has failed to satisfy the statutory requirements for a permissible rule change.

In addition, as the GE Rule is proposed, these administrative capability requirements would have an immediate, adverse and disproportionate impact on AACS members. Because, as the Department's data demonstrates, cosmetology certificate programs fail the GE Rule at much higher rates than other programs, many AACS schools offering such programs are likely to trigger these new administrative capability requirements leading to limitation or other enforcement actions that would threaten the ability of AACS schools to continue participation in Title IV programs. Until the GE Rule is amended to address our concerns, we oppose this proposed language.

### E. Certification Procedures

__§ 668.13(e)__

*The Department has amended § 668.13(e) to allow the Secretary to consider supplementary performance measures in its certification determination. The Secretary is allowed to assess the following:*

> *(1) Withdrawal rate of the institution;*
> *(2) D/E rates of programs;*
> *(3) Earnings Premium Measures of programs;*
> *(4) Amount an institution spends on instruction, academic support, and support services and, in addition, the amount spent on recruiting activities, advertising, and other funds spent on pre-enrollment activities; and*
> *(5) Licensure pass rate of program.*

<u>AACS Comment</u>:

The current language of § 668.13 provides certain procedures that the Department may undertake in its decision to certify an institution. The Department has stated that § 668.13(e) provides

---

[213] 88 Fed. Reg. at 32375.

[214] *Id.* at 32305.



additional context of the quality of an institution. As stated in other sections of this Public Comment, the D/E Rate and the Earnings Premium Measure fail to accurately indicate the quality of a cosmetology institution. The addition of those two metrics within the supplementary performance measures may result in a significant number of otherwise eligible cosmetology institutions not receiving certification status. AACS strongly recommends removing the D/E Rate and the Earnings Premium Measure from its certification analysis.

### § 668.14(b)(26)(ii)

*The NPRM amends § 668.14(b)(26)(ii) to limit Title IV eligibility for clock hour programs to either: (a) 100% of the state's minimum hours for where the institution is located, or under limited circumstances, (b) 100% of a state's minimum hours for a state within the metropolitan statistical area of the institution.*

<u>AACS Comment</u>:

AACS opposes this proposal. The Department should eliminate its proposed edits to § 668.14(b)(26), which would lower the clock hours cap for Title IV eligibility for certain programs that lead to gainful employment in a recognized occupation.

The current language of § 668.14(b)(26) permits institutions to offer Title IV aid at a maximum of "150% of the minimum number of clock hours required for training in the recognized occupation for which the program prepares the student, as established by the state in which the program is offered, if the State has established such a requirement, or as established by any federal agency."[215] The Proposed Rule amends § 668.14(b)(26)(ii) to limit Title IV eligibility for clock hour programs to either: (a) 100% of the state's minimum hours for where the institution is located, or under limited circumstances, (b) 100% of a state's minimum hours for a state within the metropolitan statistical area of the institution.[216] If an institution proceeds to comply with the alternative of up to 100% of another State's minimum hours, the institution must submit documentation, substantiated by a certified public accountant, of one of three qualifying requirements. The three qualifying requirements are as follows:

- A majority of students resided in that other State while enrolled in the program during the most recently completed Award Year;
- A majority of students who completed the program in the most recently completed Award Year were employed in that other State; or
- The other State is part of the same metropolitan statistical area as the institution's home State and a majority of students, upon enrollment in the program during the

---

[215] Proposed § 668.14(b)(26).

[216] 88 Fed. Reg. at 32320.



most recently completed award year state in writing that they intend to work in that State.[217]

The proposed amendment to § 668.14(b)(26) will significantly impact institutions currently exceeding the 100% state minimum and short-term programs under 600 clock hours that obtained Title IV eligibility under the 150% threshold. In the 2014 Gainful Employment Final Rule, the Department stated that "the relationship is considered to be reasonable if the number of clock hours of the program does not exceed by more than 50 percent the minimum number of clock hours required for training that has been established by the State in which the program is located."[218] The current rule has allowed institutions to offer Title IV eligible short term programs that would become Title IV ineligible if the Department adopts this change. For example, where state minimum hours are 400 clock hours for a program, a school may offer a 600 hour program (150% of the state minimum clock hours) and the student receives Title IV aid for the full length of the program. This allows students to receive additional occupation-related training while receiving federal aid. With a cap at 100% of a state's minimum hours, students will not receive any federal aid for this program.

Institutions in compliance with the current requirement will face substantial challenges in continuing to participate in Title IV federal aid programs under the newly reformed certification procedures. Short-term clock hour programs will not be able to satisfy the new clock hour requirements. The amendment will result in institutions losing Title IV eligibility for these programs, which will likely lead to significant revenue impacts if not closure of the schools. This, in turn, affects the availability of educational opportunities for non-traditional students relying on federal aid to access these programs.

Short-term programs provide critical pathways to students, predominantly low-income and minority students that value the flexibility and workforce ready preparation provided by these programs. The amended certification procedures will result in longstanding Title IV eligible programs losing its eligibility. This will have a significant impact on the higher education industry, its students, graduates and interested parties. AACS strongly opposes any revisions that directly or indirectly harms students.

The length of educational programs, regardless of industry, is the prerogative of institutions and the purview of accreditors. Institutions are in the best positions to determine appropriate program lengths and curricula. Oversight, if required, is provided by accreditors, which are charged with ensuring the quality of an educational program. Department regulations, found at 34 C.F.R. Part 602, Subpart B, ensure that accrediting agencies have been judged by the Department as being reliable authorities of the quality of the education or training provided by the institutions or programs it accredits. The Department's proposed cap attempts to assert federal control into an area where such control is not appropriate. We observe that Congress, concerned with the

---

[217] *Id.*

[218] 79 Fed. Reg. at 64990.



potential for such overreach, in the General Education Provisions Act[219] expressly prohibits the Department from attempting to exercise any direction, supervision, or control over educational program curriculum.

### § 668.14(f)

*The Department amends the conditions that applies to institutions undergoing a change of ownership that attempt to convert from a for-profit institution to a non-profit institution. The second condition is the continued compliance with the Gainful Employment requirements outlined in Subpart S of Part 668 until the Department has completed its financial analysis of the institution.*

AACS Comment:

AACS opposes the continued reliance of the Gainful Employment requirements provided in Subpart S of 668. As stated throughout this Public Comment, the accountability framework provided in Subpart S inaccurately assesses the quality of cosmetology institutions. Institutions seeking to convert from for-profit to non-profit status should not continue to comply with Subpart S of Part 668, unless the Department revises its framework in accordance with our recommendations.

### F.      Ability to Benefit – 34 C.F.R. §§ 668.2 and 668.157

The proposed ATB rule changes reflect the consensus language agreed upon in the rulemaking negotiations. The HEA, in Section 484(d), establishes several ATB options that a student without a high school diploma may pursue in order to gain eligibility to access federal financial aid, including participating in a state process approved by the Department. ATB students, with limited exception, are required to enroll in an eligible career pathway program to access federal student aid. Several AACS member schools currently offer one or more eligible career pathway programs.

For institutions like AACS schools that offer one or more eligible career pathway programs outside of a state process, the regulations do three things that impact these programs: (1) include a definition for "eligible career pathway programs;" (2) establish new documentation requirements to demonstrate compliance and (3) establish a new verification process at the Department to ensure regulatory compliance of all eligible career pathway programs. We support each of these regulatory changes, but make recommendations to ensure that proprietary institutions like AACS schools are not punished in violation of the HEA for offering these programs and may continue to offer students without a high school diploma or GED this valuable pathway to concurrently earning a secondary and postsecondary credential.

---

[219] 20 U.S.C. § 1221 *et seq.*



A.   <u>Proposals</u>

**668.2 (Amended)**

The Department proposes to incorporate into § 668.2 the HEA definition of an "eligible career pathway program" which now aligns with the definition contained in the Workforce Innovation and Opportunity Act ("WIOA"):

*A program that combines rigorous and high-quality education, training, and other services that—*

> *(1) Align with the skill needs of industries in the economy of the State or regional economy involved;*
> *(2) Prepare an individual to be successful in any of a full range of secondary or postsecondary education options, including apprenticeships registered under the Act of August 16, 1937 (commonly known as the ''National Apprenticeship Act''; 50 Stat. 664, chapter 663; 29 U.S.C. 50 et seq.);*
> *(3) Include counseling to support an individual in achieving the individual's education and career goals;*
> *(4) Include, as appropriate, education offered concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster;*
> *(5) Organize education, training, and other services to meet the particular needs of an individual in a manner that accelerates the educational and career advancement of the individual to the extent practicable;*
> *(6) Enable an individual to attain a secondary school diploma or its recognized equivalent, and at least one recognized postsecondary credential; and*
> *(7) Help an individual enter or advance within a specific occupation or occupational cluster.*

**668.157 (New)**

The Department proposes that an institution offering an eligible career pathway program to be able to document certain requirements as detailed in new § 668.157 as follows:

> *§ 668.157 Eligible career pathway program.*
> *(a) An institution demonstrates to the Secretary that a student is enrolled in an eligible career pathway program by documenting that—*
> *(1) The student has enrolled in or is receiving all three of the following elements simultaneously—*
> *(i) An eligible postsecondary program as defined in § 668.8;*
> *(ii) Adult education and literacy activities under the Workforce Innovation and Opportunity Act as described in 34 CFR 463.30 that assist adults in attaining a*



*secondary school diploma or its recognized equivalent and in the transition to postsecondary education and training; and*
*(iii) Workforce preparation activities as described in 34 CFR 463.34;*
*(2) The program aligns with the skill needs of industries in the State or regional labor market in which the institution is located, based on research the institution has conducted, including—*
*(i) Government reports identifying in demand occupations in the State or regional labor market;*
*(ii) Surveys, interviews, meetings, or other information obtained by the institution regarding the hiring needs of employers in the State or regional labor market; and*
*(iii) Documentation that demonstrates direct engagement with industry;*
*(3) The skill needs described in paragraph (a)(2) of this section align with the specific coursework and postsecondary credential provided by the postsecondary program or other required training;*
*(4) The program provides academic and career counseling services that assist students in pursuing their credential and obtaining jobs aligned with skill needs described in paragraph (a)(2) of this section, and identifies the individuals providing the career counseling services;*
*(5) The appropriate education is offered, concurrently with and in the same context as workforce preparation activities and training for a specific occupation or occupational cluster through an agreement, memorandum of understanding, or some other evidence of alignment of postsecondary and adult education providers that ensures the secondary education is aligned with the students' career objectives; and*
*(6) The program is designed to lead to a valid high school diploma as defined in § 668.16(p) or its recognized equivalent.*
*(b) For career pathway programs that do not enroll students through a State process as defined in § 668.156, the Secretary will verify the eligibility of eligible career pathway programs for*
*title IV, HEA program purposes pursuant to paragraph (a) of this section. The Secretary provides an institution with the opportunity to appeal any adverse eligibility decision.*

B.  <u>AACS Comment and Recommendations</u>

AACS agrees with the new definition in 668.2, the new documentation requirements in 668.157 and the new proposed verification process. The definition is consistent with recent congressional amendments to HEA and prior Department eligible career pathway guidance.

As stated in the NPRM, at 32391-92, the Department previously did not approve individual career pathway programs and provided minimal guidance on documentation requirements. Institutions were required to make a good faith attempt at compliance with the HEA language with minimal guidance from the Department. We object, however, to the Department's reference in its policy justification to the unsubstantiated need to "curtail bad actors' efforts to provide subpar programming" as a veiled reference to the implementation of eligible career pathway programs to date mostly by proprietary institutions. *All* institutions require greater clarity on



implementation of the eligible career pathway program to ensure such programs comply with HEA and the HEA permits *all* institutions to offer such programs. We are concerned, given the Department's hostility toward for-profit colleges, that the Department's establishment of an as-yet defined "verification" program for eligible career pathway programs may result in an effort by the Department to "weed out" eligible career pathway programs offered at proprietary institutions. This is particularly true because the Department is pursuing a punitive GE Rule which would allow the Department to point to a failing GE program as a sub-par component of an eligible career pathway program.

Specifically, under proposed § 668.157(b), the Department "would review and approve every eligible career pathway program that enrolls students through means other than exclusively the State process. This is to ensure that the programs comply with the regulatory definition and documentation requirements. By requiring this verification, the Department would be able to address existing issues by which some programs may have failed to meet statutory requirements and have still received aid for ATB."

<u>Recommendations:</u>

First, the Department should make clear that institutions that are currently offering one or more eligible career pathway programs outside of a state process should be allowed to continue offering those programs uninterrupted until such time as the Department has reviewed that institution's eligible career pathway programs and approved such programs or noted any required changes.

Second, given the lack of guidance on implementation of compliant eligible career pathway programs, institutions should not be held liable for a future conclusion by the Department that an eligible career pathway program does not meet HEA requirements. Rather, the Department should work constructively with institutions to improve career pathway programs to strengthen HEA compliance without backward looking liabilities.

Finally, the Department should take an even-handed approach in its review of eligible career pathway programs so as not to use the approval process in a punitive manner to eliminate proprietary institutions' ability to offer an eligible career pathway programs while allowing public and private non-profit institutions to offer similar programs.

This is a concern given that the GE Rule primarily impacts proprietary institutions and thus proprietary institutions with a failing GE program could be unable to offer an eligible career pathway program while another institution with a similar program would be unaffected. This is another example of how the GE Rule leads to absurd results that do not protect students and is instead a targeted, punitive regulation aimed at curtailing educational programs at proprietary institutions, including congressionally sanctioned eligible career pathway programs. The Department should publish on its website the basis for its conclusions that an eligible career pathway program submitted by an institution is, or is not, in compliance with the HEA for all programs it reviews to ensure the Department is not using its review process to target and eliminate proprietary institution programs.

80



It bears pointing out that the state ATB process addressed in 668.156 would amend current § 668.156(b) (now redesignated as proposed § 668.156(e)) to clarify that the State is not subject to the success rate requirement at the time of the initial application, but is subject to the requirement for the subsequent period and reduces the required success rate (completion of the program) from the current 95 percent to 85 percent, with the option to reduce to 75 percent. The Department has chosen, therefore, when it comes to the state ATB process in which community colleges are likely to participate, to water down student success requirements. The Department has evidenced an arbitrary approach to eligible career pathway programs: one the one hand, imposing a GE Rule that may entirely eliminate some proprietary school pathway programs and targeting the elimination of so-called "sub-par" pathway programs through an opaque verification process and, on the second hand, weakening student success rates for pathway programs offered by public and private non-profit institutions.

## IV.   Conclusion

Thank you for the opportunity to submit our views. We ask that the Department closely evaluate our comments and carefully balance its intended goals against the disproportionate negative impact the Proposed Rule will have on the entire beauty and wellness education sector, including students, graduates, employees, local employers, and allied businesses. Our students are overwhelmingly female, diverse and low-income and benefit from the career options for which our members prepare our graduates. The impact that the Proposed Rule will have on the beauty and wellness industry, our membership, and the economy as a whole is unprecedented, catastrophic and requires significant reform.