**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| OGLE SCHOOL MANAGEMENT, LLC *et al.*,<br><br>             *Plaintiffs*,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>             *Defendants*. | No. 4:24-cv-00259-O |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 4

    I.     The Higher Education Act of 1965 ................................................................ 4

    II.    Regulatory History .......................................................................................... 7

    III.   The 2023 FVT and GE Rules ......................................................................... 9

    IV.   Procedural History ........................................................................................ 12

ARGUMENT ................................................................................................................ 13

    I.     Legal Standard .............................................................................................. 13

    II.    Plaintiffs Face No Threat of Irreparable Injury Absent a Preliminary
            Injunction .................................................................................................... 13

    III.   Plaintiffs Are Unlikely To Succeed on the Merits ...................................... 16

            A.     As Other Courts Have Recognized, the Secretary Has Statutory
                  Authority To Promulgate the GE Rule ..................................................... 16

            B.     The GE Rule Reflects the Department's Reasoned Approach to
                  Assessing Whether GE Programs Satisfy Statutory Eligibility
                  Requirements ........................................................................................... 25

                  1.    The D/E and EP Metrics Reasonably Rely on Reported Earnings .... 25

                  2.    The Metrics' Earnings Measurements Are Reasonable ..................... 31

                  3.    The D/E Metric's 8% and 20% Thresholds Are Well Founded ........ 36

                  4.    The Preamble Thoroughly Explains the GE Rule's Costs and
                       Benefits and Shows that It Serves Title IV's Purpose To Help
                       Students .......................................................................................... 39

    IV.   The Public Interest and Balance of Equities Weigh Against a Preliminary
            Injunction .................................................................................................... 42

CONCLUSION ............................................................................................................. 44

## **TABLE OF AUTHORITIES**

### **Cases**

*Am. Ass'n of Cosmetology Schs.* ("*AACS*") *v. DeVos*, 258 F. Supp. 3d 50 (D.D.C. 2017) ..... 8, 28

*Anyadike v. Vernon Coll.*,
No. 7:15-cv-157-O, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ........................... 14

*Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215 (5th Cir. 2016) ..................................... 25

*Ass'n of Private Colls. & Univs.* ("*APCU*") *v. Duncan*,
870 F. Supp. 2d 133 (D.D.C. 2012) ...............................................2, 7-8, 17, 18, 22-23, 38

*Ass'n of Private Sector Colls.* ("*APSCU*") *& Univs v. Duncan*,
No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016) (unpublished) ................ *passim*

*APSCU v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) ....................................................... 5

*APSCU v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015),
*aff'd*, No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8, 2016)................................ *passim*

*Ass'n of Proprietary Colls.* ("*APC*") *v. Duncan*,
107 F. Supp. 3d 332 (S.D.N.Y. 2015) .......................................... 2, 7, 8, 17, 18, 22, 34, 38

*Biden v. Texas*, 597 U.S. 785 (2022) ......................................................................... 23

*Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460 (M.D. Fla. 2022) ..................................... 15

*Career Coll. Ass'n v. Riley*, 74 F.3d 1265 (D.C. Cir. 1996) ....................................................... 23

*Career Colls. & Schs. v. U.S. Dep't of Educ.*,
No. 23-50491, 2024 WL 1461737 (5th Cir. Apr. 4, 2024) ............................................. 16

*Chamber of Com. v. SEC,* 85 F.4th 760 (5th Cir. 2023) ............................................................. 35

*Cheapside Mins., Ltd. v. Devon Energy Prod. Co.*, 94 F.4th 492 (5th Cir. 2024) ...................... 19

*Chevron, USA, Inc. v. NRDC*, 467 U.S. 837 (1984) ................................................................... 20

*Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976 (S.D.N.Y. 1989) .............. 15

*Dolan v. U.S. Postal Serv.*, 546 U.S. 481 (2006) ....................................................................... 19

*FCC v. Prometheus Radio Proj.*, 592 U.S. 414 (2021) .............................................................. 25

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ............................................................ 15

*Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603 (N.D. Tex. 2006) ........................ 15

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*,
　　No. 3:09-cv-390, 2009 WL 1766095 (N.D. Tex. June 23, 2009) .................................... 14

*James v. ICE*, 543 U.S. 335 (2005) ............................................................................................ 23

*La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217 (5th Cir. 2010) ....................................... 13

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
　　No. 3:17-cv-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ................................. 14

*Lewis v. Casey*, 518 U.S. 343 (1996) .................................................................................... 15, 16

*Louisiana ex rel. Guste v. Verity*, 853 F.2d 322 (5th Cir. 1988) ............................................... 25

*Millennium Funding, Inc. v. 1701 Mgmt. LLC*,
　　No. 21-cv-20862, 2021 WL 3618227 (S.D. Fla. Aug. 16, 2021) ................................... 15

*Munaf v. Geren*, 553 U.S. 674 (2008) ....................................................................................... 13

*Nken v. Holder*, 556 U.S. 418 (2009) .................................................................................. 13, 43

*Pals Grp., Inc. v. Quiskeya Trading Corp.*,
　　No. 16-23905, 2017 WL 532299 (S.D. Fla. Feb. 9, 2017) ........................................ 14-15

*Redeemed Christian Church of God v. USCIS*, 331 F. Supp. 3d 684 (S.D. Tex. 2018) ............. 14

*Reese v. Garland*, 66 F.4th 530 (5th Cir. 2023) ........................................................................ 18

*Rest. L. Ctr. v. DOL*, 66 F.4th 593 (5th Cir. 2023) ................................................................... 16

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350 (S.D. Fla. 2002) ....... 15

*Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898 (5th Cir. 2021) .......................................... 25

*Texas v. DHS*, No. DR-23-cv-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) .................... 17

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2016) ............................................................................. 16

*Texas v. EPA*, 91 F.4th 280 (5th Cir. 2024) ....................................................................... 19, 30

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) ............................................... 16

*United States v. Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020) ................................................. 23

*United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023),
    *cert. denied*, 144 S. Ct. 551 (2024) .......................................................................................... 19

*United States v. Rabanal*, 508 F.3d 741 (5th Cir. 2007) .............................................................. 19

*Univ. of Tex. v. Camenisch,* 451 U.S. 390 (1981) ....................................................................... 13

*Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021) ..................................... 16

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................................................... 43

*Wireless Agents, LLC v. T-Mobile, USA, Inc.*,
    No. 3:05-cv-94, 2006 WL 1540587 (N.D. Tex. June 6, 2006) ........................................... 14

## **Statutes**

Administrative Procedure Act ("APA"), 5 U.S.C. § 706 ................................................. 12, 17, 25

20 U.S.C. § 1002 ...................................................................................................................... 6, 23

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070-1099dd .................................... 1, 4

20 U.S.C. § 1070 ...................................................................................................................... 4, 18

20 U.S.C. § 1078 ........................................................................................................................... 5

20 U.S.C. § 1080 ........................................................................................................................... 5

20 U.S.C. § 1085 ......................................................................................................................... 22

20 U.S.C. § 1087a ............................................................................................................. 4, 18, 31

20 U.S.C. § 1087c ..................................................................................................................... 5, 6

20 U.S.C. § 1087d ..................................................................................................................... 5, 6

20 U.S.C. § 1088 ............................................................................................................ 5-6, 18, 22, 23

20 U.S.C. § 1094 ........................................................................................................ 5, 6, 17, 18, 22

20 U.S.C. § 1099c ......................................................................................................................... 5

20 U.S.C. § 1221e-3 ................................................................................................................. 6, 17

20 U.S.C. § 1231a ............................................................................................ 17

20 U.S.C. § 3474 ......................................................................................... 6, 17

National Vocational Student Loan Insurance Act of 1965,
    Pub. L. 89-287, § 17(a), 79 Stat. 1037 ............................................... 6

**Legislative Materials**

H.R. Rep. No. 89-308 (1965) ........................................................................... 6

S. Rep. No. 89-758 (1965) ............................................................................... 6

**Regulations**

79 Fed. Reg. 64890 (Oct. 31, 2014) ("2014 Rule") ...................................... 7

84 Fed. Reg. 31392 (July 1, 2019) ("2019 Rule") ....................................... 8

NPRM, 88 Fed. Reg. 32300 (May 19, 2023) ..................................... *passim*

Final regulations ("FVT & GE Rules"), 88 Fed. Reg. 70004 (Oct. 10, 2023) ................... *passim*

34 C.F.R. § 668.2 ............................................................................................ 32

34 C.F.R. § 668.43 .......................................................................................... 10

34 C.F.R. Subpart Q ....................................................................................... 10

34 C.F.R. § 668.403 ................................................................................. 32, 36

34 C.F.R. § 668.404 ........................................................................................ 32

34 C.F.R. § 668.408 ........................................................................................ 10

34 C.F.R. § 668.409 ........................................................................................ 16

34 C.F.R. Subpart S ........................................................................................ 11

34 C.F.R. § 668.602 ........................................................................................ 12

34 C.F.R. § 668.605 ........................................................................................ 12

34 C.F.R. § 668.606 ......................................................................................... 16


**<u>Secondary Sources</u>**

11A Charles Alan Wright *et al*., Fed. Prac. & Proc. Civ. ("FPP") § 2947 (3d ed.) .............. 16, 43

11A Wright *et al*., FPP § 2948.1 (3d ed.) ............................................................ 13, 14

Baum, Sandy & Saul Schwartz,
      *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt*,
      The College Board (2006)[1] ..............................................................................37-38

Baum, Sandy,
      *DeVos misrepresents the evidence in seeking gainful employment deregulation*,
      Urban Institute (2018)[2] ...................................................................................... 38

Cellini, Stephanie Riegg & Kathryn J. Blanchard,
      *Hair and taxes: Cosmetology programs, accountability policy, and the
      problem of underreported income*, Postsecondary Equity & Economics
      Research Project (2022)[3] .............................................................. 8, 27, 28, 30

Cellini, Stephanie Riegg & Claudia Goldin,
      *Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges*,
      Am. Econ. J.: Economic Policy 6(4) (Nov. 2014)[4] ................................... 29, 35

Cellini, Stephanie Riegg & Bianca Onwukwe,
      *Cosmetology Schools Everywhere* (Aug. 2022)[5] ..................................... 24, 29, 31, 35, 42

Qnity Institute, A Career in Pro Beauty (2023)[6] ................................................. 29, 32

---

[1] Included as Exhibit 1 in attached Appendix of administrative record excerpts.
[2] Included as Exhibit 2 in attached Appendix of administrative record excerpts.
[3] Included as Exhibit 3 in attached Appendix of administrative record excerpts.
[4] Included as Exhibit 4 in attached Appendix of administrative record excerpts.
[5] Included as Exhibit 5 in attached Appendix of administrative record excerpts.
[6] Included as Exhibit 6 in attached Appendix of administrative record excerpts.

## INTRODUCTION

Plaintiffs are two members of the American Association of Cosmetology Schools ("AACS"), which filed suit in December 2023 to challenge the same Department of Education ("Department") final regulations that Plaintiffs challenge here. Those regulations, set forth at 88 Fed. Reg. 70004 (Oct. 10, 2023), were promulgated under Title IV of the Higher Education Act of 1965 ("HEA"), which established various Federally funded student financial assistance programs, including loan programs, to help students access a postsecondary education. As the agency charged with administering Title IV, the Department must ensure the taxpayer funds it disburses serve their intended purpose. Schools like Plaintiffs collectively receive billions of dollars of Title IV student loan money as tuition and fees and do not have to repay any of it if students default or enter loan forgiveness plans. Rather, that risk is borne entirely by the students, who suffer long-lasting adverse consequences if they cannot repay their loans, and taxpayers, who cover the resulting loss.

Facing a growing student debt crisis with over $1.5 trillion and counting in outstanding loans that graduates are unable to repay, with long-standing consequences for their own futures and the public fisc, the Department determined to take steps within its statutory authority to ensure that Title IV aid helps students as Congress intended. It did so through two separate rules, set forth in the same Federal Register notice, that each build upon prior efforts that never fully went into effect but were upheld in substantial part by other courts. The Financial Value Transparency ("FVT") Rule establishes a framework to help students compare postsecondary school options by sharing, via a Department website, relevant information about the financial costs and benefits of nearly all programs that participate in Title IV. The Gainful Employment ("GE") Rule establishes an accountability framework—modified from those in prior rules based on the Department's experience, as well as new research and analysis—to measure whether career training programs

participating in Title IV prepare students for gainful employment, as statutorily required.

Plaintiffs delayed for months after AACS filed suit before bringing their own challenge, then rushed to seek emergency relief on the ground that the FVT Rule would require them to report certain information by July 31, 2024. But the Department then independently extended that deadline by two months. Plaintiffs now identify July 1, 2024—the Rules' effective date—as the date by which they need emergency relief, but the Rules require nothing of schools simply by going into effect. The GE Rule—which is the Rule Plaintiffs challenge—requires at least two years of program-specific metric calculations before a program can be deemed ineligible, which could not occur until 2026, at the earliest. The FVT Rule sets annual reporting deadlines, but the first of these is now not until October 1, 2024. Plaintiffs fail to justify emergency relief when their claims could be resolved on summary judgment well before they face the harms they allege.

Nor do the merits of Plaintiffs' claims favor a preliminary injunction. Plaintiffs first challenge the Department's statutory authority to issue the GE Rule, arguing that the statutory eligibility criterion for career training programs—that they must "prepare students for gainful employment in a recognized occupation"—prohibits the use of metrics to assess eligibility and instead requires the Department to accept any program that intends its graduates to get paying jobs. However, several other courts have already concluded that the statutory phrase "gainful employment," read in context, does not plainly mean "any job that pays"; those cases instead upheld the Department's reasoned assessment that programs do not prepare students for gainful employment if, on average, they leave their graduates drowning in more debt than their earnings can bear. *Ass'n of Private Colls. & Univs.* ("*APCU*") *v. Duncan*, 870 F. Supp. 2d 133, 146 (D.D.C. 2012); *Ass'n of Proprietary Colls.* ("*APC*") *v. Duncan*, 107 F. Supp. 3d 332, 358-63 (S.D.N.Y. 2015); *Ass'n of Private Sector Colls. & Univs.* ("*APSCU*") *v. Duncan*, 110 F. Supp. 3d 176, 184-

89 (D.D.C. 2015), *aff'd*, No. 15-5190, 640 Fed. Appx. 5, 7-8 (D.C. Cir. Mar. 8, 2016).

Plaintiffs also argue aspects of the GE Rule are arbitrary and capricious, but in each instance, the Department has supported its decisions with sound reasoning and consideration of the relevant factors. Plaintiffs' various complaints boil down to the argument that they and many other cosmetology programs are likely to fail the GE Rule's eligibility assessment and may ultimately (if they fail for two out of three years) lose access, at least temporarily, to Title IV funds. The Department addressed the particular concerns of cosmetology programs in the Rules' Preamble, explaining its careful review of the research in this area. The Department concluded that, unlike other career training fields where most programs are predicted to remain eligible, the cosmetology programs that participate in Title IV do share characteristics making them more likely to fail—though not due to underreported income as Plaintiffs allege. Rather, research suggests many of these programs charge relatively high tuition to train students for a profession where typical earnings are relatively low. Of course, the higher the tuition, the more risk-free Title IV income these programs receive even as their graduates are more likely to default or otherwise fail to repay their loans. But cosmetology programs need not follow this business model, and most do not. Hundreds of cosmetology programs throughout Texas do not participate in Title IV at all, yet apparently succeed by charging students less. The Department reasonably concluded that the specific features of cosmetology programs do not justify ignoring Title IV's statutory eligibility criteria. The GE Rule seeks to ensure GE programs prepare students for gainful employment as Congress intended and to steer GE programs toward business models more in line with that goal.

The balance of hardships and public interest also weigh against an injunction. Forcing the Department to halt its preparations for the FVT Rule—which imposes no penalties on programs and is not even the subject of Plaintiffs' challenge here—would inflict heavy logistical costs and

burdens, ultimately harming students who will be left without the resources the FVT Rule would provide to make informed choices among postsecondary options. Instead, students would continue to face their current significant risk of amassing unaffordable student loans, which can adversely affect their lives for decades to come. Enjoining the GE Rule will interfere with the Department's efforts to enforce statutory eligibility criteria to help ensure students seeking career training are not left worse off than when they started. Delaying the Rules' protections also threatens to cost taxpayers billions of dollars in lost savings and to deprive students of billions in increased earnings. In the face of that impact, even if Plaintiffs show likely violations, any relief should be narrowly tailored to the specific harms that Plaintiffs can establish.

## **BACKGROUND**

### I.     **The Higher Education Act of 1965**

When signing the HEA into law on November 8, 1965 at his alma mater in San Marcos, Texas, President Lyndon B. Johnson emphasized the law's benefits for schools, and above all, for students, who could expect futures of "greater productivity" and "more profitable" jobs because federal assistance would allow them to afford postsecondary education.[1] While other HEA titles focus on schools and teachers, Title IV is devoted to students, detailing various grant, loan, and work study assistance programs. *See* 20 U.S.C. §§ 1070–1099d; *cf. id.* §§ 1070(a), 1087a(a) (recognizing purpose of Title IV's grant and loan programs is to help students pursue their courses of study at participating schools). In recent years, the Department has annually disbursed more than $100 billion in new Title IV federal aid to millions of postsecondary students and their families, including approximately $72 billion in loans. 88 Fed. Reg. at 70103, 70107.

Although students are the intended beneficiaries of Title IV aid, postsecondary schools

---

[1] *See* Public Papers of the Presidents, Johnson 1965 book 2, at 1103-04, *available at* https://www.govinfo.gov/app/collection/PPP.

benefit when student aid recipients choose to attend their programs and thereby funnel federal

grant and loan money to those programs in the form of tuition and fees. Students choose a particular

career training program hoping their investment of time, effort, and money will pay off financially.

88 Fed. Reg. at 70015. At the very least, students hope they will be able to repay their Title IV

loans. The consequences if they cannot repay their loans are severe. High debt levels decrease a

student's prospects for marriage and home ownership. *Id.* at 70116. Students who default on their

loans face collection costs and penalties, garnishment of their wages, loss of tax refunds, and

significant drops in their credit scores that can hinder their ability to rent or buy a home, sign up

for utilities or insurance, buy a car, or get a job. *Id.* at 70117.

Not only students, but American taxpayers, face adverse consequences when Title IV loans

are not repaid. Defaults "shift[] [student] tuition costs onto taxpayers" because the HEA requires

the United States government to cover those costs one way or another. *See APSCU v. Duncan*, 681

F.3d 427, 435 (D.C. Cir. 2012); 20 U.S.C. §§ 1078(c), 1080; 88 Fed. Reg. at 70012-13.

Schools' finances, on the other hand, are unaffected. Instead, schools keep their students'

tuition payments—and thus financially benefit from Title IV—"regardless of whether those

students are ultimately able to repay their loans." *APSCU*, 681 F.3d at 435.

Although Congress did not make schools financial guarantors for students' loans, the

HEA's Title IV framework nevertheless holds schools accountable through statutory conditions

and requirements administered by the Secretary. The HEA limits Title IV participation to

"eligible" schools and requires such schools to enter into program participation agreements with

the Department. *See* 20 U.S.C. §§ 1087c, 1087d, 1094; *APSCU*, 681 F.3d at 435. Schools must

show they are financially responsible by providing the services they describe. 20 U.S.C.

§ 1099c(c)(1)(A). The Secretary selects schools to participate in Title IV's loan program based on

their applications, "containing such information and assurances as the Secretary may require," as well as their satisfaction of "such other eligibility requirements as the Secretary shall prescribe." *Id.* § 1087c(b)(2). Participation agreements condition a school's continuing Title IV eligibility on the school's compliance both with express statutory requirements and with further requirements that the Secretary "determines are necessary to protect the interests of the United States and to promote the purposes of" Title IV. *Id.* § 1087d(a)(6). Among other things, schools must provide information to the Department relating to the school's "administrative capability and financial responsibility," as well as other information that "the Secretary may reasonably require." *See id.* § 1094(a). Congress also vested the Secretary with authority to issue and amend rules "governing the manner of operations of, and governing the applicable programs administered by, the Department." *Id.* § 1221e-3; *see also id.* § 3474 (authorizing Secretary to prescribe rules that he deems "necessary or appropriate to administer and manage" the Department's functions).

Congress also identified specific eligibility requirements for trade and vocational schools. When Congress extended federal loan eligibility to students at for-profit career training programs through a separate 1965 law, later merged with the HEA, it did so only after receiving assurances that a high percentage of students receiving such training later found sufficiently high-paying jobs to afford repayment. S. Rep. No. 89-758, at 3-12 (1965); H.R. Rep. No. 89-308, at 3-9, 11 (1965). In the separate law, Congress limited eligibility to schools providing "a program of postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations." National Vocational Student Loan Insurance Act of 1965, Pub. L. No. 89-287, § 17(a), 79 Stat. 1037. The current HEA provisions similarly limit Title IV aid in this category to schools that provide "an *eligible* program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), (emphasis added); *cf. id.*

§ 1088(b)(1) (an "eligible program" is one that, among other things, "provides a program of training to prepare students for gainful employment in a recognized profession.").

## II.      Regulatory History

For over a decade, the Department has recognized that, while many students benefit from Title IV loans, a significant number struggle with the resulting debt long after graduation and ultimately fail to repay their loans. The Department also recognized that a disproportionate share of graduates with unaffordable loan debt attended programs at for-profit schools, which are generally more expensive than their public or nonprofit counterparts, leading to higher loans. *See* 79 Fed. Reg. 64890, 65032 (Oct. 31, 2014). The Department concluded that some GE programs were failing to prepare students for gainful employment in accord with Title IV's statutory eligibility requirement. In rules issued first in 2011 and then in 2014, the Department set forth reporting and disclosure requirements as well as accountability measures aimed at addressing GE programs graduates' rising loan defaults that could not be primarily attributed to students' characteristics, but instead correlated to the quality of training that GE programs provided. *See, e.g.*, *APCU*, 870 F. Supp. 2d at 150-51 (describing "a series of multivariate regression analyses" that the Department conducted before issuing the 2011 Rule to rule out the possibility that its measures simply reflected student demographics); *accord APSCU*, 110 F. Supp. 3d at 192 (discussing similar analysis described in 2014 Rule); *APC*, 107 F. Supp. 3d at 364-65 (same).

All courts to consider the 2011 and 2014 Rules recognized the Department's statutory authority to issue them, rejecting the same arguments that Plaintiffs raise here. *See APCU*, 870 F. Supp. 2d at 146-48; *APC*, 107 F. Supp. 3d at 358-63; *APSCU*, 110 F. Supp. 3d at 184-89, *aff'd by APSCU*, 640 Fed. Appx. at *7-8. These courts also held that the debt-to-earnings ("D/E") metric that the Department first introduced in the 2011 Rule satisfied facial APA review. *APCU*, 870 F.

Supp. 2d at 152-53 (holding D/E metric reasonable but invalidating 2011 Rule because separate "debt repayment" metric—not at issue in any subsequent rule—was insufficiently supported by evidence); *see also APC*, 107 F. Supp. 3d at 368 (upholding 2014 Rule containing the same D/E metric); *APSCU*, 110 F. Supp. 3d at 191 (same), *aff'd by APSCU*, 640 Fed. Appx. at *8.

Ultimately, the only court that found fault with the D/E metric did so in an as-applied context. In *AACS*, an organization of cosmetology schools claimed cosmetology graduates failed to report tip income to the IRS and cited a single study suggesting reported earnings were up to 50% lower as a result. *AACS v. DeVos*, 258 F. Supp. 3d 50, 74-75 (D.D.C. 2017). The court held the Department had reasonably ruled out proposed alternatives to the 2014 Rule's use of aggregate reported earnings from the Social Security Administration ("SSA") for initial D/E rate calculations. *See id.* But the court concluded that the 2014 Rule's integrity standards for alternate earnings data offered by failing programs that sought recalculation of their rates on appeal were too difficult for cosmetology programs to satisfy. *See id.* The court thus decided to craft its own remedy by removing those integrity standards altogether for AACS members. *See id.* at 76-77.

The Department implemented the *AACS* decision across-the-board for its first year of D/E rate calculations, allowing any program to resubmit alternate earnings data with no data quality control. Not surprisingly, the programs that did were able to provide substantially higher earnings data—on average 82% higher. 88 Fed. Reg. at 32336.[2] Before a second year's calculations could occur, the SSA stopped providing earnings data for the initial calculations, and the Department was forced to halt implementation of the 2014 Rule. 84 Fed. Reg. 31392, 31392-93 (July 1, 2019).

In 2019, a new Administration then rescinded the 2014 Rule. *Id.* at 31393. It concluded

---

[2] *Cf.* Cellini, Stephanie Riegg & Kathryn J. Blanchard, *Hair and taxes: Cosmetology programs, accountability policy, and the problem of underreported income* (2022) (ex. 3 in attached Appendix ("App.") of excerpts from the certified administrative record for the 2023 regulations).

that problems with loan repayment extended beyond graduates of for-profit GE programs, and that the framework in the 2014 Rule was "insufficient to address the student borrowing and under-payment problem of this magnitude." *Id.* at 31394. Rather, data showing that 43% of all outstanding loans were in distress "reinforce the need for an accountability and transparency framework that applies to all title IV programs and institutions." *Id.* The 2019 Rule settled on the College Scorecard "as the tool for delivering" "program-level debt and earnings data for title IV programs," further noting that, in light of the Department's "general authority to collect and report data related to the performance of title IV programs," no rulemaking was required to modify the College Scorecard. *Id.* The Department emphasized that the Scorecard's expansion would give students and parents "access to comparable information about program outcomes at all types of title IV-participating institutions," informing students' enrollment choices with debt and earnings data necessary to enable a "market-based accountability system to function." *Id.*

## III.    The 2023 FVT and GE Rules

The expansion of the College Scorecard, however, did little to rein in unpaid student debt. Currently, over $1.5 trillion in Title IV loans remains outstanding—an increase of 49% in the last ten years. 88 Fed. Reg. at 70006. Studies showed that merely posting debt and earnings information on the Scorecard was insufficient; rather, it is critical that students access such information "at key points during the college decision-making process." NPRM, 88 Fed. Reg. 32300, 32323-24 (May 19, 2023); *cf.* 88 Fed. Reg. at 70070. The Department also determined that GE accountability measures should be reinstated, with adjustments to more accurately assess whether GE programs prepare students for gainful employment. 88 Fed. Reg. 32300, 32307-08, 32309-11, 3243-43. After a lengthy negotiated and notice-and-comment rulemaking process, the Department issued the FVT and GE Rules on October 10, 2023, with an effective date of July 1, 2024. The Rules establish

transparency and accountability frameworks that differ in significant respects from prior GE rules:

**First**, the FVT Rule, set forth in 34 C.F.R. § 668.43 and Subpart Q, fundamentally differs from the transparency frameworks of the 2011 and 2014 Rules because it generally covers all Title IV programs, not just GE programs. *See* 88 Fed. Reg. at 32324. The FVT Rule thus builds on the 2019 Rule's conclusion that students are best able to make informed choices when they have comparable information about all available programs, allowing for apples-to-apples comparisons, but it enhances the mechanisms through which information is provided to make it more useful. *Id.*; 88 Fed. Reg. at 70020. In particular, the FVT Rule establishes a new Department website, to be set up by July 1, 2026. 88 Fed. Reg. at 32351; 88 Fed Reg. at 70072-77, 70187-88 (§ 668.43(d)(1)). Programs are required to report certain information to populate the website's data fields. *Id.* at 70187, 70191 (§§ 668.43(d)(1), .408).

The website will be unique among other Department websites in providing students with key information about the financial value of postsecondary programs at key points in time when students are making enrollment decisions. Prospective students will receive the website URL before they sign an enrollment agreement, complete registration, or make a financial commitment, and enrolled students will receive the URL each year before they make their first payment to continue their studies. 88 Fed. Reg. at 70187 (§ 668.43(d)(3), (4))

The website will also include two metrics, calculated by the Department using information collected from all programs with enough graduates to meet data privacy standards, to help students compare programs' financial outcomes. First is a D/E metric, similar to the metric set forth in prior GE rules, but now measuring graduates' earnings "approximately one year later relative to when they complete their degree than under the 2014 Prior Rule." 88 Fed. Reg. at 32335. Because graduates' earnings tend to increase over time, this change "will tend to increase the measured

earnings of all programs." 88 Fed. Reg. at 70042. The 2023 version of the D/E calculation omits an alternate earnings appeal process because new research revealed deep flaws in the single study suggesting underreporting of tip income was likely to affect results while post-*AACS* alternate earnings had been grossly inflated. *Id.* at 70042 & n.139.

The FVT Rule's second metric—the Earnings Premium ("EP") metric—measures how program graduates' typical earnings compare to earnings of typical high school graduates. *Id.* at 70015 ("While the D/E rates measure identifies programs where debt is high relative to earnings, the EP measure assesses the economic boost a program provides to its students independent of the debt incurred."). Recognizing that "[t]he vast majority of students cite the opportunity for a good job or higher earnings as a key, if not the most important, reason they chose to pursue a college degree," the Department concluded the EP measure would provide valuable information for prospective students choosing what program to attend. *Id.* The Department also identified a strong correlation between low EPs and student defaults, reinforcing its understanding that even small amounts of debt are unaffordable to those with very low earnings. *Id.*

**Second**, the GE Rule, laid out in 34 C.F.R. Subpart S, uses the same D/E and EP metrics that will be posted on the FVT website for a separate purpose—to determine whether GE programs meet their unique statutory eligibility requirement by preparing students for gainful employment in a recognized occupation. 78 Fed. Reg. at 32342-43; 78 Fed. Reg. at 70015-16. The Department recognized GE programs' "mission" under the statutory eligibility requirement to prepare students for gainful employment in a recognized occupation was "to further students' career success," and training that "inflicts financial harm on its students" by leaving graduates with more debt than they can repay, or with no greater earnings than those without postsecondary training, "cannot fairly be considered 'gainful.'" 78 Fed. Reg. at 32342-43. The Department concluded it could reasonably

11

use the metrics to assess whether GE programs are eligible under the statutory language. *Id.*

To remain eligible, GE programs must not fail the same metric (D/E or EP) for two out of any three consecutive award years for which the metrics are calculated. 88 Fed. Reg. at 70192 (§ 668.602(a)(2), (3)). Thus, the earliest any GE program might lose Title IV eligibility under the GE Rule is 2026. In addition, beginning on July 1, 2026, a GE program must warn students and prospective students of its potential loss of eligibility if it has already failed one of the metrics during the previous two award years. *Id.* at 70193 (§ 668.605). The Department projected that, even with privacy restrictions limiting the metrics' applicability to programs with 30 or more graduates a year, the metrics will allow it to assess eligibility for the GE programs attended by 80% of students receiving Title IV aid. *Id.* at 70046. While the vast majority of those programs would remain eligible, the 5% likely to fail enrolled nearly 24% of GE program students receiving Title IV aid. *Id.* at 70017.

## IV.    Procedural History

On December 22, 2023, AACS and one of its member schools filed suit in this Court, challenging the GE Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* Compl. [ECF 1], *AACS v. U.S. Dep't of Educ.* ("*AACS II*"), No. 4:23-cv-1267 (N.D. Tex. filed Dec. 22, 2023). The parties agreed the Department would lodge the administrative record on April 30, 2024, and they would then proceed to summary judgment cross-motions. *See id.* ECF 14. The Court adopted AACS's proposed date of July 30, 2024 as AACS's motion deadline. *Id.* ECF 15.

On March 20, 2024, nearly three months after AACS filed suit, and over five months after the Rules' publication, Plaintiffs—two AACS members[3]—filed their Complaint [ECF 1], designating this case as "related" to *AACS II*, and on the same day sought a preliminary injunction

---

[3] *See* https://web.beautyschools.org/schools/search (AACS website allowing member search).

under Rule 65 [ECF 4]. After the FVT Rule reporting deadline they originally cited was extended,[4] Plaintiffs identified July 1, 2024—nearly a month before AACS's motion is due—as the date by which they seek a decision. *See* P. Mem. [ECF 10] at 3; Jt. Mot. [ECF 16]. The Department lodged the administrative record in *AACS II* on April 30, 2024, as agreed. *AACS II*, ECF 16.

## ARGUMENT

### I.     Legal Standard

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). Its purpose "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981). Thus, in assessing whether the movant has shown a substantial threat of irreparable injury, an injunction should be denied "if a trial on the merits can be conducted before the [alleged] injury would occur." 11A Charles Alan Wright *et al*., Fed. Prac. & Proc. Civ. ("FPP") § 2948.1 (3d ed.). The movant must also show "a substantial likelihood of prevailing on the merits"; that "the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted"; and that "the injunction will not disserve the public interest." *La Union Del Pueblo Entero v. FEMA*, 608 F.3d 217, 219 (5th Cir. 2010). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### II.    Plaintiffs Face No Threat of Irreparable Injury Absent a Preliminary Injunction

Plaintiffs' motion fails at the outset because they do not need emergency relief before a trial on the merits could be held. In an APA case such as this, cross-motions for summary judgment take the place of a "trial on the merits." *Cf. Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-

---

[4]*See*   E.A.   GE-24-01,   https://fsapartners.ed.gov/knowledge-center/library/resource-type/Electronic%20Announcements (extending July 31, 2024 deadline to October 1, 2024); Declaration of James Kvaal ("Kvaal Decl.," attached hereto) ¶ 4.

44 (1985); *see also Redeemed Christian Church of God v. USCIS*, 331 F. Supp. 3d 684, 694 (S.D. Tex. 2018) (summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review" (internal quotation omitted)).

In their brief, Plaintiffs relied on the FVT Rule's original July 31, 2024 reporting deadline for their irreparable injury, but the Department's extension of that deadline to October 1, 2024 provides ample time for the parties to complete briefing on cross-motions for summary judgment based on the certified administrative record, which is already compiled. *See AACS II*, ECF 16. Although the *AACS II* plaintiffs have chosen to wait three months to file their summary judgment motion, Plaintiffs here need not do the same. The Court should therefore deny Plaintiffs' requested PI and order the parties to confer regarding a summary judgment briefing schedule.

Plaintiffs' delay in filing suit and seeking emergency relief also weighs heavily against their assertion of irreparable harm. "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Anyadike v. Vernon Coll.*, No. 7:15-cv-157-O, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015) (quoting *Wireless Agents, LLC v. T-Mobile, USA, Inc.*, No. 3:05-cv-94, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)); *cf.* 11A Wright et al., FPP § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). "[C]ourts generally consider anywhere from a three-month delay to a six-month delay enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-cv-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases).[5]

---

[5] *Cf. Anyadike*, 2015 WL 12964684, at *3 ("several-month delay in filing . . . militates against a finding of irreparable harm"); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, No. 3:09-cv-390, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (delay of almost five months undercut assertion of irreparable harm); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905, 2017 WL

14

Here, the Department issued the Rules on October 10, 2023. The *AACS* plaintiffs filed suit three months later. But Plaintiffs waited nearly three months after that, until March 20, 2024, to file and seek emergency relief. Their five-month delay should not be countenanced. Rather, this "substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (denying PI requested six months after plaintiffs learned of infringement).

Plaintiffs' motion independently fails because the "compliance costs" they rely on for their irreparable injury derive from the FVT Rule's reporting requirement, not the GE Rule. *See* 88 Fed. Reg. at 70061, 70191. Injunctive relief must be tailored to the specific legal violation that is established, *see Lewis v. Casey*, 518 U.S. 343, 357 (1996), but Plaintiffs do not allege the FVT Rule's reporting requirement is illegal. Indeed, Plaintiffs do not challenge the FVT Rule, pursuant to which the Department will collect and make available information about all Title IV programs. Rather, their asserted Article III injury relates solely to the potential warnings and loss of Title IV eligibility that they could face under the GE Rule. *See* Compl. ¶¶ 17, 68 (alleging that, "absent relief from this Court," the Rule will "brand [them] a failure" and cause them to lose Title IV eligibility).[6] But Plaintiffs acknowledge that any such injury is "a year or two away." *Id.* ¶ 18.

---

532299, at *6 (S.D. Fla. Feb. 9, 2017) (three-month delay "is by itself sufficient grounds to deny" requested injunction); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1356 (S.D. Fla. 2002) (finding "three-month delay . . . undercuts any sense of urgency"); *Comic Strip, Inc. v. Fox Television Stations, Inc.*, 710 F. Supp. 976, 981 (S.D.N.Y. 1989) ("three month delay"); *Millennium Funding, Inc. v. 1701 Mgmt. LLC*, No. 21-cv-20862, 2021 WL 3618227, at *10 (S.D. Fla. Aug. 16, 2021) ("it is not uncommon for courts to deny a preliminary injunction in the face of unexplained delays of more than two months") (collecting cases); *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 467 (M.D. Fla. 2022) (same).

[6]Plaintiffs' Complaint and motion largely ignore the FVT Rule. Plaintiffs assert in a footnote that the defects they allege in the metrics would "apply equally to the financial value transparency framework," P. Mem. at 42 n.17, but a one-sentence footnote in a brief is insufficient to raise a

Essentially, there is a fatal mismatch between Plaintiffs' asserted irreparable harm, for purposes of their PI motion, and their asserted Article III injury.

The Department has made clear that the two Rules stand separately. *See* 88 Fed. Reg. at 70191, 70193 (§§ 668.409, .606) (provisions of each Rule are severable). Thus, even if Plaintiffs were deemed likely to prevail on any claim, that holding would not support enjoining the FVT Rule or its reporting provision.[7] Compliance costs associated with that provision—which Plaintiffs also exaggerate by ignoring the availability of transitional reporting, Kvaal Decl. ¶¶ 5-6—therefore cannot establish irreparable injury here.[8] Plaintiffs' motion should be denied on this basis alone.

## III. Plaintiffs Are Unlikely To Succeed on the Merits

### A. As Other Courts Have Recognized, the Secretary Has Statutory Authority To Promulgate the GE Rule

Plaintiffs are also unlikely to succeed on the merits. All courts that faced the question upheld prior GE rules against claims that the Secretary had no authority to issue them. *APSCU*,

---

claim against the FVT Rule. To the contrary, the footnote concedes that Plaintiffs challenge only the GE Rule in this case.

[7] Of course, a court "need not grant the total relief sought by" a PI movant "but may mold its decree to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (quoting 11A Wright *et al.*, FPP § 2947 (3d ed.)). That principle reinforces the mismatch here because it suggests that, at most, the Court would *only* enjoin the reporting provision (though only as to Plaintiffs), even though Plaintiffs do not identify a legal violation with respect to that provision. That result would conflict with *Lewis*'s tailoring requirement.

[8] In contrast, in all the cases Plaintiffs cite for the notion that compliance costs qualify as irreparable injury, the costs would result from compliance with the exact same requirement that the plaintiffs challenged as illegal. *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (irreparable injury caused by need to install emissions controls to comply with emissions limits); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (irreparable injury caused by challenged order denying permission to market flavored e-cigarettes); *Rest. L. Ctr. v. DOL*, 66 F.4th 593, 600 (5th Cir. 2023) (irreparable injury caused by compliance with challenged requirement that businesses claiming "tip credit" closely monitor time tipped employees spend doing untipped but supporting work). The same is true in the recent *Career Colls. & Schs. v. U.S. Dep't of Educ.*, No. 23-50491, 2024 WL 1461737, at *8-9 (5th Cir. Apr. 4, 2024) (costs of enhanced recordkeeping and training were due to increased risk of attempted recoupment pursuant to challenged rule provisions).

640 Fed. Appx. at *7-8 (affirming *APSCU*, 110 F. Supp. 3d at 184-90); *APC*, 107 F. Supp. 3d at 359-63; *APCU*, 870 F. Supp. 2d at 145-49. Plaintiffs here rehash the same arguments that failed in the past, and those arguments should again be rejected.

Importantly, Plaintiffs' statutory authority challenge implicates only the GE Rule—the accountability provisions specific to GE programs. Plaintiffs do not dispute the Secretary's authority to administer the HEA, including Title IV, through rulemaking. 20 U.S.C. §§ 1221e-3, 3474. Nor do Plaintiffs take issue with the Secretary's clear authority to collect and disseminate data and information from schools participating in Title IV to assess and publicly share Title IV programs' effectiveness in helping students.[9] The Secretary has long played a role in ensuring that participating schools provide relevant financial information—for example, in conjunction with application forms or promissory notes—and that students receive it. *See* 88 Fed. Reg. at 70007 (schools "have been distributing information to students at the direction of the Department and in accord with the applicable statutes for decades"). The Secretary's exercise of such authority to establish the FVT Rule, applicable to all Title IV programs, is not at issue.

Plaintiffs' first APA challenge[10] instead disputes the Secretary's authority to promulgate

---

[9] *See* 20 U.S.C. § 1231a(3) (directing Secretary to "collect data and information on applicable programs for the purpose of obtaining objective measurements of the effectiveness of such programs in achieving the intended purposes of such programs"); *id.* § 1094(a)(3) (participating schools must provide "upon request" information "relating to the[ir] administrative capability and financial responsibility"), (5) (schools must "submit reports to the Secretary . . . at such times and containing such information as the Secretary may reasonably require to carry out" Title IV's purpose), (8) (schools that advertise job placement rates must provide students with "the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements").

[10] Plaintiffs' PI motion asserts the Secretary has acted "*ultra vires*," but their Complaint does not raise a nonstatutory *ultra vires* claim. *Cf. Texas v. DHS*, No. DR-23-cv-55, 2023 WL 8285223, at *17 (W.D. Tex. Nov. 29, 2023). Rather, it asserts under the APA that the Secretary's interpretation of GE eligibility criteria is "not in accordance with law" or "in excess of statutory . . . limitations." Compl. ¶ 81 (quoting 5 U.S.C. § 706(2)(A), (C)).

the GE Rule provisions setting forth Title IV eligibility criteria for GE programs. Of course, the Secretary plainly is *not* authorized to enter into Title IV participation agreements with schools that are statutorily excluded from participation, nor could the Secretary properly authorize the use of Title IV funds to attend an ineligible program. *See* 20 U.S.C. §§ 1088(b)(1), 1094(a). Accordingly, the Secretary not only may but must make program-level eligibility determinations under § 1088(b)(1) to ensure that Title IV operates within its statutory bounds.

Plaintiffs' claim thus boils down to a disagreement with the Secretary's interpretation of Title IV's statutory eligibility requirement for GE programs, which in their view renders the GE Rule "not in accordance with law." Compl. ¶ 81. However, the Secretary has properly interpreted the statutory eligibility criterion that programs "provide[] a program of training to prepare students for gainful employment in a recognized profession," 20 U.S.C. § 1088(b)(1)(A)(i), as requiring such programs to "actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation." 88 Fed. Reg. at 32342. The Secretary also properly recognized that students are not prepared for "gainful" employment if a program is designed to leave its graduates financially worse off than when they started. *Id.* at 32343.

The Secretary's interpretation is the best reading of the statutory text within the context of the HEA as a whole, considering Congress's unambiguous intent that Title IV aid help students. *See* 20 U.S.C. §§ 1070(a), 1087a(a); *cf. Reese v. Garland*, 66 F.4th 530, 533 & n.10 (5th Cir. 2023). Three district judges have agreed, recognizing that contemporary dictionary definitions of "gainful" as "profitable" or "lucrative" can imply "an excess of returns over expenses," and that "gainful employment in a recognized occupation," taken as a whole, suggests a "decently paying" job. *APC*, 107 F. Supp. 3d at 359 (quoting *APCU*, 870 F. Supp. 2d at 145-46); *accord APSCU*, 110 F. Supp. 3d at 185. Each of these courts squarely rejected the proposal that "gainful" in this

context plainly means "any" paying job in a vocational field, as Plaintiffs suggest here, *see* P. Mem. at 21. *See, e.g., APSCU*, 110 F. Supp. 3d at 185 (recognizing that "reading 'gainful employment' as 'a paying job that pays'" would render the term "gainful" redundant, in violation of the canon against surplusage); *cf. Texas v. EPA*, 91 F.4th 280, 298 (5th Cir. 2024) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant." (internal quotation omitted)).

Not only the canon against surplusage, but also other well-established canons of statutory construction support the Secretary's interpretation over Plaintiffs'. Chief among these, when interpreting language in a single clause within a complex statutory framework, is that "[t]ext should never be divorced from context." *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 551 (2024). While dictionary definitions may aid in ascertaining a term's meaning, the proper interpretation of a word or phrase "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *accord Cheapside Mins., Ltd. v. Devon Energy Prod. Co.*, 94 F.4th 492, 499 (5th Cir. 2024) (undefined terms should be interpreted "according to their ordinary and natural meaning and the overall policies and objectives of the statute" (internal quotation omitted)).

The courts that interpreted the "gainful employment" language in prior cases followed this approach, recognizing the Secretary's interpretation was not only consistent with dictionary definitions of "gainful," but also with context and Congress's purpose. Moreover, the Secretary's interpretation avoids absurd results. *United States v. Rabanal*, 508 F.3d 741, 743 (5th Cir. 2007). As the D.C. Circuit concluded, "[i]t would be strange for Congress to loan out money to train

students for jobs that were insufficiently remunerative to permit the students to repay their loans. And it would be a perverse system that, by design, wasted taxpayer money in order to impose crippling, credit-destroying debt on lower-income students and graduates." *APSCU*, 640 Fed. Appx. at 8. The Department's interpretation, not the plaintiffs'—and not Plaintiffs' here—avoids such obvious perversity.[11]

Plaintiffs throw these principles to the wind at the outset, reeling off dictionary definitions of isolated words that are far removed from the relevant context. They suggest, for example, that the term "program" in a statute governing Title IV assistance might not denote a course of training or study at a school but instead might just be a "plan of action" or a "planned series of activities." P. Mem. at 20 & n.7. Even though they acknowledge "gainful" commonly means "lucrative" and "profitable," they conclude that "gainful employment" simply means a "paying job." *Id.* at 21 & n.11. Plaintiffs make no attempt to reconcile their view of the statutory language with the absurd result that GE programs accepting students' Title IV loan money would be free to leave students worse off than when they started, ignoring Congress's stated intent that Title IV funds help students, with devastating consequences to students and taxpayers alike.

None of Plaintiffs' arguments in favor of their proposed "plain language" reading overcome that glaring flaw. Other courts emphasized that "context matters," *APSCU*, 110 F. Supp. 3d at 186, when rejecting another old argument Plaintiffs rehash here, Pl. Mem. at 26, regarding the occurrence of the phrase "gainful employment" in other statutes. As those courts recognized,

---

[11] Plaintiffs oddly criticize the Department's prior successful defenses of the 2011 and 2014 Rules as "*Chevron*-dependent." P. Mem. at 2. Prior legal analyses cannot be faulted for following the Supreme Court authority by which they were bound. In any event, as discussed herein, other courts properly applied canons of statutory construction when upholding the Department's interpretation of the same statutory language at issue here. That interpretation should be upheld under any framework because it best reflects Congress's intent that Title IV aid help students and is consistent with the overall structure of the HEA, in contrast to Plaintiffs' proposed interpretation.

"it is axiomatic that a term 'may have a plain meaning in the context of a particular section' of a statute without having 'the same meaning in all other sections and in all other contexts.'" *APSCU*, 110 F. Supp. 3d at 186. The other occurrences Plaintiffs cite "mean different things in different contexts," but the context here suggests "elevation to something more than just any paying job," consistent with the Department's interpretation. *APSCU*, 640 Fed. Appx. at *7-8.

Plaintiffs suggest that, because the Department did not require GE programs to pass specific metrics in the early decades after the HEA's enactment, its later imposition of eligibility criteria, in the 2011 and 2014 Rules and now in the GE Rule, reflects a radical new statutory interpretation. But the Department never interpreted the HEA as requiring it to funnel Title IV aid indiscriminately to GE programs that fail to prepare students for gainful employment. Under Plaintiffs' reading, the Secretary would be statutorily required to deem GE programs "eligible," and funnel Title IV loan money to them, even when graduates' net financial outcomes are on average worse than when they started—when students borrow more to afford a program than its training prepares them to repay and are left with crushing debt. Such a position would prioritize GE programs' risk-free income over students' expectations that their training will afford them better-paying jobs, wantonly wasting taxpayer money and inflicting long-lasting harm on the very students Title IV was intended to help.

Nor has the Department ever suggested that the statutory language requires one specific eligibility test or requires GE programs to guarantee the financial success of every GE program graduate.[12] As other courts have recognized, the Department's introduction of GE accountability

---

[12] Many of Plaintiffs' arguments restate in various ways that the specific metrics in the GE Rule are not expressly required by statute. *E.g.*, Pl. Mem. at 24-25 (suggesting those metrics cannot be deemed statutorily required because they cannot be applied to all programs). These arguments simply misconstrue the Department's interpretation, so they are irrelevant to the analysis. To the extent Plaintiffs intend to bolster the notion that the metrics are arbitrary, they also fail. The Department has explained the metrics will cover over 80% of student enrollments. 88 Fed. Reg. at

provisions, beginning with the 2011 Rule, did not implement a new statutory interpretation as Plaintiffs suggest. Rather, the metrics are simply a tool to assess *whether* such programs in fact prepare students for gainful employment, given new indications that some programs were instead leaving students with overwhelming debt. *E.g.*, *APC*, 107 F. Supp. 3d at 362 (recognizing "the adequacy of a program's preparation is difficult to measure—and it is reasonable to consider students' success in the job market as an indication of whether those students were, in fact, adequately prepared." (quoting *APCU*, 870 F. Supp. 2d at 147)); *cf.* 88 Fed. Reg. at 32342-43.

Plaintiffs' reliance on Title IV's cohort default rate ("CDR") provision is similarly misplaced. The statutory CDR provision bars an entire school from Title IV participation if the school's total student loan default rate exceeds 30% for three years in a row. 20 U.S.C. § 1085. The provision thus identifies a consequence of high defaults on a school-wide level. It does not preclude the Department from taking into account different data—program-level student aid debt and graduate earnings—as part of a metric helpful to identify which GE programs "provide[] a program of training to prepare students for gainful employment in a recognized profession," 20 U.S.C. § 1088(b)(1). Other courts have agreed the CDR provision is not the exclusive program integrity mechanism for all of Title IV. *See APCU*, 870 F. Supp. 2d at 147; *APSCU*, 110 F. Supp. 3d at 187. Indeed, the D.C. Circuit held that, even with the statutory CDR provision, the Department could exercise its authority under § 1094(c) to establish "reasonable standards of financial responsibility and appropriate institutional capability" by setting forth an "administrative capability" test that "differs significantly from the statutory [CDR] test." *APCU*, 870 F. Supp. 2d at 147 (discussing *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1273 (D.C. Cir. 1996)).

---

70128 tbl. 4.2. The fact that they cannot be calculated for every single program, due to student privacy concerns, does not undermine their value or utility for the programs they do cover.

As those courts recognized, this is not an instance where Congress's express use of certain words in one clause or statute might show an opposite intent where those words are missing from a parallel clause or similar statute in another context.[13] The CDR provision and the GE provisions coexist in the same context—Title IV—but they are not parallel. As the agency responsible for administering Title IV, the Department uses information about student aid debt for multiple purposes, and in the GE Rule uses it to help assess eligibility at the *program* level rather than the institutional level. The only significance of the CDR provision to the inquiry here is that it reflects and reinforces Congress's stated purpose to help students—the same purpose that informs the proper interpretation of the GE language.[14] *See* 88 Fed. Reg. at 70017 (CDR and other safeguards

---

[13] Plaintiffs cite *James v. ICE*, 543 U.S. 335, 341 (2005), but there the Court compared parallel clauses in the same statute, each clause identifying an independent alternative for an alien's removal to another country. The Court attributed interpretive significance to the fact that some alternatives expressly require the receiving country's willingness to accept the alien while others do not. *See id.* Similarly, in *United States v. Koutsostamatis*, 956 F.3d 301, 309 (5th Cir. 2020), the court was comparing the same type of clause—a restitution clause—in different statutes. Here, the CDR clause and GE language are not in parallel as alternatives or the same type of clause in different contexts. Rather, both are in Title IV, and one applies to schools while the other defines one type of eligible program. Plaintiffs also cite *Biden v. Texas*, 597 U.S. 785, 798 (2022), where the Court held that statutory language limiting available relief did not limit a court's subject matter jurisdiction, but that Court's assessment that Congress could have used "words far simpler than those that it wrote" if it had wanted to limit jurisdiction is wholly inapposite here, where Congress expressly required that a GE program "provide[] a program of training to prepare students for gainful employment," 20 U.S.C. §§ 1002(b)(1), 1088(b)(1)(A)—language that is far simpler, even if deemed ambiguous, than the language Plaintiffs propose.

[14]The same is true for other statutory provisions Plaintiffs cite. Plaintiffs reference requirements that eligible programs have already existed for a specified time, which they ascribe to Congress's attempt to exclude "fly-by-night" programs that, historically, had suddenly popped up to take advantage of federal dollars but did not try to educate students. P. Mem. at 4. Congress's express exclusion of one type of abusive program cannot reasonably mean Congress meant to allow other abusive programs to participate in Title IV as long as they have existed for the necessary time. *Cf.* 88 Fed. Reg. at 70025, 70175 (GE Rule should "make predatory behavior less attractive and less lucrative," reducing risk of waste, fraud, and abuse of taxpayer funds by schools). Plaintiffs also mention statutory debt relief (which only addresses student debt at the back end so does not avoid shifting costs to taxpayers or the significant adverse consequences graduates may suffer before obtaining such relief), the College Navigator website (which provides cost information only at the school, not program level), and financial-aid recipient surveys. P. Mem. at 22-23. None of these

are "complementary" rather than exclusive); *APSCU*, 110 F. Supp. 3d at 187 (provision allowing accreditors to assess program quality "does not forbid the Department from examining . . . programs' *out*puts in terms of student earnings and debts").

Finally, Plaintiffs argue that the GE Rule will "devastate[] programs that boost the employment prospects of minority women." P. Mem at 28. Plaintiffs overlook that programs do not boost students' employment prospects if their graduates generally earn no more than they could have before, or if they are left with debt they cannot repay. *See* Kvaal Decl. ¶ 15 (only between 18% and 33% of Plaintiffs' graduates are making progress toward reducing their loan balances two years after entering repayment). Moreover, a GE program's failure to remain eligible to participate in Title IV has no impact on students' own eligibility for Title IV aid. The Department carefully analyzed the impacts of program failures on students and assessed those impacts to be positive. 88 Fed. Reg. at 70029-30. Students would be steered away from programs with demonstrably poor financial outcomes, but they would be able to use their Title IV aid at similar programs with better outcomes nearby. 88 Fed. Reg. at 70030-31 ("More than 90 percent of students have at least one transfer option" to a similar program within the same geographic area, sometimes even at the same school, and such alternative options "leave graduates with 43 percent higher earnings and 21 percent less debt"). Students seeking training for an occupation with relatively low earnings, like cosmetology, could also find lower-cost programs that do not participate in Title IV to be affordable without recourse to loans. *Id.* at 70029-30.[15] In sum, all available tools of construction favor the Department's interpretation.

---

provisions are in structurally parallel statutory clauses, nor do they state their measures are exclusive or otherwise purport to limit the Department's exercise of authority under other statutory provisions. They therefore do not support Plaintiffs' asserted statutory interpretation.

[15] *Cf.* Cellini, Stephanie Riegg & Bianca Onwukwe, *Cosmetology Schools Everywhere: Most Cosmetology Schools Exist Outside of the Federal Student Aid System* 4 (2022) (App. ex.4).

**B.      The GE Rule Reflects the Department's Reasoned Approach to Assessing Whether GE Programs Satisfy Statutory Eligibility Requirements**

Plaintiffs argue in the alternative that the Court is likely to hold various aspects of the GE Rule arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A). APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id.* § 706. "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021), nor should the court "weigh the evidence in the record pro and con." *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Rather, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC*, 592 U.S. at 423.

**1.      The D/E and EP Metrics Reasonably Rely on Reported Earnings**

Plaintiffs first invoke the same concerns about unreported income raised in *AACS*, arguing that the D/E and EP metrics' reliance on federal records of taxpayers' reported earnings is arbitrary and capricious because cosmetologists may not report their tips on their tax returns. At the outset, Plaintiffs cannot prevail in their facial challenge on this basis because they do not contend that *all* GE programs' graduates fail to report all their earnings as required by federal law, thus conceding there are circumstances where the metrics could reasonably rely on reported earnings. *See Assoc. Builders & Contractors v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016) (facial challenge would require that "no set of circumstances exists under which" the metrics would be valid). Instead, their claim by its nature is an as-applied challenge specific to cosmetology programs.

Even as applied to cosmetology programs, Plaintiffs are unlikely to succeed on this claim.

As the administrative record will confirm, the Department carefully considered this issue and reasonably concluded that reported earnings are the best available data for both the D/E and EP metric calculations. Moreover, the Department found no persuasive evidence—and Plaintiffs point to nothing other than one old report with clearly flawed math—that unreported earnings are sufficiently prevalent, even in the cosmetology field, to affect a program's results under the new metrics. Instead, studies suggest that to the extent cosmetology programs participating in Title IV are disproportionately likely to fail the metrics, the more likely cause is those programs' high tuitions, set to maximize their risk-free Title IV income without regard to the relatively low earnings of graduates in this field. Students who must take out loans to afford the high tuitions these programs charge are left in the lurch when their earnings are insufficient to repay those loans.

In the NPRM, the Department proposed to obtain a median "earnings" amount for each program using (1) a list of students who completed the program during the specified cohort period; and (2) a median annual earnings amount for those completers, obtained from a Federal agency with earnings data (such as the IRS), together with the number of completers (if any) the agency could not match with known earnings records. 88 Fed. Reg. at 32334. For the D/E calculation, the Department would use a median loan debt for the same completers but would omit the highest debt amounts for the same number of completers that could not be matched to earnings. *Id.* In other words, if the IRS (or other agency) could not match five (unidentified) completers with earnings data, the Department would omit the five highest debt amounts from its median debt calculation. This method would yield the lowest possible D/E rate for a particular program. *Id.*

The NPRM identified several changes that, together with the Department's experience administering the 2014 Rule, led the Department to propose using reported income for earnings calculations, without any alternate earnings process. 88 Fed. Reg. at 32335. First, the Department

26

will measure earnings of program completers "approximately one year later (relative to when they complete their credential)" than under the 2014 Rule. *Id.* This method "leads to substantially higher measured program earnings," amounting to an additional $4000 (20%) for programs most at risk of failing the D/E or EP metrics, with earnings between $20,000 and $30,000. *Id.*

Second, the NPRM identified technological and legal changes in how payments are made and how income is reported. Because of the proliferation of digital payment methods (such as Venmo, Zelle, CashApp, and PayPal) rather than cash, "under-the-table" payments, including for tips, are less common and less easily hidden from the IRS. *Id.* In addition, those payment platforms must issue 1099s when a user's annual income exceeds a certain amount—scheduled to be as low as $600 in the near future. *Id.* Taxpayers are unlikely to leave income unreported if it has already been reported in a 1099, as doing so could easily trigger an audit.

Third, the NPRM explained that new research called into question the notion that underreported income was a significant issue, and pointed to problems with the prior alternate earnings appeals, particularly after the Department was forced to remove integrity standards for alternate earnings data. *Id.* at 32336 & n.97 (citing Cellini & Blanchard). Indeed, the Cellini & Blanchard study concluded, after examining publicly available data from 2017, the last year in which D/E rates had been calculated under the 2014 Rule, that while the majority of cosmetology programs (68% of 1359 programs) had received "passing" D/E rates without appeals, the post-*AACS* alternate earnings data submitted by cosmetology programs that failed the initial D/E calculation were 82% higher than the median reported earnings that the Department had received from SSA. Cellini & Blanchard 3 & fig.1.[16] The study concluded that these results could not

---

[16] Cellini & Blanchard indicate that only 61 additional cosmetology programs passed after submitting alternate earnings data. *Id.* However, they also note that 60% of those who appealed abandoned their appeals, and another 26% failed to submit required data. *Id.* figs. 3, 5.

plausibly reflect unreported tip income; rather, the authors' analysis of IRS "tax gap" and IRS audit data concluded that, in 2018, unreported tipped income for cosmetologists was on average around 8% of a cosmetologist's annual income ($1991, where the median income was $24,780). The large increases when earnings were based on "alternate" data thus likely reflected that the *AACS* court had prohibited the Department from applying the 2014 Rule's quality control standards, allowing programs unfettered discretion over what data they chose to submit. *Id.* at 2.

In the Preamble to the Rules, the Department carefully considered comments criticizing the use of federal reported earnings data to calculate D/E and EP metrics but concluded that no change to its proposed use of such data was warranted. In particular, the Department concluded that a 2014 report by Eric Bettinger, cited by the court in *AACS* as having "found" that "both tip income and self-employment income are, on average, underreported by around 60%," was significantly flawed. 88 Fed. Reg. at 70042 & n.139 (citing Cellini & Blanchard 11 n.14 as well as Department's independent review).[17] Not only did the 2022 Cellini & Blanchard study indicate that unreported tips were more likely in the range of 8% of total income, but even a recent survey conducted by the beauty industry itself, cited by numerous commenters, indicated a "high rate of

---

[17] The *AACS* court noted a commenter had cited Bettinger but did not otherwise address the report. *See AACS*, 258 F. Supp. 3d at 59-60. In fact, Bettinger apparently relied on the IRS's tax gap data, which Cellini & Blanchard also cite, but Bettinger, citing the notion that "the IRS reports that 50 percent of income is unreported," decided to "increase [total] earnings" in his model "by 50 percent when individuals in cosmetology reported having received tip income." *AACS*, Jt. App. [ECF 26], at 796. Cellini and Blanchard correctly point out that this method "mixes up the value of tipped income and total income." Cellini & Blanchard 11 n.14. They explain that if a cosmetologist's cash tips are 21% (though it is unlikely 100% of tips would be paid in cash), the unreported *income* would be 11.55%. *Id.* at 4. Of course, like Plaintiffs here, neither Bettinger nor any other commenter on the 2014 Rule provided any actual evidence of cosmetologists' unreported tip income or its extent. Indeed, the *AACS* court apparently "double-counted" Bettinger's report, citing, in addition to Bettinger, the Department's "acknowledge[ment]" that "comments included claims that 'about half of earnings in service occupations such as cosmetology' are made up of tips," *AACS*, 258 F. Supp. 3d at 59—which was itself a reference to Bettinger.

tip [reporting] compliance" by salon owners. *Id.* (citing Qnity Institute, A Career in Pro Beauty 8 (2023) (App. ex.6)). Other comments agreed that there is no evidence that underreporting is widespread among cosmetology program graduates. *See, e.g.*, Arnold Ventures, Comment # ED-2023-OPE-0089-3438 (App. ex.7), at 20-21. The Department concluded that the higher reported earnings levels three years after graduation rather than two (as under the 2014 Rule) would result in reported earnings amounts around 20% higher for those GE programs most at risk of failing the metrics, and that increase would "provide a buffer more than sufficient to counter possible error" arising from statistical noise or underreported income. 88 Fed. Reg. at 70096.

Indeed, the studies reviewed by the Department suggest that, to the extent Title IV-participating cosmetology programs are at risk of failing the new metrics, that result accurately reflects that such programs are a poor value for students, due to their high tuition costs relative to the typical earnings in this profession. Significantly, those studies suggest that the vast majority of cosmetology programs do not participate in Title IV, charge lower tuition, yet provide students with training comparable to the more expensive Title IV-participating programs. 88 Fed. Reg. at 70086.[18] In particular, in Texas, out of a total of over 800 cosmetology programs in the state, only 14% participate in Title IV, and the other 86%, located in almost every county in Texas where Title IV programs operate, provide ample alternatives should any Title IV-participating program close. *Id.*; Cellini & Onwukwe 3-4. At the same time, the Department emphasized that the

---

[18] The Preamble cites Cellini & Onwukwe (App. ex.5); and Cellini & Goldin, *Does Federal Student Aid Raise Tuition? New Evidence on For-Profit Colleges*, Am. Econ. J.: Economic Policy, 6(4) (Nov. 2014) (App. ex.4). These studies explain, for example, that a Title IV-participating cosmetology program in Dallas identified its cost for a 1000-hour program as $16,060 while a non-participating program 6 miles away charged $4775 for an equivalent course of study. Cellini & Onwukwe 3. Plaintiff Ogle School's cosmetology program tuition appears on par with the cited Title-IV participating programs, with 2024 tuitions ranging from $14,800 to $16,500, not including another $3000 for books, equipment and supplies. *See* Ogle School, 2024 Catalog 33 https://www.ogleschool.edu/wp-content/uploads/2024/02/2024-Catalog-02.27.2024.pdf.

assumption that most Title IV-participating cosmetology programs would close is itself speculative. 88 Fed. Reg. at 70086. After all, as noted above, the new metrics include a more generous measurement of earnings three, rather than two, years after program completion. Studies also suggest that, instead of closing, such programs would "adjust[] their tuition downward." *Id.*

The Department also rejected the notion that alternate earnings appeals would increase the accuracy of earnings data, noting that, "in view of the Department's experience with appeals under prior GE rules," the Department was "convinced that adding such procedures will not improve decisions but will increase delays, expenditures, and other burdens." 88 Fed. Reg. at 70090; *see id.* at 70095-98 (further explaining its decision that "it is neither necessary nor appropriate" to include an alternate earnings appeal process in the new metrics, given the "relatively low quality" of data submitted in past appeals and the research indicating underreporting of income is far less significant than prior reports had suggested); Cellini & Blanchard 2, 3.

Plaintiffs acknowledge that the Department uses reported income for many other purposes, including its determination of student aid and debt relief eligibility but discount the ubiquitous use of this data as irrelevant. Pl. Mem. at 32. Yet, tellingly, Plaintiffs do not even try to identify a more accurate standardized data source that the Department should have considered as an alternative. *See APSCU*, 110 F. Supp. 3d at 195 (upholding Department's use of reported earnings data obtained from SSA under 2014 Rule as "the best data available" at the time); *cf. Texas*, 91 F.4th at 297 (recognizing that, under *State Farm* reasonableness factors, agency's evaluation of modeling data was entitled to deference and agency did not act arbitrarily or capriciously by reasonably selecting among available alternatives). In the end, Plaintiffs fail to show any likelihood that, after reviewing the administrative record, the Court would find the Department's decision to base its earnings calculations on taxpayers' reported earnings in any way arbitrary or capricious.

## 2.  The Metrics' Earnings Measurements Are Reasonable

Plaintiffs next suggest the GE Rule's use of the new metrics is arbitrary and capricious because, they claim, the metrics hold schools "responsible for their former students' post-graduate 'financial outcomes," and "punish[es] schools for factors outside their control." Pl. Mem. at 34. But here they display their skewed understanding of Title IV's purpose. The GE Rule was not promulgated to punish schools but rather to help students, consistent with 20 U.S.C. § 1087a(a). As the Department explained in the Preamble, students attend postsecondary programs anticipating higher earnings, while graduates with low earnings are particularly vulnerable because "even small amounts of debt. . . can be unmanageable." 88 Fed. Reg. at 70015. Most programs in most fields do generally lead to higher earnings, and they do so without imposing high debt burdens. *Id.* at 70025 & tbl. 4.11. However, the Department estimates that only 8% of dollars that students borrow to attend for-profit programs with failing EP scores will be repaid, with the loss covered by taxpayers but without financial consequence to the programs themselves. *Id.* at 70117 & tbl. 2.10.

As explained above, studies reviewed by the Department suggest that cosmetology graduates generally have low earnings, but most programs in this area compensate for that reality by charging lower tuition, and they do not participate in Title IV at all. Cellini & Onwukwe 4. Plaintiffs, on the other hand, have chosen a business model by which they charge higher tuition in anticipation that students will take out Title IV loans to afford them, and thus claim 90% of their students rely on such aid. P. Mem. at 28. But this model creates a risk—though borne only by students and taxpayers, not by schools—that students will not be able to repay their loans. The Department's establishment of a financial value transparency framework for all Title IV programs in the FVT Rule, and its further promulgation of the GE Rule, setting forth criteria by which to assess whether GE programs satisfy their statutory eligibility requirements, are both designed with

Congress' intent that Title IV help students firmly in mind. Moreover, as explained above, the GE Rule's use of the metrics does not hold federally funded programs responsible for the success or failure of each and every student. Rather, the metrics look generally at the median debt and earnings of a cohort of students completing a program over a period of years. *See* 88 Fed. Reg. at 70186 (§ 668.2 defining "cohort period"). The metrics include aggregate earnings for all completers within a cohort for whom earnings data can be matched. *Id.* at 70189 (§§ 668.403(c), .404(b)). This approach makes sense because the metrics' point is to allow comparisons between completers' earnings and their debt, for the D/E metric, and between completers' earnings and what they might have earned if they had not sought postsecondary training at all, for the EP metric.

Plaintiffs argue that they cannot control whether their graduates work part-time or not at all. However, they point to no data showing that program outcomes under the metrics would be determined by certain graduates' voluntary choices to earn less. Moreover, including earnings for all graduates in a cohort in the total median earnings, regardless of any one graduate's individual circumstances, provides relevant information. As the Department explained when responding to similar comments, graduates still face the exact same debt burdens regardless of whether they work full-time, part-time, or not at all. 88 Fed. Reg. at 70035 ("Graduates choosing not to work full-time or providing volunteer services in addition to working part-time still are faced with the obligation to repay the education debt associated with their program.").[19] The Department also explained its decision not to exclude completers with no reported income because its metrics measure earnings three years after program completion—a time when the Department assesses

_____

[19] Plaintiffs cite the Qnity Institute report for the notion that only 3.5% of cosmetologists work 40 hours or more per week. Pl. Mem. at 36. However, that report also estimates that cosmetologists' W-2s report an average of $41,721 in annual earnings during their first three years after graduation, and that cosmetologists do not have high rates of unreported income. App. ex.6 at 7, 9. If anything, this report suggests that cosmetology programs are likely to pass the 2023 Rule's metrics.

32

completers are highly motivated to be employed (among other reasons, to attempt to repay their education debt). 88 Fed. Reg. at 70045. If certain graduates are nevertheless not employed at that point, including their zero earnings is still important to best "capture the labor market outcomes of program graduates, including both the likelihood that they find employment and the earnings among those who are employed." *Id.* The Department considered the point Plaintiffs raise—that some completers might be able to find work three years after graduation yet still "choose" not to work—but deemed that possibility implausible. *See id*. Plaintiffs here fail to substantiate the notion that any significant number of cosmetology graduates voluntarily abandon their professions altogether within three years after program completion, particularly after attending programs like Plaintiffs' where loans are typically required to afford them.

Meanwhile, the Preamble explains at length that many factors affecting GE programs' performance in the metrics *are* within their control, including the tuition they charge, the "workforce experience" opportunities they provide students during the program, and the career services they offer, as well as the relative allocation of resources a program devotes to "instruction or student support services," as opposed to simply trying to attract as many enrollees (and Title IV-subsidized tuition dollars) as possible. *See also* 88 Fed. Reg. at 70116 (discussing "large body of research provid[ing] causal evidence on the many ways students at for-profit colleges are at an economic disadvantage upon exiting their institutions," and "growing evidence that many for-profit programs may not be preparing students for careers as effectively as comparable programs at public institutions," including evidence that graduates of for-profit schools have been found to have "lower passage rates" on the licensing exams they need to pass to enter their professions, as well as evidence that for-profit schools "devote  more resources to recruiting and marketing than to instruction or student support services").

Plaintiffs also raise the fact that the EP metric includes all program completers, regardless of employment status, on one side of the balance, but does not include high school graduates outside the labor force on the other side of the scale. *See* Pl. Mem. at 36. But in fact the two groups are directly parallel, as the Department explained in the Preamble. On the one hand, high school graduates "in the labor force" includes both those who are employed and those who report they are available and looking for a job. 88 Fed. Reg. at 70061. On the other hand, postsecondary program graduates are similarly "likely to seek work or be employed three years after graduation." *Id.* Moreover, using "high school graduates in the labor force" for such comparisons is standard procedure when measuring "the effectiveness or value of completing a given post-secondary credential." *Id.* at 70054 & n.149 (citing examples).

Plaintiffs further suggest that graduates' low earnings likely reflect their demographics rather than the quality of the programs they attended. But other courts expressly rejected the same argument based on the Department's prior statistical analyses showing the opposite. *E.g., APSCU*, 110 F. Supp. 3d at 192 (rejecting plaintiff's argument that D/E test "really measures student demographics" because the Department ruled out that possibility through "several regression analyses"), *aff'd on this point by APSCU*, 640 Fed. Appx. at *8; *APC*, 107 F. Supp. 3d at 364-65 (rejecting plaintiff's claim as appearing "utterly to disregard the extensive statistical analyses" described in the 2014 Rule). For purposes of the FVT and GE Rules, the Department again ruled out the notion that student demographics are determinative by conducting regression analyses that led it to conclude that "programs and institutions play an important causal role in determining student outcomes, more so than student demographics," and that "GE programs that fail the metrics have particularly bad outcomes that are not explained by student demographics alone." 88 Fed. Reg. at 70031, 70142-45 & tbls. 4.22, 4.23, 4.24 (finding strong correlations between student

outcomes and program-controlled factors while only modest correlations with students' family income, gender, or race).[20] Plaintiffs' invocation of *Chamber of Com. v. SEC,* 85 F.4th 760, 778 (5th Cir. 2023), which held the SEC's analysis contained internal inconsistencies of logic that rendered its rule invalid, is inapposite because the Department here relied on sound statistics. Plaintiffs present no evidence to the contrary, and the administrative record contains none. Indeed, Plaintiffs' assertion that their poor outcomes would more likely reflect that most of their students are minority women is belied by Cellini & Onwukwe's analysis of cosmetology programs in Texas, which suggests that Plaintiffs could improve their graduates' outcomes by simply lowering their tuition, as do hundreds of other cosmetology programs in the state. Cellini & Onwukwe 4; *see also* Cellini & Goldin 201 (study of for-profit programs in five states indicated Title IV-participating programs charge 78% more than non-participating programs).

The Department also addressed concerns regarding the potential impact of covid on earnings, noting that the first earnings measurements will be for a cohort whose third year after completion was 2021 or 2022—after the impact of covid on employment had passed—and that there is no evidence median earnings for the first year will be significantly affected by covid. 88 Fed. Reg. at 70099 (indicating that the unemployment rate had fallen to 3.5%--its lowest level in 50 years—by July 2022, and because the cohort median earnings will cover both 2021 and 2022, the somewhat higher unemployment rate of 6.6% in July 2021 "will have very little impact on median earnings"). The Department also explained that in typical economic downturns, high school graduates' earnings fall more than others', which would generally result in lower EP

---

[20] The Preamble's detailed statistical analyses are sufficient to explain why the Department ultimately rejected the contrary assertions in the 2019 Rule, cited by Plaintiffs. Those assertions simply hypothesized about the impact of external factors, but the 2019 Rule did not point to any quantitative analysis supporting those hypotheses in connection with the 2014 Rule's metrics.

thresholds, creating a buffering impact on metric outcomes. *Id.* at 70058.[21] Plaintiffs' suggestion citing the 2019 Rule, that programs must be able to predict the future in order to "establish a price that will guarantee passing D/E rates," Pl. Mem. at 37, misses the point and again ignores the purpose of Title IV. Like Title IV itself, the 2023 FVT and GE Rules are not designed with the goal of allowing programs to maximize their risk-free Title IV-funded income by setting their costs as high as they possibly can without failing the metrics. The FVT Rule seeks to provide students with information about program costs and the earnings they can expect so that students can make informed choices about the program they wish to attend—exactly what the 2019 Rule proposed, *see* 84 Fed. Reg. at 31417 (favoring "an equitable and meaningful transparency framework" that reports "debt and earnings income for all types of title IV programs to the public")—and the GE Rule seeks to ensure that GE programs satisfy their statutory eligibility requirement of preparing students for gainful employment.

**3. The D/E Metric's 8% and 20% Thresholds Are Well Founded**

The D/E metric (calculated as set forth in 668.403) sets thresholds for the amount of debt students can typically withstand as a percentage of a student cohort's median earnings. Programs where median student debt exceeds 8% of the cohort's median annual earnings three years after graduation, *and* exceeds 20% of the cohort's median discretionary income (income above 150% of the federal Poverty Guideline) three years after graduation fail the metric for that year. *See* 88 Fed. Reg. at 70188 (§ 668.402). The Department applies both thresholds in recognition of the fact that the same percentage of debt to earnings will be more affordable to someone whose total earnings are relatively high. 88 Fed. Reg. at 32326 ("paying $2,000 per year is less manageable

---

[21] The Department also suggested that, in the event of some future disaster, the Secretary could invoke statutory authority to waive or modify requirements as the circumstances warrant. *See id.* at 70099 & n.152. The possibility of some such future circumstance arising, requiring such a response, does not render the 2023 Rule arbitrary and capricious.

when you make $20,000 a year than paying $4,000 per year when you make $40,000 a year"). The Department first adopted both thresholds in the 2011 Rule, applied them again in the 2014 Rule, and has now applied the same thresholds in the 2023 metric. *See* NPRM, 88 Fed. Reg. at 32326.

Plaintiffs argue the D/E metric is arbitrary, first, on the ground that its thresholds are ostensibly imported from mortgage underwriting, and, second, because it "hold[s] GE programs to a student loan repayment standard that no student would be held to by law or regulation," given that students may now be eligible to decrease their debt payments below 20% of their income if their income is sufficiently low. P. Mem. at 40. However, the Department soundly rejected both criticisms during the rulemaking process, and Plaintiffs offer no basis to overturn its reasoning.

The Preamble addresses in detail why the 8% annual income threshold and 20% discretionary income threshold are reasonable benchmarks for purposes of the D/E metrics. 88 Fed. Reg. at 70053-54. In particular, the Preamble explains how the Department reasonably took into account a 2006 study published by Sandy Baum and Saul Schwartz. *Id.* at 70054. That study recognized a general agreement in previous research that "students should not devote more than 8 percent of their gross income to repayment of student loans."[22] However, Baum & Schwartz called into question the rote reliance on the 8% figure because it derived from the percentage of additional debt that mortgage underwriters believe homeowners can undertake in addition to a mortgage. *Id.* at 3. After surveying various alternatives, the 2006 study ultimately concluded that higher earners could afford to spend no more than 20% of income on debt repayment while lower earners (those below 150% of the Poverty Guideline) could afford no repayment at all. *Id.* at 7, 11-12 (emphasizing that they were not concluding that devoting 20% of income to debt repayment would be "reasonable" for typical borrowers, but that "there are virtually no circumstances under which

---

[22] Baum, Sandy & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt* (2006) (App. ex.1), at 2.

higher debt-service ratios would be reasonable").

The Department never adopted the 8% mortgage-underwriting threshold wholesale, nor did it fully adopt Baum & Schwartz's recommendation; instead, the Department reasonably combined the two by requiring a program to fall below both an 8% annual earnings threshold and a 20% discretionary income threshold before it is deemed to "fail" the D/E metrics. *See* 88 Fed. Reg. at 32326 & fig.1. Applying both thresholds in this way accounts for the fact that higher percentages of debt are affordable if earnings in general are higher. *See id.*

Plaintiffs fail to explain why the mere facts that the thresholds were imported from another context and/or recommended over a decade ago make the thresholds arbitrary. Indeed, other courts have upheld the same thresholds as they were applied in the 2011 and 2014 GE rules. *APC*, 107 F. Supp. 3d at 366 (noting Department "cites to at least four studies that have accepted [the 8%] standard in the context of student debt," and "various states" have also based their student debt guidelines on that standard; and that both thresholds are "based upon expert studies and industry practice—objective criteria upon which the Department could reasonably rely" (quoting *APCU*, 870 F. Supp. 2d at 153)); *accord APSCU*, 110 F. Supp. 3d at 194-95. Plaintiffs' criticism is particularly inapt to the extent they suggest that the thresholds are unreasonably low. Baum himself clarified in 2018 that, "if anything, a 20 percent discretionary threshold for the median borrower is too permissive and a stricter standard would be justified."[23]

The Department's decision to retain the 20% discretionary income threshold even though many graduates whose debt exceeds 20% of their income may be eligible for loan payment reductions and ultimately loan forgiveness under the Department's income-driven repayment ("IDR") program also passes muster under arbitrary and capricious review, as does the omission

---

[23] *See* Baum, Sandy, *DeVos misrepresents the evidence in seeking gainful employment deregulation*, Urban Institute (2018) (cited by 88 Fed. Reg. at 70054 n.148) (App. ex.2).

of earnings data for non-graduates in a household. The D/E rates set maximum borrowing thresholds, based on students' earnings, that reflect what a "typical program graduate" can repay "without having to rely on payment programs" like IDR. 88 Fed. Reg. at 70050. As explained in the Preamble, the "after-the-fact protections" available through the IDR program—while providing important safeguards for students saddled with overwhelming debt—ultimately shift the costs of unreasonable debt onto taxpayers. *Id.* at 70013, 70051 (identifying IDR participation as a growing contributor to the costs shifted to taxpayers). The Department is obligated to ensure the responsible expenditure of taxpayer funds on Title IV aid within the bounds of statutory authority. *Id.* at 70013. The GE Rule thus uses the D/E metric to assess a program's statutory eligibility. Although Plaintiffs suggest total household earnings might be relevant to the amount a graduate may be able to afford in practice, the earnings of individuals in a household who did not attend a program have no bearing on whether that program prepares its students for gainful employment in a recognized occupation.[24] When Title IV programs charge high tuition to get more risk-free Title IV money, without regard to the value those programs provide to students, taxpayer funds do not serve their statutory purpose to help students.

### 4.    The Preamble Thoroughly Explains the GE Rule's Costs and Benefits and Shows that It Serves Title IV's Purpose To Help Students

Lastly, Plaintiffs argue that the GE Rule is arbitrary because, they contend, the Department has failed to substantiate a rational connection between the benefits of the GE Rule and the costs that it would impose on cosmetology programs. Plaintiffs here rely on the notion that "over 50%

---

[24] As explained above, the Department's data suggest students seeking postsecondary education do so with the expectation that their own earnings potential will be enhanced. Plaintiffs cite no contrary research suggesting that any significant number of students take on unaffordable debt for career training because they expect others in their household to repay their loans. The Department reasonably did not build into the D/E metric an assumption that students saddled with an amount of debt that they could not hope to repay with a particular program's typical earnings would be able to rely on entire households to bear such costs.

of all cosmetology programs" would fail the GE Rule's metrics, and that programs like Plaintiffs',
which rely on Title IV for two thirds of their total income, would thus close. P. Mem. at 41.
However, Plaintiffs are unlikely to succeed in this argument, most obviously because they
incorrectly assume all cosmetology programs participate in and are reliant on Title IV.

In its Regulatory Impact Analysis in the Rules' Preamble, the Department made a
"reasoned determination" that both Rules' benefits "justify their costs." *See* 88 Fed. Reg. at 70100
(citing E.O. 13563). That analysis easily satisfies the applicable deferential review. *See, e.g., Mex.
Gulf Fishing Co. v. U.S. Dep't of Com.,* 60 F.4th 956, 973 (5th Cir. 2023) (consideration of costs
and benefits associated with a regulation requires that the agency's "reasons and policy choices"
satisfy "minimum standards of rationality" (internal quotation omitted)); *Cigar Ass'n  v. FDA*, 5
F.4th 68, 76 (D.C. Cir. 2021) ("because the court reviews cost-benefit analyses deferentially," a
plaintiff's "burden to show error is high" (internal quotation omitted)).

The problem that both Rules identify and seek to address—the fact that many students who
complete college, graduate school, or a career training program are left with unaffordable debt
from their Title IV loans, and that when students cannot repay, the cost of their loan debt is unfairly
borne by taxpayers—is undeniable. 88 Fed. Reg. at 70100-01. The significance of this problem
cannot be overstated, given the billions of taxpayer dollars that are funneled to Title IV-
participating schools each year. *See id*. at 70103-07 (in Academic Year 2022, $86 billion was
directed through Title IV student aid to non-GE programs and $16 billion to GE programs). With
overall cohort default rates exceeding 10% for several categories of degree programs, including
for-profit certificate programs, the costs when programs do not provide financial value to students
run in the hundreds of millions of dollars, with adverse impacts on the lives and credit histories of
millions of graduates. *Id.* at 70113, 70116-18. The Preamble explains that "the earnings gain for

the average for-profit certificate-seeking student was not sufficient to compensate them for the amount of student debt taken on to attend the program," but that outcomes varied depending on the specific program and field of study. *Id.* at 70116-18. Applying the new metrics to assess GE programs' Title IV eligibility will identify which programs provide training to prepare students for gainful employment in a recognized occupation and which do not. *See id*. at 70116 & nn.237-248.

The Preamble also squarely addresses the specific characteristics of cosmetology programs and refutes Plaintiffs' assertions that over 50% of *all* cosmetology programs would close under the GE Rule, or that 80% of cosmetology students would be left without any available program to attend, P. Mem. at 41. The Preamble's data analysis showed that cosmetology programs that failed the estimated metric calculations had "much higher loan payments, lower earnings, and higher default rates" than Title IV-participating cosmetology programs that passed. 88 Fed. Reg. at 70139 & tbl. 4.19. Yet cosmetology programs that lose Title IV eligibility tend to lower their tuition with no effect on quality. *Id.* at 70086; *see also id.* at 70118 ("Research suggests that Federal student aid supports for-profit expansions and higher prices," with Title IV-participating for-profit programs charging 80% more tuition than non-participating programs, with no better earnings outcomes for students). In fact, most cosmetology programs do not participate in Title IV at all; those programs charge far lower tuitions while operating free of federal aid. *Id.* Moreover, Title IV-participating cosmetology programs that remain Title IV-eligible could expand their programs to respond to any demand that non-participating programs do not meet. *Id.*

To be sure, Title IV-participating cosmetology programs may fare better than the 2023 Rule's preliminary estimates suggest since those estimates, based on the best data currently available to the Department, combine more types of programs into single categories (using 4-digit rather than 6-digit CIP codes); do not incorporate the new metrics' removal of loan debt not

attributable to tuition and fees; and were not able to measure earnings and debt from identical periods. *See id.* at 70123. Programs can also improve from one year to the next, and GE programs will not lose eligibility unless they fail the same metric for two out of three years. However, even if cosmetology programs like Plaintiffs' were to lose Title IV eligibility (a result that would occur, at the earliest, in 2026), the research reviewed by the Department suggests that students will find ample more affordable alternatives that will in no way diminish the quality of their training. 88 Fed. Reg. at 70118-19, 70145-47; Cellini & Onwukwe 4. As the Preamble points out, hundreds of non-Title IV-participating cosmetology programs operate in Texas, in the same counties where Title IV-participating programs operate. 88 Fed. Reg. at 70147.

Plaintiffs speculate that, if their programs shut down, their students may end up at one of the smaller programs that does participate in Title IV but has too few completers to be subject to the metrics, and there is no guarantee that program will be better. The Department has explained that, consistent with its own and IRS data policies, it cannot perform D/E or EP calculations for very small programs without compromising student privacy. 88 Fed. Reg. at 70046. However, the metrics will cover over 80% of student enrollments, including 87% of enrollments in for-profit undergraduate programs. *See id.* at 70046, 70121, 70128. No comments submitted during the rulemaking provided any statistical analysis or other evidence substantiating that there is any significant risk that students who would have attended cosmetology programs that fail the D/E or EP metrics will end up at a small program that provides even less value, and Plaintiffs also fail to provide such evidence. The speculative risk they posit is minimal at best and does not undermine the Department's cost-benefit analysis.

## IV.    The Public Interest and Balance of Equities Weigh Against a Preliminary Injunction

The balance of equities and the public interest factors "merge when the Government is the

opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright *et al*., FPP § 2947 (3d ed.)).

Here, these combined factors strongly counsel against issuing the requested preliminary injunction. Plaintiffs evidently seek to enjoin the 2023 Rules in their entirety even though their dispute appears limited to the GE Rule's potential impact on themselves, or at most on the discrete category of cosmetology programs. Plaintiffs do not question the Department's authority to establish the FVT Rule, which crucially addresses an epic unpaid student debt crisis, nor do they quarrel with the notion of a transparency framework that provides financial value information about all programs. By establishing the most comprehensive system yet for sharing information, and doing so in a way that, research suggests, will be particularly helpful to students making enrollment decisions, the FVT Rule has the potential to assist the Title IV-funded postsecondary education market to self-correct through transparency measures that every past rule, including the 2019 Rule, has favored. On the other hand, enjoining implementation of the FVT Rule will perpetuate the current debt crisis, which, by its nature, cannot be solved after the debt is incurred and graduates fail to earn enough to repay it. The only potential remedies then involve managing or reducing students' payment obligations, but such solutions shift even more costs to taxpayers.

Because the FVT Rule provides information about all programs, it will benefit students' enrollment decisions for all categories of study, not just cosmetology. If that information is withheld, all students receiving Title IV aid, as well as taxpayers, will continue to suffer the adverse consequences described in the Rules' Preamble. Moreover, any injunction at this

preliminary stage in the litigation will threaten the Department's ability to meet its obligations under the FVT Rule to calculate the first D/E and EP measures for the upcoming year and will impose significant logistical costs due to the need to modify existing contracts and halt Department employees' ongoing preparations. Declaration of James Kvaal ¶¶ 8-10 (attached hereto).

The GE Rule stands separately but is equally crucial for ensuring that GE programs meet statutory eligibility requirements and that students seeking to improve their career success will not instead be left worse off than when they started. Students attending such programs, and the public at large, will benefit from the GE Rule because their interests are served when the Department takes steps to ensure that Title IV funds are spent responsibly. Together, the Rules are projected to save taxpayers $13.8 billion between 2024 and 2033 and lead to increased student earnings of approximately $32.3 billion – benefits that will be threatened or lost if the Rules are enjoined. 88 Fed. Reg. at 70163, 70167.

On the other side of the balance, Plaintiffs fail to show that they face any harms at all during the time the Court would need to fully consider their claims through cross-motions for summary judgment. Moreover, the reporting burdens they estimate appear to be greatly exaggerated. Kvaal Decl. ¶¶ 6-7. Plaintiffs' asserted reliance on Title IV funds is no basis to prohibit the Department from taking steps to ensure that they are eligible to receive them. In the end, Congress intended Title IV aid to help students access postsecondary education, and that interest properly takes precedence over the fate of individual programs that do not satisfy eligibility criteria.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction should be denied.

DATED:  May 3, 2024                              Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

/s/ Kathryn L. Wyer
KATHRYN L. WYER (Utah Bar No. 9846)
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Counsel for Defendants*