IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| OGLE SCHOOL MANAGEMENT, LLC *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,<br><br>*Defendants*. | No. 4:24-cv-00259-O |

## DECLARATION OF JAMES RICHARD KVAAL

I, James Richard Kvaal, do declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and accurate to the best of my information and belief:

1. I am the Under Secretary of Education at the United States Department of Education (Department). My nomination for this position was confirmed by the United States Senate on September 14, 2021, and I was sworn in on September 15, 2021. As the Under Secretary of Education, my responsibilities include the coordination of major policies, programs, and activities related to Postsecondary Education and Federal Student Aid for the Department. This includes, but is not limited to, the implementation of two separate rules that the Department promulgated through a federal register notice on October 10, 2023: a new financial value transparency framework ("FVT Rule") and an accountability framework for gainful employment programs ("GE Rule"). *See generally* "Financial Value Transparency and Gainful Employment," Notice of Final Regulations, 88 Fed. Reg. 70004 (Oct. 10, 2023) ("2023 NFR"). As such, I am familiar with the steps the Department must take to implement the FVT Rule and the GE Rule,

the obligations of institutions under each of the Rules, and the potential impacts on students and institutions if either of the Rules were to be enjoined. I make this declaration based on my personal knowledge and based on information provided to me in my official capacity. The FVT Rule and the GE Rule each operates independently of the other, in that they each incorporate separate requirements and affect institutions and students in different ways. I therefore address the harms that would result from enjoining each Rule separately below.

### *FVT Rule*

2. The FVT Rule, set forth in 34 CFR Part 668 Subpart Q and § 668.43, seeks to increase transparency regarding the costs, sources of financial aid, and outcomes of postsecondary programs so that students can more easily compare their options and make better-informed enrollment decisions, and the public can better evaluate whether the spending of federal funds results in financial value. The Rule does so by establishing procedures to collect certain information from institutions about their programs, post that information along with statistical measures based on certain calculations that use such information on a Department website, and ensure the website's URL is provided to students at key points in their decision-making process.

3. Because the FVT Rule at its core is informational in nature, it does not impact a program's eligibility to participate in Title IV student financial assistance programs, nor does the Department impose any financial penalties on programs based on their calculated measures of financial value. Because the FVT Rule's program information website will be operated by the Department, the FVT Rule also imposes no restrictions or obligations on institutions' provision of information, other than the requirement that institutions share information to access the Department's website with students and prospective students.

4.     The FVT Rule does generally require institutions to report certain information to the Department annually by October 1 of each year. 34 C.F.R. § 668.408(b)(1)(iii). For the first year after the NFR's effective date, the FVT Rule had originally set the reporting deadline for July 31, 2024. However, after receiving concerns from institutions and other stakeholders, the Department announced an extension of the first year's reporting deadline to October 1, 2024, in line with the annual reporting deadline for future years. *See* Federal Student Aid, *Timeline of Financial Value Transparency and Gainful Employment Reporting Requirements*, https://perma.cc/YDC5-998D. The Department made the determination that it could extend this deadline without impacting other steps in its timeline for implementing the FVT Rule, including its ability to operationalize the FVT website by July 1, 2026. Even with this extension, the Department maintained its commitment to finalize its reporting guidance, publish technical specifications, and provide numerous training webinars for institutions through the spring and summer. *See id.*

5.     The Department carefully designed these reporting requirements in a manner that is not overly burdensome for institutions. First, much of the data required for calculating the metrics under the FVT Rule includes data that was already reported by institutions through previously established administrative processes, including reporting enrollment and Direct Loan disbursement. *See* 34 C.F.R. § 668.405(a). Additionally, many institutions already report similar financial information on the official surveys conducted by the National Center for Education Statistics, the Department's primary statistical agency. *See generally* nces.ed.gov/about. Many institutions (all for-profits, 88% of public, and 47% of private non-profit) will also have some experience complying with the reporting requirements for at least some of their students under a prior Department rule issued in 2014, 79 Fed. Reg. 64890 (Oct. 31, 2014). Accordingly, they

may already have procedures in place for collecting such information. In addition, although the Department estimated that reporting burdens would be significantly higher the first year the requirement is in effect, it also established a six-year transition period, during which institutions may avoid burdens associated with gathering information from periods more than two award years prior to the FVT Rule's effective date. *See* 34 C.F.R. § 668.408(c) (88 Fed. Reg. at 70191). Under the transitional reporting option, institutions need only report information for the two most recently completed award years. *Id.* § 668.408(c)(1)(ii). For example, institutions exercising this option for the upcoming October 1, 2024 reporting deadline would have to report information for the award years 2022-2023 and 2023-2024.

6. I have reviewed the Declarations of John Blair and Nate Swanson submitted on behalf of the plaintiffs in this case and have concluded that they both ignore the transitional reporting option set forth in § 668.408(c), and that their estimated burdens assume that the only choice available is reporting information for the full six years before the Rule's effective date. That assumption almost certainly renders the estimates inaccurate. For example, Mr. Swanson asserts that the Rule requires institutions to report student information dating back to 2017, implying that Tricoci would therefore have to locate such information in an antiquated system that it used before the 2022-2023 award year. Swanson Decl. ¶ 31. In fact, however, the transitional reporting option would allow Tricoci to entirely avoid searching that system and instead limit the information it reports to years beginning with the 2022-2023 award year. Accordingly, Mr. Swanson's estimate that Tricoci employees would have to spend over 1,400 hours to comply with the first reporting deadline appears to exaggerate the potential burdens of the requirement. Mr. Blair similarly appears to ignore the transitional reporting option when estimating the burdens imposed by the reporting requirement. *See* Blair Decl. ¶¶ 33-35.

7. In addition, Mr. Blair and Mr. Swanson appear to overstate the reporting burden by ignoring the fact that the Department plans to provide institutions with draft "completers lists" that identify the cohorts of students whose earnings will be included in the FVT metrics. Institutions will have 60 days to make corrections to those lists. Additionally, as of April 2024, institutions are able to access new reports in the National Student Loan Data System (NSLDS) to assist with the student identification process. These efforts should help mitigate the challenges and time associated with searching for individual students in NSLDS, as described by both Mr. Blair and Mr. Swanson. Blair Decl. ¶ 32; Swanson Decl. ¶ 32. It is also worth noting that the additional data that must be reported under the FVT rule will, in certain instances, make it more likely that an institutional program's debt-to-earnings measure will reflect greater financial value because the additional collected data will allow the Department to cap the total loan debt associated with each student to only a program's tuition, fees, books, equipment, and supplies. *See* 34 C.F.R. § 668.403(b)(1)(i).

8. The FVT Rule requires that, for each award year after it goes into effect, the Department use some of the reported information to calculate the two measurements of a program's financial value that are set forth in the FVT Rule—the debt-to-earnings ("D/E") measure and the earnings premium ("EP") measure, 88 Fed. Reg. at 70188-89 (34 C.F.R. §§ 668.403(a), 668.404(a)). Although the website where these measures will be posted in future years will not become operational until 2026, the Department's goal is to calculate an initial year's D/E and EP measures for all applicable programs (those with enough graduates to meet data privacy standards) in early 2025 and to make that information publicly available so that students, their families, institutions, and the general public can access it at that time. Enjoining the FVT Rule now will have repercussions that will interfere with the Department's

preparations and would make it impossible for the Department to meet this publication timeline in early 2025. Halting implementation of the FVT Rule also risks preventing the Department from meeting the deadlines specified in the 2023 NFR to establish the public information website and initiate acknowledgments by July 1, 2026.

9. While the current October 1, 2024 reporting deadline is the first obligation that institutions face under the FVT Rule, the Department has already begun its own preparations to implement the FVT Rule. As is standard for Department rules, which, under the schedule established by Congress, typically go into effect on July 1 of the year following their promulgation, the Department must begin preparations before the effective date. For the FVT Rule, in addition to its preparation of guidance and training opportunities for institutions, the Department must establish the appropriate infrastructure to implement both the reporting requirement and the D/E and EP measurement calculations. The steps that must be undertaken in this effort include modifying the Department's existing data systems to accept the uploads of information from institutions; to negotiate agreements that facilitate sending certain information about each program's completers to the Internal Revenue Service (IRS); to receive in turn the associated aggregate earnings information for each program; and then to perform the D/E and EP calculations using the earnings information and other data.

10. Over 100 Department personnel are already working full-time or part-time on these efforts by, for example: updating multiple impacted technical systems; building security, privacy, testing, and data quality procedures; drafting external communications, guidance, and training; and managing numerous external contracts. Because the process of engaging contractors requires the Department to request changes to existing contracts, it typically takes many months to complete. The Department therefore has already begun that process, and must

6

continue to work toward changing additional contracts after the FVT Rule goes into effect. To date, the Department has awarded approximately $ 4.6 million in contract modifications, and anticipates awarding $1-1.5 million more in modifications before the end of the fiscal year to support the calculation of the D/E and EP measures. Under the standard contract terms, if the Department were forced to stop its preparations to implement the FVT Rule, the funds awarded under the contract may be forfeited, subject to negotiations to pay for work that has been completed; the Department may also have to pay a cancellation fee. Finally, the Department may have to pay additional costs for any delay stemming from an injunction.

      11.     There is an enormous public interest in allowing the Department to proceed with its implementation of the FVT Rule. The FVT Rule synthesizes and builds upon the Department's efforts across different Administrations to provide informational transparency for all students and prospective students considering postsecondary education. For example, the Department's earlier efforts to create a transparency framework did so only for one category of programs—those that provide vocational training. The Department then determined that it should provide the same information for all programs so that students would be able to make accurate comparisons. The Department reviewed studies that indicated that the timing of providing this information is crucial. Only by ensuring that students and prospective students receive financial value information at the relevant time—such as when they are in the process of making enrollment decisions—can the Department effectively help students make informed choices. These series of realizations culminated in the FVT Rule, which does provide the same information for all programs and includes requirements that ensure students can access that information at the very point in time when they are deciding where to enroll and making a financial commitment to the institution. Because enrollment decisions are generally made during

the same time each year, enjoining the Department's implementation of the FVT Rule would prevent its benefit for students who would otherwise have received that information prior to deciding where to enroll.

12. In addition, halting the FVT Rule would be particularly harmful for those considering graduate degrees since there is no other comprehensive source of public information on the financial value of graduate programs even though graduate loans represent almost half of annual loan volume. Specifically, it would preclude approximately 2.5 million students enrolling in around 43,000 graduate programs—where the average completing student attends a program that leaves its median student with about $59,000 in debt—from accessing information about program costs, sources of financial aid, and estimates of how much they will need to pay out of pocket (including loans) to acquire a degree from a given program.

### *GE Rule*

13. In contrast to the FVT Rule, the GE Rule addresses the Title IV eligibility of certain programs that are statutorily required to prepare students for gainful employment in a recognized occupation. GE programs are not subject to any additional reporting requirements under the GE Rule.

14. In their declarations, both Mr. Blair and Mr. Swanson assert that Ogle and Tricoci, respectively, are likely to fail one or both of the measures used by the GE Rule to assess GE programs' eligibility, relying on the Department's issuance of estimated results based on 2019 data. Blair Decl. ¶ 22; Swanson Decl. ¶ 22. They suggest this result is incongruous with the "relatively low debt burden" of, on average, approximately $7,000 per student, that they identify for their graduates. Blair Decl. ¶ 16; Swanson Decl. ¶ 16. They also suggest that their graduates "default on their student loans relatively infrequently." Blair Decl. ¶ 18; Swanson Decl. ¶ 18.

15.     Publicly available information on Department websites suggests that, in fact, these programs may be charging higher tuition than their students can reasonably afford when the relatively low earnings of cosmetology professionals are taken into account. College Scorecard data suggest that only between 18% and 33% of students at various Ogle and Tricoci schools are making progress toward reducing their Title IV loan balances two years after entering repayment. *See* https://collegescorecard.ed.gov/.

16.     Both Mr. Blair and Mr. Swanson indicate that they do not know whether their institutions' graduates report all of their earnings to the IRS, but they suggest that it is "well-recognized" that beauty and wellness professionals generally underreport income because they are compensated or tipped in cash. Blair Decl. ¶ 19; Swanson Decl. ¶ 19. The Department carefully considered the studies and data available on this issue and concluded that underreporting is not a significant problem that would be likely to affect a program's outcomes under the D/E or EP measures. *See* 88 Fed. Reg. at 70042 & n.139. On the other hand, there are a small number of professions, including cosmetology, where the earnings that a professional can expect—even after completing a vocational program—are relatively low. Students who seek to enter such professions can benefit from the GE Rule's provisions that will help to shift students towards higher-value programs through mechanisms such as requiring warnings for low-value programs at risk of losing Title IV eligibility, and no longer providing Title IV aid to programs that consistently fail the same financial value measure—either D/E or EP.

17.     The Department promulgated the GE Rule after over a year of public discussions, first through negotiated rulemaking and then through public notice and comment procedures, which in turn followed over a decade of research and experience with prior efforts to measure whether GE programs prepare their students for gainful employment in a recognized

9

occupation. If the Department is prohibited from implementing the GE Rule, it will be left without a key tool to avoid spending billions of dollars to support students enrolling in programs that we know regularly leave a majority of their graduates with poor financial outcomes. Title IV aid, funded by taxpayers, would continue to be funneled to GE programs that do not provide good value for students and instead leave them with debt they cannot afford to repay. The resulting harms to students and to taxpayers would be immense. Students who sought vocational training at these programs with the expectation that doing so would prepare them to enter a profession to earn more than they could otherwise would instead continue to face the adverse consequences of unaffordable debt or low earnings. Even students who ultimately are able to access certain mechanisms that are designed to mitigate harms to borrowers—for example, the Department's improved income-driven repayment plans and discharge programs—will still have to endure the struggle of trying to manage their debt before they obtain such relief. Any amount that students do not repay will be covered by the Department, shifting the cost of poor programs to taxpayers.

Executed on this ___ day of May 2024.

JAMES KVAAL
Digitally signed by JAMES KVAAL
Date: 2024.05.03 12:37:11 -04'00'

James Richard Kvaal