**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as the United States Secretary of Education, <br><br> *Defendants*. | No. 4:24-cv-259-O |

**<u>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION</u>**

**<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .......................................................................................................ii

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      Plaintiffs Are Likely To Succeed On The Merits.................................................2

        A. The 2023 Rule is *Ultra Vires* ...................................................................2

        B. The 2023 Rule Is Arbitrary And Capricious ...............................................9

               1.      The Rule Illogically Relies on Concededly Inaccurate Earnings
                       Data..............................................................................................9

               2.      The Rule Illogically Penalizes Schools for Factors Beyond Their
                       Control..........................................................................................11

               3.      The Rule Uses Illogical Debt-to-Earnings Thresholds ...................14

               4.      The  Rule's Cost-Benefit Analysis Is Illogical ...............................16

II.     Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction ............17

III.    The Remaining Factors Likewise Support A Preliminary Injunction.......................20

CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*AACS v. Devos,*
  258 F.Supp.3d 50 (D.D.C. 2017) .................................................................................9

*Ala. Ass'n of Realtors v. HHS,*
  594 U.S. 758 (2021) ...................................................................................................20

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) .............................................................................*passim*

*CCST v. U.S. Dep't of Educ.,*
  681 F.Supp.3d 647 (W.D. Tex. 2023).........................................................................20

*Chamber of Com. v. DOL,*
  885 F.3d 360 (5th Cir. 2018).......................................................................................5

*Chamber of Com. v. SEC,*
  85 F.4th 760 (5th Cir. 2023) ......................................................................................16

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund,*
  583 U.S. 416 (2018) .....................................................................................................8

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ...................................................................................................15

*Loaiza v. Loaiza,*
  130 S.W.3d 894 (Tex. App. 2004)..............................................................................16

*Lomax v. Ortiz-Marquez,*
  140 S.Ct. 1721 (2020)..................................................................................................6

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) ......................................................................................14

*NFIB v. OSHA,*
  595 U.S. 109 (2022)......................................................................................................7

*Sw. Elec. Power Co. v. EPA,*
  920 F.3d 999 (5th Cir. 2019) .....................................................................................12

*Texas v. Biden,*
  10 F.4th 538 (5th Cir. 2021) ................................................................................10, 17

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) ......................................................................................20

*United States v. Cooper*,
  38 F.4th 428 (5th Cir. 2022) ................................................................................6

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ............................................................................................19

**Statutes**

5 U.S.C. §705 .............................................................................................................19

20 U.S.C. §1002 ..................................................................................................2, 7, 8

20 U.S.C. §1070 ...........................................................................................................8

20 U.S.C. §1087a .........................................................................................................8

20 U.S.C. §1088 ...........................................................................................................2

Pub. L. No. 92-318, 86 Stat. 235 ................................................................................4

**Regulations**

34 C.F.R. §600.2 ...........................................................................................................4

76 Fed. Reg. 34,386 (June 13, 2011) ......................................................................2, 9

79 Fed. Reg. 64,890 (Oct. 31, 2014) .......................................................................2, 9

79 Fed. Reg. 16,426 (March 25, 2014) .....................................................................15

84 Fed. Reg. 31,392 (July 1, 2019) .....................................................................*passim*

88 Fed. Reg. 43,820 (July 10, 2023) .........................................................................16

88 Fed. Reg. 70,004 (Oct. 10, 2023) ...................................................................*passim*

**Other Authorities**

*Black's Law Dictionary* (4th ed. rev. 1968) ..............................................................3

*Black's Law Dictionary* (11th ed. 2019) ...................................................................3

CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s................12

David Carleton, *Landmark Congressional Laws on Education* (2002) .....................7

IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform
  Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation*
  (Nov. 21, 2023), https://rb.gy/6jkx6k ....................................................................10

Jill Desjean, *Is Your Campus Ready for New Regulations Effective July 1, 2024?*, Nat'l Ass'n of Student Financial Aid Administrators (May 6, 2024), https://rb.gy/qqq6jq ...........................18

S. Rep. No. 92-346 (1971) ...........................................................................................................4

Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much?  Defining Benchmarks for Manageable Student Debt*, College Board (2006), https://rb.gy/zcsl1r...................................15

The Random House Dictionary of the English Language (2d ed. unabridged, 1987) ........................3

U.S. Bureau of Labor Statistics, *2018 SOC Definitions* (Nov. 2017), https://rb.gy/2zfef1 ..................................................................................................................4

U.S. Bureau of Labor Statistics, *May 2019 National Occupation Employment and Wage Estimates* (last modified Mar. 31, 2020), https://rb.gy/g9sn4r .............................................4

U.S. Dep't of Educ., *Biden-Harris Administration Announces Landmark Final Rules to Protect Consumers From Unaffordable Student Debt and Increase Transparency* (Sept. 27, 2023), https://rb.gy/iavrwt ......................................................................................................17

## INTRODUCTION

Just last month, the Fifth Circuit preliminarily enjoined a rule promulgated by the Biden Administration's Department of Education (Department) that "upend[ed]" decades of regulatory practice and "overturn[ed] recent regulations issued by the previous Administration." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 226 (5th Cir. 2024) (*CCST*). After utilizing traditional tools of statutory interpretation—and noting that, before the Obama Administration, the Department had "*never* previously asserted" the authority under the Higher Education Act (HEA) that it "now claims it has always possessed"—and after dismissing *Chevron*-dependent precedent because the Department did not seek *Chevron* deference, the court found that the rule is likely *ultra vires* and arbitrary and capricious. *Id.* at 239-54. The court also had little trouble finding irreparable harm, as the plaintiffs' alleged compliance costs cleared the low "only … more than de minimis" hurdle. *Id.* at 234-39. And the court found the public-interest factor readily met too. *See id.* at 254-55.

That decision did not address the 2023 Rule at issue in this case, *see* 88 Fed. Reg. 70,004 (Oct. 10, 2023), but all the same reasoning necessitates a preliminary injunction here as well. The 2023 Rule seeks to disqualify programs from Title-IV eligibility based on an interpretation of the HEA's "gainful employment" language with zero grounding in text, structure, or history, and the Department's defense relies almost entirely on *Chevron*-dependent cases even though the Department never cites *Chevron* or requests *Chevron* deference. The 2023 Rule is also arbitrary and capricious in the extreme and demands deeply flawed data and calculations. And despite the Department's efforts to pin compliance costs on a separate rule, Plaintiffs sought relief from both rules, and the Department has no justification for collecting deeply flawed and misleading data for any purpose. While the Department quibbles about timing, its own actions in extending the timeline to comply with the 2023 Rule's reporting requirement months before the rule's effective date underscores that regulated parties must incur irreparable compliance costs long before the regulatory deadline. Simply put, Plaintiffs are incurring irreparable harm *now*. The other factors support relief too, as neither the government nor the public has any valid interest in the perpetuation of unlawful agency action. The Court should preliminarily enjoin the 2023 Rule and do so promptly.

1

## ARGUMENT

### I.  Plaintiffs Are Likely To Succeed On The Merits.

As the Fifth Circuit just reaffirmed, "'likelihood of success on the merits … is the most important of the preliminary injunction factors.'" *CCST*, 98 F.4th at 233.  The Department's submission confirms that Plaintiffs are exceedingly likely to succeed on the merits, as the 2023 Rule is patently *ultra vires* and arbitrary and capricious in multiple ways.  *See* Ogle.Br.19-43.

#### A.  The 2023 Rule is *Ultra Vires.*

The HEA states that a for-profit school can qualify as "eligible" to process Title-IV aid if  it "provides an eligible program of  training to prepare students for gainful employment in a recognized occupation."  20 U.S.C. §§1002(a), (b)(1)(A)(i); *see id.* §1088(b)(1)(A)(i).  All tools of  statutory interpretation confirm that this language means only that for-profit schools must provide instruction designed to get current enrollees ready for a paying job in an acknowledged vocational field—*i.e.*, unlike public or non-profit schools, for-profit schools typically cannot qualify as Title-IV eligible by providing general instruction in the liberal arts or humanities.  *See* Ogle.Br.19-29.  The Department fails to establish that, unbeknownst to everyone for half-a-century, this language *actually* means that the Title-IV eligibility of  for-profit schools should turn on metrics inspired by mortgage underwriters and academics scouring the European debt literature that measure the debt-to-earnings ratios of  program alumni and that compare those graduates' earnings to those of  a subset of  high school graduates aged 25-34.

The Department starts off  on the wrong foot in insisting that the Court should reject Plaintiffs' statutory argument because district courts elsewhere "upheld [the 2011 and 2014 Rules] against claims that the [Department] had no authority to issue them."  Opp.16-17; *see* 76 Fed. Reg. 34,386 (June 13, 2011) (2011 Rule); 79 Fed. Reg. 64,890 (Oct. 31, 2014) (2014 Rule).  To begin with, even the Department acknowledges that the 2023 Rule "differ[s] in significant respects" from the 2011 and 2014 Rules, not least because it includes an earnings-premium metric never previously addressed.  Opp.10.  More fundamentally, "the statutory interpretation" in every case invoked by the Department "relied on *Chevron* deference"—and *Chevron* deference alone—but "the Department makes no *Chevron* argument here," rendering those non-precedential out-of-circuit cases "distinguishable" (whether or

not *Chevron* is overruled or curtailed in the coming weeks). *CCST*, 98 F.4th at 248.

But although the Department is no longer requesting *Chevron* deference as it did when defending the 2011 and 2014 Rules—or even citing *Chevron*—it boldly suggests that the concededly "*Chevron*-dependent" cases addressing those rules somehow "properly applied canons of statutory construction" that refute Plaintiffs' statutory arguments. Opp.20 n.11. That argument is as unpersuasive as it sounds. No amount of wishful thinking can convert *Chevron*-step-two decisions where courts declared statutory text ambiguous into persuasive interpretations of statutory text.

And once the enterprise shifts from identifying ambiguity to discerning plain meaning, the Department's atextual and ahistorical position does not stand a chance. Starting with the operative text, the Department first asserts that "dictionary definitions of 'gainful' as 'profitable' or 'lucrative' can imply 'an excess of returns over expenses.'" Opp.18. The Department does not explain how its own favored implied definition supports an earnings-premium metric that does not examine "expenses" at all or a debt-to-earnings test that demands far more than that earnings merely exceed student-loan expenses. In all events, there is no need to resort to implications or penumbras here. After all, while it is certainly true that dictionaries define "gainful" as "profitable" and "lucrative," the Department omits the punchline: "profitable" and "lucrative" just mean "bearing or yielding a revenue or salary." *Black's Law Dictionary* 807, 1098 (4th ed. rev. 1968); *see* Ogle.Br.21 n.11. That is why the phrase "gainful employment" (traced back to the 17th century, no less) is defined as "work that a person can pursue and perform for money." *Black's Law Dictionary*, Gainful Employment *in* Employment (11th ed. 2019). Whether the money earned exceeds some ill-defined peer group or one particular expense by a pre-determined ratio is simply not part of the definition.

The Department protests that this centuries-old understanding violates the "canon against surplusage," since "employment" purportedly already encompasses payment. Opp.19. But that argument again reflects a poor understanding of the English language, as "employment" can simply mean "an activity or the like that occupies a person's time," even if unpaid—*e.g.*, "[s]he found knitting a comforting employment for her idle hours." The Random House Dictionary of the English Language 638 (2d ed. unabridged, 1987) (Random House). The modifier "gainful" thus does important work,

3

as it clarifies that the relevant type of "employment" is paid employment.  Indeed, Congress has recognized as much by adding specific provisions to bring certain non-paying occupations—*e.g.*, "volunteer firemen"—within the ambit of "gainful employment."  Pub. L. No. 92-318, §202(b), 86 Stat. 235.[1]

Zooming out further, the Department asserts that the phrase "'gainful employment in a recognized occupation,' taken as a whole, suggests a 'decently paying' job" (as coincidentally measured by the Department's novel metrics).  Opp.18.  But adding the term "recognized occupation" does not change the calculus.  In reality, a "recognized occupation" is just a vocation that is generally acknowledged as such.  *See* Ogle.Br.21.  Consistent with that view, outside the context of the 2023 Rule, the Department agrees that jobs like "dishwasher" and "fast food cook" are "recognized occupations," *see* U.S. Bureau of Labor Statistics, *2018 SOC Definitions* 94, 96 (Nov. 2017), https://rb.gy/2zfef1; 34 C.F.R. §600.2, even though such workers typically earn *less* than what the Department considers "decent" pay, *compare* U.S. Bureau of Labor Statistics, *May 2019 National Occupation Employment and Wage Estimates* (last modified Mar. 31, 2020), https://rb.gy/g9sn4r, *with* 88 Fed. Reg. at 70,125 (Table 4.1).  As that general practice illustrates, nebulous conceptions of "decent pay" are not baked into the ordinary meaning of either "gainful employment" or "recognized occupation."

Undeterred, the Department asserts that surely the "proper interpret[ation]" of all the operative text—"provide[] a program of training to prepare students for gainful employment in a recognized profession"—is that it "requir[es] such programs to 'actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation,'" by which the Department means jobs that allow "graduates" to clear certain "financial[]" benchmarks.  Opp.18.  But words like "program," "training," and "prepare" have nothing to do with post-graduate finances either; they instead suggest adding to a skill base,[2] *see* Ogle.Br.23, which is precisely what Plaintiffs'

---

[1] *See* S. Rep. No. 92-346, at 75 (1971) ("Since these firemen serve on a volunteer basis, without compensation, they are not gainfully employed as firemen and therefore their training cannot be considered fundable vocational education.  Section 203(b) amends the definition of vocational education to include training for volunteer firemen explicitly.").

[2] Thus, students who complete gainful-employment programs are not "worse off than when they started," since they gain skills and knowledge that they previously lacked.  *Contra* Opp.20.

programs do.  Moreover, the Department's fixation on "graduates" just confirms that it is "rewrit[ing] the law," *Chamber of Com. v. DOL*, 885 F.3d 360, 373 (5th Cir. 2018), as the operative text in fact focuses on the training provided to "students"—*i.e.*, those currently "enrolled in a school," Random House 1888—as opposed to the financial outcomes of "graduates" who are out on their own and years removed from school supervision.

The problems with the Department's textual argument run deeper.  If the gainful-employment language really meant that for-profit schools could lose their Title IV-eligibility based on debt-to-earnings and earnings-premium metrics for alumni years down the line, schools would have to accomplish the "nearly impossible task" of "predict[ing] macro-economic conditions, future earnings, and various other factors that influence employment and earnings well in to the future."  84 Fed. Reg. 31,392, 31,417 (July 1, 2019) (2019 Rule).  Confronted with its own words, the Department quibbles that schools would not have to "guarantee the financial success of *every* … program graduate," ostensibly because its metrics assess the median graduate.  Opp.21 (emphasis added).  But ensuring that the median graduate (and therefore half of all graduates) clears specific financial hurdles years after leaving school is no less daunting (and precisely what the Department addressed in 2019).  And if Congress intended Title-IV eligibility to entail such "nearly impossible" undertakings, "one would reasonably expect Congress to say so" directly given the "undeniably significant" "consequences" of losing Title-IV eligibility.  *Chamber of Com.*, 885 F.3d at 376; *see* 88 Fed. Reg. at 70,083.

On top of all that, the Department "[o]f course" agrees that it is "*not authorized*" to disburse Title-IV aid to "schools that are statutorily excluded from participation," and it recognizes that the gainful-employment language is a "specific eligibility requirement[]" that for-profit schools "must" satisfy to process such aid.  Opp.6, 18.  As the Department does not dispute, however, it cannot actually apply its debt-to-earnings and earnings-premium metrics to the vast majority of programs that it considers Title-IV eligible, including programs that are too new, too small, or located in places like Palau.  *See* Ogle.Br.24-25.  The Department blithely declares this issue "irrelevant," supposedly because it need not show that its chosen metrics are "required by statute."  Opp.21 n.12.  But that is precisely what the Department must show when it does not invoke *Chevron*.  Moreover, to the extent

that the Department would disqualify schools based on tests that it cannot even apply to most Title-IV-eligible programs, it has plainly wandered far from the statutory text of Title IV.

The Department's arguments regarding statutory "context" are even weaker than its textual ones. The Department acknowledges that, on multiple occasions, Congress specifically addressed matters of post-graduate debt and earnings in the HEA, such as in provisions addressing the "cohort default rate," "debt relief," the "College Navigator website," and "financial-aid recipient surveys." Opp.22-23 & n.14. And the Department does not argue that Congress ever used gainful-employment language to address these matters. Undeterred, the Department dismisses these other provisions because they are "not parallel" to the gainful-employment language—*e.g.*, the other provisions apply to "schools" and not "programs," or address post-graduate debt and earnings "at the back end" whereas the 2023 Rule is supposedly disqualifying programs based on such data at the front end. Opp.23 & n.14. The Department is missing the forest for the trees. The salient point is that "we know that Congress knows how to target" post-graduate debt and earnings—because Congress has a consistent practice of using language that is unambiguously directed towards those topics. *United States v. Cooper*, 38 F.4th 428, 434 (5th Cir. 2022). That Congress has chosen to address those issues at the school-, rather than the program-level, and at the back-, rather than the front-end, are congressional judgments worthy of respect, not an invitation to distort the meaning of "gainful employment."

In addition, the Department concedes that the HEA repeatedly uses the phrase "gainful employment" in other provisions, and it does not dispute that those provisions use it consistent with its ordinary meaning to refer simply to a paying job. *See* Opp.20-21. The Department thus posits that the "gainful employment" language in the operative text here "mean[s]" something "different" given the immediately surrounding "context." Opp.21. But embracing that approach "would violate yet another rule of statutory construction: 'In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning' across a statute." *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1725 (2020). The Department's invocation of "context" cannot overcome that heavy presumption—especially since the Department *ignores* critical context. As Plaintiffs have explained, Congress in 2008 amended one of the provisions at issue to clarify that a for-profit school could obtain Title-IV

6

eligibility even if it "provides a program leading to a baccalaureate degree in liberal arts."  20 U.S.C. §1002(b)(1)(A)(ii).  That amendment thus "reaffirmed" that the operative gainful-employment language just "differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities."  84 Fed. Reg. at 31,401.  The Department has no answer to an amendment that confirms ordinary meaning and consistent usage.

Nor does the Department have answers for the rest of the pre-2008 historical record.  It does not and cannot deny that a "lack of historical precedent" for regulatory action in the previous "half century" is a "telling indication" that such action "extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022); *see CCST*, 98 F.4th at 241.  The Department thus is forced to deny that its novel "accountability" metrics are "implement[ing] a new statutory interpretation." Opp.21-22.  That assertion beggars all belief.  Indeed, the Department's submission elsewhere concedes that it "first" embraced "accountability measures" that supposedly enforce the gainful-employment language (*i.e.*, debt-to-earnings metrics) "beginning" only "in 2011"—46 years after the HEA's enactment.  Opp.7, 21-22.  And the Department "recognize[d]" in the 2023 Rule that the earnings-premium metric is completely "new."  88 Fed. Reg. at 70,014; *see also* Dkt.1 ¶¶42-43 (discussing the Department's historical understanding of the gainful-employment language).

The Department's historical problems do not end there.  The Department again acknowledges that the operative gainful-employment language in the extant version of the HEA is not substantively different from language in the National Vocational Student Loan Insurance Act of 1965 (NVSLIA) requiring for-profit schools to provide "a program of postsecondary vocational or technical education designed to fit individuals for *useful* employment in recognized occupations."  Opp.6 (emphasis added).  Plaintiffs explained that "[n]o ordinary user of the English language would say that preparing students for 'useful employment' entails an assessment of debt-to-earnings ratios or comparisons to the earnings of an age-restricted pool of high school graduates."  Ogle.Br.27.  The Department tellingly does not put up a fight.  Furthermore, Plaintiffs highlighted that multiple statutes pre-dating the HEA and NVSLIA—including one that the Department does not deny is "the Magna Carta of vocational education," David Carleton, *Landmark Congressional Laws on Education* 63 (2002)—used gainful/useful

employment language and that none contemplated the use of debt-to-earnings or earnings-premium metrics. *See* Ogle.Br.28. Again, the Department's silence in its response is deafening.

Unable to muster support from text, context, history, or precedent, the Department leans on Title IV's "purpose," which (the Department says) is "to help students." Opp.18, 20 & n.11, 23. Even if Title IV enumerated that broad purpose, the Supreme Court has "long rejected the notion that '*whatever* furthers the statute's primary objective must be the law.'" *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 434 (2018). But Title IV never enumerates that broad and manipulable purpose. In reality, Title IV articulates more specific (and less in-the-eye-of-the-beholder) purposes, such as "making available the benefits of postsecondary education to eligible students … in institutions of higher education," 20 U.S.C. §1070(a); *see id.* §1087a(a) (similar), which are in turn defined to include for-profit schools that "provide[] an eligible program of training to prepare students for gainful employment in a recognized occupation," *id.* §1002(b)(1)(A)(i). That actually enumerated purpose just brings us back to "gainful employment" and its ordinary meaning, which plainly does not empower the Department to disqualify schools providing training for gainful employment and satisfying statutory default metrics based on its vague sense that it will "help students" to deny them funding for the programs that they have chosen to pursue.

The Department thus argues that adopting Plaintiffs' plain-text approach and rejecting its purposivist approach would produce "absurd" results, since "[i]t would be strange for Congress to loan out money to train students for jobs that were insufficiently remunerative to permit the students to repay their loans." Opp.19-20. But, as the Department has previously emphasized, "Congress intends for all Federal student loan borrowers to repay their loans, not just those who borrow to attend 'vocational training' programs." 84 Fed. Reg. at 31,401. For that reason, Congress has set cohort default rates applicable to all schools to weed out schools that disproportionately produce graduates unable to shoulder their student-debt ratios. But there is absolutely no warrant for using language that does no more than distinguish vocational training from liberal-arts education to impose distinct requirements on a subset of vocational-training programs at schools with perfectly acceptable default rates.

In short, it is beyond debate that the Department's effort to tie the Title-IV eligibility of

programs offered by for-profit schools to metrics that are divorced from the statutory text is *ultra vires*.

**B.     The 2023 Rule Is Arbitrary And Capricious.**

The 2023 Rule is also arbitrary and capricious in at least four ways, *see* Ogle.Br.29-43, and the Department's submission succeeds only in reinforcing the point.

**1.     The Rule Illogically Relies on Concededly Inaccurate Earnings Data**

The 2023 Rule hinges on two metrics that in turn rely on federal data purportedly showing the earnings of program graduates.  In the 2019 Rule, the Department admitted that federal earnings data are inaccurate because "many individuals do not" report all earnings, and it singled out the "cosmetology" sector as especially affected by this issue.  84 Fed. Reg. at 31,409.  And in both the 2011 and 2014 Rules, the Department "did not dispute" that there is a "significant problem" with federal earnings data because "many … graduates fail to report substantial portions of their income," *AACS v. Devos*, 258 F.Supp.3d 50, 56 (D.D.C. 2017), so it gave cosmetology schools at least some ability to challenge the earnings data in an appeals process, *see, e.g.*, 79 Fed. Reg. at 64,955; 76 Fed. Reg. at 34,424-25.  Thus, the Department's decision in the 2023 Rule to rely solely on federal earnings data "without an opportunity to appeal these earnings estimates or accommodation for the possibility of income underreporting" is arbitrary in the extreme.  88 Fed. Reg. at 70,042; *see* Ogle.Br.30-34.

The Department attempts to defend this indefensible departure first on the ground that measuring earnings in the third post-graduate year instead of the second (as under the 2014 Rule) will "lead[] to substantially higher measured program earnings."  Opp.27.  That is worse than non-responsive.  If "graduates' earnings tend to increase over time," Opp.10, then year-3 data will be even more distorted than year-2 data and thus even *more* earnings will go unreported.  Citing a passage from the 2023 Rule, the Department tries to neutralize this issue by arguing that the increase in third-year earnings will "'provide a buffer more than sufficient to counter possible error' arising from … underreported income."  Opp.29.  But that passage in fact relates to the "statistical noise added" to the earnings data "by the IRS," 88 Fed. Reg. at 70,096; *see* 88 Fed. Reg. at 32,355, not underreported income.

Next, the Department asserts that "payment platforms" like Venmo "must issue 1099s when a user's annual income exceeds a certain amount—scheduled to be as low as $600 in the near future"—

and "[t]axpayers are unlikely to leave income unreported if it has already been reported in a 1099." Opp.27.  But the Department still has identified no evidence that cash is no longer king when it comes to cosmetology, let alone that there are no regional or economic variances in Venmo-adoption rates. *See* Ogle.Br.32; *cf. Texas v. Biden*, 10 F.4th 538, 555 (5th Cir. 2021) ("We do not defer to the agency's conclusory or unsupported suppositions.").  Worse still, this change to the 1099 reporting threshold has not even taken effect.  Instead, through at least tax year 2023, the reporting threshold is $20,000; and while the IRS "is planning for a threshold of $5,000 for tax year 2024," it has not yet implemented it.  IRS, *IRS Announces Delay in Form 1099-K Reporting Threshold for Third Party Platform Payments in 2023; Plans for a Threshold of $5,000 for 2024 to Phase in Implementation* (Nov. 21, 2023), https://rb.gy/6jkx6k. Thus, the someday prospect of a $600 threshold for 1099s is utterly irrelevant, since the 2023 Rule will disqualify programs based on flawed data that long precedes this possible change.  *See* Ogle.Br.32.

Taking another tack, the Department suggests that "new research" has "called into question the notion that underreported income was a significant issue" and has "pointed to problems with the prior alternate earnings appeals."  Opp.27.  But that "new research" (the Cellini & Blanchard study) did not suggest that federal earnings data are now accurate or that alternative-earnings-appeal processes are not administrable.  Quite the opposite.  Even that research *agreed* that the underreporting of tip income is "prevalent" in the cosmetology sector and ultimately argued that, in an "appeal" process, "a reasonable earnings adjustment would be to allow earnings to be inflated by" "8-10%" to account for underreported tips—while conceding that "underreporting is *not* limited to tips."  Opp.Ex.3 at 6 (emphasis added).  How unadjusted federal earnings data could possibly qualify as the "best" data when even its own favored studies say otherwise is left unexplained by the Department.  Opp.26.

The Department nevertheless claims that "no change" to its use of federal earnings data "was warranted" because "comments agreed that there is no evidence that underreporting is widespread among cosmetology program graduates" and because a "recent survey conducted by the beauty industry itself … indicated a 'high rate of tip [reporting] compliance' by salon owners."  Opp.28-29.  But the comments cited by the Department (from Arnold Ventures) just pointed to the Cellini & Blanchard study referenced above (which Arnold Ventures financed), which found widespread tip

underreporting and did not even measure all forms of underreporting.  *See* Opp.Ex.7 at 20 & n.78; Opp.Ex.3 at 1.  And the Department badly misreads the cited survey (the Qnity survey).  In fact, that survey emphasized that "[u]nderreporting of income" is an "issue[] with current workforce earnings data" and then said that, among a very small sample size of 160 companies that claimed to largely report tip income, cosmetologists had "staggering[ly]" *higher* annual earnings as compared to what the Department's average-earnings data reflected.  Opp.Ex.6 at 7, 37, 39, 51.  Far from supporting the Department's position, then, the Qnity survey severely undermines it, since it strongly indicates that accounting for commonly underreported income dramatically increases cosmetologist earnings.

The Department thus changes the subject, blaming Title-IV-eligible cosmetology programs for "high tuition costs relative to the typical earnings in this profession."[3]  Opp.29.  But that "over-simplifie[d]" theory,[4] 84 Fed. Reg. at 31,399—which has no connection to the earnings-premium metric—just begs the question whether the Department has accurate earnings data for the "typical" cosmetologist.  Until now, no one (including the Department) has thought that unadjusted federal earnings data are correct; the Department's decision here to forge ahead with such data while eliminating any appeal process "is not adequately justified or reasonably explained."  *CCST*, 98 F.4th at 246.

### 2. The Rule Illogically Penalizes Schools for Factors Beyond Their Control

The 2023 Rule is also arbitrary and capricious because its earnings-based metrics penalize schools for factors outside their control.  The 2023 Rule blames schools for their graduates' "insufficiently remunerative" jobs, Opp.20, *even if* (for example) graduates themselves choose to work only part-time or not at all, those graduates are affected by historical discrimination that depresses earnings, and those graduates' earnings are affected by unpredictable macroeconomic shocks.  In 2019, the

---

[3] It bears emphasizing that the Department has previously conceded that "creating a system of sanctions that are so closely linked to the tuition and fees a [school] charges would exceed the Department's current authority."  84 Fed. Reg. at 31,416.

[4] As the 2019 Rule explained, "in some instances, … higher cost is associated with better equipment and facilities, more highly qualified faculty, better quality or more plentiful supplies, and more abundant or convenient student support services," 84 Fed. Reg. at 31,415—*i.e.*, the type of expenditures that the Department still seems to think that schools should incur, *see* Opp.33.  In addition, lower tuition at public schools may reflect "public subsidies."  84 Fed. Reg. at 31,416.

Department deemed it "absurd" to hold schools accountable for such uncontrollable "variables."  84 Fed. Reg. at 31,409-10.  The Department's reversal of course here is just as absurd.  *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1014, 1018 (5th Cir. 2019); *see* Ogle.Br.34-37.

The Department's response is incoherent.  The Department cannot deny that many graduates choose to work part-time—because the 2023 Rule says so.  In response to comments that "workers often choose fields such as cosmetology for their flexible work schedules, allowing them to combine part-time work with other valuable activities," the Department "acknowledge[d]" as much.  88 Fed. Reg. at 70,044.  The Department nevertheless claims that it is free to ignore the impact of part-time work because "program outcomes under the metrics" purportedly are unlikely to "be determined by certain graduates' voluntary choices to earn less."  Opp.32.  But choices that workers in a given field "often" make are not isolated occurrences unlikely to impact the metrics.  That is why the Department's own data showed that virtually every cosmetology program subject to its earning-based metrics will fail them.  Indeed, the Department itself is relying on studies (*e.g.*, the Qnity survey) showing that the average cosmetologist works just 27.8 hours/week.  *See* Opp.Ex.6 at 42.  To just assume that the impact of part-time work is isolated or immaterial is "absurd[]."  *CCST*, 98 F.4th at 246.  Perhaps recognizing as much, the Department claims that its metrics still "provide[] relevant information" "regardless of … individual circumstances."  Opp.32.  But the proper response to "relevant" but misleading information is to correct for the inaccuracy—say, by applying a multiplier to reflect the earnings of a graduate choosing to work a 40-hour week—not to ignore the problem with the data and disqualify from Title-IV participation a swath of programs based on concededly problematic data.

The Department also deems it "implausible" that graduates "might be able to find work three years after graduation yet still 'choose' not to work."  Opp.33.  Those who have heard of children would beg to differ.  Plaintiffs' students, for example, are 96-98% female, and the median graduate is in her mid-20s, *see* Dkt.10.Ex.A ¶14; Dkt.10.Ex.B. ¶14—placing the median graduate three-years-removed from school in prime childbearing years, *see* CDC, *Births and Natality* (last rev. Apr. 25, 2024), https://rb.gy/p3dt3s ("[m]ean age at first birth" is "27.4").  And "[a]mong the 10,727,000 married couples with children under the age of 6, there are 3,811,000 in which the husband works but the wife

does not." 84 Fed. Reg. at 31,406. It thus is hardly "implausible" that, three years post-graduation, cosmetologists would (at least temporarily) choose to exit the labor force even if they could find work.[5]

The Department does not deny that historical discrimination against women and minorities can suppress earnings—again, because the 2023 Rule admits as much. *See* 88 Fed. Reg. at 70,031 ("We agree that systemic discrimination … may affect … earnings after graduation."). The Department nevertheless sweeps that issue aside because Plaintiffs purportedly ignored their "regression analyses" suggesting that "demographics" are not "determinative" of earnings "alone." Opp.34. But plenty of non-sole causes still move the needle, and regardless, the Department is indisputably holding schools accountable for their graduates' earnings even though the Department concedes that those earnings (at least partly) reflect historical discrimination for which schools are not responsible. When the Department is already blaming schools for graduates' voluntary decisions to work part-time and so many other uncontrollable variables, that illogical choice just compounds the problems.

Finally, the Department does not and cannot deny that the 2023 Rule blames schools for macroeconomic events that impact earnings. *See, e.g.*, 88 Fed. Reg. at 70,092 ("We acknowledge that the COVID-19 pandemic likely affected the earnings of workers in salons, spas, [and] the beauty industry[.]"). Nor does the Department seriously dispute that its debt-to-earnings metric is manifestly ill-suited to adjust for such events.[6] While the Department cites the 2023 Rule to suggest that its earning-premium metric has a "buffering" mechanism that favors schools since the earnings of high school graduates tend to fall more than others' during economic downturns, Opp.35-36, the cited passage

---

[5] Workers also regularly "take time out of employment" to "care for other family members, manage a personal health condition, start a business, or pursue other personal lifestyle choices." Ogle.Br.34. And workers who opt for a field known for flexible hours are disproportionately likely to opt out in these ways. The Department does not engage with those issues. All this underscores why it is irrational for the earnings-premium metric to compare the earnings of program graduates who are not even in the labor force to those of high school graduates "in the labor force." Opp.34.

[6] The Department states that "Plaintiffs' suggestion … that programs must be able to predict the future in order to 'establish a price that will guarantee passing D/E rates' … misses the point." Opp.36. But the Department does not explain which point that is, nor could it: Tuition rates (which inform the numerator in the debt-to-earnings metric) are established years before the period relevant to the Department's assessment of earnings (which inform the metric's denominator).

says only that this buffering mechanism applies when the earnings of high school graduates are compared to those of "college graduates," which does not help schools (like cosmetology schools) that do not produce college graduates, 88 Fed. Reg. at 70,058.  The Department thus is left arguing that at least the COVID-19 pandemic "will have very little impact" on its metrics because "the first earnings measurements will be for a cohort whose third year after completion was 2021 or 2022," and by then, "the unemployment rate had fallen to 3.5%."  Opp.35.  But the Department's discussion of the pandemic just shows how bizarre the 2023 Rule really is.  Indeed, if a 2018 cosmetology-school graduate had to accept a lower-paying job in an entirely different industry in 2020 because the pandemic forced the closure of her salon, *see* Ogle.Br.37, the Department would *still* consider her 2021 earnings in that different industry as a valid barometer of whether the cosmetology school adequately performed its cosmetology-related educational duties in 2018.  That makes no sense at all.

With nothing else to offer, the Department says that at least *some* "factors" affecting a program's "performance in the metrics *are* within [the school's] control."  Opp.33.  But that argument gives up the game, as it concedes that a program's performance in the metrics turns on numerous factors *outside* a school's control.  The Department offered an "unsatisfactory" "rationale" for this baffling approach in the 2023 Rule; its latest attempt is no improvement.  *CCST*, 98 F.4th at 246.

### 3.    The Rule Uses Illogical Debt-to-Earnings Thresholds

The Department cannot refute Plaintiffs' showing that it failed to "adequately justify" the 8% and 20% debt thresholds used in the debt-to-earnings metric.  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023); *see* Ogle.Br.38-41.  The Department claims that the 2023 Rule "addresses in detail why the 8% annual income threshold" is "reasonable."  Opp.37.  But that so-called "detailed" explanation just observes in passing that the 8% threshold arises from "mortgage industry practice," 88 Fed. Reg. at 70,054, while otherwise directing readers to the justification provided in the proposed rule, *see id.* at 70,020 ("As discussed in the NPRM, … the annual D/E rate threshold is grounded in mortgage-underwriting standards.").  As the Department does not dispute, the justification provided in the proposed rule is—quite literally—a copy-and-paste of the justification provided in the 2014 Rule, which cited only the 2006 paper from Baum and Schwartz.  *See* 79 Fed.

Reg. 16,426, 16,443 & nn.50-51 (March 25, 2014).  But as the Department explained in the 2019 Rule, a "more careful reading of" the Baum and Schwartz paper revealed that it "does not support the eight percent threshold" at all, "but instead clearly refutes it for the purpose of establishing manageable student loan debt," 84 Fed. Reg. at 31,426, since that paper explicitly said that "[t]he shortcomings" of the 8% threshold "are apparent" and that it has "no particular merit or justification" "as a benchmark for manageable student loan borrowing," Sandy Baum & Saul Schwartz, *How Much Debt Is Too Much?  Defining Benchmarks for Manageable Student Debt* 3, College Board (2006), https://rb.gy/zcsl1r (Baum & Schwartz).  Given that recent determination, the Department had a duty in the 2023 Rule to "reasonably explain[]" why an 8% threshold that it had just skewered as irrational is suddenly now rational.  *CCST*, 98 F.4th at 246.  But the 2023 Rule does not even "display awareness that it is changing position" in the first place.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  And the Department's submission here just repeats that error.  *See* Opp.37 ("The Department first adopted both thresholds in the 2011 Rule, applied them again in the 2014 Rule, and has now applied the same thresholds in the 2023 metric.").

That alone dooms the debt-to-earnings metric, as that metric cannot survive without the 8% threshold—as the Department does not contest.  *See* Ogle.Br.39.  But the Department's defense of the 20% threshold is lacking too.  The Department insists that its use of the 20% threshold "passes muster under arbitrary and capricious review," Opp.38, but it does not deny that Baum and Schwartz themselves characterized that metric (*i.e.*, the one that they invented) as "somewhat arbitrary," Baum & Schwartz 12.  The Department also does not dispute that Baum and Schwartz said that the 20% threshold "should be … modifi[ed] for family size," *id.*, and that the 20% threshold in the 2023 Rule makes no such adjustment.  Instead, the Department argues that "the earnings of individuals in a household who did not attend a program have no bearing on whether that program prepares its students for gainful employment in a recognized occupation."  Opp.39.  But the Department has (atextually) interpreted that language to turn on whether educational programs are "affordable."  88 Fed. Reg. at 70,012.  It is common sense that households afford what they pay for by sharing income.  Indeed, states like Texas are "community property" states, meaning that "any spouse's personal

income during marriage" is owned together.  *Loaiza v. Loaiza*, 130 S.W.3d 894, 908 (Tex. App. 2004).

And ignoring household income and imposing a 20% threshold is especially odd since the Department's own income-driven repayment programs *do* account for household income and then cap repayment obligations at just 5-10% of the household's discretionary income.  *See* 88 Fed. Reg. 43,820, 43,820, 43,881 (July 10, 2023).  The upshot is that the 20% threshold in the 2023 Rule is "obsolete."  84 Fed. Reg. at 31,407.  The Department's only argument is that the "after-the-fact pro-tections" provided by income-driven repayment programs are beside the point because the 2023 Rule addresses the supposed antecedent failure of schools to ensure that graduates have sufficiently high-paying jobs.  Opp.39.  That theory is even more unpersuasive the second time around.  *See* pp.11-14, *supra*.  Indeed, as the Department does not deny, graduates themselves sometimes voluntarily choose lower-paying jobs to benefit from income-driven repayment programs.  *See* Ogle.Br.41.

### 4.    The  Rule's Cost-Benefit Analysis Is Illogical

Try as it might, the Department falls far short of "adequately substantiat[ing]" "benefits" that "'bear a rational relationship'" to the huge "'costs imposed'" by the 2023 Rule.  *Chamber of Com. v. SEC*, 85 F.4th 760, 777 (5th Cir. 2023); *see* Ogle.Br.41-42.  The Department claims that "Plaintiffs are unlikely to succeed … most obviously because they incorrectly assume all cosmetology programs par-ticipate in and are reliant on Title IV."  Opp.40.  Yet Plaintiffs cited the Department's own data showing that, "of the 1,270 cosmetology programs currently eligible for Title-IV funding," 639 of those programs (or over 50%)—which collectively enroll 153,700 of the 191,600 students attending such programs (or over 80%)—are projected to fail under the 2023 Rule.  Ogle.Br.18; *see* Ogle.Br.41.

The Department seeks to downplay that figure because "Title IV-participating cosmetology programs that remain Title IV-eligible could expand their programs to respond to any demand that non-participating programs do not meet."  Opp.41.  But, as the Department does not dispute, *only 13* of the 1,270 Title-IV-eligible cosmetology programs nationwide are projected to pass the 2023 Rule's metrics (and none is in the states where Plaintiffs operate).  *See* Ogle.Br.19.  The Department thus is banking on the possibility that the cosmetology programs that it did *not* have the capability to evaluate (*e.g.*, smaller programs and those in Palau) will pick up the slack and ensure that graduates have

sufficiently remunerative jobs—and that there is a "minimal" risk that they will fail to do so. Opp.42. But the Department has never offered any data to support that fanciful supposition, and courts "do not defer to the agency's conclusory or unsupported suppositions." *Texas*, 10 F.4th at 555.

Nor do the Department's remaining arguments get the job done. The Department suggests that "cosmetology programs that lose Title IV eligibility" could "lower their tuition" to avoid failing the 2023 Rule's metrics in the future. Opp.41. But the question here is whether the Department adequately substantiated its view that the majority of cosmetology programs should lose their Title-IV eligibility in the first place (it did not). The Department also posits that the hundreds of programs projected to fail the 2023 Rule's metrics might not in fact fail. *See* Opp.41. But not even the Department is buying that: It is publicly proclaiming that the 2023 Rule "will protect" 700,000 students at various programs (*i.e.*, by failing them), U.S. Dep't of Educ., *Biden-Harris Administration Announces Landmark Final Rules to Protect Consumers From Unaffordable Student Debt and Increase Transparency* (Sept. 27, 2023), https://rb.gy/iavrwt, and that number includes the 150,000+ students at cosmetology programs, *see* 88 Fed. Reg. at 70,140 (Table 4.18). Lastly, the Department suggests that all these program failures are much ado about nothing, because "students will find ample more affordable alternatives" among "non-Title IV-participating cosmetology programs." Opp.42. But it strains credulity to suggest that the way to "help students" who require much-needed Title-IV aid is to direct them to schools where that aid is not even available. Opp.39. Indeed, the Department conceded in the 2023 Rule that the loss of Title-IV aid is an "undeniably serious consequence for students" for a reason. 88 Fed. Reg. at 70,083; *cf. CCST*, 98 F.4th at 255 (explaining that a school's loss of Title-IV eligibility "would be to the detriment of students who rely on the availability of Direct Loans," a "consequence" that "would harm the public at large"). Plaintiffs thus are likely to succeed on all their merits arguments.

## II. Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction.

The Department's arguments regarding the irreparable-harm prong fall flat too. As *CCST* reiterated, "[a]lleged compliance costs need only be 'more than de minimis'" to satisfy that prong. 98 F.4th at 236. Plaintiffs plainly clear that low bar given the substantial compliance costs associated with the 2023 Rule's reporting requirement, which is what enables the Department to compute its

unlawful metrics.  *See* Ogle.Br.43-44.  While the Department (dubiously) posits that Plaintiffs have "exaggerate[d]" those compliance costs,[7] Opp.16, that unsubstantiated quibble ignores both the governing standard (more-than-de-minimis costs suffice), and the Department's own felt need to extend the reporting deadline by two months well in advance of the regulatory deadline (underscoring that data collection is no small or inexpensive undertaking).

The Department seeks to pin all these compliance costs on the need to comply with the "financial value transparency framework" that applies to all Title-IV-eligible programs, rather than the "accountability and eligibility framework" that applies only to Title-IV-eligible gainful-employment programs.  Opp.15.  Nonsense.  There is no basis for slicing the baloney so thinly.  The 2023 Rule ties those costs together by acknowledging that "[t]he primary costs of the final regulations related to the financial value transparency *and GE accountability requirements* are the additional reporting required by institutions."  88 Fed. Reg. at 70,009 (emphasis added).  That is precisely why Plaintiffs requested a preliminary injunction that encompasses *both frameworks*.  The Department's effort to pretend otherwise ignores the very first sentence of the preliminary-injunction motion, which specifically requested an injunction against, *inter alia,* "subparts Q and S of 34 C.F.R. part 668."  Dkt.4 at 1.  As the 2023 Rule explains, "subpart Q" *is* the "financial value transparency framework" (and "subpart S" is "the accountability and eligibility framework").  88 Fed. Reg. at 70,005.  And as the Department recognizes here, *see* Opp.15 n.6, Plaintiffs argued in their opening brief that all the arbitrary-and-capricious arguments pressed against the 2023 Rule's metrics "apply equally to the financial value transparency

---

[7] The Department invokes the "transitional reporting" method, which allows schools to report information for the two (instead of six) most recent award years.  Opp.16.  But the Department does not disclose that this transitional-reporting method will generally make it even *more* likely that a program will fail the debt-to-earnings metric, since the transitional-reporting method tends to artificially inflate the numerator in that metric.  *See* Jill Desjean, *Is Your Campus Ready for New Regulations Effective July 1, 2024?*, Nat'l Ass'n of Student Financial Aid Administrators (May 6, 2024), https://rb.gy/qqq6jq (noting that "transitional reporting may cause your institution to have higher D/E ratios than would be observed using standard reporting").  Worse, if a school selects the transitional-reporting option, they must use that method (and live with the consequences) for six years.  *See* 88 Fed. Reg. at 70,191.

framework, as that framework uses the same tests,"[8] Ogle.Br.42 n.17; *see* 88 Fed. Reg. at 70,188-91. The Department thus cannot eliminate Plaintiffs' irreparable injury by pretending that they challenged only half a loaf.  Nor, more generally, can an agency justify imposing *ultra vires* requirements or relying on flawed data by imposing a reporting requirement on top of a wholly unjustified substantive eligibility requirement.  "We will make you gather the flawed data anyways" is not a valid agency response to a showing of irreparable harm from a flawed substantive eligibility requirement.  That is especially true here where the irreparable harm goes beyond data collection to all the uncertainty created for students and Plaintiffs alike based on the looming threat of ineligibility.

Shifting gears, the Department asserts that, before Plaintiffs will incur unrecoverable compliance costs, there is "ample time" to "confer regarding a summary judgment briefing schedule" and for this Court to resolve "cross-motions for summary judgment based on the certified administrative record," Opp.14, which is "tens of thousands of pages" and which the Department filed in the *AACS* case weeks after Plaintiffs moved for a preliminary injunction, *AACS*.Dkt.16.[9]  But this Court just deemed "appropriate" a summary-judgment briefing schedule in *AACS* that will consume four months, excluding the time to write an opinion.  *AACS*.Dkt.15.  A comparable schedule here would guarantee irreparable harm.  Instead of racing through what the Department describes as a "voluminous" administrative record, *AACS*.Dkt.12 at 2, which it anticipates discussing at length in summary-judgment briefing, *see* Opp.14, 26, the prudent course is to issue a preliminary injunction before the 2023 Rule's July 1 effective date[10]—which would "preserve the relative positions of the parties," *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see* 5 U.S.C. §705—and to then resolve cross-motions for summary judgment here and in *AACS* on the schedule that the Court just endorsed.

---

[8] The Department suggests that Plaintiffs' arguments regarding the financial value transparency framework are inadequate because they appear (only partly) in a footnote (apparently forgetting that its own submission includes over 2,000 words of argument in footnotes).  Opp.15 n.6.  But the footnote just made a point about the import of the *body* text.

[9] "*AACS*.Dkt." refers to the docket in *AACS v. U.S. Dep't of Educ.*, No. 23-cv-1267 (N.D. Tex.).

[10] To reiterate, Plaintiffs are now requesting relief by July 1 (instead of the May 20 date originally requested) in light of the Department's subsequent extension of the reporting-requirement deadline and to reduce the burden on the Court.  *See* Dkt.16.

The Department suggests that Plaintiffs' supposed "delay" in seeking a preliminary injunction "weighs heavily against their assertion of irreparable harm." Opp.14. That theory is hard to take seriously given the Department's view that there is still "ample time" before this Court needs to act. Opp.16. Regardless, none of the cases cited by the Department suggests that Plaintiffs engaged in dilatory conduct by moving for a preliminary injunction on the same day that they filed their complaint (and by moving even *more* quickly than the successful *CCST* plaintiffs, who sought a preliminary injunction in April 2023 against a rule taking effect in July 2023, *see CCST v. U.S. Dep't of Educ.*, 681 F.Supp.3d 647, 654 (W.D. Tex. 2023)). Each cited case involved plaintiffs *already* suffering from the complained-of harm who *then* waited several months before seeking injunctive relief. Nothing of the sort occurred here. Simply put, as in *CCST*, the irreparable-harm prong is amply satisfied.

## III.    The Remaining Factors Likewise Support A Preliminary Injunction.

Finally, the Department's effort to dispute the public-interest and balance-of-equities factors—which "merge" here, Opp.42-43—is also unavailing. *See* Ogle.Br.44. The Department emphasizes the purported "benefit[s]" of the 2023 Rule, which (it claims) will trickle down to "taxpayers." Opp.43-44. But the Department does not dispute that there is "no 'interest in the perpetuation of unlawful agency action,'" *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022), "even in pursuit of desirable ends," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021) (per curiam). And the Department's supposed interest in helping taxpayers is suspect to boot given that the Department is bent on "forgiv[ing] … students' loan obligations" "to the greatest extent possible." *CCST*, 98 F.4th at 226 n.1. Thus, instead of allowing the unprecedented and unlawful 2023 Rule to take effect July 1, the Court should grant a preliminary injunction—and spare the Fifth Circuit from having to do so.[11]

## CONCLUSION

The Court should grant the motion for a preliminary injunction no later than July 1, 2024.

---

[11] As *CCST* explains, "[n]othing in the text" of the Administrative Procedure Act "suggests that either preliminary or ultimate relief … needs to be limited to [the plaintiffs]." 98 F.4th at 255. Several of Plaintiffs' arguments (*e.g.*, that the 2023 Rule's metrics illogically blame schools for uncontrollable variables and that the debt-to-earnings metric uses illogical percentage thresholds) affect all regulated programs, even if they are not gainful-employment programs or cosmetologist programs.

Respectfully submitted,

s/Cole Ramey

Paul D. Clement, VA Bar #37915
  (pro hac vice)
Andrew C. Lawrence, VA Bar #99830
  (pro hac vice)
Kevin Wynosky*, PA Bar #326087
  (pro hac vice)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com

Cole Ramey, TX Bar #16494980
Christin Jones, TX Bar #24070017
KILPATRICK TOWNSEND & STOCKTON LLP
2001 Ross Avenue
Suite 4400
Dallas, TX 75201
(214) 922-7126
cramey@ktslaw.com
cjones@ktslaw.com

*Supervised by principals of the firm who are
  members of the Virginia bar

*Counsel for Plaintiffs*

May 24, 2024