UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| OGLE SCHOOL MANAGEMENT, LLC; TRICOCI UNIVERSITY OF BEAUTY CULTURE, LLC,<br><br>    Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, IN HIS OFFICIAL CAPACITY AS THE UNITED STATES SECRETARY OF EDUCATION,<br><br>    Defendants. | Civil Action No. 4:24-cv-000259-O |

## ORDER

Before the Court are Plaintiffs' Motion for Injunction (ECF No. 4) and Memorandum in Support (ECF No. 10); Defendants' Response (ECF No. 25); and Plaintiffs' Reply (ECF No. 30). For the reasons outlined below, Plaintiffs' Motion is **DENIED**.

**I.  BACKGROUND**

Title IV of the Higher Education Act ("HEA") authorizes federal funding to eligible schools. Particularly, the HEA allows for-profit schools access to Title IV loans if they can satisfy certain conditions. One of those conditions is that programs offered by for-profit schools ("GE Programs") must lead to gainful employment. 20 U.S.C. § 1088(b)(1). About a decade ago, in response to a growing debt crisis, the Department of Education (the "Department") took statutory steps to tie certain Gainful Employment ("GE") measures to Title IV funding.[1] Through Rules issued first in 2011 and then in 2014, the Department set forth reporting and disclosure

---
[1] Defs.' Resp. 4, ECF No. 25.

requirements, as well as accountability measures. The 2011 and 2014 Rules were aimed at addressing GE graduates' rising loan defaults that could not be primarily attributed to students' characteristics, but instead were attributable to the quality of training that GE programs provided. *Ass'n of Priv. Colls. & Univs. v. Duncan* (*Duncan I*), 870 F. Supp. 2d 133, 150–51 (D.D.C. 2012) (describing "a series of multivariate regression analyses" that the Department conducted before issuing the 2011 Rule to rule out the possibility that its measures simply reflected student demographics); *accord Ass'n of Priv. Colls. & Univs. v. Duncan* (*Duncan II*), 110 F. Supp. 3d 176, 192 (D.D.C. 2015), *aff'd*, No. 15–5190, 640 Fed. App'x 5 (D.C. Cir. Mar. 8, 2016) (discussing similar analysis described in 2014 Rule); *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015) (same). Neither the 2011 nor the 2014 Rules were ever fully implemented, and the Department, under a new administration, rescinded the 2014 Rule in 2019, stating that the Department "incorrectly described congressional intent" with its GE regulations and engaged in "regulatory overreach." Program Integrity: GE, 84 Fed. Reg. 31392, 31402 (July 1, 2019).

Then, in October 2023, the Department sought to reinstate GE accountability measures and issued the Financial Value Transparency ("FVT") and GE Rules (collectively, the "2023 Rule") in response to increasing outstanding debt for Title IV loans.[2] FVT & GE, 88 Fed. Reg. 70004 (Oct. 10, 2023) (establishing subparts Q and S of 34 C.F.R. § 668 (2024).

First, the FVT Rule establishes a new Department website to be created by July 1, 2026. FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. 32300, 32351 (May 19, 2023); FVT & GE, 88 Fed. Reg. at 70072–77, 70187–88. Under the FVT Rule, GE Programs are required to report certain information to populate the website's data fields. FVT & GE, 88 Fed. Reg. at 70187, 70191. The website will provide students with key information

---

[2] Defs.' Resp. 9, ECF No. 25.

about the financial value of postsecondary programs at key points in time when students are making enrollment decisions. The website will also include two metrics, (1) the debt to-earnings ("D/E") metric and (2) the Earnings Premium ("EP") that aim to help students compare programs' financial outcomes. "The D/E rates thresholds are based on research into how much debt service payments are affordable based on an individual's earnings." FVT & GE, 88 Fed. Reg. at 70020, 70124. GE Programs do not fulfill "the D/E criteria when a program's discretionary D/E[3] rate is above 20 percent, and the annual D/E[4] rate is above 8 percent.". *Id.* The EP metric measures how program graduates' typical earnings compare to earnings of typical high school graduates." FVT & GE, 88 Fed. Reg. at 70015 ("While the D/E rates measure identifies programs where debt is high relative to earnings, the EP measure assesses the economic boost a program provides to its students independent of the debt incurred.").

Second, the GE Rule, laid out in 34 C.F.R. Subpart S, uses the same D/E and EP metrics that will be posted on the FVT website to determine whether GE Programs meet their unique statutory eligibility requirement by preparing students for gainful employment in a recognized occupation. FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. at 32342–43; FVT & GE, 88 Fed. Reg. at 70015–16. To remain eligible, GE Programs must not fail the same metric (D/E or EP) for two out of any three consecutive award years for which the metrics are calculated. FVT & GE, 88 Fed. Reg. at 70192. The Department estimates that GE Programs are not at risk of losing eligibility under the GE Rule until 2026.[5]

---

[3] The discretionary D/E rate is the percentage of a program's annual loan payment compared to the discretionary earnings of the students who completed the program, as calculated under § 668.403. FVT & GE, 88 Fed. Reg. at 70186.
[4] The annual D/E rate is the ratio of a program's annual loan payment amount to the annual earnings of the students who completed the program, expressed as a percentage, as calculated under § 668.403. *Id.*
[5] Defs.' Resp. 12, ECF No. 25.

On March 21, 2024, Plaintiffs filed a motion to preliminary enjoin both the FVP and GE Rules, which is now ripe for review.[6]

## II. LEGAL STANDARD

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the movant, the party seeking relief bears the burden of proving all elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). And while the decision to grant or deny injunctive relief is committed to the district court's discretion, such relief is considered an "extraordinary remedy," never awarded as of right. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (explaining that a court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction").

## III. ANALYSIS

Plaintiffs challenge the 2023 Rule as in excess of statutory authority and arbitrary and capricious under 5 U.S.C § 706(2)(A), (C). The Court will address each in turn.

### A. Contrary to Law and in Excess of Statutory Authority

Plaintiffs' first assert that the 2023 Rule is ultra vires because it is "not in accordance with law" and "in excess of statutory . . . limitations," which requires the reviewing court to "hold [it]

---

[6] Pls.' Mot. for Injunction, ECF No. 10; Defs.' Resp., ECF No. 25; Pls.' Reply, ECF No.30.

unlawful and set [it] aside." 5 U.S.C § 706(2)(A), (C). The APA authorizes reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When an agency has been given authority to administer and enforce a particular statute, as is the case here, it must often interpret the relevant congressional enactments in carrying out that charge. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006).

Courts have regularly recognized that the Secretary of Education "enjoys broad authority 'to make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department.'" *Duncan I*, 870 F. Supp. 2d at 141 (quoting 20 U.S.C. § 1221e-3); *see also* 20 U.S.C. § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). Of course, this does not mean that the Department may interpret or redefine terms in contravention of the originating statutes. *See Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) ("The authority of administrative agencies is constrained by the language of the statute they administer."). Finally, though *Chevron* deference applies to agency interpretations of ambiguous statutes, such deference is inapplicable if, as in this case, the agency has not asked the reviewing court to defer. *Cargill v. Garland*, 57 F.4th 447, 465–66 (5th Cir. 2023) (discussing when a court may apply the deference standard articulated in *Chevron U.S.A., Inc. v. NRDC*. 467 U.S. 837 (1984)), *aff'd* No. 22-976, 2024 WL 3028425 (U.S. Jun. 14, 2024).

According to Plaintiffs, the 2023 Rule exceeds the Department's statutory authority because the Department's interpretation of "gainful employment" is inconsistent with the statutory

5

term's plain meaning.[7] One condition for Title IV eligibility is that for-profit programs must "provide . . . training to prepare students for gainful employment in a recognized profession." 20 U.S.C. § 1088(b)(1)(A)(i). Plaintiffs suggest that this statutory language "means that, as one of the conditions to qualify as Title IV-eligible, for-profit schools must provide a plan of instruction that is designed to get those who are currently enrolled in the program ready for a paying job in an acknowledged vocational field."[8] On the other hand, the Department interprets this provision to require GE Programs to "actually train and prepare postsecondary students for jobs that they would be less likely to obtain without that training and preparation."[9] The Department also contends that students are not prepared for *gainful* employment if a program is designed to leave its graduates financially worse off than when they started.[10]

The HEA does not more specifically define what it means to provide a program of training to prepare students for gainful employment in a recognized occupation or profession. FVT & GE, 88 Fed. Reg. at 70,008. Because the HEA does not define "gainful employment" the ordinary meaning of the words control. *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *cert. granted*, No. 23-852, 2024 WL 1706014 (U.S. Apr. 22, 2024). To determine ordinary meaning, it is "common" for courts and litigants to use "[l]egal or other well-accepted dictionaries." *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012). And when such sources reveal that statutory text is "unambiguous," the interpretive exercise not only "begins" with that text, but "ends" there too. *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 132 (5th Cir. 2018).

---

[7] Pls.' Mot. for Injunction 19, ECF No. 10.
[8] *Id.* at 21.
[9] Defs.' Resp. 18, ECF 25 (citing FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. at 32342).
[10] *Id.* (citing FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. at 32343).

At this stage, the Court is not convinced that the 2023 Rule so clearly contradicts the statutory definition of "gainful employment" that preliminary injunctive relief should issue.[11] Contemporary dictionary definitions of "gainful" reveals that it means "profitable," "lucrative," or "an excess of returns."[12] What the 2023 Rule purports to prevent is the Department from funneling Title IV loan money to for-profit schools whose graduates' financial outcomes are, on average, worse than when they started. When students borrow more to afford a program that its training prepares them to repay, that program is by definition not profitable because it did not prepare the student for gainful employment. Thus, the 2023 Rule is not so clearly in excess of statutory limitations, as Plaintiffs suggest. And while the Department's use and application of the 2023 Rule may prove to be improper, it is not so clearly beyond the bounds of the agency's authority that the extraordinary remedy of injunctive relief is in order.

Plaintiffs' other arguments fail for similar reasons. Because the Court concludes at this stage that one of the more "natural interpretations" of "gainful employment" encompasses profitability and, by extension, advantageous financial outcomes, it does not consider the applicability of the legislative history, historical record, and other cannons of construction to which Plaintiffs suggest uncover the statutory meaning. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 185 (2004). In sum, Plaintiffs have not carried their burden at this stage to show a substantial likelihood of success on the merits of this APA claim.

---

[11] The parties do not appear to dispute the meaning of any other terms in the GE Provision. *See* Pls.' Mot. for Injunction 21, ECF No. 10.

[12] *Employment*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "employment" as the condition of having a paying job ); *see also* OED (defining "gainful" as "leading to pecuniary gain; lucrative; remunerative"; defining "pecuniary" as "[c]onsisting of money"; defining "lucrative" as "profitable"; defining "remunerative" as "bring[ing] financial remuneration; profitable"; defining "remuneration" as "money paid for work or a service; payment; pay"); *Gainful*, BLACK'S LAW DICTIONARY 610, 855 (5th ed. 1979) (defining "gainful employment" as "any calling, occupation, profession or work which one may profitably pursue"; explaining that "profitable" means "lucrative" or "bearing or yielding a revenue or salary").

### B. Arbitrary and Capricious

Plaintiffs argue in the alternative that various aspects of the 2023 Rule are arbitrary and capricious under the APA, because the Rule (1) relies on inaccurate earnings data, (2) penalizes schools for factors beyond their control, (3) uses illogical D/E thresholds, and (4) the cost-benefit analysis is illogical.[13] These arguments fail to establish an APA violation at this stage.

Section 706 of the APA provides that reviewing courts must set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (internal quotation marks and citation omitted).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, (1983). Instead, courts recognize that agencies "have expertise and experience in administering their statutes that no court can properly ignore." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). Accordingly, the Court must not "impose upon agencies specific procedural requirements that have no basis in the APA." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). Even so, an agency must provide a more "detailed justification" for a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

---

[13] Pls.' Mot. for Injunction 30, 34, 38, 41, ECF No. 10.

In determining whether an agency action is arbitrary and capricious, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm Mut. Auto. Ins. Co.*, 463 U.S at 43. An agency's action is "arbitrary and capricious" if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Likewise, "an agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so." *Fox Television Stations, Inc.*, 556 U.S. at 537. At the least, the agency must "display awareness that it is changing position," and "show that there are good reasons for the new policy." *Id.* at 515.

Plaintiffs cannot meet the heavy burden in this case. The record shows that the Department engaged in thorough rule making. The Department reviewed and responded to comments about the reported earnings and the D/E ratio. The Department specifically considered comments criticizing the use of federal reported earnings data to calculate D/E and EP metrics but concluded that no change to its proposed use of such data was warranted. Particularly, the Department cited to two studies indicating that unreported earnings in the cosmetology space are not widespread. FVT & GE, 88 Fed. Reg. at 70042 & n.139. The Department also implemented new timelines for measuring income and new technological and legal changes to identify how payments are made that will lead to "substantially higher measured program earnings." FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. at 32335.

Additionally, the Department also responded to comments about the D/E ratio, and the record is filled with the Department's explanations for the metrics. *See* FVT & GE, Fin. Resp.,

Admin. Capability, Certification proc., Ability to Benefit, 88 Fed. Reg. at 32325–32; FVT & GE, 88 Fed. Reg. at 70053–54. For example, the Preamble addresses why the 8% annual income threshold and 20% discretionary income threshold are reasonable benchmarks for purposes of the D/E metrics. FVT & GE, 88 Fed. Reg. at 70053–54. In particular, the Preamble explains how the Department took into account a 2006 study published by Sandy Baum and Saul Schwartz that recognized a general agreement in previous research: "[S]tudents should not devote more than 8 percent of their gross income to repayment of student loans."[14] The Department also considered that higher earners could afford to spend no more than 20% of income on debt repayment while lower earners (those below 150% of the Poverty Guideline) could afford no repayment at all. FVT & GE, 88 Fed. Reg. at 70054.

With this in mind, the Department did not adopt the 8% mortgage-underwriting full stop, nor did it fully adopt Baum & Schwartz's recommendation. Instead, the Department requires a program to fall below both an 8% annual earnings threshold and a 20% discretionary income threshold before it is deemed to "fail" the D/E metrics. *See* FVT & GE, Fin. Resp., Admin. Capability, Certification Proc., Ability to Benefit, 88 Fed. Reg. at 32326 & fig.1. Thus, the Court finds that Plaintiffs fail to show a *substantial* likelihood of success on the merits given that the Department "articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co.*, 867 F.3d at 571 (5th Cir. 2017).

The Department also explained the costs and benefits of the 2023 Rule and demonstrated that it did not unfairly penalize GE programs. According to the Department, the 2023 Rule seeks to address "the fact that many students who complete college, graduate school, or a career training program are left with unaffordable debt from their Title IV loans, and that when students cannot

---

[14] Sandy Baum & Saul Schwartz, *How Much Debt is Too Much? Defining Benchmarks for Managing Student Debt* COLLEGE BOARD, (2006), (Defs.' App. ex.1, at 2, ECF No. 25-2).

repay, the cost of their loan debt is unfairly borne by taxpayers."[15] In this same vein, the Department articulated that "'the earnings gain for the average for-profit certificate-seeking student was not sufficient to compensate them for the amount of student debt taken on to attend the program,' but that outcomes varied depending on the specific program and field of study."[16] Under this reasoning, the Department posits that the 2023 Rule does not seek to impose unjustly costs or penalize GE programs, but instead seeks to alleviate the risk that exorbitant and potentially unjustified Title IV loans create for students and taxpayers—something that Congress likely intended to prevent. The APA requires no more justification. *See FCC v. Prometheus Radio Project*, 519 U.S. 414, 427 (2021).

In sum, the Department considered the record evidence, which included various academic studies, on debt thresholds, earnings metrics, and the increasing debt load of Title IV programs. As a result, the Court finds, at this stage, that the Department's analysis was likely reasonable—and reasonably explained—for purposes of the APA's deferential arbitrary-and-capricious standard at the preliminary injunction stage. Accordingly, Plaintiffs have not shown that they are *substantially* likely to succeed on their arbitrary and capricious claim to warrant the extreme relief of a preliminary injunction.

## IV. CONCLUSION

Because Plaintiffs have not met their burden to justify an extraordinary remedy of injunctive relief at this stage, the Court **DENIES** the Motion for a Preliminary Injunction. This holding is not a substitute for a merits-based decision. Plaintiffs may ultimately succeed upon review of the full administrative record at summary judgment. Plaintiffs shall confer with Defendants regarding whether consolidation with *American Association of Cosmetology Schools*

---

[15] Defs.' Resp. 40, ECF No. 25 (citing FVT & GE, 88 Fed. Reg. at 70100–01).
[16] *Id.* at 40–41 (quoting FVT & GE, 88 Fed. Reg. at 70116–18).

*v. United States Department of Education*, No. 4:23-cv-1267 (N.D. Tex.) (O'Connor, J.) is appropriate. The Parties **SHALL** file a notice on the docket describing the parties' conference no later than **July 1, 2024**.

    **SO ORDERED** on this **20th day** of **June, 2024**.

                                                  _____
                                                  Reed O'Connor
                                                  **UNITED STATES DISTRICT JUDGE**